# Exhibit

# B

1

Volume: I
Pages: 1 - 285
Exhibits: 1 - 3

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Mark Biliack, M.D.,          )
an individual,               )
            Plaintiff,       )
                             )
      versus                 )
                             )
The Paul Revere Life         )
Insurance Company, a         )   Case No.
Massachusetts Corporation;   )   2:16-cv-03631-DJH
Unum Group, a Delaware       )
Corporation; Austin Jerome   )
Philbin, M.D., an individual; )
Suzanne Benson, M.D., an     )
Individual,                  )
            Defendants.      )

*** Confidential ***

VIDEOTAPED DEPOSITION OF PAUL PETER
December 7, 2018
11:47 a.m.
Beechwood Hotel, Renaissance Room
363 Plantation Street
Worcester, Massachusetts 01605


Court Reporter:  Julie Thomson Riley, RDR, CRR

*************************************
FLYNN REPORTING ASSOCIATES
Professional Court Reporters

508) 755-1303  *  (888) 244-8858
www.flynnreporting.com

*************************************

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF:

 3        Dawson & Rosenthal, P.C.

 4        BY:  Steven C. Dawson, Esquire

 5        BY:  Anita Rosenthal, Esquire

 6        BY:  Sander R. Dawson, Esquire

 7        25 Schnebly Hill Road

 8        Sedona, Arizona 86336-4233

 9        (928) 282-3111

10        sdawson@dawsonandrosenthal.com

11        dandr@dawsonandrosenthal.com

12        sanderdawson@dawsonandrosenthal.com

13

14             - and -

15

16        Friedman Rubin, PLLP

17        BY:  Jeffrey K. Rubin, Esquire

18        51 University Street, Suite 201

19        Seattle, Washington 98101

20        (206) 501-4446

21        jrubin@friedmanrubin.com

22

23

24   (continued)
```

1    APPEARANCES (continued):

2    <u>FOR THE DEFENDANTS:</u>

3         Sheppard Mullin Richter & Hampton, LLP

4         BY:  Theona Zhordania, Esquire

5         333 South Hope Street, 43rd Floor

6         Los Angeles, California 90071-1442

7         (213) 617-5546

8         tzhordania@sheppardmullin.com

9

10                  - and -

11

12        Unum Group

13        BY:  Cesar R. Britos, AVP & Sr. Counsel

14        Law Department

15        2211 Congress Street-C475

16        Portland, Maine 04122

17        (207) 575-3307

18        cbritos@unum.com

19

20   Also Present:

21   Darryn Carroll, Videographer

22     Planet Depos

23

24

4

                        I N D E X

Deposition of:                                        Page

Paul Peter

        by Mr. Dawson                                    7

        by Ms. Zhordania                               208

        by Mr. Dawson                                  259

        by Ms. Zhordania                               278

                     E X H I B I T S

No.                                                   Page

Exhibit 1        Document entitled UnumProvident

                 Manager Toolkit, 2005 Business

                 Plan & BBS Communications,

                 The Benefits Center, Bates

                 Stamp Nos. August 3730 through

                 August 3765 and Moffatt 411

                 through Moffat 446.                    50

(continued)

5

E X H I B I T S (continued)

No.                                                      Page

Exhibit 2      E-mail string, Bates Stamp

               No. Biliack-PRL-MS-EA-000049.    88

Exhibit 3      Document entitled Weekly

               Tracking - Qtr View, as of

               December 31, 2016, Bates

               Stamp No. PRL-MS-BILIACK-WKLY

               TRACKING-CONFIDENTIAL-000010.   135

***The original exhibits were returned to

Attorney Dawson.

----------------------------------------------------

                    AFTERNOON SESSION

                      11:47 a.m.

----------------------------------------------------

          THE VIDEOGRAPHER:  Here begins Disk No. 1

in the videotaped deposition of Paul Peter in the

matter of Biliack, M.D. versus the Paul Revere Life

Insurance Company, et al., in the United States

District Court, District of Arizona, Case

No. 2:16-cv-03631-DJH.

          Today's date is December 7, 2018.  The time

on the video monitor is 11:48 a.m.  The videographer

today is Darryn Carroll, representing Planet Depos.

This video deposition is taking place at

363 Plantation Street, Worcester, Massachusetts.

          Would counsel please voice identify

themselves and state whom they represent.

          MR. DAWSON:  On behalf of the plaintiff,

Steve Dawson, along with Anita Rosenthal, Jeff

Rubin, and Sander Dawson.

          MS. ZHORDANIA:  Theona --

          MR. DAWSON:  Bless you.

          MS. ZHORDANIA:  Thank you.

          Theona Zhordania on behalf of the defendants

1  as well as the witness in connection with this

2  deposition.

3          MR. BRITOS:  Cesar Britos for Unum.

4          THE VIDEOGRAPHER:  Thank you.

5          The court reporter today is Julie Riley,

6  representing Flynn Reporting and Associates.

7          Would the court reporter please swear in

8  the witness.

9                      *   *   *

10                  PAUL PETER,

11 having been satisfactorily identified and duly sworn

12 by the Notary Public was examined and testified as

13 follows:

14              DIRECT EXAMINATION

15 BY MR. DAWSON:

16     Q.    Good morning.

17     A.    Good morning.

18     Q.    Would you state your full name, please.

19     A.    Paul Steven Peter.

20     Q.    Mr. Peter, what is your employment?

21     A.    I'm a self-employed consultant.

22     Q.    And what do you consult about?

23     A.    Primarily as a subject matter expert for

24 disability income insurance.

1     *Q.*    You consult in litigated matters?

2     *A.*    Yes.

3     *Q.*    You have been deposed before; correct?

4     *A.*    Correct.

5     *Q.*    Give me an idea about how many times.

6     *A.*    Approximately 15.

7     *Q.*    What about in the last two years, you've

8  been deposed how many times?

9     *A.*    I believe it was just once about two years

10  ago.

11     *Q.*    All right.  Is there anything that you

12  believe would at all limit your ability to testify

13  completely and truthfully today?

14     *A.*    Not that I can think of.

15     *Q.*    All right.  Or anything that you believe

16  would at all limit your willingness to testify

17  completely and truthfully today?

18     *A.*    Not that I can think of.

19     *Q.*    All right.  I understand that

20  Ms. Zhordania, if I'm saying your name right, is

21  representing you today; correct?

22     *A.*    Yes.

23     *Q.*    And is Unum paying for that counsel?

24     *A.*    Yes.

1    Q.    All right.  Have you expressly agreed to
2 waivers of any potential conflicts of interest?
3    A.    I'm not sure.
4    Q.    All right.  Well, if you expressly had
5 agreed, then I suspect you would know.
6    A.    I have not signed documents to that
7 effect, no.
8    Q.    Okay.  I'm going to ask about your
9 background to a certain extent.  Before you went
10 to work in the insurance industry, what was your
11 educational background?
12    A.    I have a bachelor's degree in economics.
13    Q.    Okay.  And what was your first job in the
14 insurance-related field?
15    A.    My first job was as an assistant
16 underwriter for the Paul Revere Life Insurance
17 Company.
18    Q.    So putting aside your consulting work now,
19 has all of your employment in the insurance industry
20 been in connection with a Unum-affiliated company?
21    A.    Yes, Unum and predecessor companies.
22    Q.    Okay.  How many years did you work for
23 Unum and/or a predecessor company?
24    A.    About 30.

1    *Q.*    What year did you begin with them?

2    *A.*    1986.

3    *Q.*    And you began in the underwriting department

4  apparently?

5    *A.*    Yes.

6    *Q.*    Okay.  And how many years did you spend in

7  the underwriting department?

8    *A.*    Approximately 20.

9    *Q.*    So '86 til about 2006 --

10    *A.*    Yes.

11    *Q.*    -- correct?

12         And what was the highest level that you

13  ended up rising to in underwriting?

14    *A.*    I was Assistant Vice President of

15  Underwriting.

16    *Q.*    And approximately what year did you become

17  Assistant Vice President?

18    *A.*    It's hard to remember for sure, but I'm

19  going to say approximately 1998.

20    *Q.*    At the time that you began in 1986, would

21  it be accurate that Paul Revere was offering an IDI

22  own occupation, noncancellable disability product?

23    *A.*    Yes.

24    *Q.*    And while you were still in underwriting,

1  did Paul Revere stop offering that product?

2     A.    Yes, I believe so.

3     Q.    Around 1994, does that sound right?

4     A.    I'm not sure.  I think somewhere in the

5  1990s, but I can't be more specific.

6     Q.    All right.  In 2006, what was your change

7  in job position?

8     A.    I moved from being Assistant Vice

9  President of Underwriting to an Assistant Vice

10 President in Claims.

11    Q.    Okay.  And as an Assistant Vice President

12 of Claims, what were your job duties?

13    A.    I was responsible for managing a team of

14 several Claims Directors, who, in turn, had what

15 Unum calls DBSs, Disability Benefits Specialists

16 reporting to them.

17    Q.    All right.  And as a -- so you worked as

18 an Assistant Vice President in Claims from 1998

19 until what year?

20    A.    No, I worked as an Assistant Vice

21 President in Claims from 2006.

22    Q.    I'm sorry.  2006?

23    A.    To 2016.

24    Q.    And in 2016, how many Directors were

1   reporting to you?

2       A.      Approximately six.

3       Q.      And one of the Directors that reported to

4   you would have been Elysabeth Wetton; is that

5   correct?

6       A.      Yes.

7       Q.      And then there would be Joseph Sullivan?

8       A.      Yes.

9       Q.      Timothy Loftus?

10      A.      Yes.

11      Q.      Did you also have a QCC report to you?

12      A.      I did.

13      Q.      James Birch?

14      A.      Yes.

15      Q.      The Directors that reported to you, did

16  they all handle claims that would be considered to

17  be in active management?

18      A.      Yes.

19      Q.      Okay.  And the Directors were assigned

20  claims -- well, let me back up.

21              At one point, there was a division in the

22  claims operation where units were divided based upon

23  impairment.  Were you aware of that or familiar with

24  that?

1   A.   Yes.

2   Q.   Was that ever the case when you were in

3   the claims operation?

4   A.   No.

5   Q.   Okay.  During your time in the claims

6   operation, how were the claim units divided up?  On

7   what basis?

8   A.   Geographically.

9   Q.   And in the, say, 2015, 2016 time frame,

10  geographically what area of the country were you

11  overseeing?

12  A.   My best recollection is that I had parts

13  of the Northeast and parts of the West Coast.

14  Q.   Okay.  We see mention in the Biliack file

15  a position known as a DMS.  Can you tell me what

16  that is.

17  A.   Sure.  It stands for disability management

18  specialist.

19  Q.   All right.  And that's somebody who's sort

20  of being groomed to be a Director; would that be

21  fair to say?

22  A.   Yes.

23  Q.   All right.  And you had a DMS that

24  reported to you as well; is that correct?

1    A.    Yes.

2    Q.    The Directors had about how many active

3    claims in his or her inventory, each Director?

4    A.    I'd say approximately 250 to 300.

5    Q.    All right.  And then that would mean then

6    your overall responsibility would be a multiplier

7    of six, and somewhere from 1,500 to 1,800 active

8    claims?

9    A.    Yes, I think that's a good approximation.

10   Q.    All right.  In 1996 -- let me back up

11   before that.

12         In 1986, when you went to work for Paul

13   Revere, at that time, Paul Revere and Provident Life

14   and Unum Life were separate, unrelated companies;

15   correct?

16   A.    Correct.

17   Q.    And they were competitors, in fact?

18   A.    Yes.

19   Q.    In I think the records show and let me ask

20   if it's consistent with your memory that in 1996,

21   Provident had announced in a press release that it

22   would be purchasing Paul Revere.  Does that square

23   with your memory or time frame?

24   A.    I think approximately, whether it was

1  announced as a purchase or a merger, I'm not sure,

2  but there was some type of joining of the two

3  companies.

4     Q.    All right.  And the joining then happened

5  in 1997; does that sound correct?

6     A.    I believe so.

7     Q.    All right.  And with the joining of the

8  two companies, is it correct that the Paul Revere

9  employees became Provident employees?

10    A.    Yes.

11    Q.    So subsequent to this joining of the

12 companies your compensation would have come from

13 Provident; correct?

14    A.    I think that's what my paycheck would have

15 said, yes.

16    Q.    All right.  And then there was a change a

17 few years after that where the Provident Companies

18 merged with Unum Life Insurance Company; correct?

19    A.    Yes.

20    Q.    And does it sound right that was around

21 1999?

22    A.    It sounds about right, yes.

23    Q.    All right.  And at that point, the merged

24 entity was then called UnumProvident; correct?

1     *A.*    Correct.

2     *Q.*    And a couple of years after that,

3 UnumProvident, the name was changed to Unum Group;

4 is that correct?

5     *A.*    Yes.

6     *Q.*    Which is as it's known today?

7     *A.*    Yes.

8     *Q.*    All right.  So your tenure in claims in

9 2006 began after these acquisitions and mergers,

10 however they're most accurately classified.  It was

11 Unum Group at the point you began in claims; is that

12 correct?

13    *A.*    I believe so, yes.

14    *Q.*    Okay.  Who did you initially report to

15 once you became AVP in Claims?

16    *A.*    Maureen Griffin.

17    *Q.*    And Ms. Griffin had become -- well, what

18 was her position?

19    *A.*    At the time I began reporting to her, she

20 was a Vice President of Individual Disability

21 Claims.

22    *Q.*    Okay.  And she had assumed that role not

23 too long before you assumed the role of AVP in

24 Claims?

1        MS. ZHORDANIA:  Calls for speculation.

2        Q.    Do you know that?  Are you aware of that?

3        A.    I'm not sure how long before, but I think

4 it, you know, was probably, you know, less than a

5 year, maybe a few months.

6        Q.    All right.  The hierarchy of the Claims

7 Department -- and before I ask you that specific

8 question, we'll talk a little bit about terminology.

9        At Unum Group, the Claims Department is

10 also referred to as the Benefits Operation; is that

11 correct?

12        A.    Yes.

13        Q.    Sometimes the Benefits Center?

14        A.    To some extent, I think that terminology

15 may have --

16        Q.    Fallen off.

17        A.    -- become less prevalent over time.

18        Q.    Okay.  So that I'm understanding, at

19 currently -- well, as of 2016, would it be accurate

20 that the claims operation at Unum was also referred

21 to as the Benefits Operation?

22        A.    Yes.

23        Q.    And going back to some extent in the past,

24 the claims operation might also be known as the

1  Benefits Center?

2      A.    Yes.

3      Q.    Okay.  Now, we'll talk about the

4  hierarchy.  What we would typically refer to as

5  claims adjusters, Unum referred to as DBSs; is that

6  correct?

7      A.    Yes.

8      Q.    And that stands for Disability Benefits

9  Specialist?

10     A.    Yes.

11     Q.    And DBSs report to the Directors?

12     A.    Yes.

13     Q.    And then the Directors, as we've kind of

14 touched on, report to your position, Assistant Vice

15 President; correct?

16     A.    Yes.

17           Could I ask you to just speak up a little

18 bit.  I'm having a little trouble hearing you.

19     Q.    Yeah.  Yeah.

20     A.    Thank you.

21     Q.    In 2016, how many Assistant Vice

22 Presidents in claims were there?

23     A.    I would say either three or four.

24     Q.    Who were the others at the time?

1    A.    There was Holly Crawford, Anthony Scuderi,

2    and possibly Kim Davis.  I'm not exactly sure when

3    she relocated from Worcester back to Chattanooga; so

4    that's why I said either three or four.

5    Q.    All right.

6    A.    It may have changed during 2016, as a

7    matter of fact.

8    Q.    And the AVPs then would report to the Vice

9    President of Individual Disability; correct?

10    A.    Yes.

11    Q.    And were there two Vice Presidents of

12    Individual Disability as of 2016?

13    A.    My recollection is that at the beginning

14    of 2016, there were two, and sometime during the

15    course of 2016, there was one.

16    Q.    All right.  One of the two was Ms. Griffin;

17    correct?

18    A.    Yes.

19    Q.    And was the other Scott Williams?

20    A.    Yes.

21    Q.    And who left before the other?

22    A.    Mr. Williams left, I believe, at some point

23    during 2016.

24    Q.    All right.  And to your knowledge, did he

1   leave the company altogether?

2       A.    No.   My recollection is that he took a new

3   position with the company, not in claims.

4       Q.    Okay.  And is it your understanding that

5   he was not replaced?

6       A.    Yes.

7       Q.    In the 2015, '16 time frame, who did

8   Ms. Griffin report to?

9           MS. ZHORDANIA:  To the extent it calls for

10  speculation.

11      A.    To the best of my recollection, it was

12  Nancy McGee.

13      Q.    And to your knowledge, Ms. McGee's

14  position or title was what?

15      A.    I believe she was also a Vice President.

16      Q.    But a Vice President occupying a higher

17  position than Ms. Griffin's Vice Presidency; would

18  that be fair to say?

19          MS. ZHORDANIA:  Foundation.

20      A.    I'm not sure of the different levels of

21  Vice President.  My recollection is that they were

22  both Vice Presidents, whether -- and Ms. Griffin

23  reported to Ms. McGee.  Whether they had different

24  job levels or within the company, I'm not sure.  I

1   just know one reported to the other.

2   Q.    All right.  Do you know was Nancy McGee

3   the Vice President of -- strike that.

4         Yeah, Vice President of IDI and LTC,

5   long-term claims?

6   A.    That sounds correct.

7   Q.    All right.  And to your knowledge, did

8   Ms. Griffin have any supervisory responsibility for

9   LTC?

10   A.    Not as far as I can recall.

11   Q.    All right.  And had you also ever heard

12   Ms. McGee referred to as head of claims?

13   A.    I can't say that I recall that, no.

14   Q.    All right.  And did Ms. McGee, to your

15   knowledge, report to Mr. Jack McGarry?

16   A.    At one point, she did.  I can't say if

17   that were the case in 2015 or 2016.

18   Q.    All right.  About the time you were

19   starting in claims, in 2006, were you aware that

20   Mr. McGarry took on the role of CEO of the closed

21   block?

22   A.    I know that Mr. McGarry had that title at

23   one point, but I don't recall when.

24   Q.    Okay.  Do you recall that Mr. McGarry had

1   that title through much of your tenure in claims?

2       A.    As far as I can recall, that sounds

3   correct.

4       Q.    All right.  Did you ever have management

5   meetings where Ms. McGee would be present?

6       A.    Yes.

7       Q.    And were those a regular, periodic

8   scheduled meeting?

9       A.    I don't think there was any regularity in

10  terms of every month or every quarter, but it's

11  certainly accurate to say that there were meetings

12  that involved Ms. McGee periodically during my

13  tenure in claims.

14      Q.    All right.  Could you estimate on average

15  how many times a year you might attend a meeting

16  either in person or virtually where Ms. McGee would

17  be present?

18      A.    I'm not --

19            MS. ZHORDANIA:  Vague as to time.

20      A.    I'm not sure that I can give an accurate

21  recollection of that, no.

22      Q.    All right.  Would it be accurate to say it

23  would be more than one time a year?  It would be

24  multiple times?

1     MS. ZHORDANIA:  To the extent it calls for
2  speculation.
3          Go ahead.
4     A.    I think that's reasonable to say, yes.
5     Q.    All right.  And would there ever be times
6  where you would be present with claims management
7  where Mr. McGarry would be in attendance, either in
8  person or virtually?
9     A.    Occasionally, yes.
10     Q.    Somewhat less frequently than in meetings
11  with Ms. McGee though?
12     A.    I think that's accurate.
13     Q.    Going back to your time and your experience
14  in underwriting from 1986 to 2006, did you learn
15  that at some point during that span, let's say from
16  the 1986 time frame up into the 1990s, that
17  underwriting of IDI own occupation policies became
18  somewhat more stringent?
19     A.    I think that's accurate.
20     Q.    And we talked at the beginning about Paul
21  Revere stopping selling that product, which you said
22  you recall, but you didn't recall when, I believe.
23  Am I remembering that correctly?
24     A.    Yes.

1    *Q.*    Okay.  And did you understand that they

2    stopped offering that product because it turned out

3    to not be financially successful?

4    MS. ZHORDANIA:  Foundation.

5    *A.*    My recollection is that it was determined

6    that the company chose not to offer that product any

7    more because the product had proven to be less

8    financially successful than originally forecast.

9    *Q.*    Okay.  Did you know from your work

10   beginning in the mid 1980s, that the disability

11   insurance market in the 1980s had become very

12   competitive?

13   MS. ZHORDANIA:  Foundation.

14   *A.*    I don't have a frame of reference prior to

15   my tenure, beginning in 1986, but I would say it's

16   accurate that during the '80s and part of the '90s

17   that it was a competitive industry.

18   *Q.*    All right.  There were more companies

19   offering own occupation disability products than you

20   would find today in the market, for example; is that

21   true?

22   *A.*    I think so, yes.

23   *Q.*    All right.  And with the competition, the

24   individual disability own occupation products became

1  more liberal in their offerings, would you agree

2  with that?

3          MS. ZHORDANIA:  Vague.

4      A.      There was a period of time, again, sometime

5  in between the mid '80s and the mid '90s where I

6  would say that is correct.

7      Q.      All right.  And by more liberal, some of

8  the changes that were happening is, for example,

9  income replacement ratios increased; correct?

10     A.      Yes.

11     Q.      The benefit periods that were offered

12 increased over what they had been; is that correct?

13     A.      I don't think I would agree with that, no.

14     Q.      All right.  Were there more offerings of

15 lifetime benefits than had been the case in the past,

16 to your knowledge?

17     A.      Again, I would say that the offering of

18 lifetime benefits during my tenure, I don't recall

19 changing a lot.  Again, we're talking 30 years ago;

20 so, it's hard to recall that, and again, I don't

21 have the frame of reference prior to 1986 to

22 compare.

23     Q.      All right.  Did you come to learn, however,

24 in your work in underwriting that the lifetime

1    benefit option was not as readily available, say, in

2    the years before you began in the business?

3              MS. ZHORDANIA:  Foundation.  Calls for

4    speculation.

5         A.    I don't recall.

6         Q.    Do you recall that it was later determined

7    that the policies were actually not -- they were

8    underpriced?

9              MS. ZHORDANIA:  Foundation.

10        A.    Again, similar to the own occupation

11   benefit, it was a situation where Paul Revere and

12   other companies, to the best of my knowledge,

13   determined that those provisions were not performing

14   to the extent that the companies had forecast that

15   they would.

16        Q.    All right.  One of the characteristics of

17   the policies, they were considered noncancellable,

18   guaranteed renewable; correct?

19        A.    Some of the policies, yes.

20        Q.    All right.  Which meant premiums could not

21   be increased over the life of the policy?

22        A.    Yes.

23        Q.    All right.  So -- and another thing that

24   happened is the claims experience on the policies

1    was greater than had originally been forecasted?

2              MS. ZHORDANIA:  Vague as to time.

3        A.    I think it's fair to say that in some

4    cases for some claims, the experience was not as

5    good as had been forecast.

6        Q.    I'm not sure what you mean by in some

7    cases for some claims.  Could you explain that.

8        A.    Well, your question was fairly broad, and

9    I guess I'm trying to make the distinction that I'm

10   not saying all policies and all benefit provisions

11   did not perform up to the expectations that had been

12   forecast, but some of the policies and some of the

13   provisions would fall into that category.

14       Q.    All right.  I see the need for

15   clarification.

16             You're familiar with what became known as

17   the closed block; correct?

18       A.    Yes.

19       Q.    And how would you define in terms

20   of -- putting aside long-term care, what comprised

21   the closed block?

22       A.    I would say that it was a block or group

23   of claims and policies that were no longer offered

24   by the company.  To the best of my recollection,

1   there was no exact cut-off of time, but there was a
2   group of policies and a group of claims that, again,
3   the company no longer sold and were different than
4   the types of policies that the company was then
5   selling.  So that group or block of claims became
6   known as the closed block in the sense that it was
7   closed to new sales, and there was a distinction
8   made between the closed block and more recently
9   issued business.
10      Q.    All right.  The closed block of policies
11  and claims was comprised of policies that had been
12  issued by several companies; is that correct?
13      A.    Several companies that had a relationship
14  to Unum or predecessor companies, yes.
15      Q.    All right.  So, for example, there was
16  Paul Revere policies in that block, Provident
17  policies in that block, Unum policies in that block;
18  correct?
19      A.    Yes.
20      Q.    And then there were policies of companies
21  that Unum had somehow taken on the responsibility
22  for handling the claim for; correct?
23          I don't think I artfully worded that, but.
24      A.    Yes, I would say that there were companies

1   that over a period of time decided that they did not

2   want to be in the individual disability business any

3   longer, and so arrangements were made for Unum and

4   predecessor companies to take over that business and

5   be responsible for the policy administration and

6   claims administration for those policies.

7       Q.    All right.  And this change in the

8   disability income insurance market had a relationship

9   to this competitive nature and the financial outcome,

10  as you were talking about, not being what had been

11  forecast; is that your understanding?

12          MS. ZHORDANIA:  Compound.  Vague.

13      A.    Could you repeat that, please.

14      Q.    Yeah.  So companies -- for example, Paul

15  Revere took over the IDI claims for General American

16  Life Insurance Company.  Are you aware of that?

17      A.    Yes.

18      Q.    All right.  And General American was

19  interested in having someone - it turned out to be

20  Paul Revere - take over its IDI claims because

21  General American was having financial problems with

22  that block of business.  Are you aware of that?

23          MS. ZHORDANIA:  Foundation.  Calls for

24  speculation.

Case 1:19-cv-00131-TRM-CHS  Document 32-2 Filed 11/11/19  Page 30 of 316  PageID #: 7145

1    A.    I'm aware that Paul Revere took over the

2    block of General American claims, whether that was

3    due to financial problems that General American had

4    or simply a corporate decision by General American

5    to no longer be in that business, I'm not sure.

6    Q.    All right.  In any event, General American

7    elected to exit that business, and Paul Revere took

8    over the handling of their IDI claims; correct?

9    A.    Yes.

10   Q.    The same was true for Equitable; correct?

11   A.    Yes.

12   Q.    And I believe that Unum was handling

13   New York Life claims?

14   A.    At least some of them, yes.

15   Q.    And there were other companies as well?

16   A.    Yes.

17   Q.    So you might find these companies that had

18   originally issued the paper or the products as part

19   of the closed block of claims?

20   A.    Yes.

21   Q.    The common characteristics of those policies

22   even though they are from different companies

23   comprising the closed block -- first of all, is it

24   true that they were all own occupation disability

1  policies?

2      A.    I don't believe that's true, no.

3      Q.    All right.  Tell me how that is incorrect.

4      A.    To the best of my recollection, the closed

5  block encompassed, you know, policies that had been

6  issued from some period of time back.  I think it's

7  fair to say that some of those policies contained an

8  own occupation benefit, and I believe some of them

9  did not.

10     Q.    Do you believe it would be accurate to say

11 that the majority contained an own occupation

12 definition of disability?

13           MS. ZHORDANIA:  Foundation.  Calls for

14 speculation.

15     A.    I don't know.

16     Q.    Were a majority of the policies the

17 noncancellable guaranteed renewable variety?

18     A.    I think that's likely to have been the

19 case, yes.

20     Q.    And, again, meaning premiums could not be

21 raised on those policies; correct?

22     A.    Correct.

23     Q.    In the -- getting later into the 1980s,

24 and into the 1990s, did you become aware that Paul

1   Revere and Provident were looking at whether the

2   Claims Department could help lessen some of the

3   financial losses?

4           MS. ZHORDANIA:  Vague.  Foundation.

5       *A.*    I'm not sure that I recall that.

6       *Q.*    All right.  Do you recall Provident

7   announcing that it was moving from a claim payment

8   to a claim management approach?

9       *A.*    No.

10          MS. ZHORDANIA:  Foundation.

11      *Q.*    Were you aware that Paul Revere was

12  applying stronger claim management techniques to

13  these claims?

14          MS. ZHORDANIA:  Foundation.

15      *A.*    During -- I just want to make sure I

16  understand what time frame you're talking about.

17      *Q.*    Fair enough.

18          Somehow I'm missing a folder.  I'll come

19  back to this subject.  I might have to run up over a

20  break and get a file.

21          Were you familiar with Steve Rutledge at

22  Paul Revere?

23      *A.*    I knew Steve, yes.

24      *Q.*    Okay.  Did he work in the Claims or Benefits

1 Operation section at the time you were in

2 underwriting?

3     A.    At least for part of the time, yes.

4     Q.    When you moved -- transferred over to

5 claims, was Mr. Rutledge still with the company?

6     A.    I don't know.

7     Q.    Okay.  Were you familiar with an article

8 that Mr. Rutledge had written for The International

9 Claims Association in 1995 entitled "You Really

10 Should Listen to your Claim Department"?

11     A.    No.

12     Q.    Mr. Rutledge used a, I guess, a sentence

13 in this article I'm wondering if you ever heard

14 mention, which was "The claim department didn't

15 cause the mudslide and probably could not have

16 prevented it, but in many cases, the claim

17 department has been asked to clean up the mess."

18     Did you ever hear a reference to that?

19     A.    No.

20     Q.    Did you come to learn that more resources

21 were being put into the Claims Department to better

22 manage the IDI claims?

23     MS. ZHORDANIA:  Vague.  Foundation.

24     A.    I was aware that more resources were being

1   added to the Claims Department, but since I was not

2   in the Claims Department for part of that time, I am

3   not sure as to the reasons why.

4       Q.    Okay.  In terms of the increased resources,

5   it included, for example, increased medical

6   resources; correct?

7       A.    I don't know.

8       Q.    Are you aware of any of the increased

9   resources that the claims operation began adding in

10  the -- in terms of time reference more like in the

11  mid 1990s and on?

12      A.    Other than a vague recollection that there

13  was hiring under way in that organization, I can't

14  be more specific as to what types of positions, and,

15  again, that predated my tenure in the claims

16  organization.

17      Q.    I'm going to ask you about some terms

18  because I see what seems to me different words

19  referencing same meaning at different times, but

20  that's what I want to ask you.

21            If there -- if somebody's on claim and is

22  receiving payment, and if those -- the company

23  decides that the insured is no longer entitled to

24  benefits, they no longer meet the definition of

<table>
<tr><td>1</td><td>disability, would it be accurate -- would you</td></tr>
<tr><td>2</td><td>understand what one would mean to say that person's</td></tr>
<tr><td>3</td><td>claim has been terminated?</td></tr>
<tr><td>4</td><td>MS. ZHORDANIA:  Vague.</td></tr>
<tr><td>5</td><td>A.    That was not a term or a phrase that I was</td></tr>
<tr><td>6</td><td>particularly familiar with, but I understand what I</td></tr>
<tr><td>7</td><td>think was -- could be meant by that.</td></tr>
<tr><td>8</td><td>Q.    All right.  And terminated would be as</td></tr>
<tr><td>9</td><td>distinguished from somebody who's submitting a</td></tr>
<tr><td>10</td><td>claim, it's considered, and the claim is denied.</td></tr>
<tr><td>11</td><td>It's not accepted.  Would you understand that it's a</td></tr>
<tr><td>12</td><td>denial and a termination?</td></tr>
<tr><td>13</td><td>A.    It sounds as though you're making a</td></tr>
<tr><td>14</td><td>distinction between a situation where a claimant</td></tr>
<tr><td>15</td><td>received benefits for a period of time as compared</td></tr>
<tr><td>16</td><td>to a situation where a claim was submitted, a review</td></tr>
<tr><td>17</td><td>was completed, and it was determined that the</td></tr>
<tr><td>18</td><td>claimant did not qualify for benefits under the</td></tr>
<tr><td>19</td><td>terms of the policy.</td></tr>
<tr><td>20</td><td>Q.    Correct.  And you recognize the</td></tr>
<tr><td>21</td><td>distinction between a denial and a termination?</td></tr>
<tr><td>22</td><td>A.    If what I've just articulated is what</td></tr>
<tr><td>23</td><td>you're asking, then, yes.</td></tr>
<tr><td>24</td><td>Q.    All right.  Are you familiar at one point</td></tr>
</table>

1  in the 1990s resolutions came to be sort of

2  synonymous with terminations?

3          MS. ZHORDANIA:  Calls for speculation.

4      A.      Again, that was before my tenure in

5  claims; so, I'm really not familiar with what

6  particular terms meant --

7      Q.      All right.

8      A.      -- at a time when I wasn't part of the

9  organization.

10     Q.      When you were a part of the organization

11  of claims or once you were a part of the organization

12  of claims, there was a term "recoveries" being used;

13  is that correct?

14     A.      Yes.

15     Q.      And they sometimes reference unpaid

16  recoveries and paid recoveries; correct?

17     A.      Yes.

18     Q.      And what would unpaid and paid recoveries

19  be?

20          MS. ZHORDANIA:  I just want to put an

21  objection on the record on behalf of the defendants

22  that this line of questioning is inappropriate of a

23  former employee whose testimony will not be admissible

24  against -- whose testimony will not be binding on

1    Unum Group, because he's not here testifying as a

2    Rule 30(b)(6) witness. So I just wanted to be put

3    counsel on notice that we would be moving to exclude

4    anything that has to do with Unum's general practices,

5    and I also believe that the line of questioning that

6    we've had is not relevant to the issues in the case,

7    with respect to this particular witness. So I just

8    wanted that on the record.

9          Go ahead.

10    A.    Could you please repeat the question.

11    Q.    Yeah. Could you explain what unpaid

12    recoveries and paid recoveries refers to.

13    A.    Sure. To the best of my recollection, a

14    paid recovery represented a situation where a claim

15    had been paid, benefits had been paid for a period

16    of time under the terms of the policy, and it was

17    determined at some point that the claimant no longer

18    qualified for benefits, for whatever reason. When

19    that claim was closed, that was known as a paid

20    recovery.

21          An unpaid recovery was a situation where

22    a claim was submitted, and no benefits were paid

23    because it was determined that the insured did not

24    qualify for benefits under the terms of the policy,

1   and when that claim was closed, that would have been

2   referred to as an unpaid recovery.

3      Q.    And let's go back to the first one, paid

4   recovery.  Under that definition or explanation that

5   you gave, if a claim was closed and benefits were no

6   longer paid, the reserve that had been held on that

7   claim would be released or recovered; is that

8   correct?

9          MS. ZHORDANIA:  Foundation.

10      A.    I believe that's correct, yes.

11      Q.    All right.  In your experience for roughly

12   10 years in claims, would you agree that there are

13   some claims by their nature that occupy more of a

14   gray area?

15          MS. ZHORDANIA:  Vague.

16      A.    I would say that, you know, there was

17   a variety of levels of complexity of particular

18   claims depending on all of the circumstances.  So

19   some were more clear cut than others, so, therefore,

20   some were more gray than others.

21      Q.    All right.  Claims that were more

22   subjective in nature, for example, psychiatric,

23   mental, nervous claims, would you agree that they

24   would tend to be -- occupy that gray area more often

1   than not?

2           MS. ZHORDANIA:   Incomplete hypothetical.

3   Calls for speculation.   Foundation.

4       *A.*     I am not sure I would agree with that.

5       *Q.*     Okay.  Did you know Mr. Kinback?

6       *A.*     I knew two Mr. Kinbacks.  Could you

7   specify which one.

8       *Q.*     I could if I recalled his first name.

9   Chris Kinback?

10      *A.*     Yes.  I knew who he was, yes.

11      *Q.*     All right.  He was at Paul Revere and was

12  with the company after Provident and Paul Revere

13  became one?

14      *A.*     I know he was with Paul Revere.  When he

15  left and what the company was called at that time, I

16  don't recall.

17      *Q.*     Okay.  Did you have any familiarity with a

18  memo that Mr. Kinback had written about psychiatric

19  claims occupying a gray area?

20      *A.*     No.

21      *Q.*     Okay.  Another type of what might be

22  considered subjective claim would be claims of

23  disability based upon pain.  Would you agree with

24  that?

Case 1:19-cv-00131-TRM-CHS   Document 32-1 Filed 12/11/19   Page 40 of 316  PageID #: 7155

1    A.    You know, the term "subjective" is not

2  something that we typically used in the company, but

3  if you're speaking to the generic dictionary

4  definition of subjective, I would say that in some

5  cases, claims involving pain could be considered

6  more subjective than some other claims.

7    Q.    All right.  And I assume we're talking

8  about the same thing, but what I'm referring to is

9  complaints of pain, for example, are not readily

10 demonstrable by imaging studies, for example;

11 correct?

12   A.    That's correct.

13   Q.    Just as a psychiatric claim.  I mean

14 someone claiming disabling depression you're not

15 going to get a clear definitive picture of that,

16 most likely?

17        MS. ZHORDANIA:  Objection.  Argumentative.

18 Calls for expert opinion.

19        Go ahead.

20   A.    I would say that there's no definitive

21 test in the sense of an X-ray or imaging studies in

22 the case of a depression claim, no.

23   Q.    It was recognized in the Benefits

24 Operation

1   that these types of claims offered a maybe a greater

2   chance for resolution of some type; is that correct?

3           MS. ZHORDANIA:  Vague.  And vague to time

4   as well.

5       A.    When you say "these types of claims" could

6   you clarify.

7       Q.    Yes, I'm talking about these subjective

8   natured claims, the examples of pain, psychiatric

9   claims?

10      A.    And I'm sorry.  Could you repeat what

11  about those questions -- claims is your question.

12      Q.    Yes.  Yes.  It was recognized in the

13  claims operation that those types of claims offered

14  an opportunity to recognize a greater chance for a

15  resolution.

16          MS. ZHORDANIA:  Objection.  Vague.

17  Foundation.

18      A.    I don't agree with that.

19      Q.    By the time you had switched over to the

20  claim operation, did you learn that the company was

21  doing projections concerning the future number of

22  recoveries that they might expect?

23          MS. ZHORDANIA:  Vague as to time.

24      A.    At the time I joined the claims

1   organization, I was aware that there was an

2   analysis done of historical claim recovery rates or

3   percentages, and as is the case with many businesses,

4   that was a metric that was used to help forecast

5   what the likelihood of future claim recoveries would

6   be.

7       Q.   What is your understanding as to when this

8   analysis had been done?

9       A.   I don't have an understanding of when it

10  was done other than to say I thought it was an

11  ongoing analysis done by our finance and actuarial

12  teams, you know, again, on an ongoing basis.

13      Q.   All right.  Do you know at what point the

14  company began projecting how many recoveries they

15  expected they would have in the future?

16      A.   No.

17      Q.   You just know that was happening by the

18  time you began in the Claims Department; correct?

19      A.   Yes.

20      Q.   By the time you began in the Claims

21  Department, the company would have certain targets

22  and goals for claim recoveries or claim closures;

23  correct?

24           MS. ZHORDANIA:  Foundation.  Argumentative.

1    Go ahead.

2    *A.*    I would not describe them as either

3    targets or goals.  I would say that, again, based

4    on the historical performance of a large block of

5    claims, there was forecasting that was done to model

6    or predict the likely rate or percentage of claims

7    that would recover.

8    *Q.*    All right.  The forecasting that was done,

9    it would be accurate to say that the number of

10   claims forecasted to be closed or recovered would

11   become an expectation; is that true?

12   *A.*    I would say that that was one metric,

13   among others, that was used as a way to assess the

14   performance of a given block of claims in comparison

15   to what the historical performance would predict for

16   the future.

17   *Q.*    All right.  I'm not sure your answer

18   matches up to my question.  Let me try another

19   question.

20       The company would keep track of the actual

21   performance of the block of claims relative to the

22   expected performance; correct?

23   *A.*    Yes.

24   *Q.*    And at least in that regard, the number of

1 claims forecasted for recovery was the expected
2 number?
3          MS. ZHORDANIA:  Misstates prior testimony.
4          Go ahead.
5      A.    I wouldn't term it an expectation.  Again,
6  I would term it as one metric that was used to
7  evaluate the block of claims against historical
8  performance.
9      Q.    Regardless of whether there's one metric
10 or many, many, many, many metrics, I'm not really
11 asking you about that, and I'm not really certain of
12 what your response is right now.
13          Is it -- was it the case or not that Unum,
14 through its forecasting, would set out a number of
15 recoveries that were expected?
16          MS. ZHORDANIA:  Asked and answered.
17     A.    Again, I think what I'm a little bit hung
18 up on is the term "expected."
19          So, again, as is the case with many
20 businesses based on historical performance, there
21 are certain metrics that are used to predict how the
22 business will perform in the future, and over the
23 course of time, there's an evaluation done that
24 compares how the business is performing currently to

1   what those historical expectations are.

2       Q.    All right.  You talked about this was one

3   metric used to -- I forget your exact words, but to

4   gauge or measure how the block of business was

5   performing; is that generally correct?

6       A.    Yes.

7       Q.    Is it also accurate that that same metric

8   was used to measure how the individuals in the claim

9   operation were performing?

10          MS. ZHORDANIA:  Object to the word

11  "individuals in the claim" as overbroad and vague.

12      Q.    Let me restate it.  It was a bit broad.

13          Would it be accurate that that same metric

14  was used to measure the performance, say, of DBSs

15  and Directors?

16          MS. ZHORDANIA:  Compound.

17      A.    It was accurate to say that that metric,

18  and we're talking about the recovery, the claim

19  recovery metric was one of several metrics, along

20  with various quality and service metrics, that were

21  used to evaluate the performance of Directors.

22          It would not be accurate to say that the

23  claim recovery metrics were used to evaluate the

24  performance of DBSs.

1   Q.    Okay.  So just to simplify then, it would
2   be accurate to say that the recovery expectation
3   would be one metric that was used to measure the
4   performance of -- performance evaluation of Directors;
5   correct?
6           MS. ZHORDANIA:  Asked and answered.
7   A.    Again, that was one metric, along with
8   quality and service metrics, that were used to
9   evaluate the performance of claim Directors.
10  Q.    Okay.  And in looking at that metric, what
11  would be -- what would be compared, again, would be
12  the actual recovery results versus the planned
13  recovery results; correct?
14  A.    Yes.
15  Q.    All right.  Let me jump back to something
16  I asked before about what comprised the closed block
17  in terms of types of policies, and you said they
18  were not all own occupation defined disability
19  policies.  There were some that were also considered
20  to be a modified own occupation definition; correct?
21  A.    I believe so.
22  Q.    And were there additional disability
23  policies comprising the closed block that were
24  anything other than own occupation or modified own

1    occupation?

2        A.    I believe so, yes.

3              MS. ZHORDANIA:  Calls for speculation.

4        Q.    So were there policies comprising the

5    closed block that would be considered any occupation

6    definitions?

7        A.    I believe so.

8        Q.    Do you have any idea what percentage any

9    occupation definition policies would make up of the

10   closed block?

11             MS. ZHORDANIA:  Calls for speculation.

12       A.    I do not.

13       Q.    Do you know that it would be a minority of

14   the policies?

15       A.    I'm not sure.

16       Q.    Well, in the claims that you oversaw --

17   well, let me back up.

18             The Directors that you were supervising,

19   were they managing claims in the closed block?

20       A.    In part, yes.

21       Q.    And they're managing claims in addition to

22   claims in the closed block?

23       A.    Yes.

24       Q.    The claims -- and what was the mix between

1  closed block versus not closed block?

2          MS. ZHORDANIA:  Calls for speculation.

3  Foundation.

4      A.    I don't know.

5      Q.    And I'm not looking for something precise,

6  but I assume you have a general idea of what your

7  inventory was.

8          MS. ZHORDANIA:  Argumentative.  Asked and

9  answered.

10     A.    There was a mix of claims between the

11 closed block and what was called the recently issued

12 block, but I really can't recall a percentage or

13 range that would be more specific.

14     Q.    As an AVP, you were responsible for

15 assessing your Directors' inventory management, the

16 management of their claims inventory; is that

17 correct?

18     A.    Yes.

19     Q.    And you talk about metrics.  Is it correct

20 that operational metrics would be used for that

21 purpose --

22         MS. ZHORDANIA:  Vague.

23     Q.    -- maybe among other things, but?

24     A.    Yes.

1    Q.    Okay.  And operational metrics would

2    include the measure of actual recoveries to the

3    plan; correct?

4    A.    That was one of many operational metrics

5    that I would use to assess the performance of

6    Directors.

7    Q.    And this operational metric related to how

8    a given Director was doing in relation to their

9    recovery expectations; correct?

10   A.    Could you repeat that, please.

11   Q.    Yes.  This particular operational metric

12   related to how a given Director was doing in

13   relation to his or her recovery expectations?

14   A.    Yes.

15   Q.    Now, in order to do that, you, of course,

16   needed to be aware of what the plan was in order to

17   measure what actually was happening against, fair to

18   say?

19   A.    Yes.

20   Q.    And you would learn that -- well, there

21   would be an overall corporate business plan that

22   would come out on an annual basis; correct?

23         MS. ZHORDANIA:  Foundation.

24   A.    Can you be more specific when you say -- I

<pre>
 1   mean there were certainly corporate business plans,
 2   but I'm not sure I understand as it relates to this
 3   what you're asking.
 4       Q.    Okay.  By way of example --
 5            MR. DAWSON:  Can we mark that as one.
 6            MS. ZHORDANIA:  All right.  I'm just going
 7   to ask that the deposition be designated as
 8   confidential since I'm looking at this.  It looks
 9   like a confidential document or I don't know if it
10   is.
11            MR. DAWSON:  That's fine.  It's --
12            MS. ZHORDANIA:  We'll just designate --
13            MR. DAWSON:  -- not, but we can sort that
14   out.
15            MS. ZHORDANIA:  Yeah, let's just designate
16   the deposition as confidential, and then we can give
17   you more specific designations after we receive the
18   transcript.
19            (Document was marked Exhibit No. 1 for
20   identification.)
21       Q.    Exhibit 1 is -- well, first of all,
22   there's a Bates -- two Bates numbers on it.  The
23   first one is August 3730.  Do you see that, the
24   bottom right corner?
</pre>

1       A.      Yes.

2       Q.      Okay.  And it indicates, "UnumProvident

3  Manager Toolkit, 2005 Business Plan and BBS

4  Communications," under that, "The Benefits Center";

5  correct?

6       A.      Yes.

7       Q.      All right.  Now, 2005 predated your

8  joining -- becoming AVP of Claims by approximately a

9  year, if I understand the timeline correctly; right?

10      A.      Yes.

11      Q.      Did you ever have familiarity with

12  something called a Manager Toolkit?

13      A.      I have familiarity with that term, yes.

14      Q.      Okay.  On August 3731 which is the next

15  page, you'll see a communication timeline.  Have you

16  got that in front of you?

17      A.      Yes.

18      Q.      All right.  And the far left column at

19  the top shows "Corporate Communication," and under

20  the description, it indicates the "Communication of

21  final Corporate and US Brokerage Scorecard goals and

22  measures."

23              Do you see that?

24      A.      Yes.

1     *Q.*    And were you familiar with the -- that it

2  would happen, I guess, is how I'll put it, that

3  essentially every year there would be a communication

4  of corporate scorecard goals and measures?

5           MS. ZHORDANIA:  Objection.  Vague.

6  Foundation.

7     *A.*    I don't recall seeing this document or

8  even documents similar to it at a later time than

9  2005, but I would say it's accurate to say that the

10  company established certain goals or objectives for

11  the company relative to, let's say, sales growth and

12  premium, and I'm sure others, and that those were

13  communicated in some way to employees.

14     *Q.*    All right.  And according to Exhibit 1,

15  under the "Time Frame" this would be done, this

16  indicates "Post-Board Meeting."  Is what you're

17  describing would those communications come out after

18  the board had met about it?

19           MS. ZHORDANIA:  Objection.  Argumentative.

20  Foundation.

21           The witness just said he hasn't seen this

22  document since 2005 or something to that effect; so,

23  I would object to this line of questioning.

24           Go ahead.

1    A.    So, again, my recollection is that when

2    the Board of Directors for the company would meet,

3    I -- you know, they would meet, I believe, several

4    times a year.  At some point either at the end of a

5    given year or the beginning of a subsequent year,

6    one of the outcomes of that board meeting would be,

7    you know, goals and objectives for the company to

8    hopefully accomplish during the coming year.

9    Q.    All right.  And you mentioned that

10   they -- and, again, I'm paraphrasing.  I'm not

11   quoting.  You understood the company would come out

12   with business plans for I forget the examples you

13   gave, in sales and things of that nature; correct?

14             MS. ZHORDANIA:  Vague.

15   A.    Yes.

16   Q.    All right.  They would do -- have similar

17   business plan for the Benefits Operation --

18             MS. ZHORDANIA:  Foundation.

19   Q.    -- correct?

20   A.    My recollection is that there would be

21   corporate goals or objectives, and then in addition

22   to that, there would be goals and objectives for the

23   major functional areas in the company:  underwriting,

24   claims, sales, and so forth that those respective

1   areas would strive to achieve over the coming year.

2       Q.    All right.  And the goals and objectives

3   for claims or the benefit operation would obviously

4   as an AVP of Claims be communicated to you; correct?

5       A.    I believe that's accurate, yes.

6       Q.    All right.  And then also each month your

7   mention your manager, Ms. Griffin, that you reported

8   to, would give you the goal for the next month's

9   operation results for your section; correct?

10      A.    Some of the objectives or expectations

11  would be provided by Ms. Griffin.  Others would be

12  accessible to me in other ways.

13      Q.    Okay.  Ms. Griffin would provide you

14  with -- the goals and expectations that she would

15  provide you with were set forth in what was referred

16  to as a recovery plan; is that correct?

17      A.    I believe so, yes.

18      Q.    All right.  And the recovery plan is as

19  its name denotes would be the plan for the

20  recoveries for that upcoming month; correct?

21          MS. ZHORDANIA:  Misstates prior testimony.

22      A.    The information that Ms. Griffin would

23  provide would identify, based on historical

24  performance of the block of claims under management,

1     what the likely expectations were for the coming
2     month for that block of claims.
3         Q.    And including and specifically relative to
4     recoveries for that coming month; correct?
5         A.    Yes.
6         Q.    And you then would, in turn, communicate
7     to your Directors what the expectations were for
8     recoveries for their teams for that coming month;
9     correct?
10        A.    Yes.
11        Q.    Would you have any separate meeting or
12    discussion with the QCC who reported to you relative
13    to the recovery plan for the month?
14        A.    Separate from what?
15        Q.    Separate from the Directors?
16        A.    I'm not sure.  Typically, to the best of
17    my recollection, I would communicate the information
18    just to the Directors.  I definitely recall that.  I
19    don't really recall communicating it to the QCC,
20    because he or she were not managing a block of
21    claims.  They were serving in a different function.
22        Q.    In terms of where Ms. Griffin received the
23    information in the recovery plan, she would get
24    that, from your understanding, for each month from

1  the finance organization; correct?

2          MS. ZHORDANIA:  Calls for speculation.
3  Foundation.

4      A.    I'm not sure exactly where she would get
5  it from, but I -- to the best of my recollection, it
6  was from finance or actuarial or something along
7  those lines.

8      Q.    Did you understand that the monthly recovery
9  plan that Ms. Griffin would you give to was a
10 derivative of the company-wide business plan?

11         MS. ZHORDANIA:  Assumes facts not in
12 evidence.  Foundation.

13     A.    I'm not sure I would say it was derivative
14 of the company business plan.  I would say it was
15 something that was given to me.  What it might have
16 been part of, I'm not sure.

17     Q.    I believe you said that you would -- you
18 would have access to, you'd be provided with the
19 annual business plan for the Benefits Operation;
20 correct?

21         MS. ZHORDANIA:  Objection.  Misstates
22 prior testimony.

23     A.    I think I said I would be aware of or it
24 would be communicated to me what the main objectives

1    and goals of the benefits organization were for the
2    given year.
3         Q.    All right.  And the business plan for the
4    Benefits Operation for the year would include, among
5    I'm sure many other things, a plan regarding
6    recoveries; correct?
7              MS. ZHORDANIA:  Asked and answered.
8         A.    That was not something that I was provided
9    with.  So when I stated that I had knowledge of or
10   had been provided with the plan, business plan for
11   the year for the benefits organization, typically, I
12   don't recall recovery expectations being part of
13   that business plan.
14        Q.    The recovery plan that you were given by
15   Ms. Griffin every month, the expectations in that
16   plan would be given in the form of two numbers;
17   correct?
18        A.    Yes.
19        Q.    One, a count -- a total count of the claims
20   that were expected to recover for that month?
21        A.    Yes.
22        Q.    And the second was a dollar amount
23   representing what the release of reserve on a given
24   claim would be; correct?

1    A.    Yes.

2          Well, I would just clarify it was a dollar

3    amount of an aggregate of claims not -- so the -- I

4    was provided with a count or a number of claims, and

5    then the aggregate reserve release that would be

6    associated with that count of claims.

7    Q.    Well, didn't Ms. Griffin provide you with

8    an aggregate number for your organization as a whole

9    and also numbers for each of your Director teams?

10   A.    Yes.

11   Q.    And so assuming, if I'm understanding

12   this, then one could add up the numbers for each of

13   your Directors' team, and it should come out roughly

14   to that aggregate number?

15   A.    Yes.

16   Q.    And on average, the number in terms of the

17   recovery expectation for dollars of reserves for

18   each Director team, rather, each Director team would

19   be from one to $2 million?

20   A.    I think that's a reasonable estimate.

21   Q.    All right.  And that means the monthly

22   aggregate for your organization would, taking the

23   six Directors, would average somewhere from six to

24   $12 million?

1      A.     Yes.

2      Q.     Another available tool for managing the

3  claim inventory was something called the change in

4  status fields; is that correct?

5      A.     Yes.

6      Q.     And that involved Directors could populate

7  online expected changes in the status of their

8  claims; correct?

9      A.     Yes.

10     Q.     Which would include expected paid recoveries

11 to happen in the future in their claims; correct?

12     A.     Expected paid recoveries were one of the

13 types of change in status that the Directors would

14 populate into this online tool.

15     Q.     And the expected change in terms of the

16 expected recovery, that would be -- could be noted

17 in the change in status field, the change might be

18 for the next month or even further into the future;

19 correct?

20     A.     Yes.

21     Q.     And you would have online access to this

22 with the Directors or what information they're

23 filling in in this regard; correct?

24     A.     Yes.

1    Q.   And also on a monthly basis, you would

2    receive a printed report of the claims expected to

3    recover that would include an approximate reserve

4    amount associated with those claims; is that true?

5    A.   Yes, I would receive that from Ms. Griffin

6    or perhaps her administrative assistant.

7    Q.   All right.  And anywhere from 10 to 50

8    claims per Director per month would tend to be the

9    expected number of recoveries for a month; is that

10   correct?

11   A.   No.  I would say the expected number of

12   recoveries would not be anywhere close to that 50

13   number.  I would say, you know, 10 to 50 might be

14   the total range for expected change in status, so

15   part of which would include the recoveries and part

16   of which would not.  They would represent other

17   types of changes in status.

18   Q.   If you were just looking at recoveries,

19   what would the average tend to be per claim for

20   claims per Director per month?

21   A.   You know, as a range, I would say maybe

22   from eight to 15, something like that, and we're

23   talking about both paid and unpaid recoveries.

24   Q.   All right.  And, again, an unpaid recovery

1  would be what a layperson might call a denied claim;
2  correct?
3      A.    I think a denied claim could be one
4  example of an unpaid recovery.  I'm not sure it
5  would be all inclusive though.
6      Q.    Well, what would other examples be?
7      A.    I don't recall.
8      Q.    And from this information, that enabled
9  you -- you could add up to see where your team's
10 performance was likely going to be relative to the
11 plan; correct?
12     A.    I would use the information that I was
13 provided at the beginning of each month to forecast
14 the likely performance of my team for that month,
15 yes.
16     Q.    I'm not sure if you're stating it that way
17 as disagreeing with the way I stated it or not.  So
18 let me try to clarify.
19     A.    Could you please restate it then.
20     Q.    I had asked that from the change in status
21 list that you were provided from Ms. Griffin or her
22 administrative assistant that had reserve numbers
23 assigned to the claims, wasn't it correct that you
24 could add those up and be able to see what your

<sup></sup>

1   team's performance was going to be relative to the

2   plan for that month?

3           MS. ZHORDANIA:  Objection.  Argumentative.

4   Foundation.

5       *A.*     I could see where the performance was

6   expected or forecasted to be, but it wouldn't be

7   until the end of the month that I could see how that

8   reconciled.

9       *Q.*     Right.  And I think I had said what was

10  likely going to be given, the data that you have on

11  this report?

12          MS. ZHORDANIA:  Asked and answered.

13      *A.*     I could take the information I was

14  provided and come up with an approximation of where

15  it was likely that the team would finish at the end

16  of the month.

17      *Q.*     Okay.  When you talk about unpaid recovery,

18  unpaid recovered claims would also have reserves

19  associated with them prior to them being there in

20  the system as being recovered; correct?

21      *A.*     I believe every open claim had a reserve

22  associated with it.

23      *Q.*     All right.  And just, again, so we're

24  understanding terms, if I submit a claim, even

<sup></sup>

1   though you haven't evaluated and decided on the

2   claim, that's going to cause an open claim; correct?

3       A.    Yes.

4       Q.    Okay.  Now, if the -- as you add up the

5   reserves connected with the anticipated recoveries

6   for the month for your Directors, and if you see

7   that even if all of those expected recoveries

8   happen, you'll still be short of what the plan is

9   for recoveries for that month, you could meet with

10  individual Directors to discuss some rationale as to

11  why their anticipated recoveries were what they

12  were; is that correct?

13      A.    Well, first of all --

14            MS. ZHORDANIA:  Foundation.

15      A.    -- I would say that it would be very

16  unlikely that all of the claims on the change in

17  status report identified as a potential recovery.

18  It would be very unlikely that all of those claims

19  would actually resolve in that month.

20      Q.    Okay.  On average, what did experience

21  teach in terms of what percentage of the claims on

22  the list expected to recover would actually recover?

23            MS. ZHORDANIA:  Overbroad.  Calls for

24  speculation.

1          Go ahead.

2     A.    I don't think I can give a percentage

3 because I would say different Directors utilized the

4 change in status tool a little bit differently.

5 Some had different thresholds under which they would

6 put something on that list than others.  So, you

7 know, it was really up to them to determine what

8 they thought the likelihood of the claim recovering

9 would be.  Some would enter, you know, claims that

10 had a relatively small chance of recovering and

11 others would, I think, choose to enter claims that

12 maybe were more likely than not to recover; so, I

13 can't really give a specific percentage because of

14 the variation from one Director to another.

15     Q.    But and I would expect there would be

16 variation, and I guess I'm asking, given the

17 variation, when you kind of stand back and eyeball

18 it, did you not come to get a sense of well, the

19 experience teaches we -- there tends to be around

20 50 percent recovered from what's actually on this

21 list or fill in the blank?

22          MS. ZHORDANIA:  Foundation.  Asked and

23 answered.  Calls for speculation.  Go ahead.

24     A.    Again, I don't recall having a particular

```
1    percentage or range of percentages that I would have
2    relied on to utilize.
3         Q.    Wouldn't this list give you information
4    that would be informative of the likelihood of your
5    meeting the planned recovery number for the month?
6         A.    Yes.
7         Q.    And if the -- you know, the higher the
8    number is relative to the plan, wouldn't it be true,
9    the more likely you're going to hit the plan number?
10        A.    The higher what number?
11        Q.    The higher the number of the aggregate of
12   the reserves on the list?
13        A.    I don't think I understand what you're
14   asking.
15        Q.    All right.  When you get the list from
16   Ms. Griffin for the change in status by recoveries
17   for the upcoming month, and the total of those
18   reserves is a larger number, relative to the plan
19   number, as opposed to a smaller number, I'm asking
20   wouldn't the larger the number suggest to you the
21   more likely you're going to hit plan as opposed to a
22   low number?
23              MS. ZHORDANIA:  Foundation.
24        A.    Again, the list that I was provided would
```

1    include the estimated reserve information for any

2    claim that the Director identified as a potential

3    change in status for that month or for a future

4    month within I forget if it was somewhere between

5    three and six months in the future, so --

6       Q.    Can I interrupt you for a second.  I want

7    to understand what you're saying, and then we'll get

8    your place and go on.

9       A.    Sure.

10      Q.    Are you saying that the list you would get

11   each month from Ms. Griffin or her administrative

12   assistant would be for claims expected to recover,

13   according to the Director populating it on the

14   change in status, for that month that you're about

15   to enter as well as more months in the future?

16      A.    To the best of my recollection, the online

17   change in status tool that we're discussing that was

18   populated by the Directors had a time component to

19   it; so, the Directors were expected to have

20   knowledge of the group of claims and the block that

21   they were responsible for, and for entering future

22   change in status potential for those claims.  And

23   some of those claims would be expected to recover in

24   the current month, and some would be expected to

1   recover in future months, and so what I'm saying is
2   that the report or information I was provided had
3   claims for a greater than one month time frame.
4       Q.    And I understand that online when you
5   would look at the change in status fields, it would
6   be for multiple months.  Just so you're clear, I'm
7   asking the written report that you were given from
8   Ms. Griffin, would that also include multiple
9   months?
10      A.    I believe it did, but I can't remember for
11  sure.
12      Q.    All right.  For sure the online did;
13  written report, you don't recall?
14      A.    The online information definitely had
15  change in status information for beyond the current
16  month.  I believe that the written report I
17  received, which contained the approximate reserve
18  information, I believe that that also included the
19  future month information, but I can't recall for
20  sure.
21      Q.    Well, do you recall - and I ask you this,
22  and maybe it will trigger your memory - that the
23  written report that you got, was it providing you
24  associated reserves for the immediate month that's

<sub>1</sub> about to happen and multiple months going forward?

<sub>2</sub>                    MS. ZHORDANIA:  Asked and answered.

<sub>3</sub>        A.    That's what I'm saying I can't recall for

<sub>4</sub> sure.  My best recollection is that the written

<sub>5</sub> report I received from Ms. Griffin or her assistant

<sub>6</sub> contained information on claims and approximate

<sub>7</sub> reserve information for not only that current month

<sub>8</sub> but also for months into the future coinciding with

<sub>9</sub> what the Directors had populated in the online tool.

<sub>10</sub>        Q.    Okay.  How big was this report?

<sub>11</sub>        A.    Can you clarify what you mean by that.

<sub>12</sub>        Q.    Number of pages?

<sub>13</sub>        A.    For a given Director, I think we've

<sub>14</sub> established that, you know, they would be, as a

<sub>15</sub> rough estimate, you know, 10 to 50 projected changes

<sub>16</sub> in status on the report, and so the size of the report

<sub>17</sub> for each Director would reflect that and multiply

<sub>18</sub> that times six, and that would be the size of the

<sub>19</sub> report that I would get.  I can't tell you how many

<sub>20</sub> pages, because I don't remember, you know, how big

<sub>21</sub> the font was on the report or anything like that,

<sub>22</sub> but.

<sub>23</sub>        Q.    All right.  So you would get a report for

<sub>24</sub> each Director underneath your supervision from

1    Ms. Griffin --

2        A.    Yes.

3        Q.    -- correct?

4              The eight to ten expected recoveries that

5    you estimated, is that including claims for all the

6    future months?

7        A.    I think I estimated eight to 15, and that

8    estimate was in relation to a given month, which I

9    understood the context of your question at the time

10   to mean.

11       Q.    And it was, but I didn't know we were

12   talking about multiple months that were on the

13   report; so, I wanted to clarify that.

14             As you would kind of absorb the monthly

15   report with the associated reserves, and if it

16   appeared to you from the report, given the numbers

17   that the likelihood of meeting the plan recovery was

18   going to be very small or, say, impossible, would

19   there ever be any steps you would take about that?

20       A.    Yes.

21             MS. ZHORDANIA:  Foundation.

22       Q.    And would one of the steps you could take

23   would be to speak with your Directors?

24             MS. ZHORDANIA:  Misstates prior testimony.

1    A.    Well, I would speak with my Directors on

2    an ongoing basis all the time, whether the --

3    regardless of the likelihood that the forecasted

4    monthly results were or were not on track.

5    Q.    Sure.  But I'm not asking that.  What I'm

6    asking you is if one of the steps you could take

7    would be to speak to your Directors about this

8    issue?

9    A.    It would be one of the steps, but it would

10   also be one of the steps regardless of whether I

11   expected the results to be what they were forecast

12   to be.

13   Q.    Well, if I'm understanding you, Mr. Peter,

14   you're just saying you don't need this as a reason

15   to speak to your Directors; correct?

16   A.    Yes.

17   Q.    You speak to your Directors throughout the

18   month; correct?

19   A.    Yes.

20   Q.    All right.  So that you understand what

21   I'm asking you, if you get this report and seeing

22   it, you conclude it's very unlikely you're going to

23   meet the recovery plan for the month, would you

24   likely speak to individual Directors about their

1    particular forecast for recoveries?

2        A.    Yes, as I stated before, Directors were

3    expected to have knowledge of their inventory and

4    their block of claims.  So if -- if under the

5    scenario you're describing, I would likely speak

6    with the Director to learn more about the reasons

7    why the projected results were different than what

8    the historical forecast would suggest.

9        Q.    Okay.  And in speaking with Directors

10   about that, might that result in in their projected

11   result increasing?

12            MS. ZHORDANIA:  Foundation.

13       A.    I'm sorry.  I don't --

14       Q.    Their projected result for recoveries in

15   the upcoming month to increase to more closely match

16   the planned forecast?

17            MS. ZHORDANIA:  Foundation.

18       A.    You're asking if the result of my

19   conversation with them was that their forecast would

20   increase?

21       Q.    That's one way to put the question, I

22   guess, yeah.

23       A.    I would say no.  I would say that my

24   objective in speaking to them would be to gain their

perspective on their block of claims and why their

forecast was different from what the historical

projection would suggest.

Q.     All right.  It is true that as an AVP, you

were -- you also were judged on whether your

organization -- your organization's recoveries were

meeting plan; correct?

A.     That was certainly one of the factors that

I was evaluated against, yes.

Q.     All right.  And your Directors are evaluated

on that as well; correct?

A.     Among other things, yes.

Q.     Okay.  So if it appears to you from -- I

mean isn't this one of the reasons that you are

getting this paper copy of the projected recoveries

from Ms. Griffin with the associated reserves, so

that it will help you manage the claims inventory?

A.     I'm not sure I would say it helps me

manage it.  I would say it helps me evaluate the

performance of the block of claims against what the

forecast was.  So it was a tool among many others.

We had tools to evaluate, you know, quality and time

service, customer service, and so forth, and this

was one of the metrics; the recovery metric that

<div style="text-align:left">

1   we're speaking of was one of the metrics that would

2   be used to evaluate the performance of myself and my

3   teams.

4       *Q.*    All right.  Well, when you -- as you

5   indicated, yes, you might sit down and talk to an

6   individual Director, to learn about why his or her

7   projected recoveries for that month were below plan;

8   correct?

9       *A.*    Yes.

10      *Q.*    Okay.  And in doing so, you would ask the

11  Director to explain why their projected number is as

12  low as it is relative to the plan; correct?

13          MS. ZHORDANIA:  Asked and answered.

14  Misstates prior testimony.

15      *A.*    I would speak with the Director to gain

16  their perspective on the block of claims under their

17  management and learn more about what they knew about

18  the claims that would help explain why the projection

19  was different from -- why their projection was

20  different from what the plan was.

21      *Q.*    Right.  So you would look for an

22  explanation from them as to why their number was

23  lower than what the plan was?

24          MS. ZHORDANIA:  Asked and answered.

</div>

1    A.    Yes, that's part of what we would discuss.

2    Q.    All right.  As the month would go on, you

3  would have periodic follow-up with each Director to

4  see where each was in relation to the month's

5  recovery goal; correct?

6    A.    Yes, I met with my Directors periodically

7  to talk about their team's performance in relation

8  to the recovery metric as well as several other

9  metrics.

10    Q.    And if a claim that had been listed as one

11  that was expected to close by a Director had not, in

12  your meeting, you would seek an explanation for why

13  the claim hadn't closed; correct?

14    A.    Yes.

15    Q.    Okay.

16    A.    Not every time, every claim, but certainly

17  there were situations where we would discuss why a

18  given claim had been projected to recover and

19  ultimately didn't --

20    Q.    All right.

21    A.    -- in that time frame.

22    Q.    Well, if a claim had been projected to

23  recover and did not in that time frame, you would

24  often have a discussion with the Director for an

1  explanation as to why it had not; is that fair to
2  say?
3           MS. ZHORDANIA:  Asked and answered.
4      A.    I would say sometimes.  I don't know if it
5  was the majority or not, but there were certainly
6  situations that I would discuss that, yes.
7      Q.    All right.  Let's take a break.
8      A.    Pardon me.
9      Q.    Let's take a break.
10     A.    Okay.
11          THE VIDEOGRAPHER:  We are off the record
12  at 1:25 p.m.
13          (Short break taken.)
14          THE VIDEOGRAPHER:  We are on the record at
15  1:37 p.m.
16  BY MR. DAWSON:
17     Q.    Mr. Peter, I kind of have some retrograde
18  motion here, going back to your tenure at Paul Revere,
19  beginning in 1986, by the time of the merger with
20  Unum, so I guess probably after -- before or after
21  whether it was an acquisition or merger with
22  Provident, in addition to being Assistant Vice
23  President, you were also an officer of the company,
24  correct, of Paul Revere?

1   A.    Yes, I think by virtue of the AVP title, I
2   was an officer.
3   Q.    All right.  And that was true then after
4   the merger as well?  I mean, you were still --
5   A.    My recollection is I became an AVP after
6   the Paul Revere/Provident merger, but I'm not
7   exactly sure.
8   Q.    All right.  So let me clean up my question
9   then.  You became an officer in addition to being
10  AVP after -- I'm sorry -- which merger did you say?
11  A.    My recollection is it was after the first
12  merger which is the Paul Revere/Provident one.
13  Q.    All right.
14  A.    And, again, it wasn't a -- the officer
15  designation came with the AVP title.  It wasn't a
16  separate distinction.  I think every AVP was, by
17  definition, an officer.
18  Q.    An officer.  All right.  Thank you.
19        Let's see where I am here.
20        MS. ZHORDANIA:  You were about to be done.
21        (Laughter.)
22        THE WITNESS:  Thanks anyway.
23        MS. ZHORDANIA:  I'm working for you.
24  BY MR. DAWSON:

1       *Q.*    We were talking before the break about you

2  speaking to the Directors underneath your supervision.

3  I think -- did I ask you this?  I don't know if I

4  asked you this or not, and that is would you have

5  periodic follow-ups with each Director to see where

6  they were in relation to the month's recovery goal?

7       MS. ZHORDANIA:  Asked and answered.

8       *A.*    I think you did ask --

9       *Q.*    That's asked and answered?

10      *A.*    Do you want me to answer again?

11      *Q.*    I believe you said you would?

12      *A.*    I think I said that was one of the things

13 that I would talk to my team about on an ongoing

14 basis.

15      *Q.*    Right.  All right.  And the Directors had

16 responsibility for five or six DBSs underneath them?

17      *A.*    Yes, generally.

18      *Q.*    All right.  And they had responsibility

19 for managing the inventory of claims that the DBSs

20 underneath them were working on; correct?

21      *A.*    The Directors did?

22      *Q.*    The Directors did.

23      *A.*    Yes.

24      *Q.*    So similarly, the Directors would be

1  expected as part of their managerial duties to speak

2  with the DBSs about what was going on on claims,

3  among other things, but relative to knowing what's

4  happening with the recovery, the actual recoveries

5  relative to the plan?

6          MS. ZHORDANIA:  Objection.  Misstates

7  prior testimony.  Foundation.

8     *A.*     It was a director's responsibility to, you

9  know, work with their team of DBSs to handle,

10  adjudicate the claims in their area of responsibility.

11          I'm not really sure -- well, let me -- I

12  would think that one of the things that the Directors

13  would speak to their DBSs about was, you know, with

14  respect to all the claims in their inventory what

15  they were doing on the claims, what they were

16  thinking would happen on the claims, if they needed

17  help with the claims, and so forth, just kind of

18  basic, you know, management of a team.

19     *Q.*     Sure, and I'm just, again, so we're

20  communicating with one another, I'm asking just

21  about a specific aspect, and that is you would

22  expect the Directors to speak with their DBSs on

23  this issue of actual recoveries to planned

24  recoveries, just on that topic?

1    MS. ZHORDANIA:  Objection.  Misstates

2  prior testimony.  Foundation.  Go ahead.

3    *A.*    The DBSs were really focused on, you know,

4  handling the claims that they were responsible for

5  and the service aspects of them.  The populating of

6  the change in status tool was really something that

7  was primarily done by the Directors; and so the

8  focus of the communication between the Directors and

9  their DBSs was on just what was happening with their

10  particular claims, not really so much on whether it

11  did or did not achieve the change in status that was

12  predicted.

13    *Q.*    All right.  Fair enough.  And, in fact,

14  the DBSs didn't even have authority to close a

15  claim; correct?

16    *A.*    That's correct.  Every -- the practice was

17  that any claim closure needed to be signed off by

18  both the Director and the QCC.

19    *Q.*    All right.

20    *A.*    I don't think we defined QCC yet, so I'll

21  just, for what it's worth, say it stands for quality

22  compliance consultant.

23    *Q.*    Okay.  So if a claim was going to be

24  closed, and thereby, have a recovery, that was going

| | |
|---|---|
| 1 | to be a decision that had to come from the Director, |
| 2 | and as you say and signed off by the QCC; correct? |
| 3 | MS. ZHORDANIA:  Foundation. |
| 4 | A.    I wouldn't say it was a decision that came |
| 5 | from the Director.  I would say the Director and the |
| 6 | QCC were responsible for approving it or signing off |
| 7 | on it, but the impetus for the decision to close the |
| 8 | claim would typically come from the DBS, but they |
| 9 | needed authority or approval to do it. |
| 10 | Q.    When you say the "impetus for the decision |
| 11 | to close the claim," is that to say the DBS is the |
| 12 | one who's working the claim file day-to-day.  Would |
| 13 | that be correct? |
| 14 | A.    Yes. |
| 15 | Q.    I mean to the extent it's worked day-to-day, |
| 16 | but. |
| 17 | A.    Sure. |
| 18 | Q.    And it would be expected that the DBS |
| 19 | would be the one to let his or her Director know, I |
| 20 | think this claim is in a position, is in a state to |
| 21 | be closed? |
| 22 | A.    Right.  I guess -- |
| 23 | MS. ZHORDANIA:  Foundation. |
| 24 | A.    -- I was trying to say -- the way I |

<sub>1</sub> interpreted your question was that the Director

<sub>2</sub> would instruct or tell the DBS to -- that it was

<sub>3</sub> time to close the claim, and what I'm saying is

<sub>4</sub> really the impetus, the recommendation for that came

<sub>5</sub> from the DBS to the Director, not vice versa.

<sub>6</sub>     Q.    All right.  And the Director was in a

<sub>7</sub> position of authority to say no, I don't agree with

<sub>8</sub> your recommendation or say, yes, I do and let's move

<sub>9</sub> it on to the QCC; is that correct?

<sub>10</sub>     A.    Yes.

<sub>11</sub>     Q.    All right.  And we talk about you having

<sub>12</sub> periodic follow-up with each of your Directors.

<sub>13</sub> Your supervisor, Ms. Griffin, would also have

<sub>14</sub> periodic follow-up with you in relation to the

<sub>15</sub> month's recovery goal; correct?

<sub>16</sub>     A.    That was one of many things that we would

<sub>17</sub> speak about in meetings between the two of us, yes.

<sub>18</sub>     Q.    All right.  And in those meetings,

<sub>19</sub> Ms. Griffin would have access to where your

<sub>20</sub> organization was relative to the recovery plan;

<sub>21</sub> correct?

<sub>22</sub>     A.    My recollection is that that information

<sub>23</sub> was compiled weekly, so it wasn't real-time

<sub>24</sub> information per se, but on a week-to-week basis,

1  Ms. Griffin would have access to how my team was
2  performing in relation to the plan information.
3      Q.    All right.  And your periodic meetings
4  with Ms. Griffin in this regard would tend to be
5  after one of those weekly updates as to where your
6  organization was, fair to say?
7      A.    It could be before or after.  I mean, if
8  it was -- you know, I guess by definition, if it's
9  after week two, it's before week three; so, it's
10  really both.
11      Q.    I got you.  All right.
12           Was there any concern during your years in
13  the claim operation, among any in the claim department
14  that, to your knowledge, that this practice of
15  monitoring actual recoveries to recovery plan and
16  where are you at and where your numbers are may
17  influence claim decisions to be made without fair
18  regard to the insured's interests?
19      A.    You're asking if anyone ever thought that?
20      Q.    To your knowledge, of course.
21      A.    I don't know.
22      Q.    Well, my question was not very good.
23           I'm not asking for anything beyond your
24  knowledge.  So the answer "I don't know" means I

1   didn't ask a good question.

2            I'm asking, to your knowledge, did anyone

3   ever express any concern that this practice may

4   influence claim decisions to be made without fair

5   regard for the insured's interest?

6       *A.*    I don't recall that being the case, no.

7       *Q.*    I mean it was made clear to -- it was made

8   clear to you as an AVP that making the plan recovery

9   numbers was not merely a hope, but it was an

10  expectation; correct?

11           MS. ZHORDANIA:  Asked and answered.

12  Misstates prior testimony.

13      *A.*    I would say that there were numerous

14  standards and metrics and expectations that I was

15  held accountable for as an AVP, one of which was how

16  the block of claims that I had under the management

17  of my teams performed over a period of time in

18  relation to what the historical expectations were.

19      *Q.*    All right.  And to narrow that somewhat,

20  it is true that you were held accountable for the

21  actual recoveries measuring against the plan;

22  correct?

23           MS. ZHORDANIA:  Asked and answered.

24      *A.*    Again, that was one of the many factors

1    that I was held accountable for, yes.

2        Q.    And you, in turn, would hold accountable

3    the Directors underneath you for the actual recoveries

4    within their inventory and how they measured against

5    the plan; correct?

6        A.    That was one of the factors, yes.

7        Q.    Okay.  And you -- I mean it was part of

8    your job to make clear to the Director that you were

9    holding them accountable for this; is that fair to

10   say?

11             MS. ZHORDANIA:  Objection.  Foundation.

12       A.    Yes, I think -- I would like to think that

13   as a manager I was clear on what the numerous

14   expectations were of the Director and whether they

15   relate to recovery expectations or the quality or

16   timeliness of the decisions, I'd like to think that

17   as a manager, I clearly communicated those.

18       Q.    All right.  You would impress upon each

19   of your Directors the importance of meeting the

20   recovery numbers?

21             MS. ZHORDANIA:  Objection.  Asked and

22   answered.

23       Q.    Fair to say?

24       A.    Again, that was one of the many factors

1   that I would impress upon them as being important.

2       Q.   All right.  And this particular factor,

3   the importance of achieving the recovery plan would

4   be the subject of ongoing discussions between you

5   and each of your Directors; true?

6           MS. ZHORDANIA:  Objection.  Asked and

7   answered.

8       A.   As -- yes, as was the case with many

9   metrics.

10      Q.   Okay.  And within those ongoing discussions,

11  you would let your Directors know where they were in

12  relation to meeting his or her monthly recovery

13  target; true?

14      A.   As well as other metrics, yes.

15      Q.   And within these periodic discussions, you

16  might inquire of a Director what barriers may exist

17  that would prevent a particular claim that had

18  expected to close from closing?

19      A.   Yes.

20      Q.   Holding your Directors accountable for

21  meeting the expected operational performance or the

22  operational metrics was also something that was

23  included in the director's performance evaluations;

24  correct?

1      A.    I believe so.

2      Q.    And was it included in yours as well?

3      A.    I believe so, yes.

4      Q.    You might in discussions with a Director

5   ask to be kept apprised of the status of a given

6   claim that was expected to recover; true?

7      A.    I would have occasion to ask to be

8   apprised of status of different types of claims,

9   including ones that were expected to recover.

10     Q.    All right.  And you may also ask to be

11  kept apprised of a claim that had closed but might

12  reopen?

13          MS. ZHORDANIA:  Vague.

14     A.    Yes.  My recollection is that I -- part of

15  my responsibility as an AVP was to review and sign

16  off on the claims that needed to be reopened, so

17  that I would be aware of them personally.

18     Q.    So is that to say so you had -- you

19  especially had interest in a claim that had closed

20  that you had reason to know was being considered for

21  a possible reopen?

22          MS. ZHORDANIA:  Misstates testimony.

23     A.    You're asking if -- I'm sorry.  Could you

24  please repeat it.

1      Q.    Yeah, you had answered my prior question

2 that you had to review and sign off on claims that

3 needed to be reopened, so that you needed to be

4 personally aware of them; correct?

5      A.    Yes.  Yes.

6      Q.    And that was in response to my question of

7 you would at times be asked to be apprised of the

8 status of claims that had closed that were in

9 consideration as to whether they're going to be

10 reopened.  That's a fact.

11      So my next question is are you saying

12 because you had to review and sign off, you would

13 especially, yes, want to be apprised of claims that

14 had closed that may be considered to be reopened?

15      A.    Well, I guess I didn't have to be asked

16 because I was required to review them, and the

17 reason I was required to review them is that the

18 quality and the appropriateness of the claim

19 decisions that a given Director or their team made

20 was something that I was held accountable for, and

21 so, part of the reason for my reviewing claims that

22 were being recommended to reopen after they had been

23 closed was as a way to monitor the quality of the

24 decisions that had been previously made, and that

1   would enable me to notice any trends that might

2   exist with a given Director and their teams, if, for

3   example, one Director team had a higher number of

4   reopens than all of their peer teams, I might wonder

5   why that was the case and perhaps the claims that

6   they were signing off on to close, maybe that needed

7   to be looked at because there was an unusually high

8   percentage of them that were subsequently reopening.

9           MR. DAWSON:  Okay.  Mark this as two,

10  please.

11          (Document was marked Exhibit No. 2 for

12  identification.)

13      Q.    Mr. Peter, Exhibit 2 is a page from the

14  claim file, and the bottom right corner of the page

15  number is 00049.  Do you see that?

16      A.    Yes.

17      Q.    Had you reviewed the claims file prior to

18  your deposition or portions?

19      A.    Not in preparation for the deposition.  I

20  may or may not have reviewed the file in conjunction

21  with my employment, back prior to two years ago.

22      Q.    But you have not since?

23      A.    Correct.

24      Q.    Okay.  The bottom e-mail, which is the

1    first in sequence is from a Brenda Shepard.  Who is

2    Ms. Shepard?

3        A.    As is indicated in the signature block of

4    her e-mail, she's a lead appeals specialist for

5    Unum.

6        Q.    All right.  And the body of her e-mail

7    says, "Attached please find my RT Memo of today's

8    date."

9              What is an RT memo?

10       A.    You know, I actually don't recall.  I

11   think it might be something about return, but --

12       Q.    Yes, and I'm not sure where I saw this

13   reference, but is it correct that it means a

14   decision hasn't been made yet?

15       A.    No.  Well, I guess it depends on what type

16   of decision you're referencing.

17       Q.    Okay.  Well, the date of this is March 2,

18   2016.  Do you see that?

19       A.    Yes.

20       Q.    And does this look familiar to you from

21   when you worked on the claim?

22       A.    I mean I don't recall this particular

23   e-mail.

24       Q.    All right.

*A.* The nature of it is familiar, as a general -- not specific to this claim but as a general type of e-mail that I would see and respond to.

*Q.* I understand what you're saying and, again, what is the general nature of it that gives you familiarity?

*A.* So the purpose of Ms. Shepard's e-mail is to -- again, she's in our appeals organization, and the appeals organization is part of but separate from the claims or benefit operations area, and the appeals area is responsible for reviewing decisions on claims where the operations area has made a decision, and the claimant subsequently appeals that decision.

So the practices that were in place provided a mechanism for a claimant to appeal, let's say, the denial of their claim, and in conjunction with that, the entire claim file would be reviewed by the appeals organization, so in this case, Ms. Shepard; and the claim would be reviewed and analyzed, kind of, you know, from the beginning as a new type of review to ascertain whether the decision to deny the claim was consistent with Unum's

PLC-MSI-ABRAMOWSKI-PAUL PETER DEPO 12-7-2018-00090

1  practices.

2          In some cases, the claimant would submit

3  an appeal without any new information being

4  provided, and in some instances, the claimant would

5  submit an appeal along with some additional

6  information that the claimant felt would help change

7  the decision that the company made to deny their

8  claim.

9    *Q.*    All right.  So the status -- and I'll just

10 represent to you this is out of Biliack's claim

11 file.  This is his claim number we see referenced

12 here.

13         And the status at this point is that an

14 appeal is considered to have been submitted, but a

15 decision hasn't been yet made on it.

16         Is that the type of communication that you

17 might typically be copied on?

18         MS. ZHORDANIA:  Objection.  Lacks

19 foundation.

20   *A.*    I would typically be copied on a situation

21 where an appeal was made, and I would be apprised of

22 the outcome one way or another after the appeal

23 review had been completed.  So I would not be part

24 of the review.  My team would not be part of the

1    review.  As I said, it was an independent part of

2    the company that did the appeal reviews, but it

3    would be common practice for the appeals organization

4    to notify me and others of what decision they had

5    reached.

6         *Q.*    All right.  On this e-mail, you do see

7    that you are a recipient on it; correct?

8         *A.*    Yes.

9         *Q.*    All right.  As is Jodi Bishop, the DBS;

10   correct?

11        *A.*    She is a DBS.  I don't know whether -- I'm

12   assuming she's the DBS on the Biliack claim, but I

13   don't know that for sure.

14        *Q.*    All right.  As is the QCC, Mr. Birch?

15        *A.*    Yes.

16        *Q.*    And Steven Carlson, was he the appeals

17   supervisor?

18        *A.*    I believe he would have been Brenda's,

19   Ms. Shepard's Director.

20        *Q.*    All right.  Is it Mr. Ferranti or

21   Ms. Ferranti?

22        *A.*    Ms.

23        *Q.*    What position did she have?

24        *A.*    I believe she would have been -- so

1   Mr. Carlson was Ms. Shepard's manager, and

2   Ms. Ferranti was Mr. Carlson's manager.

3       Q.    As Mr. Carlson's manager, would she be an

4   AVP?

5       A.    I believe she was, yes.

6       Q.    And Mr. Hackett, his position?

7       A.    He, I forget his title, but he was -- he

8   had something to do with our complaints or compliance

9   area.

10      Q.    Was he traditionally copied on e-mails

11  relating to appeals?

12            MS. ZHORDANIA:  To the extent it calls for

13  speculation, I object.

14      A.    I think so, but I'm not sure.  My best

15  recollection is that the list of people and their

16  positions would be kind of a standard, set thing

17  that the appeals specialist would -- that those were

18  the individuals and their positions that would be

19  notified whenever an appeal was decided.

20      Q.    All right.  Ms. Bishop's Director,

21  Elysabeth Wetton, is copied on it; correct?

22      A.    Yes.

23      Q.    As were the two Vice Presidents at the

24  time, Mr. Williams and Ms. Griffin; correct?

Case 1:19-cv-00131-TRM-CHS  Document 43-2 Filed 11/07/19 Page 94 of 316 PageID #: 7209

1    A.    Yes.

2    Q.    And then also Scott Gillaspie was copied

3    on it.  Do you see that?

4    A.    Yes.

5    Q.    What's his position?

6    A.    I forget his exact title, but he was, I

7    think, a business analyst, someone who would be

8    responsible for compiling different metrics, and so

9    we would, for example, evaluate over a period of

10   time how many appeals there were and what the outcome

11   of them had been, and so Mr. Gillaspie, would, I

12   believe, have been responsible for compiling that

13   data into some type of report that we could utilize

14   later.

15   Q.    What role did Mr. Gillaspie play relative

16   to the recovery plan?

17         MS. ZHORDANIA:  Foundation.  Calls for

18   speculation.

19         Go ahead.

20   A.    Other than -- I guess his role was, again,

21   as a business analyst was simply compiling on a

22   month-to-month basis the -- what the performance of

23   given teams were in relation to the plan expectation.

24   So he -- to the best of my knowledge, he did

1  not -- he did not devise the plan expectations.  He

2  did not communicate them.  It was his role as a

3  business analyst and someone who was kind of

4  responsible for compiling metrics to compile a wide

5  variety of information, again, with respect to

6  appeals, with respect to monthly plan performance,

7  and many others.

8      Q.    Including with respect to recovery?

9      A.    Again, I think he was responsible for

10  compiling in a report the numbers or the information

11  for each team.

12     Q.    Including recovery?

13     A.    Yes.

14     Q.    All right.  You referred to him as a

15  business analyst.  If Mr. Gillaspie described

16  himself as a financial analyst, would that be

17  contrary to what you thought his role was?

18     A.    No, as I said I wasn't sure of the exact

19  title, but it was -- I would use those terms somewhat

20  interchangeably.

21     Q.    All right.  When you said he compiled a

22  month to month, the actual results to the plan, so

23  included within that, Mr. Gillaspie would be the one

24  compiling the actual recovery results measured

1    against the plan recovered results; correct?

2            MS. ZHORDANIA:  Calls for speculation.

3    Foundation.

4        A.    My recollection is that was one of his

5    responsibilities, yes.

6        Q.    Okay.  So if a -- if a claim is closed,

7    it's recovered; correct?

8        A.    Yes.

9        Q.    And Mr. Gillaspie would be apprised of

10   that; correct?

11           MS. ZHORDANIA:  Calls for speculation.

12   Lacks foundation.

13       A.    I don't believe he would be apprised of

14   each claim individually being closed.  I believe he

15   would see at the end of a given month or some period

16   of time he would see the aggregate results.  I don't

17   think he had anything to do with the results or the

18   outcome of a given claim.  He was responsible for

19   compiling the results on an aggregate basis.

20       Q.    All right.  Well, in order to compile the

21   results on an aggregate basis, Mr. Gillaspie would

22   have to be provided with information in terms of

23   reserves recovered when claims are closed; correct?

24           MS. ZHORDANIA:  Calls for speculation.

Foundation.

*A.* Again, he would, I believe, be apprised or have access to information about the reserves in aggregate but not necessarily for a particular claim individually.

*Q.* To your understanding why would it be that Mr. Gillaspie, as a financial analyst, would be copied on an individual -- on an e-mail about an individual claim such as this?

MS. ZHORDANIA: Calls for speculation.

*A.* As I stated, his responsibility was to compile a variety of metrics that spoke to the operational performance of the claims organization.

So in order for us to understand how many appeals were submitted and the outcome of those claims, he would need the information in order to compile a report that, in aggregate, showed the information that I'm talking about.

So we would be able to look on a monthly or, say, quarterly basis and see "X" number of appeals had been submitted. Some portion or percentage of those were upheld; some portion or percentage was overturned, and so forth.

So he was -- to answer your question, my

<div style="text-align: right"></div>

1　understanding is he was provided with this information

2　in order to help compile the reporting that he was

3　responsible for.

4　　　　Q.　　But what I'm trying to learn from your

5　testimony, it sounds like Mr. Gillaspie would be

6　getting information in the aggregate, you know, at

7　the end of the month, for example, which is what

8　caused me to ask you why would he be on an e-mail

9　on a claim as it's happening, deciding whether it's

10　going to be reopened or not?

11　　　　MS. ZHORDANIA:　I'm sorry.　What's your

12　question?

13　　　　MR. DAWSON:　I said I'm asking why would

14　he be on an e-mail --

15　　　　MS. ZHORDANIA:　Oh, okay.

16　　　　MR. DAWSON:　-- on a claim as it's

17　happening as to whether it's going to be opened or

18　not?

19　　　　MS. ZHORDANIA:　Asked and answered.　Calls

20　for speculation.　Lacks foundation.

21　　　　A.　　Again, my recollection would be that some

22　information Mr. Gillaspie would have available to

23　him automatically or through a system of some kind

24　that he would be able to view and use to compile the

reports that he was responsible for.  In some cases,
you know, our system reporting was not -- was not
such that all that information would be available
to him.  So there would be some things that he would
have to kind of, you know, manually keep track of,
and apparently the appeals outcome is one of those.

Q.   All right.  So if a claim closes, thereby,
it's recovered and thereby the reserve is recovered;
correct?

A.   I guess I would use the term that the
reserve is released.

Q.   The reserve is released.

And if that claim is reopened, then a
reserve has to be established again; correct?

A.   Yes.

Q.   So in order for Mr. Gillaspie to compile
the reports that he is responsible for, relative to
the actual recoveries compared to the plan, he would
need to know about reopens; correct?

MS. ZHORDANIA:  Objection.  Calls for
speculation.  Lacks foundation.

A.   Again, Mr. Gillaspie was responsible in
his role for providing a variety of reporting and
metric information, and one of the metrics that we

|    |                                                          |
|----|----------------------------------------------------------|
| 1  | would evaluate on an ongoing basis was the               |
| 2  | percentage of claims that reopened, and so, in order     |
| 3  | for him to do his job, he needed to know how many        |
| 4  | claims reopened.                                         |

5      Q.    Or apparently the claims that may reopen?

6            MS. ZHORDANIA:  Argumentative.  Asked and

7      answered.

8      A.    I'm not sure.

9            MS. ZHORDANIA:  Calls for speculation.

10     A.    I've answered to the best I can of what

11     his responsibility was.  I'm not familiar with every

12     detail of what he did.

13     Q.    And there's a reply e-mail about

14     Ms. Shepard's, same day, but after hers from you,

15     indicating "Please keep me posted on the status of

16     this claim."

17           Do you see that?

18     A.    Yes.

19     Q.    Now, since reopening Dr. Biliack's claim

20     was not recommended, according to the claim file,

21     why would you want to be kept posted on the status?

22           MS. ZHORDANIA:  Foundation.

23     A.    I don't -- what I see in front of me

24     doesn't tell me that the recommendation was to not

1   reopen the claim.

2       Q.    Well, assume with me for purposes of my

3   question that the claim file does not reflect that

4   the claim was recommended to be reopened.  With that

5   assumption, can you tell me why you would want to be

6   kept posted on the status?

7           MS. ZHORDANIA:  Object to lacks foundation

8   and incomplete hypothetical.

9           Go ahead.

10      A.    You know, I would say that part of my

11  responsibility was to understand what happened to

12  claims after a decision was made.  So if a decision

13  was made to deny a claim, and then an appeal was

14  submitted, I would want to know what was happening

15  with that claim.  I would want to know if

16  subsequently it reopened.  If it did reopen, I would

17  be curious to know whether it reopened with or

18  without any new information.

19          So if the decision was made to reopen the

20  claim without any new information, then I would

21  probably talk to the Director about why that was,

22  why did our appeals organization, upon their review,

23  recommend that the claim be reopened, and by

24  extension, therefore, it shouldn't have been closed,

1   I would want to know that, as it spoke to the

2   quality of the decision that the DBS and the

3   Director and the QCC made.

4       *Q.*    Do you have a general recollection of what

5   the size of Dr. Biliack's reserve was?

6       *A.*    I have no idea.

7       *Q.*    Okay.  If you were to assume that his

8   claim was approximately $8,900 a month, he was in

9   his 50s, and it was lifetime benefits, would you

10  conclude from that that the reserve on his claim,

11  relatively speaking, would have been significant?

12          MS. ZHORDANIA:  Object to "significant" as

13  vague and also object to the extent it calls for

14  speculation.

15          Go ahead.

16      *A.*    I did not have any training in terms of

17  calculating or even estimating reserve information.

18  I was the recipient of information from my manager

19  that provided that information to me.  I did not

20  have any, again, training in terms of how to

21  calculate that; and so I would, you know, in answer

22  to your question, I'm sure that the reserve on

23  Dr. Biliack's claim was higher than some and less

24  than others, but I can't quantify it in any way

1   because I don't have that background.

2   Q.    Well, it doesn't really take training to

3   get an understanding that the larger the monthly

4   benefit and the longer the duration, the higher the

5   reserve, wouldn't you agree?

6   A.    My understanding is that is accurate as a

7   general statement, but I'm sure there were other

8   factors that came into establishing the reserve.

9        Again, that was something that was done

10  outside of the claims organization by our finance

11  and actuarial folks, and my understanding is that in

12  addition to the factors you mentioned, which were

13  the benefit amount and the benefit period, that

14  there were other factors involved as well, but I

15  don't have a list of what those are.

16  Q.    I'm sure.  I'm sure.

17       If you had a claim close, and this is a

18  hypothetical, let's say that the reserve on the

19  claim was a million and a half dollars and now we're

20  looking at the possibility that claim may reopen, if

21  that were to happen, would you agree that would have

22  a noticeable impact on the actual recoveries to plan

23  for your group?

24       MS. ZHORDANIA:  Objection.  Incomplete

1  hypothetical.  Calls for speculation, and vague as

2  to "noticeable."

3      Go ahead.

4      A.    Yeah, I was -- I would say it would have

5  an impact, but, you know, you're asking about one

6  claim in a vacuum, and so in a given month, there

7  are, you know, dozens of claims that recover.

8  There's some number of claims that reopen, and so

9  it's difficult to state hypothetically what impact

10  or how noticeable an impact of one claim in a given

11  month with multiple variables would be.

12     Q.    Would a large claim with a large dollar

13  reserve merit your attention any more, any less than

14  the smallest of claims?

15     A.    From a reopen perspective?

16     Q.    From a when you're looking and trying to

17  know what's happening with your inventory in terms

18  of recoveries?

19     A.    I would say that the size of the reserve

20  on the claim was relevant in terms of oh, enabling

21  me to help forecast whether my team would -- where

22  they would be in relation to the plan based on

23  historical expectations, but the size of the reserve

24  really did not influence how I looked at the claim

1    or my thought process in reviewing a claim.

2          My objective was to review each claim on

3    its own merits, and, you know, arrive at a decision

4    or sign off on a decision that reflected the merits

5    of that case, whether it had a small reserve or

6    large or medium reserve.

7        Q.    Well, but wouldn't the size of the reserve

8    you have interest in, just in terms of the outcome

9    of the claim and how it's going to impact your

10   operational metrics?

11         MS. ZHORDANIA:  Objection.  Asked and

12   answered.  Misstates testimony.

13       A.    Would I have interest in it?

14       Q.    Yes.

15       A.    Again, as I tried to state, my interest

16   would be in relation to how the size of any claim

17   related to what the monthly plan was and what the

18   forecasted performance in relation to that plan was.

19       Q.    I mean it would be true that a smaller

20   number of claims with larger numbers of reserves

21   would get to the plan for recovery easier than a

22   large number of claims and small reserves; correct?

23   I mean that would follow.

24         MS. ZHORDANIA:  Vague.

1    A.    It would get to the dollar amount of the

2    recovery plan sooner, but not to the count plan of

3    the recovery -- the count aspect of the recovery

4    plans.

5    Q.    Meaning the individual claim count, when

6    you say the count aspect?

7    A.    Yes.  Yes.  Correct.  Because as we

8    discussed, the recovery plan that I was provided

9    with each month included both a claim count and a

10   reserve release amount.

11   Q.    Which are dollars?

12   A.    Yes.

13   Q.    While I'm asking you about some of these

14   Dr. Biliack e-mails in his claim file, were you

15   in -- were you aware at the time it was happening

16   that after Dr. Biliack's claim was closed, his

17   counsel had requested a copy of the file?  Were you

18   aware of that?

19   A.    I have no recollection of Dr. Biliack's

20   claim.

21   Q.    Okay.  I want to ask what your knowledge

22   about this from a policy perspective is.  The file,

23   a copy of the file was sent to Dr. Biliack's

24   counsel, but Unum would not agree to send the

1   surveillance footage that was taken.

2           First of all, was there a policy or

3   practice that you were aware of in that regard?

4       A.    I don't remember for sure.

5       Q.    Ultimately Dr. Biliack's counsel was

6   told -- well, let me back up.  I'll give you this

7   fact too.  The termination of Dr. Biliack's claim

8   the letter, the rationale for the termination

9   included the surveillance, you know, what was

10  observed on the surveillance.

11          Does that change your answer at all in

12  terms of what the policy or practice may have been,

13  if you remember, without providing the surveillance?

14          MS. ZHORDANIA:  Asked and answered.

15      A.    No, I still don't recall.

16      Q.    Okay.  Ultimately Dr. Biliack's counsel

17  was told if they wanted to see the surveillance,

18  they would have to somehow gain the capacity to

19  issue a subpoena to get it.

20          Do you have a recollection of if that was

21  consistent with policy and practice?

22          MS. ZHORDANIA:  Foundation.

23      A.    I don't recall.

24      Q.    You would know, of course, that in order

1 for a policyholder of Unum to issue a subpoena to

2 see the videotape of him being surveilled, he would

3 have to file a lawsuit?

4          MS. ZHORDANIA:  Calls for speculation.

5 Foundation.

6     *Q.*     Correct?

7     *A.*     I'm not sure really what needs to occur

8 for a subpoena to be issued.  You know, I have a

9 basic understanding that it involves, you know,

10 attorneys and, but as far as the mechanics of

11 issuing one or what is required to issue a subpoena,

12 I'm not sure.

13     *Q.*     Do you have any knowledge of Biliack to

14 the extent were you ever asked to sign off on

15 anything regarding Biliack?

16     *A.*     Again, I have no recollection of

17 Dr. Biliack's file or what involvement I may or may

18 not have had in it.

19     *Q.*     By virtue of Dr. Biliack asking to have

20 the claim reopened or the decision appealed, in my

21 understanding, that would not trigger a need for you

22 to sign off on anything?

23     *A.*     His appeal certainly would not have

24 required me to sign off on anything.  If the

1   Director ultimately made the recommendation to

2   reopen the claim, then I typically would have been

3   required to sign off on that decision.

4       Q.   All right.  So you're not going to have to

5   sign off unless and until there's a point where

6   somebody below you is recommending the claim be

7   reopened, and thereby a reserve would have to be

8   established again; correct?

9       A.   Right.  My responsibility was to approve a

10  recommendation to reopen a file.  If a recommendation

11  was made to keep the file closed, I would not be

12  required to sign off on that.

13      Q.   Okay.  One last question on the issue

14  about providing surveillance tape and just testing

15  your memory one last time.

16           Do you recall was the decision to provide

17  an insured surveillance video was it made on a

18  case-by-case basis as opposed to sort of a

19  one-policy-fits-all basis?

20      A.   I'm not sure because that was not

21  something that I would generally be involved in.

22  That was something that the Director was responsible

23  for, and, you know, I imagine that there were

24  situations where they might have, you know,

<table>
<tr><td>1</td><td>consulted with our legal department perhaps or their</td></tr>
<tr><td>2</td><td>peers.  I'm not sure, but the decision to or not to</td></tr>
<tr><td>3</td><td>release surveillance information was not something I</td></tr>
<tr><td>4</td><td>would typically be involved in.  So I can't answer</td></tr>
<tr><td>5</td><td>whether it was case by case or more of a general</td></tr>
<tr><td>6</td><td>policy.</td></tr>
<tr><td>7</td><td>Q.    All right.  Elysabeth Wetton was deposed</td></tr>
<tr><td>8</td><td>earlier in the case, and rather than paraphrasing,</td></tr>
<tr><td>9</td><td>let me read this answer to you, if I can find her</td></tr>
<tr><td>10</td><td>here.</td></tr>
<tr><td>11</td><td>This is at page 248, line 22 of Ms. Wetton's</td></tr>
<tr><td>12</td><td>transcript:</td></tr>
<tr><td>13</td><td>"QUESTION:  Did you ever express any</td></tr>
<tr><td>14</td><td>concern to Mr. Peter about these financial</td></tr>
<tr><td>15</td><td>expectations that were being put on your unit?"</td></tr>
<tr><td>16</td><td>"ANSWER:  Just concerns about --"</td></tr>
<tr><td>17</td><td>"QUESTION:  This doesn't seem right.  I</td></tr>
<tr><td>18</td><td>don't know how we're going to do this, anything</td></tr>
<tr><td>19</td><td>along those lines?"</td></tr>
<tr><td>20</td><td>"ANSWER:  I mean, I probably did at some</td></tr>
<tr><td>21</td><td>point."</td></tr>
<tr><td>22</td><td>"QUESTION:  Did you ever get any pushback</td></tr>
<tr><td>23</td><td>from Mr. Peter about this?"</td></tr>
<tr><td>24</td><td>"ANSWER:  I don't recall -- I don't recall</td></tr>
</table>

1   anything specifically for him responding and pushing
2   back."
3           Going to page 250:
4           "QUESTION:  Did you ever express to
5   Mr. Peter that financial outcomes shouldn't play a
6   part in claims decisions?"
7           "ANSWER:  I mean, generally speaking, I
8   did."
9           I had asked you before if you were aware
10  of anybody ever expressing concern that these --
11  these recovery expectations or goals might impact
12  the quality of the fairness of the claims decision,
13  and you said, I think, you didn't recall that
14  happening.
15          Do you not recall Ms. Wetton raising any
16  of these concerns?
17          MS. ZHORDANIA:  Asked and answered.
18     A.   I do not.
19     Q.   If she had asked you that I have some
20  concern over financial considerations playing a role
21  in these decisions, what would you have told her?
22          MS. ZHORDANIA:  Objection to the extent it
23  calls for speculation.
24          Go ahead.

1    *A.*    I think I would have likely said that, you

2   know, the historical expectations are based on a

3   long history of the type of claims in her block of

4   claims under management, and that, you know, that

5   they were intended as a guideline.  You know, as I

6   stated earlier, many businesses have many metrics

7   that they use to evaluate performance, and a common

8   way to evaluate performance is based on what's

9   happened in the past.

10          So all things being equal, if the same

11  types of situations and circumstances exist, if

12  that -- if those claims yielded whatever number or

13  recoveries in the past, that it's, you know, on the

14  surface, reasonable to expect that they would

15  continue to do so.

16          I'd suspect I would have asked Ms. Wetton

17  if she felt that the -- that the plan expectations

18  were not achievable for her to help me understand

19  why that was the case.  So were there aspects of the

20  claims under her management that would suggest that

21  some of the circumstances had changed, so that the

22  historical expectation would not be as valid as we

23  were told it should be?

24          So I would have tried to understand -- I

<sup>1</sup> would have delved into her knowledge of her block of

<sup>2</sup> claims and tried to determine whether the inability

<sup>3</sup> to reach the historical plan expectations, if that

<sup>4</sup> was due to the nature of the claims or if it was due

<sup>5</sup> to Ms. Wetton's knowledge or ability or ability to

<sup>6</sup> manage her team, and so forth.

<sup>7</sup>           So I would have just tried to gain a

<sup>8</sup> broader understanding, and if -- if she and if

<sup>9</sup> others continued to express that concern, I probably

<sup>10</sup> would have raised the concern with my manager and

<sup>11</sup> perhaps, you know, we would have gone back to the

<sup>12</sup> finance and the actuarial folks to say something

<sup>13</sup> along the lines that, you know, what your forecasts

<sup>14</sup> are suggesting are not what we're seeing now, and

<sup>15</sup> you know, make people aware of that, so that they

<sup>16</sup> could perhaps, you know, evaluate the historical data

<sup>17</sup> more thoroughly or differently or somehow determine

<sup>18</sup> if any adjustments needed to be made.

<sup>19</sup>     Q.    What span of time is the historical

<sup>20</sup> analysis coming from?

<sup>21</sup>           MS. ZHORDANIA:  Calls for speculation.

<sup>22</sup>     A.    I don't know.

<sup>23</sup>           MS. ZHORDANIA:  Foundation.

<sup>24</sup>     Q.    If Ms. Wetton asked, Mr. Peter, what span

1   of time is this historical information you're

2   telling me about coming from, your answer would be

3   the same:  I don't know; correct?

4        A.    I would say I don't know.  I would say,

5   you know, my understanding is that the block of

6   claims that Unum has by virtue of our size and being

7   a leader in the disability market is very large.

8   You know, I had been told at one point that the data

9   we had was second in size only to the Social Security

10  Administration.  I don't know if that's accurate,

11  but that's what I was told.

12            And so the larger the data that the

13  assumptions are based on, the more likely it is to

14  be statistically significant and relevant, but as

15  far as a particular number of years that it was

16  based on, I don't know.

17       Q.    The size of Unum, you said in terms of

18  number of claims, second only to the Social Security

19  Administration.  It's fair to say that its -- its

20  historical analysis just by virtue of the number of

21  claims, you're dealing with the law of large numbers

22  here; correct?

23       A.    I think that was implicit in my answer to

24  the prior question.

1  *Q.*    Yeah.  I mean you had said earlier on - I
2  forget the number now - but just for your
3  organization, the number of active claims tended to
4  run -- I don't remember now.
5  *A.*    I think what I said was a given Director
6  team might have 250 to 300 claims in their area,
7  and so if we assume that at a given time I had
8  six Directors reporting to me, then if my math is
9  right, that would be 1,500 to 1,800 claims in my
10 organization, active, open claims.
11 *Q.*    And if you've got four Directors, as you
12 estimated, you'd take that times four; correct?
13 *A.*    I think I estimated four AVPs, not
14 Directors.
15 *Q.*    I'm sorry.  I meant AVPs.  And the
16 actuarial numbers that -- your analysis rationale
17 that you suggested you had explained to Ms. Wetton,
18 do you know does that include also beyond IDI
19 claims?
20          MS. ZHORDANIA:  Calls for speculation.
21 Foundation.
22 *A.*    I'm not sure.  My -- I think my
23 understanding was that there would be a -- that the
24 analysis or the historical experience would be

1 broken out between individual disability claims and

2 long-term disability claims, group LTD claims.  As

3 far as whether they were totally separate or whether

4 one block informed the other or had -- was combined

5 in some way, I don't know.

6     Q.    You don't know.

7           What about is it broken out -- is there a

8 distinction made between own occupation policies

9 versus modified own occ. versus any occ.

10    A.    You know, it's possible that that was the

11 case from --

12    Q.    I assume it's possible --

13    A.    -- from an actuarial perspective, but it

14 was not something that I was provided with.  I never

15 received any information that broke down the block

16 of claims into own occ. or not own occ. or any

17 subdivision of whether or not own occ. existed.

18    Q.    All right.  And I think you already said,

19 and whether we're looking historically at claims for

20 the last two years or last ten years or 20 years,

21 you don't know; correct?

22    A.    Correct.

23    Q.    The explanation to my or the hypothetical

24 about Ms. Wetton raising some concerns about this

1   approach, it really breaks down, wouldn't you agree,

2   when you go from data looking at tens of thousands

3   of claims to somebody dealing with a few dozen

4   claims, where claim decisions have to be made this

5   month about Mr. Jones and Mrs. Smith, it's -- here's

6   my question:  Wouldn't you agree it's not an

7   apples-to-apples comparison what I'm doing on

8   Mr. Smith's claim because of your historical

9   analysis of which you don't even know it's based on?

10          MS. ZHORDANIA:  Objection.  Argumentative.

11  Lacks foundation.

12      A.    So what is your actual question?

13      Q.    I would have said the same thing if I were

14  you.

15          (Laughter.)

16      Q.    Just because -- let's say we understand

17  the data behind this historical analysis, and

18  because over tens of thousands of claims over "X"

19  period of time, there is an average of "Y" recoveries,

20  a month in the company, that does nothing to inform

21  me as a Director as to whether the claim in front of

22  me is fairly paid or fairly denied, wouldn't you

23  agree?

24          MS. ZHORDANIA:  Objection.  Foundation and

1   argumentative.

2       *A.*     Looking at what you listed in a vacuum
3   would not provide that information, but --

4       *Q.*     It would be of no help to me, would it?

5       *A.*     I can't speculate to what would be of help
6   to you, but.

7       *Q.*     Well, would it be of help to you if you
8   were making the decision on a person's claim, a
9   person who says I'm disabled.  I can't work.  I have
10  no way to generate income to know that well
11  historically, we have "X" number of recoveries a
12  month in this huge Unum organization.  Would that be
13  a help to you on that claim?

14      *A.*     Not particularly.  As I stated before, the
15  objective was to evaluate every claim based on its
16  own merits, and, in fact, that is, I would say, a
17  main reason why the DBSs who were responsible for
18  those claims -- so when you earlier referenced a few
19  dozen claims, that number is most applicable to a
20  given DBS, because a given DBS would have, let's
21  say, 50 claims.  So that's a few dozen.

22          The DBSs were not provided with any count
23  or financial reserve information.  So they performed
24  their task based on the merits of each claim.

1    So a given Director who has 250 or 300

2 claims, which is more than a few dozen, is it

3 helpful for them to know on average how the

4 demographics and makeup of the block of claims that

5 they have under their management, I would think it

6 would be helpful to have an estimate of how that

7 block as a whole should perform.

8    It would not necessarily impact my

9 decision on the Mr. Jones claim that you asked

10 about, but over time, I think it's reasonable to

11 expect that the performance of the claims under my

12 management as a Director or as an AVP would roughly

13 approximate what the historical expectations were.

14    *Q.*    Well, in terms of numbers we are talking

15 about the eight to 15 claims on the change in status

16 field that are expected to close this month, and

17 Ms. Wetton is talking about your coming around and

18 talking to her about why certain claims didn't close

19 that were on that change in status screen from those

20 eight to 15 claims.

21    Do you believe your law of large number

22 actuarial analysis answer to her is going to be of

23 help when she says, I don't think financial outcomes

24 should play a part in these claim decisions?

1    MS. ZHORDANIA: Objection. Mischaracterizes

2 Ms. Wetton's testimony. Argumentative and compound.

3    Go ahead.

4    A.    Just to clarify, my role in this example

5 in speaking with Ms. Wetton, I would ask about

6 claims that she had forecast would recover that

7 didn't. I would also ask about claims that

8 recovered that she hadn't forecast, and the reason I

9 would do that is because it spoke to her overall

10 knowledge of her block of claims and so, if she

11 continually forecast claims to recover, and they

12 didn't or conversely, she had a lot of claims in her

13 block that recovered that she hadn't forecasted

14 would make me question how involved she is in the

15 claims, how knowledgeable she is about the claims on

16 her team.

17    Q.    Mr. Peter, wouldn't you agree that the

18 actuarial historical analysis should really play no

19 part in deciding any given claim?

20    A.    I don't think it does.

21    Q.    And it should not, would you agree?

22    A.    I would.

23    Q.    Right. Each claim should be handled on

24 its own merits; correct?

1    A.    Yes.

2    Q.    And if it does or doesn't meet the

3    actuarial expectations, that's too bad, wouldn't you

4    agree?

5    A.    I think as long as the reason it didn't is

6    appropriate.

7    Q.    As long as it's fairly handled on its own

8    merits --

9    A.    Right.

10    Q.    -- whether it does or doesn't meet

11    actuarial merits, that's too bad, would you not

12    agree?

13    MS. ZHORDANIA:  Argumentative.  Asked and

14    answered.

15    A.    When you say "too bad" --

16    Q.    I mean it shouldn't matter.

17    A.    On a given claim, I would agree.

18    Q.    All right.  And, yet, this historical,

19    actuarial analysis is being driven down into the

20    company at a pretty granular level, correct, while

21    you were there?

22    MS. ZHORDANIA:  Object.  Argumentative.

23    Misstates prior testimony.

24    A.    Again, it was driven down to the Director

1 level, and a Director had 250 to 300 claims, so.

2 Q. And at the risk of interrupting, and the

3 Director is the one who is -- has the authority to

4 sign off on whether a claim's denied; correct?

5 A. In part, but it's also the QCC who signs

6 off on those as well, so it's a dual authority.

7 Q. Without going on too much of a side path,

8 QCCs are not substantively looking at the analysis

9 of a claim decision; isn't that true?

10 A. Not at all.

11 Q. Not at all it's not true or not at all

12 they're not?

13 A. It's not true at all.

14 Q. They are substantively analyzing whether a

15 claim was fairly recommended to be denied?

16 A. Absolutely. Their responsibility -- their

17 main responsibility at least as of the time I left

18 the company was to review every claim that was sent

19 to them with a recommendation to deny. They were

20 responsible for independently reviewing that claim

21 from the beginning to the end of the claim file.

22 Q. We'll let the QCC's testimony stand on its

23 own, I guess.

24 MS. ZHORDANIA: Move to strike that comment.

1    Q.    The other issue --

2            MR. DAWSON:  Yeah, I wouldn't want to read

3    that to a jury.

4    BY MR. DAWSON:

5    Q.    The other issue that comes into play about

6    your, you know, law of large numbers historical,

7    actuarial analysis is isn't it necessary to take

8    into consideration that you're dealing with a closed

9    block of claims?

10           MS. ZHORDANIA:  Object to the preface to

11   the extent it mischaracterizes witness' testimony

12   and foundation.

13           Go ahead.

14   A.    The plan information that we were provided

15   for -- provided with -- excuse me -- was certainly

16   provided from people and functional areas in the

17   company who knew that the block of claims was

18   partially comprised of a closed block.  So I would

19   assume but don't have personal knowledge that that

20   was already factored into what they were providing

21   as far as forecast on what the claim block would

22   yield in terms of recoveries.

23   Q.    All right.  To kind of unpack this, by

24   being a closed block, you don't have new lives coming

1    into this group; correct?

2           MS. ZHORDANIA:  Vague.

3       *A.*    If you're specifically talking about the

4    closed block, that's true, but we did --

5       *Q.*    Right.  I am.

6       *A.*    -- previously say that the -- a given

7    claim Directors' block was comprised of both closed

8    and not closed or what Unum called the recently

9    issued business.

10      *Q.*    All right.  Well, let's assume we're

11   talking about claims like Dr. Biliack's which would

12   be part of the closed block.  You're aware of that?

13   You know that Dr. Biliack's claim was comprised of

14   closed block?

15      *A.*    I did not.

16      *Q.*    Paul Revere policies issued in 1992, 1993,

17   own occupation guaranteed renewable, noncancellable,

18   lifetime benefits, closed block; correct?

19      *A.*    Based on --

20           MS. ZHORDANIA:  Foundation.

21      *A.*    Based on what you just described, just

22   based on the 1992, '93 time frame, which I did not

23   previously know, then, yes, it makes sense that that

24   was part of the closed block.

1     *Q.*    All right.  So if you are going to talk

2    about the historical analysis of recoveries, you

3    should be -- one should be talking about the data

4    relative to the closed block, if we're talking about

5    this policy; correct?

6          MS. ZHORDANIA:  Object to the extent it

7    calls for expert testimony and foundation.

8          Go ahead.

9     *A.*    Again, all I can really say is that the

10   plan information that I was provided monthly did not

11   break down that between closed block and recently

12   issued block.  So I presume, again, that the people

13   providing that information had knowledge of the fact

14   that the block was comprised of both closed and

15   recently issued and presumably had knowledge of the

16   percentage split between the two.

17    *Q.*    So you are presuming that the historical

18   information, which is the basis for the recovery

19   plan, is factoring in that you have an aging group

20   of insureds within the closed block; true?

21    *A.*    I'm presuming that the people who provided

22   us with the information, that it was their job to

23   understand the closed block and the recently issued

24   block and the various policy provisions and

1   demographics that existed and that that was part of

2   their role.  That's my understanding of what -- part

3   of what actuaries do.

4       Q.    All right.  And you expect with an aging

5   block, you're going to have increased mortality -- I'm

6   sorry -- morbidity?

7           MS. ZHORDANIA:  Objection.  Calls for

8   expert testimony.  Foundation.

9       Q.    Well, you were in underwriting for how

10  many years, 20 years?

11      A.    Yes.

12          MS. ZHORDANIA:  And foundation.

13      Q.    It's not within your 30 years of experience

14  in the company that as you get older, the chances of

15  becoming sick and disabled go up?

16      A.    I think that's a fair general statement,

17  yes.

18      Q.    Yeah.  And Ms. Wetton knows that this

19  measure of the actual recovery results compared to

20  the planned forecast was a factor in how her

21  incentive compensation was determined; correct?

22          MS. ZHORDANIA:  Calls for speculation.

23          MR. DAWSON:  Let me reword the question.

24          MS. ZHORDANIA:  You said --

1          MR. DAWSON:  Let me reword the question.

2     BY MR. DAWSON:

3          Q.    It is true that the director's measure of

4     their actual recovery results compared to the

5     planned forecast was a factor in how the director's

6     incentive compensation was determined?

7          MS. ZHORDANIA:  Asked and answered.

8          A.    The director's performance in relation to

9     their actual to expected recoveries was one of many

10    factors that went into their overall performance

11    evaluation.  That performance evaluation, in turn,

12    helped determine the amount of their incentive

13    compensation.

14         Q.    All right.  So it's true it was a factor?

15         A.    One of many.

16         MS. ZHORDANIA:  Asked and answered.

17         Q.    Okay.  And these recovery plans being

18    provided to Ms. Griffin, from Ms. Griffin to you,

19    from you to the Director, and then following up with

20    what the actual are are compared to that, is it your

21    testimony that -- that that -- that is a practice

22    that Unum believed, through your eyes, was

23    appropriate, justified, and I'll leave it at that,

24    was appropriate and justified?

1      *A.*    The practice of filtering down the

2   information that you described, you're asking if

3   that was appropriate.

4      *Q.*    Right.  From Vice President to Assistant

5   Vice President to the Director and then back up what

6   the actual results are?

7      *A.*    I can say that that was the practice

8   throughout my tenure in the claims organization.

9   You know, like any large company, we have people

10   whose responsibility it is to determine what's

11   appropriate, what's in compliance.

12      *Q.*    I'm just asking your opinion.

13      *A.*    Yeah, my opinion is that as a recipient of

14   that information that the company, you know, to do

15   it for 10 years, my belief is that it was considered

16   to be perfectly appropriate.

17      *Q.*    Why was there such a lack of transparency

18   with regard to all the communications about these

19   recovery goals?

20      MS. ZHORDANIA:  Foundation.  Argumentative.

21      *A.*    I am not sure -- well, I guess could you

22   clarify what you mean by a "lack of transparency."

23      *Q.*    Yeah.  The recovery plan expectations

24   that were communicated by Ms. Griffin to you, the

1    communication was done orally; correct?

2        A.    Yes.

3        Q.    It was done in one-on-one meetings; correct?

4        A.    Sometimes.

5        Q.    Most times?

6        A.    I'll stick with sometimes.

7        Q.    All right.  I'm -- all right.

8              I don't know if you're remembering.  I

9    don't know if you're giving your best guess, but I

10   want to make sure is it your testimony that, let's

11   say, as many times as not, Ms. Griffin would convey

12   to you the recovery plan expectations in the

13   presence of other people?

14       A.    I really don't recall.  Certainly there

15   were many times when she did it with just her and I

16   together.  I believe that she also did it when my

17   peers were present, so other AVPs.  If I had to say,

18   I would say that more than half the time she did it

19   with just she and I, but I would say that that

20   reflected efficiency versus a lack of transparency,

21   because I didn't need to know the details of

22   everything for my peers, and they didn't need to

23   know it for me.

24       Q.    And you communicated the recovery

1   expectations to your Directors orally; correct?

2       A.    Yes.

3       Q.    One-on-one?

4       A.    Generally.

5       Q.    Typically behind closed doors?

6       A.    No.  Actually my office didn't even have a

7   door.

8       Q.    What about the pods?

9       A.    The?

10      Q.    Pods.  Ms. Wetton said pods.  The doors

11  were closed.  The door would be closed.

12      A.    We certainly had meeting rooms with closed

13  doors, but it -- I didn't seek out rooms with doors

14  to communicate information.  You know, the way or

15  the circumstances under which I communicated the

16  information you're talking about to my Directors

17  were in conjunction with what we called one-on-one

18  meetings.  So the purpose of these meetings was

19  between myself and a given Director.  We would talk

20  about a variety of topics, relative to the Director,

21  to their team, to DBS personnel issues, so a variety

22  of information that, as a general statement, would

23  be appropriate to talk about behind closed doors.

24            So the circumstances of my communicating

1  the recovery expectations were as part of those

2  meetings, but it -- I guess, I'm distinguishing that

3  that's the circumstance that resulted in it being in

4  a room with a door closed as opposed to, you know,

5  my seeking out a room with a door specifically for

6  the purpose of communicating the recovery

7  expectations.

8      Q.    When Ms. Griffin would give you the

9  recovery plan expectations orally, you would write

10 down the numbers; correct?

11     A.    Yes.

12     Q.    But you would not keep a written record;

13 correct?

14     A.    Keep for what period of time?

15     Q.    After that month has passed and you're

16 into the next month; correct?

17     A.    So the numbers were updated each month,

18 and so it was generally my practice that as a new

19 month started I would retain that information

20 because the information that I had previously been

21 provided with was now out of date.

22     Q.    So you wouldn't keep a record; correct?

23     A.    Not from month to month.  Correct.

24     Q.    And the Directors were expected to do the

|  | |
|---|---|
| 1 | same, correct, write down the numbers as you would |
| 2 | give them to them one-on-one and not keep them after |
| 3 | that month passed? |
| 4 | MS. ZHORDANIA: Objection. Argumentative. |
| 5 | Compound and foundation. |
| 6 | A. I would say that the Directors were |
| 7 | expected to follow the same practice I did, which is |
| 8 | when you receive updated information, there's no |
| 9 | longer a need to keep the outdated information and |
| 10 | so you don't keep it. |
| 11 | Q. The CIS, the change in status printouts |
| 12 | with reserve dollars that you would get from |
| 13 | Ms. Griffin or her administrative assistant, you |
| 14 | would shred those after each month; correct? |
| 15 | A. It was our practice to shred any documents |
| 16 | that had any personal or identifying information, so |
| 17 | any document that had a claimant's name or policy |
| 18 | number, or date of birth, Social Security number, |
| 19 | anything that could be, you know, identified to a |
| 20 | particular person, it was our practice, I think the |
| 21 | company's practice that that, you know, the |
| 22 | appropriate way to dispose of that information was |
| 23 | to put it in a bin that was locked and later picked |
| 24 | up for shredding. |

1    *Q.*    Well, you keep claim files, don't you?

2    You don't shred those, do you?

3    *A.*    Well, the claim files are electronic.

4    They were generally for most of my time in the claim

5    organization, they were not paper files.  They were

6    electronic files.

7    *Q.*    Which raises the question why is this all

8    verbal?  Why is this not electronic?

9         MS. ZHORDANIA:  Why what?

10         MR. DAWSON:  Well, what we just have been

11    talking about.

12         MS. ZHORDANIA:  Are you referring to CIS

13    reports?

14         MR. DAWSON:  I am referring to the plan

15    recovery expectations and the CIS written reports

16    with reserve information on it.  Well, those are

17    written; you're shredding, but the recovery plan

18    expectation reports.  Well, why verbal?

19         MS. ZHORDANIA:  Object as to compound and

20    vague.  I'm not sure I understand the question, but

21    if you understand it, go ahead.

22         THE WITNESS:  I'm not really sure.  I can

23    only tell you that that's what the practice was

24    throughout my tenure in claims.  I don't know

<sup></sup>

1   why -- you know, I can't say for sure why some
2   information was verbal and some wasn't.
3   BY MR. DAWSON:
4       Q.    Well, why did you choose to convey this
5   information verbally to your Directors?
6            MS. ZHORDANIA:  Asked and answered.
7       A.    I was following the same practice that my
8   manager took with me.
9       Q.    Well, were you instructed that that's how
10  you should do it?
11      A.    Probably, yes.
12      Q.    You say you're following the same practice
13  that your manager had done.  You were following the
14  practice that you understood to be Unum's policy in
15  this regard; correct?
16      A.    I don't know that I --
17           MS. ZHORDANIA:  Foundation.
18      A.    -- had a broader understanding other than
19  what I was involved with and observed.  So my
20  manager chose to do it a certain way, to provide the
21  information a certain way, and I followed suit.  I'm
22  not sure what other Vice Presidents did or did not
23  do, if they did the same thing, if they provided it
24  in writing, I'm not sure.

1      *Q.*    Well, over your ten years as AVP, did you

2      ever come to learn or hear of anyone doing it a

3      different way?

4      *A.*    No.  I reported to Ms. Griffin for my

5      entire tenure, so I never really had exposure to

6      another Vice President's way of doing it.

7      *Q.*    As did other AVPs, they reported to

8      Ms. Griffin; correct?

9      *A.*    Did other AVPs report to Ms. Griffin?

10     Yes.

11     *Q.*    You had something -- you had weekly

12     tracking documents.  Do you remember those?

13     *A.*    I remember that term, yes.

14     *Q.*    Yeah, let me ask you about these.

15           MR. DAWSON:  We'll mark that.

16           (Document was marked Exhibit No. 3 for

17     identification.)

18           MS. ZHORDANIA:  Is this exhibit?

19           THE COURT REPORTER:  Three.

20           MR. DAWSON:  Three.

21     BY MR. DAWSON:

22     *Q.*    So, if I can find my copy.  Do you have a

23     Bates label of ten at the bottom of the page number?

24           Is there a Bates number?

1    A.    I don't see that.

2    Q.    It's right here.

3    A.    Oh, okay.  Yes, now I see it.

4    Q.    And the language right above the Bates

5    label indicates that "The financial metrics

6    contained in this report reflect general business

7    projections based on the company's historical

8    experience, adjusted for its current business

9    composition and outlook.  They represent broad

10   guideposts only, and do not constitute any form of

11   denial or closure targets.  They may not be used to

12   determine the outcome of a particular claim, each of

13   which must be evaluated on its own merits without

14   regard to any general or specific business plan

15   projections.  These metrics are intended for those

16   with managerial accountabilities only and are not

17   intended for and should not be shared with

18   Disability Benefits Specialists."

19         Did I read that correctly?

20   A.    I believe so.

21   Q.    All right.  You would have the weekly

22   tracking reports available electronically; correct?

23   A.    Yes.

24   Q.    And when you would look at the weekly

1 tracking report on the screen, would that language

2 that I read be obscuring the substance, the data in

3 the report as it is here?

4    *A.*    Would it be obscuring it?

5    *Q.*    Obscuring it?  Covering it?

6    *A.*    Oh, I see --

7         MS. ZHORDANIA:  Foundation.

8    *A.*    -- because the type is encroaching on the

9 report?

10    *Q.*    (Nods.)

11    *A.*    I don't recall.

12    *Q.*    I mean it's more than encroaching on the

13 report.  It's hiding the last line of information;

14 correct?

15         MS. ZHORDANIA:  Objection.  Argumentative

16 and foundation.

17    *Q.*    Well, I'm not arguing.  I'm asking isn't

18 that true?

19    *A.*    It appears that the statement that you

20 read is obscuring part of the information on the

21 report.

22    *Q.*    Okay.

23    *A.*    I don't -- I presume that when I could

24 view it online that was not the case, but I have no

1    personal recollection of that.

2        Q.    Do you believe you would recall if you

3    went to look at a report and you couldn't read what

4    you wanted to read because that language was

5    covering it?

6            MS. ZHORDANIA:  Objection.  Argumentative.

7    Asked and answered.

8        A.    That makes sense.  I just don't recall.

9        Q.    When you would view the weekly tracking

10   document online, was that language that I just read

11   anywhere on the report?

12       A.    You know, I presume that this is an

13   accurate copy of what the report was, so if that

14   language is appearing on this document, I presume

15   that it appeared on the screen.  I assume this is a

16   print of what the screen or the report looked like.

17       Q.    Do you have a recollection sitting here

18   today when you would review the weekly tracking

19   document on the screen of there being that admonishing

20   language that I read on the document on the screen?

21       A.    I don't recall one way or the other.

22       Q.    And then you certainly don't recall if

23   sometimes it would be in a different place like

24   overlapping some of the data on the report --

1    A.    Correct.

2    Q.    -- correct?

3          You recall the scorecards, the balance

4    scorecards?

5    A.    I remember that term, yes.

6    Q.    All right.  Do you recall if this same

7    language was on the scorecards when you looked at

8    those on the screen?

9    A.    I don't recall.

10   Q.    You were expected to be aware of the

11   actual recovery results, month to month; correct?

12   A.    Yes.

13   Q.    And consistency in the results was

14   preferred; is that fair to say?

15   A.    Consistency in?

16   Q.    The recovery results?

17   A.    As they related to the historical

18   expectations?

19   Q.    For month to month.

20   A.    The expectation was that the achievement

21   of the results in a given month compared to the

22   expectations for that month that that ratio or that

23   percentage would be consistent from month to month

24   as opposed to the pure results in a given month

1    being consistent from month to month because they

2    varied from month to month.

3        Q.   The plan numbers varied from month to

4    month?

5        A.   Yes.

6        Q.   Is it not the case that you were encouraged

7    to have consistent and predictable operational

8    results month to month?

9        A.   Yes, that is true.

10       Q.   All right.  And part of the operation

11   results includes the recovery results?

12       A.   Yes.

13       Q.   Okay.  And that is because recoveries

14   affected the report of the company's -- of the

15   company's monthly and quarterly financial results;

16   correct?

17            MS. ZHORDANIA:  Foundation.

18       A.   I don't know the details, but my

19   understanding was that the -- that our performance

20   in that area was one of many things that impacted

21   the line of business, and, in turn, the company's

22   reporting of results, yes.

23       Q.   All right.  And reporting financial

24   results, and, you know, the investment community,

1  Wall Street, prefers a degree of predictability?

2          MS. ZHORDANIA:  Foundation.

3      A.    I've been told that, yes.

4      Q.    All right.  And this concept of consistency

5  is even part of how your Directors' performance

6  would be evaluated.  Do you recall that?

7      A.    Yes.

8      Q.    This desire for consistency in meeting the

9  monthly recovery and targets -- well, strike that.

10          If you -- if a recovery target has been

11  made for the current month, and if there are any

12  additional recoveries that month, that same month,

13  the recording of those recoveries in Unum's internal

14  system would sometimes be delayed until the

15  following month; true?

16     A.    I would agree with that except to the

17  extent that you categorized them as targets, and I

18  would not.

19     Q.    All right.  If the recovery plan number

20  had been made for the current month, and if there

21  are any additional recoveries that month, the

22  recording of those in Unum's internal system would

23  sometimes be delayed until the following month; is

24  that true?

1   A. Yes.

2   Q. And that practice would help the paid

3 recovery metrics to be more consistent from month to

4 month; correct?

5   A. Yes.

6   Q. And it would also help with making the

7 recovery goals and expectations that you had and

8 Directors underneath you had for the next month;

9 correct?

10   A. If the recording of the recovery in our

11 internal system was delayed into the following

12 month, then that would count toward the recovery

13 plan for that following month.

14   Q. Right.  In essence, giving you a head

15 start on meeting the plan or expectation for the

16 next month, you'd agree?

17   A. Yes.

18   Q. Okay.  Now, you were terminated from Unum

19 in October of 2016?

20   A. Yes.

21

22

23

24



1    *Q.*    All right.  I mean you had been doing it,

2    delaying the recording under the circumstance we've

3    discussed, because it would help you meet the

4    numbers that were given; correct?

5                   MS. ZHORDANIA:  Objection.  Foundation.

6    *A.*    As you stated earlier, we were encouraged

7    to have consistent and predictable results --

8    *Q.*    Yeah.

9    *A.*    -- and so one way to help accomplish that

10   was to smooth out the results from month to month

11   and so one benefit of delaying the recording of the

12   claim recovery in our internal system was to help

13   with that and I want to be clear that I'm speaking

14   only about the delay in our internal system.  So

15   there was no delay, no adverse impact to the

16   claimant in any way.  They received their payment.

17   They received notification of their claim status.

18   They received everything that they should have on a

19   timely basis in realtime.  The only delay was with

20   respect to how it was recorded in our internal

21   payment system.

22   *Q.*    All right.  With that though, you would

23   delay the recording in the system that would assist

24   in meeting the expectations of your superiors;

1    correct?

2         A.    I think that's a fair statement, yes.

3         Q.    And this was something that during the

4    10 years that you were AVP of Claims occurred on a

5    fairly regular basis; correct?

6         A.    That's my belief, yes.

7         Q.    All right.  That practice had been true

8    throughout your 10 years in the claims organization,

9    would you agree?

10        A.    Yes.  Not just by me, but as by peers as

11   well.

12        Q.    All right.  How did you originally learn

13   of the practice?

14        A.    I can't recall specifically, but I, you

15   know, I would have to assume that it came from my

16   manager as far as, you know, I'm starting a new role

17   and what are the various expectations of that role,

18   and I think one of the aspects of that would have

19   been relative to achieving the consistent and

20   predictable results, and if it was a situation

21   where -- where in your earlier example, you know, on

22   the next to last day of the month, the expectation

23   had been met, that it was acceptable to delay the

24   recording of the results on the last day of the

<div style="margin-left: 2em;">

1    month to the following month, and that made sense to

2    me because it was not unlike some things that I had

3    seen in other areas of the organization.  For

4    example, when I was in underwriting, you know, the

5    sales organization would do that sometimes in

6    respect to their monthly or quarterly or annual

7    sales expectations, there would be a delay in when

8    that business was recorded on the books, and so

9    applying that same logic to my role in claims made

10    sense to me.

11    Q.   Okay.  And I'm told I think I have about

12    nine minutes left, so if you could -- and if you

13    need long answers to answer my question, then so be

14    it, but I'd ask that you try to focus just on

15    answering the question so I could --

16    A.   Is that nine minutes before the tape

17    expires or nine minutes before the end of the

18    deposition?

19    Q.   Oh, the tape.  Oh, okay.  I thought you

20    were saying we were out of time.

21    MS. ZHORDANIA:  You are out of time.  Nine

22    minutes.

23    Q.   I'm glad you asked that question.

24    A.   Can I vote?

</div>

*147*

1    *Q.*    I thought that went really fast.

2    *A.*    Can I vote on which of the ones it is?

3    No?  Apparently not.

4              MR. DAWSON:  Yeah, I'm so glad we got that

5    clarified.

6              MS. ZHORDANIA:  Whenever it's a convenient

7    time.

8              MR. DAWSON:  Now's a convenient time.

9              MS. ZHORDANIA:  Okay.

10             MR. DAWSON:  Now that I know that we have

11   time for a break.  Yeah.

12             THE VIDEOGRAPHER:  We are off the record

13   at 3:19 p.m.

14             (Short break taken.)

15             THE VIDEOGRAPHER:  We are on the record at

16   3:29 p.m.

17   BY MR. DAWSON:

18       *Q.*    Mr. Peter, before we took a break, you had

19   said that you believed that you had learned of the

20   practice of waiting to record a recovery on the

21   system the next month under the circumstances we've

22   already talked about that you believe from your

23   manager that that's where you would have learned

24   that; correct?

1    A.    I mean that's my recollection.  It

2    wouldn't be something I would just independently

3    come up with, so.

4    Q.    You wouldn't have decided to have just

5    done that on your own?

6    A.    No.  Or yes, correct.

7    Q.    All right.  And the manager at the time we

8    discussed before was Ms. Griffin; correct?

9    A.    Yes.

10   Q.    Did you learn in terms of how to -- how to

11   do this, and by that, I mean, details of well,

12   whether should you go ahead and communicate to the

13   insured that his or her benefits were ending or wait

14   until the next month to communicate it to them, I

15   mean were these details explained to you in terms of

16   how to do this?

17   A.    I don't recall that being the case, but as

18   I said earlier, you know, the only delay was in our

19   own internal system --

20   Q.    I --

21   A.    -- so there was no reason to delay anything

22   with the claimant.

23   Q.    I understand that you explained how it was

24   happening, and my question is was it explained to

you these kinds of details in terms of how to
execute this or carry it out or were those details
something that you came up with on your own?

MS. ZHORDANIA: Vague.

A.    I don't recall, you know, being given
instructions on that level of detail.  I would just
say, you know, the expectation was that we provided
as timely service and decisions as we could, and so,
since we're talking about two separate things, since
one didn't impact the other, meaning the speed at
which we got back to the claimant didn't impact the
internal accounting, if you will, that I don't
recall being instructed, but there would be no
reason to delay anything with the claimant.

Q.    Okay.  When you say you would delay
recording it on the internal system, specifically
what system are you talking about?

A.    I'm talking about our internal claim
payment system that would --

Q.    Is that OMAR or?

A.    I know OMAR was a system.  I honestly
don't remember what the name of the system was.  I
think it was -- there were different payment systems
I want to say PACE and CAPS were payment systems,

<sup></sup>

```
 1   but I honestly don't remember what system is
 2   relevant here.
 3       Q.    And when you talked about one of the
 4   things that delaying the recording in the system
 5   would accomplish would be to meet -- help get a jump
 6   start on meeting the recovery plan for the following
 7   month, would it be correct that that would also help
 8   that particular Director get a jump start on meeting
 9   his or her recovery plan for the next month?
10       A.    Yes.
11       Q.    Were the Directors aware underneath you
12   that there would sometimes be a delay in recording
13   on the internal system the recovery?
14       A.    They were the ones doing it, so I was not.
15   I was aware of it, but I didn't personally do
16   anything with the claim payment systems, so.
17       Q.    All right.
18       A.    The fact that the Directors are the ones
19   who would do that would indicate that they were
20   aware of it, because they were doing it.
21       Q.    All right.  Makes sense.
22             So was there a -- just an understanding
23   that amongst the Directors under your supervision
24   that if the recovery plan numbers had been met at
```

1   some point in the month, to then delay the recording
2   of any additional recoveries for that month until
3   the next month in the system?

4   A.    I think it was a generally understood
5   practice, and I think it goes back to what we spoke
6   about before being the expectation of, you know,
7   consistent and predictable results and so.

8   Q.    You're saying that's the reason for the
9   understanding?

10  A.    In part, yeah, it's the reason, but it
11  also is consistent with that in the sense that it
12  was -- it was known or accepted that -- well, let's
13  take the example of, you know, let's say that
14  every -- for the sake of argument, let's say that
15  every month the recovery expectation was a reserve
16  release of $2 million, just as a hypothetical.  It
17  was understood and conveyed through the use of this
18  consistent and predictable expectation that it was
19  better to, in that example, achieve $2 million every
20  month, than it would be to achieve one million this
21  month and 3 million next month and 4 million the
22  next month and none the next month.  So the
23  objective of having it be consistent and predictable
24  was what was valued.

1    Q.   By the company?

2    A.   That was my understanding, yes, and by my

3    manager.

4    Q.   And it would -- there were two aspects of

5    the measurement of your performance and your

6    Director's performance that this impacted.  One was

7    are you having consistent results; correct?

8    A.   Yes.

9    Q.   We talked about that actually as in the

10   performance evaluations consistency and results;

11   correct?

12   A.   Yes.

13   Q.   And the other aspect is and are you -- are

14   your actual numbers meeting the plan numbers;

15   correct?  It would impact both of those?

16        MS. ZHORDANIA:  Objection.  Foundation.

17   Misstates prior testimony.

18        Go ahead.

19   A.   I guess I view them as being related, not

20   two separate things but just two sides of the same

21   coin.

22   Q.   Well, or maybe stated differently, if you

23   are -- if you are meeting one of the measurements,

24   then you're necessarily meeting the other one.  Is

1   that another way to say it?  If I'm meeting the
2   measurement that I have consistent -- well, let me
3   take that back.
4       You could have consistent results but
5   they're falling short of plan; correct?
6       A.   Sure.
7       Q.   So you want -- ideally you want to meet
8   plan expectations and the consistency expectations?
9       A.   Yes, that's accurate.
10      Q.   All right.  And so as you believe you
11  learned this from your manager when you began, did
12  the Directors learn this underneath you from you?
13      A.   Probably to some extent, but in many cases
14  or probably the majority of cases, the Directors who
15  reported to me had been in that role prior to my
16  joining the claims organization; so, I don't recall,
17  you know, instructing them or advising them to do
18  this so much as it was already part of their
19  practice because they were already in those roles.
20      Q.   All right.  And did you have over your
21  10 years as an AVP in Claims, did you have Directors
22  come into your -- what would you call your group, an
23  organization?  A team?
24      A.   Either.

1       *Q.*    You didn't have a name for it?

2       *A.*    I think we called it an AVP team.

3       *Q.*    Okay.  Would you have Directors come

4  into -- I'm sorry -- you had Directors come into

5  your AVP team who had been working in other AVP

6  teams?  That's a P.

7       *A.*    Yeah, I believe that is true.

8       *Q.*    All right.  And those Directors that, you

9  know, migrated in from other AVP teams, did you ever

10  have to instruct any of those on this practice of

11  delaying the recording of a recovery?

12       *A.*    I may have.  I don't specifically recall

13  instructing them, but, again, since it appeared to

14  be fairly common practice, it didn't seem to be

15  needed to be instructed.

16       *Q.*    All right.  And you mentioned that you

17  didn't need to instruct the Directors on the

18  practice because in some instances the Directors had

19  been in their roles for years before you came in as

20  AVP in Claims; correct?

21       *A.*    Yes.  I don't know if it was years but

22  some period of time.

23       *Q.*    Some period of time, which would tell you

24  that the Directors had been doing this for some

1    period of time before you came on as AVP; correct?

2        A.    I think that's a logical assumption.

3        Q.    All right.  Was there any understanding

4    that there was a number of claims beyond which you

5    shouldn't delay recording.  Do you understand what

6    I'm asking?

7        A.    No.

8        Q.    So hypothetically, let's say that

9    the -- what would be a typical plan recovery number

10   for your AVP team?

11       A.    In a given month?

12       Q.    In a given month.

13       A.    Let's say 60 claims.

14       Q.    All right.  Let's say that's your plan

15   number in a given month, and, in fact, you hit 60

16   claims, you know, at the halfway point, which means

17   it looks like this particular month you're going to

18   be on track to, you know, 90 or 100.  Was there an

19   understanding that there's a number of claims beyond

20   which you shouldn't delay recording with that

21   explanation?

22            MS. ZHORDANIA:  Vague.

23            MR. DAWSON:  Still?

24       A.    I guess first I would say, in practice, it

1    didn't happen that, you know, halfway through the
2    month you were -- you know, it was more --
3        Q.    Right.  And I was purposely making extreme
4    examples so you would understand my question.
5        A.    Yeah, it was more like a day or two before
6    the end of the month; so, I don't recall there
7    being -- it sounds like your question is was I
8    instructed or told that I shouldn't exceed a certain
9    number of claims?
10       Q.    For example, yeah.
11       A.    I don't recall that being the case.
12       Q.    And same question, and I assume same answer
13   in terms of dollar amount of reserves?
14       A.    I guess what I would say again is that
15   because of the emphasis on consistency and
16   predictability, there was no benefit to far
17   exceeding a given month's expectations.  There was a
18   much greater benefit to carrying that over a couple
19   of days and having it count toward the following
20   month.
21       Q.    All right.  Because it is in the
22   interest -- it's more in the interest of, for you as
23   the AVP being evaluated for the Director's performance
24   evaluations to meet their consistency and plan

1   expectation numbers each month than to exceed them a

2   lot by one month and then not make them in a month?

3       *A.*     Right.  That's the example I was trying to

4   give before when I said if it was $2 million a

5   month.  So, again, there was a much greater benefit

6   to delaying that day or two in carrying it over than

7   there was to exceeding and not carrying it over; and

8   again, since there was no detriment to the claimant,

9   it just seemed to be the practice.

10      *Q.*     Was there -- did the practice include --

11  strike that.

12              Did you separately track the actual paid

13  recoveries for the months in which they happened

14  even though they may be delayed in being recorded in

15  the system?

16              MS. ZHORDANIA:  Vague.  Foundation.

17      *A.*     Can you clarify that.  I just want to make

18  sure I understand.

19      *Q.*     Yes.  So if on the 28th of the month,

20  you've met the plan number for recoveries, so now

21  you're going to delay any additional ones to record

22  in the next month, was there a practice, however,

23  someplace, somewhere to note the number of

24  recoveries beyond the 28th in the month that they

1 actually happened?

2     A.    Not to my recollection, no.

3     Q.    Okay.  When you were informed of this

4 practice, was it done in a way as to suggest to you

5 that you should not disclose that this is happening.

6 You shouldn't disclose this is happening?

7     A.    To whom?

8     Q.    Well, I started to say to others, but we

9 know you're disclosing it to some Directors.  To

10 anyone?  When you came to understand this practice

11 of delaying the recording, did you come to understand

12 that the expectation is this would not be disclosed

13 to -- is there anyone you came to understand this

14 should not be disclosed to?

15     A.    Really anything to do with the recovery

16 expectations, be they count or dollar reserve

17 information or practices surrounding that, the

18 expectation was that none of that be discussed

19 directly with the DBSs, and the premise was that,

20 you know, similar to the wording that you read

21 earlier about on that report, you know, each claim

22 should be evaluated on its own merits.  The metrics

23 were provided as historical guidance and not

24 intended to be targets and everything else that that

1  wording said.

2          So since the DBS's job was to really just

3  adjudicate their own claims, there was no -- no need

4  or there was no reason to communicate anything about

5  any kind of recovery expectations or the methods how

6  they were accounted for.  There was no reason to

7  talk to the DBSs about any of that.

8      Q.    All right.  Well, what about did

9  Ms. Griffin or anyone else caution you don't let

10 upper management know that this is going on; for

11 example, don't let Mr. McGarry know that you're

12 doing this, that we're doing this?

13     A.    I don't recall one way or the other her

14 talking about that.

15     Q.    Okay.  Or do you recall ever it being

16 suggested don't let Nancy McGee know that this

17 practice is happening?

18     A.    I don't recall either way.

19     Q.    Over your 10 years as AVP of Claims when

20 the practice was going on, did you have reason to

21 assume that management higher than Ms. Griffin were

22 aware of the practice?

23          MS. ZHORDANIA:  Did you say VP of Claims

24 or AVP of Claims?   I thought you said VP.

1          Oh, okay.  Sorry.

2     A.    I guess since it seemed to be an accepted

3     practice, and since the discussion of and

4     expectations of consistent and predictable results

5     came not only from Ms. Griffin but from people

6     higher than her, it made sense to me that they were

7     well aware of what was going on.

8     Q.    Was the manner in which you were doing

9     this delaying the recording of recoveries prior to

10    your being terminated, was it ever -- were you ever

11    criticized for it?

12    A.    Not that I recall.

13    Q.    Was the practice ever critiqued in any

14    fashion?

15    A.    Not that I recall.

16    Q.    And by that I mean, you know, someone

17    evaluating your performance that you're doing this

18    correctly; you're incorrectly?

19    A.    Not that I recall, and to the contrary, I

20    would generally receive favorable performance

21    feedback on the fact that my recovery results were

22    consistent and predictable from month to month or

23    quarter to quarter.

24    Q.    All right.  And you would get that feedback

1   from who or what source?

2       A.    From my manager, Ms. Griffin.

3       Q.    All right.  Did anybody else sign off on

4   your performance evaluations?

5       A.    Not literally sign off, meaning when I saw

6   the electronic document, it had only Ms. Griffin's

7   signature.  Whether she reviewed them with her boss,

8   that boss didn't literally physically sign off on it

9   with their signature, but whether they reviewed it

10  or were aware of it, I can't say.

11      Q.    All right.  So the goal for consistency

12  was something that was -- was a goal that was shared

13  by I think we've discussed the Directors underneath

14  you; correct?  I don't want to make this a long,

15  compound question.

16      A.    It was not shared by them to their team,

17  but it was shared in that they were aware of it.

18      Q.    Okay.  What I'm asking is the goal of

19  having consistent recovery metrics was a goal of the

20  Directors?

21      A.    Yes.

22      Q.    And it was a goal of the Vice President of

23  Individual Disability Claims as well; correct?

24      A.    Yes.

1    Q.    And it was a goal above her position as

2    well?

3          MS. ZHORDANIA:  Calls for speculation.

4    Foundation.

5    A.    I don't know, but I presume so.

6    Q.    Okay.  It was a goal for other AVPs of

7    Claims as well?

8    A.    Yes.  I think the standards that I was

9    evaluated against were consistent for anybody at the

10   same level as I was, so any other AVP.

11   Q.    In the performance evaluations, where one

12   will see, you know, mention of having consistent

13   results, would I be correct that that particular

14   measurement is coming from higher than your

15   position?

16         MS. ZHORDANIA:  Foundation.  Calls for

17   speculation.

18   Q.    You are not the one to decide, you know, I

19   think I'll put in the performance evaluation of my

20   Directors that we want consistency in the operational

21   metrics?

22   A.    Correct.  I did not put that in.

23   Q.    It came from higher than you?

24   A.    Yes.

1    *Q.*    Okay.  Was the practice, you know, delaying

2    recording recoveries until the next month ever a

3    subject of discussion in any meetings you were at?

4    *A.*    It may have been.  I can't recall

5    specifically whether it was or was not.

6    *Q.*    Okay.  You knew that this practice

7    was -- you were necessarily involved in manipulating

8    the numbers; correct?

9         MS. ZHORDANIA:  Misstates prior testimony.

10   *A.*    I don't want to say "manipulated."  I

11   would say just to be consistent that it was a delay

12   in recording them on our internal system, so.

13   *Q.*    Well, manipulating in the sense that when

14   this was done, if somebody had looked at the month

15   of November and saw there's "X" number of recoveries

16   that month, but, in fact, because of the practice,

17   there was not "X" number of recoveries, it's in that

18   sense the number that one's looking at has been

19   altered, manipulated.  I'm not looking for a

20   pejorative term.  I just don't know how else to put

21   it.

22   *A.*    Yeah, I guess, manipulated, and maybe this

23   is my own bias, but manipulated to me implies some

24   type of intent to deceive, and so that's why I'm

1   objecting to the term; but so it was altered, I

2   think is a fair term, but not done in such a way as

3   to deceive anyone, and, in fact, done in a way that

4   was consistent with how it was generally done.

5       Q.    All right.  But it was done with an intent

6   to make the numbers look better in terms of a

7   consistent -- on a consistent level; correct?

8           MS. ZHORDANIA:  Foundation and -- actually

9   withdraw that objection.

10          Go ahead.

11      A.    It was done with an intent to what I would

12  say smooth out and help achieve the numbers from

13  month to month.

14      Q.    All right.  The intent was to smooth the

15  numbers over time, the results over time?

16      A.    In order to achieve the expectation that

17  they be consistent and predictable.

18      Q.    Did it strike you or does it strike you

19  sitting here today that even though you didn't do

20  this with the intent of I think you said deceiving

21  anyone or hurting any insured, that it was, in fact,

22  not an honest accounting of the numbers?

23      A.    Well, first of all, not only was it not

24  done with the intent to hurt an insured, but, in

Case 1:19-cv-00131-TRM-CHS   Document 131-1/20/19   Page 165 of 316  PageID #:
7280

fact, it did not hurt an insured.  So I just want to

clarify that.

        But as to whether it was honest or not, I

guess I didn't think a lot about that, and the

example I gave previously that other areas of the

company, such as the sales organization, having

familiarity with them during my time in underwriting,

so I don't know that I'd characterize it as honest

or dishonest as compared to just the way the

business was done.

    Q.    Well, and it's the way business was done

in an effort as to meet the expectations and the

plan numbers?

    A.    I mean, as I said, it was beneficial to

help achieve the consistent, predictable results to

sometimes carry forward the recovery in the internal

system to the following month.  It was more beneficial

to do that than to not.

    Q.    In doing this, you necessarily would know

that the recovery numbers that are added into the

following month -- well, the recovery numbers taken

from the existing month that you're not going to end

up with -- one's not going to be looking at accurate

numbers in terms of when recoveries actually

1   happened; correct?

2       A.    I would say it's, you know, since the

3   practice was consistent, then I would argue that

4   the -- you're looking at when they actually happened

5   as in when they were actually recorded --

6       Q.    Right.

7       A.    -- not when they actually occurred as in

8   the communication to the insured, but since the

9   practice was consistent from month to month and over

10  time, I think it was an accurate representation

11  because it wasn't a situation where people, you

12  know, did it one way one month and a different way

13  the next month and yet another way the third month.

14  It was done consistently, so the information from

15  that standpoint was accurate.

16      Q.    Because consistently on a widespread

17  basis, it was done the same way over time; is that

18  what you're saying?

19      A.    That's what I believe, yes.

20      Q.    All right.  Can you think of any reason

21  that upper management would not have known it was

22  being done?

23            MS. ZHORDANIA:  I guess vague as to which

24  upper management, but go ahead.

1    *Q.*    Fair enough.  And just to be more specific,

2    can you think of any reason that management at the

3    Mr. McGarry level and/or above would not know that

4    this was being done?

5    *A.*    Well, as I said, the practice existed

6    prior to my joining the organization.  Some of the

7    upper level management that you're speaking of were

8    upper management in claims during the time that

9    preceded my joining the organization in 2006.

10         While I can't speak to what they did or

11   didn't know, it would seem unlikely to me and naive

12   of them to think that this wasn't occurring or that

13   their messaging of consistent and predictable

14   results would not, in turn, have the effect that it

15   had.

16   *Q.*    The effect of?

17   *A.*    Of delaying the recording of the results.

18   *Q.*    To meet the goals and expectations that

19   were on everybody in the claims operation, and I say

20   everybody loosely?

21   *A.*    Yeah, what I'm saying is it seems unlikely

22   to me without having personal knowledge of what they

23   did or didn't know, it seems unlikely to me that

24   they would not be aware that that was occurring on

<table>
<tr><td>1</td><td>some basis.  It seems unlikely to me that they would</td></tr>
</table>

1   some basis.  It seems unlikely to me that they would

2   not understand that the achievement of the

3   consistent and predictable results was, in part, due

4   to the fact that that was the objective.  So it

5   seems naive for me to think that they would have

6   this expectation and not understand the implications

7   of how that meant the business was run.

8       Q.    Right.  So if an expectation or a goal is

9   placed on the Vice President of Individual Claims,

10  the AVPs of Claims and the Directors of Claims to

11  meet the plan results and to do so consistently,

12  that that goal or expectation, if I'm understanding

13  what you're saying, is what's driving this reporting

14  practice?

15      A.    I'm saying that, in my opinion, it would

16  be naive for the senior management to not have an

17  understanding that what they communicated for goals

18  and objectives did not -- did not result in this

19  behavior.

20      Q.    And -- okay.  Okay.  So what's your

21  understanding as to why you were fired?

22  ███        ████████████████

23            MS. ZHORDANIA:  Asked and answered.

24            Go ahead.



Q.   Do you know was Mr. Zabel, was he within
the Benefits Operation?

A.    As I said, I forget his exact title.  I
want to say he was President of a particular
division, whether that was closed block or what, I'm
not -- I don't recall.

 

16    Q.    Yeah, I'm going to interrupt you for a

17 second.  Was that unusual that the internal audit

18 department would review some --

19    A.    I would say so.  Yes, it was unusual.

20    Q.    Okay.

21    A.    Well, let me clarify.  I suspect that as

22 part of their normal duties that they routinely

23 reviewed practices, but I would say what was unusual

24 was that I was aware of it specifically about in

1 that time frame and what they were doing.  I was not

2 typically involved or aware of what they were or

3 weren't doing.



24           MS. ZHORDANIA:  All right.  I'm going to

| | |
|---|---|
| 1 | instruct you not to answer anything where you were |
| 2 | told by attorneys, your own or one that represented |
| 3 | you, attorneys on behalf of Unum, any advice you |
| 4 | received from attorneys.  So if you can answer that |
| 5 | question without disclosing privileged information, |
| 6 | go ahead. |
| 7 | MR. DAWSON:  Well, let me understand what |
| 8 | you're instructing him. |
| 9 | MS. ZHORDANIA:  I'm instructing him not to |
| 10 | disclose privileged information.  I hope that's not |
| 11 | a surprise. |
| 12 | MR. DAWSON:  Well, what I'm trying to |
| 13 | clarify is part of what you said is don't reveal any |
| 14 | instructions from attorneys. |
| 15 | MS. ZHORDANIA:  Correct.  Because |
| 16 | privilege would be also held by Unum.  So I'm not |
| 17 | understanding the circumstances under which he was |
| 18 | terminated, but to the extent that any attorney as |
| 19 | part of investigation spoke with him, Unum would |
| 20 | claim privilege as to those as well as anything that |
| 21 | Mr. Peter received from his own attorneys. |
| 22 | BY MR. DAWSON: |
| 23 | Q.    All right.  We don't need to mark this. |
| 24 | This was Exhibit 3, if I'm reading that number |

1   correctly, of Mr. Birch's deposition.

2          And this is an Upjohn warning that bears

3   the signature of Timothy Loftus.  Do you see that?

4       A.    Yes.

5       Q.    And was Mr. Loftus terminated also?

6       A.    He was terminated, I believe, after I was

7   terminated.  So on the day I was terminated, there

8   were several other people who were also terminated.

9   I believe Mr. Loftus was terminated after that.

10      Q.    All right.  Did you have an understanding

11  that he was terminated for essentially the same

12  basis?

13          MS. ZHORDANIA:  Calls for speculation.

14      A.    I did not have specific knowledge as to

15  why he was terminated.  That, again, happened after

16  I left, and so I'm not sure.

17      Q.    All right.  Looking at Exhibit 3, which is

18  an Upjohn warning, were you asked to sign a document

19  like this?

20  ██    ██

21  ██    ████████████████████████████



22  ████████████████████████



23  ██    ████

24      Q.    Approximately when?  Either how much prior

1    or the date, if you recall it?

2        A.    It was a few weeks prior.  That's about as

3    specific as I can get.

4        Q.    All right.  And at that time, reading this

5    document, were you interviewed by an attorney for

6    Unum?

7            MS. ZHORDANIA:  I'm going to object and

8    instruct the witness not to disclose anything that

9    could potentially be privileged.  Again, I don't

10   know the circumstances, but I'll leave it up to you

11   to --

12       Q.    Well, thus far my question just calls for

13   a yes or no.  It's not asking for any information.

14   It's just simply asking were you interviewed by an

15   attorney for Unum?

16       A.    Yes.

17       Q.    Okay.  And was that one attorney or multiple

18   people at the time?

19       A.    As far as I recall, it was one.

20       Q.    And who was the attorney?

21       A.    I don't remember.

22       Q.    Was it anybody that you had known

23   previously?

24       A.    It was someone whose name I knew but not

1  someone I traditionally worked with.

2      Q.    Okay.  Was the Upjohn warning that you

3  signed, did it contain the same four bullet points

4  as on the one Mr. Loftus was provided here?

5          MS. ZHORDANIA:  Foundation.

6      A.    I certainly recall signing something that

7  was called an Upjohn warning.  Whether it was

8  identical to this or not, I don't know.



1 ████████████  ████████████████

2 ██████████████████████████████████

3 ████████████████  ██████████████████

4 ██████████████

5     *Q.*    Okay.  On the same day that you were

6 terminated, you said there were several other

7 terminations.  And who were they?

8     *A.*    As far as I remember, both of the other

9 AVPs in claims were terminated.  So I previously

10 mentioned Holly Crawford and Anthony Scuderi, my

11 manager Maureen Griffin, and her manager Nancy

12 McGee.  I believe that's everyone who was terminated

13 on that day.

14 ██ ████████ ████████████████████████

15 ████████████████████████████████

16 ████████████████████████████

17 ██████████████████████████████████

18 ██████████████████████████████████

19 ████████████

20 ██ ████████

21 ██ ████████ ████████████████

22 ██████████████████████████████████

23 ██████████████████

24 ██ ██████████████████

177



```
17    Q.    Did you seek advice of your own counsel
18  about it?
19    A.    Yes.
```







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    Q.    All right.  I'm going to ask you about a

17    couple of just miscellaneous things here, so.  One

18    is you moved over to claims soon after the company

19    had entered into the Regulatory Settlement

20    Agreement; correct?

21    A.    Yes.

22    Q.    And just to get so whoever might be seeing

23    the testimony reading it, the Regulatory Settlement

24    Agreements were entered into in 2004 and 2005.  Does

1    that comport with your memory?

2         A.    It sounds about right.

3         Q.    All right.  You go into APV of Claims in

4    2006; right?

5         A.    Yes.

6         Q.    At the time you went into claims, the

7    claim reassessment process was under way; correct?

8         A.    Yes.

9         Q.    Did you have any involvement in the claim

10   reassessment process?

11        A.    No.

12        Q.    The Regulatory Settlement Agreement

13   required Unum to incorporate certain provisions or

14   dictates within the agreement; correct?

15        A.    Can you repeat that.

16        Q.    Maybe I need a different question.

17        A.    Okay.

18        Q.    Let me ask this question:  Were you

19   involved in any planning discussions about the

20   incorporation of the RSA findings and agreements

21   into the claims operation?

22        A.    No.

23        Q.    Did you have responsibility for

24   incorporating any of the RSA findings and agreements

1   into how claims were being handled?

2      *A.*    I had responsibility for understanding any

3   changes that were brought about as a result of the

4   Regulatory Settlement Agreement in terms of claim

5   practices, and I was responsible for having a

6   knowledge of claim practices whether they were

7   already existing or whether they had changed as a

8   result of the RSA.  I did not have any involvement

9   in drafting them.  I was only involved from the

10  standpoint of being responsible for implementing

11  them appropriately.

12     *Q.*    All right.  So, for example, in 2005,

13  there was an amendment to the RSA that required

14  that the company extend significant weight to the

15  opinions of treating doctors.  Do you know what I'm

16  referring to?

17     *A.*    Yes.

18     *Q.*    Did you take any steps to see that that

19  was happening?

20     *A.*    Yes.  That was part of my review of claims

21  that I was asked to review or to weigh in on.

22     *Q.*    Explain what you're saying there.

23     *A.*    So you asked if the requirement that Unum

24  give significant weight to the findings of a

|   |   |
|---|---|
| 1 | claimant's attending physician was something that I |
| 2 | was aware of and put into practice in my review of |
| 3 | claims, and I'm saying that, yes, so if I were |
| 4 | reviewing a claim, and that was a relevant factor |
| 5 | for why I was reviewing it, then I would take that |
| 6 | into account as the RSA and as our claim guidelines |
| 7 | required. |

1     claimant's attending physician was something that I

2     was aware of and put into practice in my review of

3     claims, and I'm saying that, yes, so if I were

4     reviewing a claim, and that was a relevant factor

5     for why I was reviewing it, then I would take that

6     into account as the RSA and as our claim guidelines

7     required.

8          Q.     All right.  Did you take any steps to try

9     to see that others making decisions on claims were

10    applying the significant weight amendment language?

11         A.     Others who reported to me, yes.  Others

12    who did not report to me, I would not have had

13    involvement with.

14         Q.     So Directors that reported to you, what

15    did you do to try to ensure that they were complying

16    with the 2005 amendment about significant weight?

17         A.     I would say primarily two things.  The

18    first would be, again, if I had occasion to review a

19    claim as part of my responsibilities, then that, you

20    know, that would be one of the aspects that I would

21    look at.  And, secondly, one of the primary functions

22    of the QCC that we've talked about whose role was to

23    review claims that the Director was recommending for

24    denial, one of the important roles of the QCC was to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

evaluate the recommended decision against the
requirements of the RSA and the company's guidelines
to make sure that they were -- that the decision was
compliant with that, which would include, among
other things, giving significant weight to an
attending physician's decision -- or opinion.  Excuse
me.

    Q.    So do you believe that the Director,
Directors underneath you that would be authorizing a
denial or termination of benefits to have the claims
then sent on to the QCC, that those Directors
should, in the first instance, be applying the
significant weight standard of the amendment?

    A.    Yes, it was their responsibility to ensure
that the claim was being handled in accordance with
Unum's guidelines and practices, which incorporated
the aspects of the RSA and so the Director was
responsible for ensuring that if it was applicable
to a given claim, that significant weight had, in
fact, been given to the attending physician's
opinion.

    Q.    And was the Director responsible for
having the significant weight language from the
amendment in mind as they got back the reports from

1   the OSP and/or the DMO?

2       A.    I would say yes.

3       Q.    All right.  Do you know if the on-site

4   physician and/or the dedicated medical officer would

5   be charged with being familiar with the significant

6   weight standard in the amendment?

7       A.    None of them reported to me, but my

8   understanding is that they would, in fact, be aware

9   of that, yes.

10      Q.    All right.  So the Director would be aware

11  of it, the OSP and the DMO, and then sort of the

12  final fail safe would be the QCC, in terms of

13  signing off of an adverse claim decision; is that

14  correct?

15      A.    Right.  I would say that all personnel

16  handling claims, including all the functions that

17  you just mentioned, would be expected to have an

18  awareness of the guidelines and practices and apply

19  them appropriately.

20      Q.    They should be aware of it?

21      A.    That was the expectation.

22      Q.    One of your on-site physicians, Dr. Philbin,

23  testified that he was unaware of the RSA 2005

24  amendment language.  He testified in June 2015 to

1   that effect.  Would that surprise you?

2           MS. ZHORDANIA:  Objection.  Misstates

3   Dr. Philbin's testimony and argumentative.

4           Go ahead.

5       A.    It would surprise me that Dr. Philbin or

6   any company physician involved in claims was not

7   aware of the RSA language.

8       Q.    Was there concern in the company with the

9   impact that literal compliance with the 2005

10  significant weight amendment would have on claims

11  decisions?

12      A.    I don't know.

13      Q.    You were not aware of any concern?

14      A.    Correct.  So I -- if you're asking was

15  there concern, I don't know.  I was not aware of

16  concern or none was expressed to me that I recall.

17      Q.    When you came in to claims in 2006 and had

18  responsibility for -- I'm sorry.  I forget how you

19  worded it, but implementing the RSA standards in the

20  claims handling, did -- well, did you actually see

21  the documents, the Regulatory Settlement Agreement

22  documents?

23      A.    I don't know if I saw the actual RSA

24  documents as opposed to just seeing the claim

<div style="text-align: right"></div>

1  guidelines and practices and any revisions that were

2  a response to the RSA.  I don't recall if I saw the

3  actual RSA document.

4      Q.    Well, for example, I mean, did you become

5  aware that Unum, you know, essentially had gotten in

6  trouble with the various Departments of Insurance

7  for unfair claims practices?

8      A.    So the settlement agreement, the regulatory

9  settlement agreement and the allegations of unfair

10  practices occurred prior to my joining claims --

11      Q.    Right.

12      A.    -- and so I had an awareness that those

13  were the allegations.  I had an awareness that the

14  company had entered into this agreement.  Whether

15  the company admitted or not the allegations, I don't

16  know.

17      Q.    Do you know the company was fined?

18      A.    I'm aware that there was a fine, yes.

19      Q.    Okay.  Are you aware that the Multistate

20  Market Conduct Examination included findings that

21  Unum was, for example, ignoring evidence that

22  supported payment of a claim?

23      MS. ZHORDANIA:  Foundation.

24      A.    I know that there were various allegations

<br>

1  related to claim handling practices, but not

2  specifically what they were or not specifically

3  that.  So that could have been one of the allegations.

4  I just don't know.

5    *Q.*  Do you recall of one of the allegations

6  being Unum not giving appropriate weight to Social

7  Security findings of disability?

8    *A.*  I don't recall that being one of the

9  allegations, but it's logical to me that if that was

10  a change in practice that was implemented after the

11  RSA, where it was stipulated that now significant

12  weight had to be given to the Social Security

13  Administration findings, it makes sense to me that

14  that would have been one of the allegations.

15    *Q.*  Sorry.  I'm not understanding that.  You

16  say that if that was a change in practice that was

17  implemented after the RSA.  Do you know was it a

18  change in practice implemented after the RSA?

19      MS. ZHORDANIA:  Foundation.

20    *A.*  I believe it was, yes.

21    *Q.*  Okay.  And do you know that the Multistate

22  Conduct Examination was critical of Unum not using

23  independent medical examinations when an on-site

24  doctor disagreed with an attending physician?

1    A.    I have some vague knowledge that that was

2    the case but not the specifics.

3    Q.    Did you have input into what sort of the

4    general policy would be on your AVT team -- AVP team

5    in terms of when IMEs would be used and when they

6    wouldn't?

7    A.    Typically, no.  That was a decision that

8    was made at the time of the review by the OSP or

9    on-site physician.

10    Q.    Whether a claim is going to recover, the

11    on-site physician will have a significant amount to

12    do with that, would you agree?

13    A.    Whether a claim recovers?

14        MS. ZHORDANIA:  Vague.

15    Q.    Right.

16    A.    I guess just to clarify, I would say that

17    whether a claim is denied or not.

18    Q.    Denied or terminated?

19    A.    Yes.  Because there are other types of

20    recoveries that people recover on their own and go

21    back to work.

22    Q.    All right.  I thought those were

23    resolutions, but anyway.

24    A.    Yeah.  Okay.

1       *Q.*    So if there's going to be an adverse
2   decision on a claim?
3       *A.*    And if the reason is medically related,
4   which is generally the case, then, yes, the OSP
5   would have significant involvement in that.
6       *Q.*    And in terms of being accountable or
7   having responsibility for meeting the recovery plan,
8   did you have any influence over what the OSPs were
9   doing?
10      *A.*    No, not really.  I might have influence
11  over how they might prioritize their work.  In other
12  words, if there would be occasion where, let's say,
13  a particular claimant was especially adamant that
14  they wanted a decision as soon as possible and
15  might -- that might prompt me to contact the OSP and
16  ask if he could -- he or she could prioritize that,
17  but I didn't have any influence with regard to their
18  decision.
19      *Q.*    OSPs would sometimes partner with or shadow
20  someone in claims management.  Are you aware of
21  that?
22      *A.*    No.
23      MS. ZHORDANIA:  Vague.  Foundation.  And,
24  Steve, can I just ask you how much longer do you

1  think you're going to be.  I want to text my

2  secretary.

3          MR. DAWSON:  It's a fair question.  I

4  think I'm down to one area.

5          MS. ZHORDANIA:  Okay.

6          MR. DAWSON:  I'm going to guess 15 minutes.

7          MS. ZHORDANIA:  Okay.  Thanks.

8          MR. DAWSON:  What time is it?

9          MS. ZHORDANIA:  4:34.

10          THE VIDEOGRAPHER:  What time is it?

11          MS. ROSENTHAL:  4:30.

12          MR. DAWSON:  Okay.

13  BY MR. DAWSON:

14     Q.    You mentioned that you could have some

15  input, I believe is what you said, with the OSP

16  about maybe prioritizing, getting to certain claims

17  sooner than others; is that correct?

18     A.    Yes.

19     Q.    Could you do that with regard to claims

20  that were on the change in status list where their

21  status was expected to change to recovery?

22     A.    I could have, but I don't recall doing it.

23     Q.    Okay.  Do you know if anyone did or had

24  the option to let an OSP know to prioritize such

1     claims?

2        A.    It's possible.  I'm not sure.

3        Q.    Okay.  Switch gears for a moment.  Is it

4     correct that the claim file in a claim should reflect

5     all pertinent, relevant activity that's done on a

6     claim?

7        A.    Yes.

8        Q.    And, in fact, you know that's typically

9     required by most Departments of Insurance?

10        A.    I didn't know that, but that makes sense.

11        Q.    All right.  And you agree that's something

12     that everyone should know and should do who's

13     working on a claim to document pertinent activities?

14        A.    Yes.

15        Q.    And would you expect that would be no less

16     true for on-site physicians or DMOs who are working

17     on a claim file?

18        A.    I think it would equally apply to anyone

19     involved in the claim.

20        Q.    Okay.  And it is the case, it is the

21     practice that what is given to an on-site physician

22     to review on a claim, that itself is documented;

23     correct?

24            MS. ZHORDANIA:  Incomplete hypothetical.

1  Foundation.

2      Q.    What records that they're asking -- being
3  asked to review or that they're being given?

4      A.    I mean I think there's some.  I don't
5  recall exactly what a DBS might put in their referral
6  to the OSP, but I would think that the OSP is
7  expected to review anything pertinent to the medical
8  decision they're being asked to weigh in on.

9      Q.    All right.  And you would expect that
10 anything that is being provided to the OSP to review
11 for a claim, one could pick up the file and see what
12 those things are?

13     MS. ZHORDANIA:  Foundation.

14     A.    Right.  Again, as far as what's provided
15 to the OSP, my understanding is that the file is
16 provided to the OSP, not just particular parts of
17 it.  So by that anything that's in the file, which
18 we've established should be anything pertinent or
19 relevant, the OSP should have access to.

20     Q.    All right.  And then the OSP will do a
21 report based upon their -- based upon what they've
22 done.  Let me leave it at that.  Correct?

23     A.    They will provide a written response,
24 summarizing their review and their findings and

1    their opinion on the case.

2        Q.    All right.  For example, I've reviewed

3    doctor so and so's records and the specialist

4    records and?

5        MS. ZHORDANIA:  Foundation.

6        A.    I think that would be fairly common, yeah.

7        Q.    Okay.  And so I guess what I'm asking is

8    what the OSP actually then looks at in his or her

9    review, that should be -- will be documented in the

10    file; correct?

11        MS. ZHORDANIA:  Foundation.  Asked and

12    answered.  Incomplete hypothetical.

13        A.    You asked if what they review should be

14    documented?

15        Q.    Yes.

16        A.    In other words --

17        Q.    In their report.  Here's what I looked at.

18    Here's my answer to your questions, and here's my

19    opinion.

20        A.    I think generally, yes, I can't say for

21    sure that every single document or piece of paper

22    that the OSP looks at would be listed in their

23    report, but the expectation would be that they

24    review everything pertinent to the medical situation,

1   but they may not list every test result that they

2   look at or every finding or.

3       Q.    Would you agree that everything they look

4   at that is material to their opinions and conclusions

5   would be -- should be listed in their report?

6           MS. ZHORDANIA:  Asked and answered.

7   Foundation.  Incomplete hypothetical.

8       A.    Again, I would expect that they at least

9   generally summarize the material they looked at.

10  So, for example, if they looked at 100 pages of a

11  medical report that contained, you know, 60 pages of

12  narrative and 40 pages of test results, I would not

13  expect that they would individually list every EKG

14  or X-ray or MRI or whatever the case may be, but I

15  would expect that they would indicate that they

16  have, in fact, reviewed the entire file, inclusive

17  of the various test results.

18      Q.    All right.  And in speaking of that and

19  what they have reviewed should be within the file;

20  correct?

21          MS. ZHORDANIA:  Objection.  Foundation.

22  Incomplete hypothetical.

23      A.    The claim file should contain anything

24  that's pertinent or relevant to the claim; so, they

<sub>1</sub> should be reviewing everything that's in the claim

<sub>2</sub> file, and I don't see what -- I can't think of what

<sub>3</sub> they might be reviewing that isn't in the claim

<sub>4</sub> file.

<sub>5</sub>     *Q.*    All right.  But certainly if they're

<sub>6</sub> reviewing something that's not in the claim file

<sub>7</sub> that's pertinent, you know, comment should be made

<sub>8</sub> somewhere, so somebody picking up that file knows

<sub>9</sub> that; correct?

<sub>10</sub>          MS. ZHORDANIA:  Objection.  Asked and

<sub>11</sub> answered.  Foundation.  Incomplete hypothetical.

<sub>12</sub>     *A.*    If that were the case, I guess that's

<sub>13</sub> true, but, again, I can't think of an example of

<sub>14</sub> something that they would be reviewing that isn't

<sub>15</sub> already in the file.

<sub>16</sub>     *Q.*    Well, for example, if the OSP -- OSPs will

<sub>17</sub> often review surveillance video footage; correct?

<sub>18</sub>     *A.*    Yes.

<sub>19</sub>     *Q.*    And the surveillance footage is part of

<sub>20</sub> the file; correct?

<sub>21</sub>     *A.*    It is.  I want to say that, you know,

<sub>22</sub> because it's a physical sometimes a physical disk or

<sub>23</sub> whatever, that sometimes it was kept maybe

<sub>24</sub> separately, but there was reference in the claim

file to its existence.

Q. That's what I mean whether there's a link to get to it or a reference that there's surveillance video, so somebody knows whatever file cabinet they're kept in, that the file is self-contained enough to at least convey that; correct?

A. Yes.

Q. Okay. If an OSP is going to review a prior claim of an insured's from 20 years earlier, should there be either a reference to that fact by the OSP or should that prior claim information now be part of this claim file?

MS. ZHORDANIA: Foundation. Incomplete hypothetical, and I also renew my objection regarding a former employee whose testimony would not be binding on defendants on this subject matter.

Go ahead.

A. I don't think an OSP reviewing a prior claim file would be specifically listed in the documents that they reviewed, but what I would expect, what typically occurred, I believe, is that I have mentioned earlier that the claim files were electronic as opposed to paper, and so typically what would happen is that the prior claim file, so,

in your example, the 20-year old claim file, an electronic photocopy would be included in the current claim file and become part of that file.

*Q.* All right. And does it happen sometimes that in a current claim, an older file that was closed years earlier might be retrieved for whatever relevant information in the current claim?

*A.* I would say more often than not if there are prior files or prior claims, those should be reviewed and incorporated into the current claim.

*Q.* All right. And, again, if one picks up the claim file, they can see that that was done?

*A.* That should be the case, yes.

*Q.* Okay.

*A.* There might be some exceptions, but generally, yes.

*Q.* All right. We had testimony yesterday from the OSP on Dr. Biliack's claim that he had reviewed a prior claim of Dr. Biliack's from many years ago, 18 actually. Again, if that was true, consistent with your testimony, you should see reference somehow of that in the file?

MS. ZHORDANIA: Objection. Mischaracterizes Dr. Philbin's testimony and calls for speculation.

1  Lacks foundation.

2         Go ahead.

3     A.    I would not necessarily expect the OSP to

4  have listed, itemized that he reviewed the prior

5  file, but I would expect that a copy of the prior

6  file generally be included in the current claim

7  file, and therefore, since the expectation is that

8  the OSP review any pertinent medical information,

9  that by extension, the pertinent medical information

10 in the 18-year-old claim file should be included as

11 well?

12    Q.    All right.  If the OSP chooses to review

13 surveillance from the 18-year-old claim file and

14 believes that the surveillance from 18 years earlier

15 is material or pertinent to the OSP's opinions,

16 would you agree there should be reference to the

17 fact that that has happened?

18        MS. ZHORDANIA:  Incomplete hypothetical.

19 Calls for speculation.

20        Go ahead.

21    A.    Same answer as I gave previously that I

22 would not necessarily expect the OSP to list that as

23 something that they reviewed.  They may or may not,

24 but I would expect that that information be either

1   included in or referenced in the current claim file.

2       Q.    So to understand your answer, you're

3   saying that you would expect that the prior

4   surveillance be part of the current claim file;

5   correct?

6           MS. ZHORDANIA:  Same objection.

7       A.    If it was relevant, yes.

8           MS. ZHORDANIA:  Same objection.

9       Q.    Okay.  Though you might not expect the OSP

10  if he has reviewed the surveillance to note that he

11  had reviewed the surveillance?

12      A.    Correct.

13      Q.    If the OSP reviewed the prior surveillance

14  and in doing so, influenced his opinion on the

15  current claim, would you not then expect the OSP to

16  note that as part of his review?

17          MS. ZHORDANIA:  Objection.  Asked and

18  answered.  Incomplete hypothetical.  Foundation.

19  Lacks foundation.

20      A.    I'm not sure, but I think it's reasonable

21  that if the OSP is relying on the prior surveillance

22  as a significant part of the rationale for his or

23  her decision, that there be some reference to it,

24  but I don't know if that's required.

1      Q.    Well, wouldn't it especially be important

2    if the OSP is relying upon the prior surveillance as

3    part of his rationale for his decision that it be

4    noted somewhere because the next step is a DMO is

5    going to review what the OSP has done and decide

6    between the OSP's rationale and the treating

7    doctor --

8            MS. ZHORDANIA:  Objection.

9      Q.    -- correct?

10           MS. ZHORDANIA:  Lacks proper foundation

11   and compound also and assumes facts not in evidence.

12           Go ahead.

13     A.    I'm sorry.  Could you repeat that.

14     Q.    Yeah.  So if an OSP concludes that an

15   insured's restrictions and limitations are not

16   supported, then before that there's an adverse

17   decision on that claim, under the current -- or the

18   practice at Unum at least when you were last there,

19   that would go to a DMO for review first; correct?

20     A.    My recollection is sometimes a DMO and

21   sometimes an independent medical examiner.

22     Q.    One or the other?

23     A.    Right.

24     Q.    If it goes to a DMO to review the OSP's

1   decision, what's your understanding of what the

2   DMO's doing?  What are they being asked to do?

3       *A.*    They're being asked to review all the

4   pertinent information in the claim and make a

5   decision as to whether the OSP's decision or -- is

6   appropriate.  Typically the DMO has a -- well, maybe

7   I shouldn't say typically.  Often the DMO has a

8   higher level of expertise in a particular medical

9   specialty that is in question for the claim.  So,

10  whereas, the OSP might be more of a generalist,

11  let's say, the DMO many times is a specialist in a

12  certain area, whether that's, you know, orthopedic

13  or cancer or whatever medical discipline we want to

14  say.  So the DMO would be expected to use his or her

15  expertise to indicate whether they agree with the

16  recommendation made by the OSP.

17      *Q.*    All right.  And in doing so, the DMO would

18  necessarily need to know what was it the OSP was

19  looking at and relied upon for his or her opinion or

20  do you agree?

21          MS. ZHORDANIA:  Foundation.  Incomplete

22  hypothetical.

23      *A.*    Again, my understanding is that the DMO is

24  responsible for reviewing the file and the

<div style="text-align:right"></div>

1   information contained in it.  I don't think that the

2   DMO should be limited to only what the OSP lists as

3   what they reviewed.  I think that's a helpful

4   guidance and provides some information, but I don't

5   think it should be considered all inclusive.

6   *Q.*   And I didn't mean to suggest that.  Just

7   the opposite and that is that the DMO should start

8   with at least what the OSP had.  Would you agree

9   with that?

10          MS. ZHORDANIA:  Asked and answered.

11  *A.*   I'm not sure what their process was as far

12  as what they started with, but I would say that, you

13  know, presumably the OSP is reviewing all the

14  pertinent information in the file, whether it be

15  medical or surveillance.  It's my understanding it

16  is the DMO's responsibility to do the same thing and

17  conduct their own review.

18  *Q.*   Stated differently, if the OSP had the

19  whole file available to him, the DMO should have the

20  whole file available to him or her?

21  *A.*   Yes.  That was the practice.

22  *Q.*   Okay.  If the OSP had prior surveillance

23  available to him, the DMO should have the prior

24  surveillance available to him or her?

1     A.    Yes.

2     Q.    Okay.  In the claim file, this claim

3 file -- and I had hard copies before I lost

4 them -- this is Bates 415.

5           MS. ROSENTHAL:  Yeah.

6     Q.    In fact, you have the claim file there.

7 If you find 415.

8           THE WITNESS:  Which one am I looking at?

9 The bottom?

10          MS. ZHORDANIA:  Yes.

11          THE WITNESS:  415.

12          MS. ZHORDANIA:  Mm-hmm.

13          THE WITNESS:  Okay.

14 BY MR. DAWSON:

15     Q.    You see at the top it says "Claim

16 Document"?

17     A.    Yes.

18     Q.    And it's a "Note to File."  The note says,

19 "I requested claim 001 (both policies).  We paid

20 benefits on claim 001 for the period of 2/4/98 to

21 5/5/2000, less 90-day EP," elimination period.

22          Do you see where I'm referencing?

23     A.    Yes.

24     Q.    "However, I did get a call from Cindy

1   Boucher in Records Operations.  Cindy advised that
2   the insured's prior claim file was destroyed as it
3   has been over seven years old."
4           Do you see that?
5       A.   Yes.
6       Q.   If at a later time in the handling of
7   Dr. Biliack's claim in 2015 this prior claim file is
8   searched for again and is found and is going to be
9   used, would you expect there to be some sort of
10  comparable note reflecting that?
11          MS. ZHORDANIA:  Calls for speculation.
12      A.   I don't think so.  I would expect since
13  the normal course of events is that the prior file
14  is included, I'm not surprised to see a notation
15  when that's not the case, but I might be surprised
16  to see a notation when what is normally the case is
17  the case.
18          So in other words, you document an
19  aberration to a practice, not the practice itself.
20      Q.   You would expect the older file to be
21  included in the current file if the older file is
22  found; correct?
23          MS. ZHORDANIA:  Incomplete hypothetical.
24  Calls for speculation.

1    A.    If the older file is found -- and just to

2    clarify, I'm not a records retention expert, but

3    there are people at the company who are who

4    stipulate and determine how long records should be

5    kept.  The seven-year time frame rings a bell as

6    something that is a generally accepted not only Unum

7    practice but probably industry, and I suspect there's

8    some relevance to what insurance departments expect,

9    but in any event, if a prior file exists and can be

10    found, since some of the older files are paper, then

11    that file should be incorporated into the current

12    claim file, either by virtue of an electronic copy

13    or virtue of a reference to a paper file that exists

14    and is accessible.

15    Q.    All right.  So the prior file, you would

16    expect, would be incorporated into the current file,

17    and the current file is going to reflect that either

18    by virtue of there's the prior file or reference to

19    the prior file.  Am I understanding correctly?

20    A.    Yes.

21    Q.    And that would include if you were going

22    to incorporate include surveillance from the

23    18-year-old claim, either the surveillance should be

24    there, or there should be a reference of the

1   surveillance just as there is for the current

2   surveillance?

3           MS. ZHORDANIA:  Calls for speculation.

4       *A.*     Generally, I think that makes sense.

5           MR. DAWSON:  Your turn?

6           MS. ZHORDANIA:  Do you need a break?

7           THE WITNESS:  How long are you going to

8   be?

9           MS. ZHORDANIA:  Probably longer than

10  30 minutes.

11          THE WITNESS:  A break sounds good.

12          MS. ZHORDANIA:  Okay.

13          THE VIDEOGRAPHER:  We are off the record

14  at 4:57 p.m.

15          (Short break taken.)

16          THE VIDEOGRAPHER:  We are on the record at

17  5:04 p.m.

18                  CROSS-EXAMINATION

19  BY MS. ZHORDANIA:

20      *Q.*     Mr. Peter, I don't know if you were asked

21  this before, but do you understand you are

22  testifying under oath today?

23      *A.*     Yes.

24      *Q.*     You understand it's important to tell the

1   truth?

2       A.   Of course.

3       Q.   And in your separation agreement with

4   Unum, did you agree to anything that would prevent

5   you from telling the truth today?

6       A.   No.

7       Q.   You were subpoenaed to appear for deposition

8   today by plaintiff's counsel.  Did you understand

9   that?

10      A.   Yes.

11      Q.   In other words, it was Dr. Biliack's

12  attorneys who asked you to appear today and testify?

13      A.   Yes.

14      Q.   Unum did not ask you to appear and testify

15  in this case?

16      A.   Correct.

17      Q.   And this case is not your first encounter

18  with Dr. Biliack's attorney; is that correct?

19      A.   It's my first encounter with him deposing

20  me, but I had spoken to him on the phone once before

21  in my capacity as a consultant.

22      Q.   And who are you referring to?

23      A.   Steve Dawson.

24      Q.   And why did you -- strike that.

1    Under what circumstances did you -- strike
2  that again.
3    So did you contact Mr. Dawson or did he
4  contact you regarding your services?
5    A.    Well, initially when I began pursuing the
6  consulting work, I contacted various attorneys, and
7  I believe Mr. Dawson was one of the attorneys or
8  firms that I e-mailed or called.
9    Subsequent to that, maybe a few months
10 later, I'm not sure, he contacted me to discuss a
11 case that I think he was working on, and we talked
12 about the case for maybe half an hour or so, and it
13 was determined that -- I don't remember the specifics,
14 but I want to say that it was a very specialized
15 case, and I did not have the particular expertise
16 that he was looking for.  So we -- that became
17 apparent after we kind of, you know, talked in
18 general terms about the details of the case.
19   Q.    So Mr. Dawson contacted you in connection
20 with potentially retaining you in another case as a
21 consultant.  Did I get that right?
22     MR. DAWSON:  Objection.  Leading.
23   A.    Mr. Dawson contacted me to talk about a
24 case, and my understanding was that if I had the

1   necessary expertise that he would have considered

2   hiring me.  I don't know if that was his intention,

3   but that was my understanding.

4       Q.      During your employment at Unum Group, did

5   you directly supervise any of the on-site physicians?

6       A.      No.

7       Q.      Did you supervise any Designated Medical

8   Officers, also referred to as DMOs?

9       A.      No.

10      Q.      You mentioned that surveillance reports

11  were kept separately or something to that effect.

12  Do you recall that?

13      A.      I think I said sometimes they

14  were -- there was -- I think sometimes they were

15  part of the claim file and sometimes there was a

16  reference in the file that there was a separate

17  surveillance disk or CD or whatever it was called

18  that existed, but it was because it was a physical

19  thing as opposed to an electronic document, it was

20  housed separately.

21      Q.      Are you aware of any Unum policy

22  that -- written policy that required an on-site

23  physician who reviewed maybe surveillance from a

24  prior claim for him to have to incorporate it into

<pre>
 1   the existing claim file?
 2        A.    No, I'm not.
 3        Q.    Do you know what OSPs' general
 4   practice -- OSPs' general practice was with respect
 5   to reviewing surveillance from other previous claim
 6   files and what they did with surveillance after
 7   reviewing them?
 8        A.    Not specifically, no.
 9        Q.    From time to time -- strike that.
10              You testified that based on your
11   understanding, on-site physicians did not always
12   list everything they reviewed in connection with the
13   claim.  Did I get that testimony correctly?
14        A.    That was my testimony.  That's my
15   understanding, yes.
16        Q.    And do you understand why that is?
17        A.    Well, many of the claim files are very
18   large.  I mean, some of them, you know, if they were
19   printed would be thousands of pages, and so I think
20   the example I gave was that, you know, if there were
21   100 pages of medical records, and 60 of them were
22   narrative notes, and 40 of them were various test
23   results that it would be cumbersome and time-consuming
24   to literally list every single page and report and
</pre>

1  everything; so, it seems to make sense that as a

2  matter of practice, someone might reference, you

3  know, the test results as opposed to listing every

4  single test that comprised those results.

5      *Q.*    And you mentioned that you were terminated

6  by Unum Group sometime in 2016. When in 2016 were

7  you terminated?

8      *A.*    October.

9      *Q.*    Do you know what Unum's general practices

10  or procedures have been since October 2016 to the

11  present?

12      *A.*    No.

13      *Q.*    Let's talk about the Biliack case. Do you

14  recall Dr. Biliack's claim at all?

15      *A.*    No.

16      *Q.*    Do you recall having any conversations

17  with Liz Wetton regarding Dr. Biliack's disability

18  claim?

19      *A.*    No.

20      *Q.*    Do you recall reviewing the claim file

21  pertaining to Dr. Biliack's disability claim at all?

22      *A.*    No.

23      *Q.*    You testified about so-called CIS reports

24  earlier today. Do you recall that?

1     *A.*    Yes.

2     *Q.*    You stated that Directors would input

3 certain information in order for a CIS report to be

4 generated.  Did I get that right?

5     *A.*    Yes.

6     *Q.*    Can you tell me what is your understanding

7 as to what report or paperwork did it -- would a

8 Director fill out in order for a CIS report to be

9 generated for your purposes?

10     *A.*    My recollection is that there wasn't

11 necessarily paperwork.  It was an online system or

12 database, and in the course of their duties as a

13 Director when they were reviewing a claim file or

14 working with a DBS on a claim file, if it appeared

15 that a change in status was upcoming, and the change

16 in status could be a recovery, it could be that the

17 claim was moving from active to inactive management.

18 It could be a claim that was moving from residual to

19 total or vice versa, any type of change in status

20 that the Director became aware of, they were

21 expected to enter that information into this online

22 system.  I don't remember everything that it

23 included, but it was basically, you know, claimant's

24 name, policy number, the date that they -- or the

1    month that they expected the change in status,

2    something like that.

3        Q.    Now, Ms. Wetton testified in this case

4    that she did not input Dr. Biliack's claim into a

5    CIS report.

6        A.    Okay.

7        Q.    If you assume that Dr. Biliack's claim

8    wasn't input in that system you just talked about,

9    would you expect to see Dr. Biliack's claim on the

10   CIS report that you received?

11       A.    No.  The report that I saw was based on

12   the data or the information that the Directors

13   input.

14       Q.    And if Dr. Biliack's claim wasn't on the

15   CIS report, would his claim be one of the claims

16   you'd be following up with Ms. Wetton on?

17       A.    Typically, no.  I wouldn't be aware of it.

18       Q.    Based on your ten-year employment history

19   as AVP of Claims, can you tell me what procedures

20   were in place to ensure that a particular claim was

21   adjusted and handled fairly.

22       A.    Sure.  I mean the expectation --

23            MR. DAWSON:  Objection.  Assumes facts not

24   in evidence.

1    *Q.*    Go ahead.

2    *A.*    I think as we've talked about before, the

3    expectation was that every claim be handled on its

4    own merits and every claim be handled fairly.

5         There were several safeguards in place to

6    help assure that.  One would be the Director

7    themselves who was responsible for the reviewing the

8    work of their DBSs.  We've talked about in the case

9    of a recommended claim denial how it was not only

10   the Director but also the QCC who had to sign off.

11   In addition to that, there were ongoing quality

12   audits of claims.  Each Director had -- excuse

13   me -- each DBS had a certain number of claims

14   reviewed over the course of a year, and those

15   reviews were done by an outside -- not outside Unum

16   but outside of claim operations area.  There was a

17   specific area that did the quality reviews, and

18   that's all that those individuals did.  They didn't

19   handle actual claims.  They just did the quality

20   reviews, and so whenever those reviews were done,

21   the findings would be shared with the Directors, and

22   the Directors were expected to, you know, discuss

23   the findings with their DBSs and compliment them on

24   things they had done well and help coach and mentor

```
1   them on areas for improvement.
2        Q.    And you mentioned earlier today that there
3   was also an Appeals Department?
4        A.    Yes.
5        Q.    And what was their role of an Appeals
6   Department with respect to denial of claims?
7        A.    So, again, there were -- every claimant
8   had the opportunity to appeal the decision to deny
9   their claim.  I think what I said was that in some
10  cases the appeal would be without the claimant
11  submitting any new information and sometimes the
12  claimant would submit new information, but in any
13  event, the appeal was conducted independently of the
14  DBS or the Director or the QCC who had been involved
15  in the claim, so it was a totally new, separate
16  review, and I think one of the documents that I was
17  provided with was an e-mail from one of the appeals
18  specialists, and so that was one way that the
19  Director and myself as an AVP would kind of keep
20  track of the quality of work that was done by a DBS.
21  So it would be relevant if a DBS had a claim that
22  they had denied where the decision was overturned on
23  appeal.
24            If the decision to overturn it on appeal
```

1  was based on new information that the DBS did not
2  have access to, then generally you wouldn't fault
3  the DBS, because they didn't have that information,
4  but if the appeal was overturned based on no new
5  information, so this is an independent person
6  reviewing the claim file in comparison to our
7  practices and procedures, if that appeals specialist
8  indicated in their review, and these were generally
9  long-tenured, highly experienced people who were
10 doing the appeals reviews, then if the situation
11 were that the appeals specialist indicated that the
12 decision should be overturned without any new
13 information, then that would, you know, give
14 occasion for the Director to discuss with the DBS
15 why that was the case, and if it was determined that
16 some policy or practice had not been followed
17 appropriately, then that would be utilized as a
18 learning tool for the team.
19      Q.    During your 10-year experience in claims
20 as AVP, did you ever suspect anyone you supervised,
21 either a DBS or a Director, of improperly denying
22 claims?
23      A.    No, I didn't, and as we've just talked
24 about, we had quite a few safeguards in place that

```
 1   would give us a heads up or make us aware of that.

 2        Q.    During your 10-year -- during your work as

 3   AVP of Claims for Unum Group, did you ever suspect

 4   any Director of improperly denying or closing claims

 5   in order to meet certain metrics?

 6        A.    No.

 7        Q.    If you had suspected that any Director was

 8   engaged in such conduct, what would you have done?

 9        A.    Well, to start with, I would have, you

10   know, not only reviewed that -- the file that caused

11   me to have the concern, but I would probably have

12   reviewed a wider sampling of the Director's work.

13             Depending on the situation, I may or may

14   not have asked for assistance from our Quality

15   Review Department.  I probably would have made my

16   manager aware of it.  I probably would have spoken

17   with the Director about it once the evaluation was

18   complete.  So it's hard to say everything, but

19   that's kind of what comes into mind as what I would

20   likely have done.

21        Q.    You supervised Elysabeth Wetton?

22        A.    Yes.

23        Q.    For how long?

24        A.    My recollection is that she reported to me
```

1  a couple of different times.  So, in aggregate, I

2  want to say three or four years maybe.

3       Q.     And during those times, did you ever

4  suspect Ms. Wetton of denying or closing a claim to

5  meet performance metrics or any other improper reason?

6       A.     No, I didn't suspect that, and I received

7  no metrics or information that would have made me

8  think that.

9       Q.     How would you describe Liz Wetton?

10       A.     I would describe her as a dedicated,

11  hard-working Director.  She had the respect of the

12  DBSs who worked for her.  She had my respect.  She

13  was very level-headed, very practical, I would say,

14  logical, you know, good critical thinking skills.

15  She was a good Director.

16       Q.     Did Ms. Wetton ever tell you anything that

17  led you to suspect that she -- strike that.

18            Did Ms. Wetton ever tell you anything that

19  made you suspicious or concerned about the way --

20  about the manner in which she was approving denials

21  of claims?

22       A.     No, not that I recall.

23       Q.     Do you know -- do you recall a DBS by the

24  name of Jodi Bishop?

1      A.      Yes.

2      Q.      How often did you interact with her?

3      A.      I mean she didn't report to me directly.

4  She reported to a Director who reported to me, so I

5  would say it was, you know, regular, but infrequent,

6  you know.  I would see her in the hallway.  I would

7  ask her how things were going and talk to her and,

8  you know, periodically I would meet with the DBSs to

9  we call them skip level one-on-ones, so instead of

10  meeting with their Director, who's my direct report,

11  I'd meet -- you know, I'd skip a level and meet

12  directly with the DBS, and so I'm sure I did it with

13  Jodi, as I did it with all of them from time to

14  time, and, you know, I didn't have any reason to

15  think anything other than that she was a good DBS.

16      Q.      Did you ever suspect any improper claims

17  handling on behalf of Jodi Bishop?

18      A.      No.

19      Q.      You talked about managerial meetings, I

20  believe.  Does that sound right?

21      A.      Yes.

22      Q.      Can you tell me what types of things you

23  would discuss with your Directors during those

24  managerial meetings?

1    A.    Sure.  So we had a standing weekly staff

2    meeting for my team.  We didn't always have them, so

3    in a given month, we might have a couple or three

4    maybe.  We would speak about whatever issues were

5    going on at the time; so anything to do with the

6    operation of the business.  It could be related to a

7    staffing situation where, you know, the workload was

8    high, and there was a need to, you know, move it

9    around outside the traditional team function.  It

10   could be a situation where a DBS had given their

11   notice and was, you know, leaving the company, and

12   we wanted to talk about how we were going to reassign

13   their claims.  It could be let's say we had had a

14   bunch of recent quality reviews, and there were some

15   themes and trends that we wanted to talk about and

16   make sure people were aware of any pertinent issues,

17   we would talk about that.

18            So, you know, I can't list everything, but

19   it was just things that I would describe as kind of,

20   you know, routine management items that would come

21   up in the day-to-day events of managing the team.

22   Q.    Now, you evaluated the performance of

23   Ms. Wetton?

24   A.    Yes.

1    *Q.*    Can you tell me what criteria you took
2    into account when evaluating the performance of
3    Ms. Wetton?
4    *A.*    Sure.  As I think I referenced in other
5    answers, you know, there were a variety of criteria
6    that went into the performance review of any Director,
7    and those would include certainly the where they
8    were in relation to their plan expectations that
9    we've talked about a lot, but a lot of things we
10   haven't talked about in terms of, you know, each
11   Director was reviewed based on the quality of the
12   decisions that their team had made.  So I said
13   earlier that each DBS had various quality reviews
14   done and so, in turn, a given Director was evaluated
15   against how their team did collectively in those
16   reviews.  Appeal rates were a factor, so if a given
17   Director had a lot of appeal overturns, that would
18   be a factor.
19            How they worked with their team?  How did
20   they coach and mentor and develop their team?  What
21   did their team think of them?  What did their peers
22   think of them in terms of being knowledgeable, in
23   terms of being helpful team players?  You know,
24   there's a really a whole litany of factors that

1   would go into an evaluation.

2       Q.    When you evaluated your Directors,

3   including Ms. Wetton, did you put more emphasis on

4   one factor or one criteria such as paid recoveries

5   versus other factor or criteria such as quality?

6       A.    I think the three major factors, you know,

7   if I had to list them would be the paid recoveries,

8   quality, and then any kind of customer service

9   issues, so timeliness of decisions, any feedback

10  that the customers gave us, either directly or as

11  part of a survey that the company would do.

12          So I think those three areas:  the

13  recoveries, the quality of the decision, and the

14  overall customer service and timeliness were all

15  relevant, equally relevant factors, and then there

16  were some of the other things I mentioned that would

17  play a part, but I probably would maybe not give

18  them the exact same weight.

19      Q.    Based on your experience in working with

20  Ms. Wetton, did she always meet the quality standards?

21      A.    I'm not sure any Director always met them.

22  I would say that the vast majority of times she did.

23  You know, I think over the course of time, you know,

24  in a given reporting period, month or quarter or

1  something, there might be a Director who fell short

2  of the quality expectations, but all of them who

3  reported to me, including Ms. Wetton, you know, on

4  average, the vast majority of the time met or exceeded

5  the quality standards.

6      *Q.*    What about customer service standards?

7      *A.*    Same thing.  Occasionally there would be

8  something that, you know, was an aberration, but we

9  had a, you know, a variety of metrics to measure

10  various aspects of customer service and timeliness,

11  and I guess a similar answer that, you know, any

12  Director would have the occasional aberration, but

13  Ms. Wetton and the rest of my team in the vast

14  majority of situations met or exceeded the service

15  aspects.

16      *Q.*    Did Ms. Wetton always meet the paid

17  recovery metric or expectation, monthly expectation?

18      *A.*    I would say that neither she nor any

19  Director that I can recall always met the

20  expectation.

21          You know, we tried to look at it, although

22  the information and the evaluation was done monthly,

23  we tried to look at it over a longer period of time,

24  because a month -- almost anything could happen in a

1　given month, but if you look at a larger sample size,

2　if you look at it quarterly, for example, things

3　should kind of even out over time, and so, there

4　were -- I'm sure there were months when Ms. Wetton

5　did not meet what you just asked about, but I think

6　that's also true of all of the other Directors who

7　reported to me, and I'm probably -- I don't know

8　for sure because I didn't have access to their

9　information, but I think it's probably true of any

10　Director in the department.

11　　　Q.　　You testified earlier that the number of

12　claims that were expected to close and the number

13　of -- the amount of recoveries that were expected to

14　be released by the end of the month was based on

15　historical performance.　Did I get that correctly?

16　　　A.　　Yeah, I think it was -- I would say it was

17　based on historical performance with weight given to

18　the current makeup of their block of claims.

19　　　Q.　　And how did you personally refer to these

20　numbers that you would receive from Ms. Griffin and

21　communicated to Ms. Wetton?

22　　　A.　　I think probably most commonly is the

23　monthly plan expectation.

24　　　Q.　　And did you understand that the numbers

```
 1  that were provided to you by Ms. Griffin were actual
 2  targets for closures?
 3      A.    I don't recall the word "target" ever
 4  being used.  I think the way they were phrased was,
 5  you know, this is the -- I recall the word "guidance"
 6  being used.  So, again, based on historical
 7  expectation or excuse me historical performance,
 8  that these were the, you know, plan expectations for
 9  that month.
10      Q.    Did the company refer to paid recoveries
11  in reports?
12            MR. DAWSON:  Objection.  Vague.
13      A.    I think there were some reports that
14  referenced paid recoveries, yes.
15      Q.    I think earlier today you looked at Weekly
16  Tracking Quarterly View.  I believe it was
17  Exhibit 3?
18      A.    Yes.
19      Q.    Does the Weekly Tracking Quarterly Review
20  include paid recoveries?
21      A.    Yes.
22      Q.    So was it -- strike that.
23            Did the company somehow keep it a secret
24  that it was tracking paid recoveries?
```

1          MR. DAWSON:  Objection.  Foundation.

2     Vague.

3          A.     Not to my knowledge, no.

4          Q.     Do you recall any other reports that refer

5     to paid recoveries other than the weekly tracking?

6          A.     I think there were others.  At this point

7     after a couple years, I can't identify what they're

8     called, but I think it's reasonable to say that this

9     was not the only one.

10         Q.     If you look at Exhibit -- the Upjohn

11    warning -- I don't recall which exhibit it was.

12    There are four bullet points on that exhibit.  Do

13    you see that?

14         A.     Yes.

15         Q.     The first one is "Improperly coding claim

16    closures to achieve performance metrics and/or plan

17    forecasts."

18              Do you see that?

19         A.     Yes.

20         Q.     Can you tell me what do you understand --

21    strike that.

22              The first bullet point that I just read,

23    can you tell me what you understand that is -- what

24    is that referring to, based on your understanding?

1    A.    I think it's referring to what we've spent

2    a fair amount of time talking about which is the

3    delaying of the coding of the claim closure in the

4    internal system to, in some cases, cross the month,

5    in order to help achieve what we have previously

6    talked about being the consistent and predictable

7    results.

8    Q.    Based on your understanding, how did

9    improperly coding claim closures to achieve

10   performance metrics and/or plan forecasts affected

11   insureds?

12   A.    It didn't.  As I've said, the delay was

13   simply in our internal system.  There was no delay

14   to anything having to do with the claimant any type

15   of phone call or letter or any notification or

16   decision, those were all done when they should have

17   been done.  The only delay was in the internal

18   system, which had no impact one way or another on

19   the claimant.

20   Q.    The second bullet point says, "Paying

21   benefits on an under reservation of rights or an

22   'exceptional basis to be of service to the claimant'

23   to achieve 'paid recovery' performance metrics."

24            Did I read that correctly?

1     A.    I think so.

2     Q.    Based on your understanding, what does

3 that bullet point refer to?

4     A.    So there were situations where some claims

5 would be paid under a what was known as a reservation

6 of rights or ROR, and the idea behind that was that

7 there were certain claims that appeared to be headed

8 toward a decision that they would be payable claims,

9 but we didn't quite have all the information that we

10 needed.  Sometimes there was a delay, let's say, in

11 receiving information from a physician.  So if the

12 Director and DBS felt that it was likely when the

13 information was received that the claim would be

14 payable, they would pay it under this so-called

15 reservation of rights, and it was a way to designate

16 a situation where we were making a payment in order

17 to provide service to the customer.  So, again, you

18 have customers who are claiming disability.  They're

19 not able to work.  Many people, probably the majority

20 of people, you know, only have a limited time period

21 where they can sustain themselves and their expenses

22 without any income coming in.

23     So in situations where it seemed likely

24 that the claim would be payable once we had the

1  information we needed, sometimes payments would be
2  made under this reservation of rights and really
3  what we were -- the rights we were reserving was
4  that if it turned out that something changed, and we
5  obtained -- that the -- that the information we were
6  waiting for when we did obtain it, if that maybe
7  contradicted what we thought we knew or provided
8  something additional, that we, by making this payment
9  under reservation of rights, we weren't forever
10  saying your claim is approved.  We're saying based
11  on what we have now, it's approved.  Here's your
12  payment, but we reserve the right to change that if
13  we subsequently get information that changes our
14  position.
15      Q.    And based on your understanding, if at
16  least some Directors at Unum paid benefits on an
17  under reservation of rights or an exceptional
18  basis --
19          THE COURT REPORTER:  I'm sorry.
20      Q.    Based on your understanding, if some
21  Directors at Unum, in fact, paid benefits on an
22  under reservation of rights or an exceptional basis
23  to be of service to the claimant to achieve paid
24  recovery performance metrics, how would that

1   affect -- how would that have affected the insureds?

2       A.    I guess I would say that in the situation

3   or the example I described previously about what

4   reservation of rights payment was, you know, I

5   described a perfectly appropriate situation that a

6   reservation of rights payment would be made.

7           If the payment was only made for the

8   purpose of achieving the paid recovery performance

9   metrics, then that would not be appropriate, but in

10  either way, the claimant was not disadvantaged in

11  any way.  If anything, they received money that they

12  might otherwise not have received or been entitled

13  to; so not only was there no detriment to the

14  claimant, you could argue that they benefitted.

15      Q.    And the third bullet point says "Paying

16  benefits without disability or eligibility being

17  fully evaluated."

18          Did I read that correctly?

19      A.    Yes.

20      Q.    And if, in fact, some Directors or DBSs

21  paid benefits without disability or eligibility

22  being fully evaluated, how would that have affected

23  the insureds?

24      A.    Again, there would have been no detriment.

1   If that occurred, then the insured would have

2   received claim benefits that they should not have

3   been entitled to based on the terms of their policy.

4      Q.    And the last bullet point says "Paying

5   benefits prior to obtaining appropriate medical

6   confirmation confirming disability determination."

7            Did I read that correctly?

8      A.    Yes.

9      Q.    And if, in fact, some Directors or DBSs

10  paid benefits prior to obtaining appropriate medical

11  confirmation confirming disability determination,

12  how would that have affected the insureds?

13     A.    Again, as with all these, there would be

14  no detriment to the claimant, and conversely there

15  would likely be a benefit.

16     Q.    So based on your understanding, did any

17  misconduct that Unum referenced in terminating you

18  from your employment, did they affect the insureds

19  negatively?

20     A.    No.

21     Q.    What is your understanding as to why Unum

22  tracks paid recoveries?

23     A.    My understanding is that, you know, as is

24  the case in almost any business, I think, there are

certain metrics that are looked at as a way to
evaluate performance and one way to do that is look
at what has happened historically, and so all things
being equal, if you have a block of claims that has
historically resulted in "X" number of recoveries,
all things being equal, it's reasonable to expect
that the performance currently would be consistent
or similar to prior performance, so, or historical
performance.

So it was one way to measure the
effectiveness of a team if they were achieving these
results that were consistent with what had
traditionally happened over time.

Q.    Did tracking of paid recovery metric help
you in any way in managing the AVP team?

A.    I think so.  It was one way to evaluate
the effectiveness of the Directors and, in turn,
their teams and, you know, if those numbers were
dramatically off over an extended period of time,
then it raised some questions about was the team
doing what they were supposed to do?  Were they
handling claims timely.  Were they handling claims
appropriately?  Were they making the decision
favorable or unfavorable that they were expected to

1    make in a timely manner.

2        Q.    Why didn't you communicate paid recovery
3    expectations to Disability Benefits Specialists?

4        A.    Really it was because we didn't think that
5    was relevant to their job.  What was relevant to
6    their job, and it actually is contained in on this
7    weekly tracking view, the fine print that Mr. Dawson
8    read earlier, you know, kind of speaks to that, that
9    what was expected of a DBS is that they handle each
10   claim on its own merits.  As Mr. Dawson pointed out,
11   you know, the historical performance of a large
12   block of claims isn't relevant to a particular
13   claim, that one claim; and so it was thought that
14   the large numbers were relevant to a Director's
15   block of business or 250 or 300 claims, but not down
16   to the relatively small number of a DBS's caseload,
17   and so it was the DBS's job to handle every claim as
18   they saw fit in conjunction with their Director and
19   other resources, and it was not, you know, the
20   number of claims that they approved or denied or did
21   anything with wasn't relevant to their performance.
22   They were evaluated on other criteria.

23       Q.    And based on your experience, who made
24   decisions to deny claims?

1    A.    You know, the DBS was responsible for

2    handling the claim and making recommendations.  There

3    were some decisions that DBSs could make on their

4    own, and there were some that required the review

5    and approval of their manager who was the Director.

6              So typically, it would be a DBS, you know,

7    making a recommendation to their Director that a

8    claim should be denied, but they needed the

9    Director's review and approval to do so.

10    Q.    While you worked at Unum Group, did you

11    ever feel that it was improper to track paid

12    recoveries and to communicate it to your Directors?

13    A.    No.

14    Q.    Did you ever complain to anyone saying, I

15    don't think it's appropriate for me to communicate

16    paid recovery expectations based on historical

17    performance to my Directors?

18    A.    No.

19    Q.    Why didn't you think it was inappropriate?

20    A.    I guess for a couple of reasons.  First,

21    it was a long-standing practice before I joined the

22    claim organization; and second, you know, having

23    been in the company, in a different function, and

24    having some knowledge of other functions, you know,

<table>
<tr><td>1</td><td>having different metrics and measurements that we</td></tr>
</table>

1   having different metrics and measurements that we

2   used and evaluated the organization against was a

3   pretty common occurrence.  I think, you know, to the

4   best of my knowledge, every functional area in the

5   company,

6   and probably in almost any business has -- has

7   performance metrics that they're evaluated against,

8   and so it didn't, you know, since paid recoveries

9   was one of those metrics as was, you know, appeal

10  rates and reopen rates and quality percentage, all

11  those things were things that we measured, and none

12  of them seemed inappropriate.

13      Q.    If you could give a different name to paid

14  recovery expectation, what would you call it?

15      A.    I'm not sure.  I guess calling it an

16  expectation maybe makes it sound like something it's

17  not.  I don't know what I would change it to, but

18  guidance or I'm really not sure.

19      Q.    Would it be accurate to describe it as a

20  forecast?

21      A.    Yeah, I think that's fair.  It's based on

22  what's happened in the past.  It is what's forecast

23  for the future, all things being equal.

24      Q.    We talked about -- actually strike that.

1    Earlier today you talked about delivering

2    consistent results.

3    A.    Consistent and predictable results.

4    Q.    Consistent and predictable results.  Was

5    consistency expected in other areas?

6    A.    Other areas of results?  Other areas of

7    the company?

8    Q.    Other areas such as you mentioned quality,

9    reopen rates.  Was consistency expected in those

10   areas in terms of customer service, quality, reopen

11   rates?

12   A.    Yes.

13   Q.    Did you ever discuss paid recovery

14   expectations with Jack McGarry?

15   A.    I don't think I ever, you know, discussed

16   it with him in a one-on-one setting.  I mean was I

17   ever a part of a meeting where he was present and

18   that was a topic, perhaps, but not individually, no.

19   Q.    Did you ever discuss with Jack McGarry

20   Unum's practice of delaying recording of paid

21   recoveries?

22   A.    Not that I recall.

23   Q.    I'm just going to jump around a little bit

24   now because I took notes as you were testifying.

1  You said you were in underwriting before

2  you joined claims.  Did I get that correctly?

3      A.    Yes.

4      Q.    Based on your underwriting experience, how

5  important is it for the insured to be truthful in

6  his or her insurance application?

7      A.    Very.

8      Q.    Why?

9      A.    It forms the basis for the contract that

10  they're provided, so, as is the case, I think, with

11  other contracts or insurance, you know, the company

12  is issuing a policy based on the representations

13  that a person, an applicant makes, so in this case,

14  you know, we're talking about a disability policy

15  that provides benefits in the event that the

16  policyholder is unable to work, that they're disabled,

17  and so, it's very important that the person applying

18  for insurance be truthful with respect to, for

19  example, their prior medical history because that

20  would affect the type of policy or perhaps the rate

21  that they're charged or whether a particular medical

22  condition would be excluded from coverage.  It would

23  be kind of like if you, you know, insured your car

24  and didn't tell them that it was currently totaled

1  from an accident.

2      Q.    Based on your understanding, why did Unum

3  track reopen rates?

4           (Music playing.)

5      A.    I'm sorry.  I was distracted, as others

6  were.  Could you please repeat that.

7      Q.    Sure.  Based on your understanding, why

8  did Unum Group track reopen rates?

9      A.    It was a kind of a metric that helped point

10 to the quality of the decisions that were made

11 initially, and so if the -- if a given individual or

12 team had high reopen rates, then it would make you

13 look into and question the quality of the decisions

14 that were made to begin with.

15     Q.    Have you ever read the RSA?

16     A.    Mr. Dawson asked me that and I think what

17 I said is that I don't know if I read the RSA or if

18 I simply read claim practices and guidelines that

19 were written and resulted from the RSA.

20     Q.    Did you ever report to Nancy McGee directly?

21     A.    No.

22     Q.    What is your understanding of the closed

23 block organization in terms of what type of policies

24 are in there, other than IDI?

1    A.    I think the way Unum describes the closed

2    block, at least as of the time I left, is that in

3    addition to these IDI policies, it also includes the

4    long-term care block of business.

5    Q.    Based on your experience in underwriting,

6    do you know whether Unum Group issues policies,

7    disability policies?

8    A.    I don't think Unum Group is a licensed

9    insurance entity.  I think they're a parent company

10   or holding company maybe.  I think the policies are

11   issued under the respective ensuring entities, like

12   maybe Provident Life and Accident or something like

13   that.  I don't think there are policies that

14   specifically say Unum Group.

15   Q.    Do you know whether Unum Group handles

16   disability claims on behalf of nonaffiliated

17   companies?

18   A.    So by "affiliated," you mean companies

19   that Unum has an agreement with to administer their

20   claims?

21   Q.    I mean affiliated companies like

22   subsidiaries or sister companies, in other words,

23   nonaffiliated company?

24   A.    So as far as I know, Unum handles claims

<table>
<tr><td>1</td><td>from companies that they have an arrangement with to</td></tr>
</table>

1  from companies that they have an arrangement with to

2  handle, but, otherwise, they don't.

3      *Q.*    And what are those companies?

4      *A.*    I can't list them all, but we've given

5  some examples before.  We talked about New York Life,

6  Equitable.  I want to say John Hancock, General

7  American.  There's probably 20 or so companies.  I

8  can't remember them all.

9      *Q.*    Okay.  Can you give me examples of paid

10 recoveries.

11     *A.*    What is a paid recovery?

12     *Q.*    Yes.  If I understood your testimony

13 earlier today, a paid recovery doesn't necessarily

14 mean a claim that was denied?  Did I get that right?

15     *A.*    Yes, it could be a situation where an

16 individual goes on claim and the nature of their

17 claim, the nature of their disability is such that

18 after a period of time they have recovered from

19 their accident or illness, whatever the case may be,

20 and returned to work.  I think the majority of the

21 paid recoveries probably fall into that category,

22 where people have a temporary disability, and

23 ultimately in a matter of some period of time, return

24 to their job.

1    *Q.*    Any other examples of paid recoveries?

2    *A.*    Not that I can recall.

3    *Q.*    What about advanced pay and close, would

4 that be a type of --

5    *A.*    Yes, it would.

6    *Q.*    Can you explain what that is.

7    *A.*    Sure.  So what we called an AP and C or an

8 advanced pay and close is a situation where based on

9 the handling of the claim, it appears that the

10 claimant will be returning to work in a relatively

11 short period of time, so let's say one to three

12 months as a guideline.

13    In some cases, it's kind of mutually

14 beneficial to not have the claimant be responsible

15 for the paperwork.  So I guess to take a step back,

16 every month that a claimant is disabled, they're

17 required to provide a statement of their disability

18 and get certification from their physician that they

19 are, in fact, disabled.

20    Certain accidents or illness, kind of by

21 their nature, suggest that they're self-limited, so

22 that they're not going to go on forever, and that in

23 a reasonable period of time, again let's say, one to

24 three months, that it seems reasonable and everything

<div style="text-align:right"></div>

1  is on track for that insured to return to work; and

2  so if it's determined that it's mutually beneficial,

3  so what I mean by that is we don't have to ask the

4  claimant or their physician to provide the paperwork,

5  we don't have to, in turn, review it, then it makes

6  sense to make this advanced payment of a month or

7  two months or three months to their expected return

8  to work date.

9          So it would be a situation where the

10  claimant and their attending physician have agreed

11  that they are, in fact, on track and planning to

12  return to work by "X" date and if they're not

13  self-employed, assuming they work for someone, then

14  the employer has also agreed to that, and so it's

15  just, I guess, a matter of efficiency to pay them in

16  advance.  So as the name implies, it's an advanced

17  payment and then a close of the claim.

18          If the claimant is subsequently unable to

19  return, if their condition worsens or there's some

20  change, then it's -- it's not a problem to reopen

21  the claim and begin paying benefits again.

22      Q.    You said that -- strike that.

23          If you saw that in a given month a

24  particular Director and his or her team were short

<sup></sup>

1   of the paid recovery expectation you had received,

2   were there any steps you could have taken to meet

3   the expectation?

4       *A.*     Steps that I would take or that they would

5   take?

6       *Q.*     That they would take or --

7              MR. DAWSON:  I'm sorry.  That who would

8   take?

9       *A.*     I was asking if she was asking is it steps

10  that I would take or that the Director would take.

11             MR. DAWSON:  Okay.

12      *A.*     So I guess the steps I would take would be

13  to just talk to the Director and find out what the

14  reasons were and if there was anything I could do to

15  help.  Do they want to talk about a claim or a

16  decision?  Do they need my help to expedite

17  something?  You know, whatever the situation may be.

18  I'm their manager, so is there something I can do to

19  help them?

20             So one example of a way, I guess, to help

21  achieve the plan expectation would be to do this AP

22  and C or advanced pay and close.

23      *Q.*     When you received a CIS report, if you saw

24  a particular claim had a large reserve associated

1  with it, did you ask any of your Directors to target

2  that claim for denial?

3      *A.*    No, absolutely not.

4      *Q.*    Did -- strike that.

5          When you saw that a particular claim on a

6  CIS report had a large reserve associated with it,

7  did you ask any of your Directors to handle that

8  particular claim in a different way than they should

9  a claim that was associated with a smaller reserve

10  amount?

11      *A.*    No.

12      *Q.*    From the CIS report, could you tell which

13  claim was from closed block?

14      *A.*    Not that I recall, no.

15      *Q.*    To your understanding -- strike that.

16          Based on your understanding, did the

17  Directors you personally supervised handle claims

18  differently from the closed block than other claims?

19      *A.*    No.  In fact, I would say that in many

20  cases, we didn't even know or pay attention to

21  whether it was part of the closed block or not.

22      *Q.*    Now, you were asked questions about I

23  believe it was Exhibit 1, Manager Toolkit.

24      *A.*    Yes.

1    *Q.*    Had you ever seen the Manager Toolkit

2    prior to today?

3    *A.*    You know, I recall the term being a

4    management toolkit, but I had not received -- I had

5    not seen this particular document or even one

6    comparable to it for a year in which I was part of

7    claims.

8    *Q.*    So during your entire time in claims, you

9    hadn't seen a document titled Management Toolkit?

10              MR. DAWSON:  Objection.  Leading.

11    *A.*    I was familiar with the term "Manager

12    Toolkit," but it was in the context of things that

13    would be helpful for a manager to know.  It was more

14    of like a human resource document that would provide

15    guidance from that standpoint of being a manager.

16    So the context, it seems to be in this case, although

17    I haven't looked at every page, this appears to be

18    more of a like a business plan, and it is identified,

19    in part, as that, but.  So I am just not familiar

20    with this document or anything that looks like it.

21    *Q.*    If you could just flip through Exhibit 1

22    and let me know whether during your entire ten-year

23    employment with Unum as AVP of Claims whether you

24    had seen a document similar to Exhibit 1.

1        (Pause.)

2        A.      So I've seen different documents that

3    include some of the aspects of this document.  I

4    don't recall seeing a document that -- one document

5    that included all of these aspects, nor do I recall

6    seeing all of these aspects in various documents.

7            What I do recall is seeing some documents

8    that include some of the material here, and I guess

9    how I would characterize this document, in general,

10   is that it's talking about certain company objectives,

11   whether they be related to revenue or customer

12   service and quality and things like that, and it's

13   kind of extending that.  So if these are the

14   corporate objectives, then here's how a particular

15   business area, so in this case, claims or benefits,

16   how that relates to them.  So what is it that

17   employees in that organization can do that ultimately

18   impact the larger corporate goal?  So it's kind of,

19   I guess, putting into perspective how people fit

20   into the big picture of the company.

21       Q.      Did you ever use Exhibit 1 to train any of

22   your Directors?

23       A.      No, I never saw it before today.

24       Q.      Did you ever use Exhibit 1 to train any of

1    your DBSs?

2        *A.*    No.

3        *Q.*    Did you ever go over with any of your

4    Directors with a document that's similar to

5    Exhibit 1?

6        *A.*    There might be certain parts of this that

7    I would have gone over; for example, there's

8    reference to people development, and, you know,

9    customer service and quality and things like that;

10   so, you know, some of those were certainly topics

11   that I would have gone over with them, but I just

12   don't recall -- not only don't I recall this

13   document.  I don't really recall a document like it

14   either.

15       *Q.*    Did you ever tell or suggest to any of

16   your Directors that their team needed to close or

17   deny more claims?

18       *A.*    No, definitely not.

19       *Q.*    Did you ever have a discussion with Scott

20   Gillaspie as to why he's copied on e-mails such as

21   the one you went over earlier today?  I don't recall

22   which exhibit it was.

23       *A.*    It looks like Exhibit 2.  Is that what the

24   circled number means?

1    *Q.*    Yes.

2    *A.*    No, I don't believe I ever had conversations

3    with him about why he was copied.

4    *Q.*    Did you ever have a discussion with anyone

5    else as to why Scott Gillaspie was copied on this

6    e-mail, Exhibit 2?

7    *A.*    No, not that I can think of.

8    *Q.*    And I'm sorry if you explained this, but

9    based on your understanding, why was Jodi Bishop

10   copied on Brenda Shepard's e-mail of March 2, 2016?

11   *A.*    She was the DBS assigned to the file, the

12   number that's sited here: 11021715.

13          So she was the assigned DBS, so this is a

14   decision that is being rendered by the appeals

15   organization.  So she's just being kept in the loop.

16   *Q.*    And why did you ask to be -- strike that.

17          Why did you ask Ms. Wetton to keep you

18   posted on the status of Dr. Biliack's claim?

19   *A.*    It was just something I did as a matter of

20   routine.  If I received information from the appeals

21   organization, then I wanted to be kept apprised of

22   what happened after that.  Again, it was a way to

23   help evaluate how a Director was doing and their

24   team and look at the quality of their decisions.

1    Q.    During your 10-year experience as AVP of

2  Claims, did you ever feel that any of your Directors

3  or DBSs were not giving significant weight to the

4  attending physician's opinions?

5    A.    Not that I can recall, no.  I think it was

6  a pretty widely accepted practice that people knew

7  about.

8    Q.    During your 10-year experience as AVP of

9  Claims for Unum Group, did you ever see a claim

10  where you felt -- strike that.

11         During your 10-year experience as AVP of

12  Claims for Unum Group, did you ever feel that any

13  Director or any particular DBS was ignoring evidence

14  in support of an insured's disability claim?

15    A.    I mean, I don't recall any specific

16  situations.  I suspect that there might have been a

17  few where I had a different opinion than they did,

18  and we would talk about the claim, but I'm not sure

19  I would have thought they were ignoring it.  I might

20  have just thought, you know, maybe they weren't

21  giving the same weight I did to it or I guess it

22  would have been worthy of a discussion.  I can't

23  remember any particular cases or even say for sure

24  that that happened, but it seems likely that over

1   10 years, that would have happened occasionally.

2       Q.    What would you have done if you felt that

3   any particular Director or a DBS was unfairly handling

4   any claim systematically?

5       A.    I certainly would have talked to them

6   about that particular claim or if it were a DBS, I

7   probably would have talked to the Director.  I would

8   have looked at other information to either corroborate

9   or not; so, I would have looked at a sample of their

10  claims or asked for help from our Quality Review

11  Department to maybe do kind of an ad hoc review of a

12  wider sample of their claims.  So, you know, one

13  example is just that one example.  So I would have

14  taken steps to try to identify whether that was a

15  trend or an aberration.

16      Q.    Did you share the paid recovery expectation

17  number with OSPs?

18      A.    No.

19      Q.    Did you share paid recovery expectations

20  with DMOs?

21      A.    No.

22      Q.    If a small claim is reopened, do you have

23  any less concern than if a large -- bad question --

24  strike that.

If a claim that's associated with larger reserve is reopened, do you have any more concerns than if a claim with a smaller amount of reserves is reversed or reopened?

A. I'm aware that the financial impact to the company is different between a small reserve and a large reserve, but it didn't impact the -- what I thought of it or the degree of significance I gave it. In fact, we were -- just as we were measured by both the count or number of recoveries as well as the financial impact, we were also measured by both the number of reopens and the financial impact; so, a count of one reopen is significant to me whether it's a small or large reserve.

Q. Do you know Mr. Birch?

A. Yes.

Q. Was he under your supervision as well?

A. For a part of my time, yes.

Q. For how long?

A. It's hard to remember for sure but a couple of years.

Q. And did you ever have any concerns about Mr. Birch not -- strike that.

Did you ever have any concerns about

1  Mr. Birch affirming denials without conducting

2  adequate review of files?

3      A.    No.  Conversely, I would say Mr. Birch was

4  known as a very thorough QCC, and, you know, his

5  opinion was widely respected in terms of his expertise

6  at his job.

7      Q.    Did you ever work with Dr. Philbin?

8      A.    I mean, we worked together in the sense

9  that we were both part of the claim department.  I

10 didn't have any, you know, particular dealings with

11 him.

12         I'm sure he reviewed claim files that were

13 in my organization, but I didn't have much contact

14 with him.  The contact with the OSPs was primarily

15 between the DBS and Director and them.

16     Q.    In this case, Dr. Biliack alleges that

17 Ms. Bishop, with the assistance of Ms. Wetton and

18 Mr. Birch, denied his disability claim intentionally,

19 knowing that he was entitled to benefits, in order

20 to meet company metrics.

21         What is your reaction to that allegation

22 based on your experience with working with Ms. Wetton,

23 Ms. Bishop, and Mr. Birch?

24         MR. DAWSON:  Objection.  Misstates the

```
1    allegations of the complaint and lacks foundation

2    for this witness to give his opinion about his

3    reaction to that.

4         Q.   Go ahead.

5         A.   I guess my reaction is surprise.  All of

6    the individuals you mentioned, Ms. Bishop,

7    Ms. Wetton, and Mr. Birch have a track record of

8    good performance, of handling claims appropriately,

9    ethically.  I have no prior experience with or

10   reason to believe that they would deny a claim if it

11   wasn't appropriate, and, in fact, Ms. Bishop wouldn't

12   even know anything about the size of the claim or

13   the reserve or anything that would have influenced

14   her decision.

15        Q.   You testified earlier today that sometimes

16   you would meet with Ms. Wetton one -- in one-on-one

17   meetings --

18        A.   Yes.

19        Q.   -- and convey to her what a paid recovery

20   expectation was for a given month.  Do you recall

21   that testimony?

22        A.   Yes.

23        Q.   Did you have an office or a cubicle?

24        A.   It was called an office, but it didn't
```

1    have a door.

2         Q.    And what about Ms. Wetton, did she have an

3    office with a door?

4         A.    Same as I had.

5         Q.    And did you sometimes meet in your office,

6    that didn't have a door or Ms. Wetton's office that

7    didn't have a door?

8         A.    Sometimes, depending on the nature of the

9    conversation.

10        Q.    And if you met with Ms. Wetton behind

11   closed doors, why was that?

12        A.    You know, as I said, periodically, probably

13   on average every other week, I would meet with each

14   Director and QCC who reported to me, and we called

15   them one-on-one meetings, and it was an opportunity

16   to talk about whatever was going on in their

17   particular team.

18            So kind of similar to my staff meetings,

19   you know, it could be a personnel matter.  It could

20   be something related to a DBS's performance or it

21   could be a variety of things that would be -- that

22   would fall into being a manager of a team, and so

23   whether it was a discussion about paid recoveries or

24   about the performance of a DBS or really about any

1  personal and confidential information, which would

2  also extend to claimant information, it was

3  appropriate to have those conversations in a room

4  with a door, so that people, you know, outside of

5  the room didn't hear what was going on and didn't

6  hear information about -- you know, it wouldn't be

7  appropriate for a DBS to hear my discussion with

8  their Director about their performance or one of

9  their peers' performances, for example.

10      Q.   Did you ever feel -- strike that.

11           Did you ever -- strike that.

12           Based on your 10-year experience in claims,

13  as AVP of Claims, did paid recovery expectations

14  play a role in any particular claim?

15      A.   No, I don't think they did.

16      Q.   Are you an actuary?

17      A.   No.

18      Q.   Do you know how actuaries actually

19  calculate their forecast or paid recoveries?

20           MR. DAWSON:  Object to the form of the

21  question.

22      A.   Not in any detail, no.

23      Q.   And you never worked as an actuary for

24  Unum Group?

1    A.    Correct.

2    Q.    Did you ever work with or for Mary Fuller?

3    A.    No.

4    Q.    How did you feel -- strike that.

5          Were you upset that Unum Group terminated

6    you from your employment?

7    A.    Yes, somewhat.

8    Q.    Were you disappointed?

9    A.    Yes.

10   Q.    Were you unhappy the way Unum Group

11   handled your employment?

12   A.    Yes.

13   Q.    Would you be -- strike that.

14         Nothing further.

15                 REDIRECT EXAMINATION

16   BY MR. DAWSON:

17   Q.    Quick follow-up.  In terms of it being --

18         MS. ROSENTHAL:  He wants to take a ten.

19         MR. DAWSON:  Oh, I'm sorry.  Quick break.

20         THE VIDEOGRAPHER:  We are off the record

21   at 6:17 p.m.

22         (Short break taken.)

23         THE VIDEOGRAPHER:  We are on the record at

24   6:27 p.m.

                    REDIRECT EXAMINATION

BY MR. DAWSON:

1    *Q.*    Mr. Peter, I'll try to jump through these

pretty quickly.

          You were being asked about the fact that

it was the plaintiff that subpoenaed you here to

testify and that Unum had not done that.

          Unum's counsel is here as your lawyer;

right?

*A.*    Yes.

*Q.*    And Unum or Unum's lawyer could talk to

you any time they wanted if they wanted to; correct?

          MS. ZHORDANIA:  Vague as to time.

*A.*    I think so, yeah.

*Q.*    Yeah.  Well, in the last five months, they

could have talked to you if they wanted?

*A.*    I guess so.

*Q.*    All right.  Under the separation agreement,

we could not have talked to you without subpoenaing

you; correct?

*A.*    That's my understanding.

*Q.*    Okay.  Paying under a reservation of

rights to affect the paid recovery performance

metrics, I believe you testified would not have any

1   detrimental impact on the insured; correct?

2       A.    Yes.

3       Q.    In fact, I think you said you could argue

4   the insured benefitted from that practice, if I

5   understand that correctly?

6       A.    Yes.

7       Q.    Would you agree that most people buy

8   insurance, disability insurance for peace of mind,

9   security?

10            MS. ZHORDANIA:  Calls for speculation.

11  Foundation.

12      A.    I think that's a common reason why people

13  buy it.

14      Q.    Right.  I mean it's that odd product that

15  we buy that we hope we don't really have to use

16  typically; correct?

17      A.    Yes.  Yes, a lot of insurance is like that

18  in a way, but.

19      Q.    Right.  And would you agree that when

20  people do suffer loss, and let's say they're

21  disabled, and they are not earning income, at that

22  point in their lives, they're often -- they're often

23  vulnerable.  Has your experience suggested that to

24  you being in the disability insurance industry all

1    this time?

2    A.    You know, I'm not sure I know the state of

3    mind of everyone, but I think to the extent that

4    someone is unable to work due to an illness or

5    injury, that that would make them feel vulnerable at

6    times.  Sure.

7    Q.    It certainly can create significant

8    disruptions in a person's life, do you agree?

9    A.    Yes.

10    Q.    To have such a person's claim accepted

11    even under reservation of rights, wouldn't it be

12    reasonable to expect an insured to make life

13    decisions and reliance on receiving benefits?

14          MS. ZHORDANIA:  Foundation.

15    A.    Well, I think the purpose of doing it

16    under reservation of rights and the explanation to

17    the claimant about what that means would indicate

18    that it's an interim decision.  What a claimant

19    chooses to do with that about making long-term

20    decisions is, I guess, up to them.

21    Q.    Well, you yourself had explained that

22    claims should be paid under reservation of rights

23    only when it is believed, based upon the existing

24    information, that the claim will be accepted without

1   a reservation of rights.  Did I understand that
2   correctly?
3       A.    I think what I said is that that seems
4   more likely than not --
5       Q.    Okay.
6       A.    -- so it may not be -- it's definitely
7   not a certainty, because we don't have all the
8   information, but, you know, it's more probable than
9   not that it would be approved.
10      Q.    Well, to accept a claim under reservation
11  of rights with the sole intent to then shut that
12  claim down to meet performance recovery or paid
13  recovery metrics is disregarding any emotional
14  impact that may have on the insured, would you agree
15  with that?
16      A.    If that were done, and I think what I said
17  is --
18      Q.    If that were done?
19      A.    -- it would be inappropriate to do that --
20      Q.    Right.
21      A.    -- but if that were done, then I could see
22  where it would adversely impact the claimant.
23      Q.    Questions about Unum tracking paid
24  recoveries and whether there's anything wrong with

<table>
<tr><td>1</td><td>that, and it is true, isn't it, that Unum doesn't</td></tr>
<tr><td>2</td><td>just track paid recoveries, but Unum provided AVPs</td></tr>
<tr><td>3</td><td>and Directors with a monthly number of paid</td></tr>
<tr><td>4</td><td>recoveries that they expect them to achieve?</td></tr>
<tr><td>5</td><td>A.    I think we've talked a lot about that --</td></tr>
<tr><td>6</td><td>Q.    Right.</td></tr>
<tr><td>7</td><td>A.    -- in terms of the information that I was</td></tr>
<tr><td>8</td><td>given by Ms. Griffin and, in turn, gave to my</td></tr>
<tr><td>9</td><td>Directors.</td></tr>
<tr><td>10</td><td>Q.    Right.  And we discussed how there's a lot</td></tr>
<tr><td>11</td><td>of ongoing follow-up to encourage the meeting of the</td></tr>
<tr><td>12</td><td>paid recovery numbers; correct?</td></tr>
<tr><td>13</td><td>A.    Well, we talked about follow-up.  I don't</td></tr>
<tr><td>14</td><td>know how much a lot is or isn't, but we talked about</td></tr>
<tr><td>15</td><td>there being follow-up.</td></tr>
<tr><td>16</td><td>Q.    Unum Group, you said, doesn't issue</td></tr>
<tr><td>17</td><td>insurance policies; correct?</td></tr>
<tr><td>18</td><td>A.    I think I said my understanding was that</td></tr>
<tr><td>19</td><td>Unum Group as an entity is a holding company or</td></tr>
<tr><td>20</td><td>parent company.  They're not officially an insurance</td></tr>
<tr><td>21</td><td>company.  So I think the insurance policies have a</td></tr>
<tr><td>22</td><td>different label on them.</td></tr>
<tr><td>23</td><td>Q.    That's what I understood you to say, yeah.</td></tr>
<tr><td>24</td><td>A.    Okay.</td></tr>
</table>

1      *Q.*    But Unum Group pays the salaries of the

2    claims employees; correct?

3      *A.*    I think of all employees.

4      *Q.*    Of all employees.

5      Unum Group is responsible for the incentive

6    compensation plan; correct?

7      *A.*    Yes.

8      *Q.*    Unum Group is responsible for the long-term

9    incentive plan, if I'm remembering the title of that

10    correctly?

11      *A.*    I think any type of compensation would

12    fall under the parent company Unum Group.

13      *Q.*    Unum Group does the training?

14      *A.*    Again, the company is Unum Group.  The

15    insuring entities as policies as filed with the

16    states are just that --

17      *Q.*    Right.

18      *A.*    -- they're not -- you know, they're not

19    the parent company.

20      *Q.*    The claims are being handled under claim

21    guidelines, promulgated by Unum Group; correct?

22      *A.*    Yes.

23      *Q.*    You testified, I believe, that you never

24    suspected a Director of improperly having denied a

1    claim.  First of all, do I have that correct?

2        A.    Yes.

3        Q.    During the 10 years that you were an AVP,

4    were there any lawsuits filed by insureds whose

5    claims were denied by your team?

6        A.    I'm sure there were, yes.

7        Q.    Lawsuits, alleging bad faith conduct?

8        A.    Probably, but I don't -- I can't recall

9    the -- you know, any specific names or anything.

10       Q.    Did you testify in any lawsuits against

11   the company when you were an AVP?

12       A.    I think the only time I testified was in

13   November of 2016 after my employment had been

14   terminated.

15       Q.    That's the only time you've been deposed?

16             MS. ZHORDANIA:  As AVP?

17       A.    As AVP of Claims.

18       Q.    Okay.  Let me ask a better question.

19             Are you saying during your tenure as AVP,

20   you were not deposed in connection with your work?

21       A.    I think there was one instance in the

22   10 years where I was deposed shortly after I

23   transitioned from underwriting to claims, but the

24   nature of my involvement, and, therefore, testimony

1    was underwriting related, not claims related.

2        Q.    All right.  Well, going back, you said

3    you -- I forget the word you used.  You think, you

4    believed that there were lawsuits filed by insureds

5    whose claims were denied by your team?

6        A.    I think that's likely.

7        Q.    All right.  What happened to those?

8        A.    I don't know.

9        Q.    Do you know if they went to trial?

10       A.    I am sure some did.  I recall people on

11   my team testifying.  I don't recall if they were

12   testifying in depositions or trial, but --

13       Q.    What have juries decided about how the

14   claims were handled?

15       A.    I don't know.

16       Q.    What have Courts decided about how claims

17   were handled on your team?

18       A.    I don't know.

19       Q.    If Unum is sued for insurance bad faith

20   and found by a jury to have acted in bad faith and

21   affirmed by a Court of Appeals to have acted in bad

22   faith, is that knowledge shared with the claims

23   operation?

24            MS. ZHORDANIA:  Calls for speculation.

1    A.    Not to my recollection, no.

2    Q.    Is this not information that you would

3    want to know if the bad faith -- there's a bad faith

4    finding by a jury?

5    A.    I think I would want to know if it were a

6    decision made by my team.

7    Q.    It could be instructional, wouldn't you

8    agree?

9    A.    It could be.  And perhaps we were instructed

10   indirectly or maybe there was a change to a policy

11   or practice as a result of a court finding that was

12   presented as a change without necessarily being

13   framed in the sense of a result of a court decision.

14   Q.    All right.  But you're speculating about

15   that, I take it?

16   A.    Yes.

17   Q.    Concerning your supervision and evaluation

18   of Ms. Wetton, was she a good Director in terms of

19   measuring her operational metrics compared to plan?

20   A.    My recollection is that she typically met

21   the expectations.

22   Q.    And was she fairly consistent in achieving

23   paid recoveries?

24   A.    To the best of my knowledge, yes, or

1   recollection.

2       Q.   All right.  Ms. Wetton was part of the

3   claims operation, I think, is it 2002?

4           MR. SANDER DAWSON:  Two thousand --

5           MS. ROSENTHAL:  Before --

6           MR. SANDER DAWSON:  Seventeen years.

7   2001.

8           MR. DAWSON:  All right.

9           MS. ZHORDANIA:  What?

10          MR. DAWSON:  He said for 17 years.  He

11  didn't have the year.

12          MS. ZHORDANIA:  Oh.

13  BY MR. DAWSON:

14      Q.   Ms. Wetton was part of the claim operation

15  before you came over to the benefits side; correct?

16      A.   That's my understanding.

17      Q.   And she was part of the claim operation

18  before the Market Conduct Examination?

19      A.   Well, if the information is accurate that

20  she began in 2001, then, yes, because the RSA was in

21  2004 or five.

22      Q.   I think it was one or two, but anyway.

23          MR. SANDER DAWSON:  2001, yeah.

24      Q.   2001.

1          All right.  And, therefore, Ms. Wetton was

2     part of the claims operation at the time of the

3     findings of improper claims practices by the

4     Multistate Market Conduct Examination, wouldn't that

5     follow?

6          A.    Yes.

7          Q.    Do you know what role Ms. Wetton may or

8     may not have had in claims where unfair practices

9     were found by the Market Conduct Examination?

10         A.    I do not.

11    ████ ███████████████████████████████████████

12    ████████████████████████████████████████████████

13    ██████████████████████████████████████████

14    ████████████████████████████████

15         Now I'm not going to ask if you know that

16    specifically, but were you generally aware that she

17    was having her reopen rates exceed what the plan

18    number was --

19         MS. ZHORDANIA:  Foundation.

20         Q.    -- in that -- to a large degree during

21    that period?

22         MS. ZHORDANIA:  Lacks foundation.

23         A.    I don't recall that being the case one way

24    or another.

1    *Q.*    Okay.  If that was the case, and I think
2    you touched on this before in your testimony, having
3    that large a number of reopens would suggest that
4    claims are being improperly denied, wouldn't you
5    agree?
6    *A.*    Not necessarily.
7          MS. ZHORDANIA:  Lacks foundation.
8    *Q.*    It could suggest that, wouldn't you agree?
9    *A.*    It could.
10   *Q.*    All right.  It would cause or it should
11   cause someone in a supervisory position of Ms. Wetton
12   to want to look into why she was having so many
13   reopened claims.  Would you agree with that?
14   *A.*    I think so.
15   *Q.*    You testified about systems being in place
16   to make sure that claims are handled fairly.  You
17   mentioned the Director and the audits, for example;
18   correct?
19   *A.*    Yes.
20   *Q.*    There were Directors in place when the
21   various Departments of Insurance fined Unum for
22   unfair interpretation of surveillance; correct?
23         MS. ZHORDANIA:  Objection.  Lacks proper
24   foundation.  Calls for speculation.

1   A.  I mean -- I don't know what the titles

2 were before I joined the organization; so, I don't

3 know if they were Directors or --

4   Q.  Supervisors?

5   A.  -- or something else.

6   Q.  Or claim handlers?

7   A.  There were some people who managed DBSs.

8 What they were called, I don't know.

9   Q.  My point is these systems that you're

10 testifying to that are overseeing whether claims are

11 being handled, it is a fact that these systems by

12 and large were in place at the time of the Market

13 Conduct Examination.  Isn't that true?

14   A.  I don't know which ones were in place at

15 the time of the Market Conduct Examination; so, I

16 can't compare that to afterwards.  My understanding

17 is that some additional practices or safeguards were

18 put into place as a result of the Market Conduct

19 Exam.

20   Q.  Well, the additional safeguard that was

21 put into place was that Unum was required to

22 institute the position of the QCC.  Are you aware of

23 that?

24   A.  I'm aware that it was put into place

1  around that time.  I'm not necessarily aware that it

2  was a direct result or not of the RSA.

3      *Q.*    Were you aware that after Unum instituted

4  the QCC position, they made them independent from

5  the claim department?  Did you know that?

6            MS. ZHORDANIA:  Vague.

7      *A.*    No.

8      *Q.*    QCCs did not report to an AVP of Claims

9  originally.  Did you not know that?

10      *A.*    I guess I didn't -- I guess when you say

11  independent of the Claims Department, so regardless

12  of whether they reported to an AVP of Claims or not,

13  I thought that they were still part of the Claims

14  Department.

15      *Q.*    No, it may have been sloppy language.  Did

16  you know that QCCs were within their own unit

17  reporting to a supervisor of QCCs, not to a

18  supervisor of claims?  Were you aware of that?

19            MS. ZHORDANIA:  Foundation.

20      *A.*    I was aware that they were in one unit as

21  opposed to being spread out, and that they reported

22  to, for lack of a more precise term, a supervisor of

23  QCCs, but I would think that that person was still

24  part of the claims organization.

1      *Q.*   And the change was made so Mr. Birch, for
2  example, was reporting to an AVP such as yourself;
3  correct?
4      *A.*   Was that change made?  Is that what you're
5  asking?
6      *Q.*   Yeah.  Change was made, and, for example,
7  Mr. Birch then was reporting to an AVP such as
8  yourself; correct?
9      *A.*   Yes.
10     *Q.*   And the AVPs we've discussed have
11 operational metrics that they're expected to comply
12 with; correct?
13     *A.*   Yes.
14     *Q.*   In terms of whether you would have had any
15 awareness of Dr. Biliack's claim following up about
16 the change in status field, we know from at least
17 from one e-mail where you said "Keep me posted," you
18 had some awareness of Dr. Biliack's claim; correct?
19     *A.*   In conjunction with the appeal, yes.
20     *Q.*   Speaking of appeals, do you believe that
21 it's fair to require an appeal to take place without
22 giving the insured the opportunity to see the whole
23 record before he or she has to do an appeal, so they
24 know what the actual evidence was that the adverse

```
1    decision was based upon?

2         A.    I mean, my recollection is that any time

3    we made a decision to deny a claim, we explained to

4    the insured, sometimes by phone, and I believe

5    always in writing what the basis for the company's

6    decision was.

7         Q.    Do you think it would be fair for the

8    insured to be able to have the documents that the

9    company's relying upon for its adverse decision?

10        A.    My recollection is that the insured did

11   have access to a copy of the documents in their

12   claim file.

13        Q.    That they would have an access to the

14   documents in their claims file; is that what you

15   said?

16        A.    Yes, my recollection is that any insured

17   would have access to the documents in their claim

18   file or a copy of their claim file upon request.

19        Q.    All right.  And, thereby, they would have

20   access to the base documents that the decision was

21   based upon; correct?

22        A.    I think so, yes.

23        Q.    And you agree that would be fair?

24        A.    Yes.
```

1    *Q.*    All right.  In terms of your being asked

2   what your reaction was to the allegations of the bad

3   faith practices here, it is a fact that the

4   allegations of improper claims practices made in

5   this lawsuit involves a claim that was handled by

6   your AVP team; correct?

7    *A.*    That's my understanding.

8    *Q.*    Sorry.  I'm not sure where I am here.

9            Claim file documentation.  You're aware

10  that the claim files should be sufficiently detailed

11  to allow, say, a regulator or auditor to recreate

12  each important decision on the claim and the basis

13  for it --

14           MS. ZHORDANIA:  Object to the extent it

15  calls for a legal conclusion or expert opinion.

16   *Q.*    -- correct?

17   *A.*    I was not aware of that as you specifically

18  outlined, no.

19   *Q.*    Well, we were talking about Market Conduct

20  Examinations.  The Multistate Market Conduct

21  Examination is not the only Market Conduct

22  Examination that has taken place of Unum claims to

23  your knowledge?

24           MS. ZHORDANIA:  Can you specify time.

1          MR. DAWSON:  No.

2          MS. ZHORDANIA:  Market -- I mean I

3    think -- which one are you referring to?

4          MR. DAWSON:  I'll take that as an

5    objection.

6          MS. ZHORDANIA:  Vague.  Objection.  Vague.

7      *A.*     My understanding is that a component of

8    the -- what I believe would be called the initial

9    Market Conduct Examinations in 2004 and 2005 -- I

10   don't know that they were the first ones, but that's

11   what I understand them to be.

12     *Q.*     All right.

13     *A.*     And so my understanding is that in

14   subsequent years there have been occasional routine

15   Market Conduct Exams that states have the right to

16   conduct of any insurance company authorized to issue

17   policies in their state.

18     *Q.*     All right.  And when State Departments of

19   Insurance exercise their right to conduct Market

20   Conduct Examinations, the insurance company is

21   expected to maintain claim files, so those auditors

22   from the Departments of Insurance can see how claims

23   have been handled.  Are you aware of that?

24          MS. ZHORDANIA:  Object to the extent it

1   calls for expert opinion or a legal conclusion.

2       A.    I'm aware that there were Market Conduct

3   Examinations that involved review of claim files; so,

4   it makes sense that the company would be required to

5   provide the claim files to the examiners.

6       Q.    Do you have familiarity with the NAIC

7   model guidelines?

8       A.    I'm aware that they exist, but that's

9   about it.

10      Q.    Would you agree that an insurance company's

11  obligated to explain the basis for an adverse claims

12  decision?

13      A.    Yes.

14      Q.    Do you know if the -- we talked a lot

15  about the historical assumptions.  Do you know if

16  the historical assumptions that you've been testifying

17  about are based, in part, on claim data that was

18  happening prior to the Multistate Market Conduct

19  Examination.

20          MS. ZHORDANIA:  Foundation.

21      A.    I don't know.  You had previously asked me

22  how far back or how many years the data represented,

23  and I said I didn't know.

24          MR. DAWSON:  That's all.

<div style="text-align:right"></div>

1          MS. ZHORDANIA:  All right.  I have a few.

2                    RECROSS-EXAMINATION

3    BY MS. ZHORDANIA:

4        Q.    I don't know if I asked you this, and if I

5    did, I apologize.  Did you ever share paid recovery

6    expectations with QCCs?

7        A.    No, not that I recall.

8        Q.    Did you ever share paid recovery expectation

9    with Mr. Birch?

10       A.    Again, not that I recall.

11       Q.    And did I understand your testimony

12   correctly that during your 10-year employment

13   history as AVP of Claims for Unum Group, you never

14   had to testify or be deposed in any case alleging

15   bad faith denial of benefits?

16       A.    What I said is that to the best of my

17   recollection, during the 10 years that I was in

18   claims, I was deposed one time, but the substance of

19   the deposition was related to my involvement when I

20   was in underwriting, and I believe it was

21   specifically related to a contestable claim.

22            So there may have been aspects to that

23   case that involved bad faith but not as far as I was

24   involved.

1    *Q.*    Okay.  So if I understand correctly, based

2    on your recollection, you were never deposed or

3    testified in a case where your team's handling of a

4    disability claim was at issue?

5         MR. DAWSON:  Objection.  That misstates

6    his testimony and it's leading.

7    *Q.*    Go ahead.

8         Let me ask you --

9    *A.*    Sure.

10   *Q.*    -- do you recall ever being deposed in a

11   case other than this case where the claims handling

12   of any of your Directors or DBSs were involved?

13        MR. DAWSON:  I withdraw my objection.  I

14   misunderstood your question.

15        MS. ZHORDANIA:  Okay.

16   *A.*    Only once which was after my employment

17   ended in October of 2016.  So one time after that, I

18   think it was November of 2016, but not while I was

19   employed.

20   *Q.*    Was either Ms. Wetton or Jodi Bishop

21   involved in that case, to your knowledge?

22   *A.*    I don't think so, no.

23   *Q.*    Ms. Bishop testified in this case that she

24   had never testified or been involved in any case

1     where her handling of the claim was at issue.  Do

2     you have a different understanding from that?

3            MR. DAWSON:  Objection.  Lack of

4     foundation.

5       *A.*     I have no knowledge one way or another.

6       *Q.*     Do you know whether there have been any

7     bad faith jury findings against Ms. Wetton or

8     Ms. Bishop?

9            MR. DAWSON:  Whoa.  Objection.  Lack of

10    foundation.  A finding would not be against an

11    individual --

12      *Q.*     Do you know --

13           MR. DAWSON:  -- it would be against the

14    company.

15           MS. ZHORDANIA:  Thank you.  I'll rephrase.

16    BY MS. ZHORDANIA:

17      *Q.*     Do you know whether there have been any

18    jury, any bad faith findings by a court or a jury, a

19    case that was handled by Ms. Bishop or Ms. Wetton?

20      *A.*     I don't know.

21      *Q.*     Do you -- earlier today you testified that

22    you don't know what Unum's policies with respect to

23    providing surveillance or you don't recall.  Do you

24    recall that testimony?

1    A.    Providing copies of surveillance to

2 insureds?

3    Q.    Correct.

4    A.    I said I don't recall, yeah.

5    Q.    And so typically when an insured requested

6 a copy of the claim file, what is your understanding?

7 What did Unum do?

8          MR. DAWSON:  Objection.  Asked and

9 answered.

10    A.    If an insured requested a copy of their

11 claim file, Unum would take the electronic claim

12 file and burn it, if that's the right term, to a CD,

13 and send that to the insured.

14    Q.    And do you know what Unum's practice was

15 with respect to if the claim file contained

16 surveillance videos or reports?

17          MR. DAWSON:  Asked and answered.

18    A.    I don't recall.

19    Q.    Okay.  That's what I wanted to make clear.

20          MS. ZHORDANIA:  That's it.

21          So we'll -- you'll forward me the original

22 transcripts, so we'll get it to the witness for

23 review or signature -- for review and signature.

24 30 days to review.

1          MR. DAWSON:  Okay.

2          THE VIDEOGRAPHER:  We are off the record

3    at 6:56 p.m.

4

5          (Deposition concluded at 6:56 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1    CERTIFICATE OF REPORTER

2        I, Julie Thomson Riley, RDR, CRR, do certify

3    that the deposition of Paul Peter, in the matter of

4    Mark Biliack, M.D., an individual vs. The Paul

5    Revere Life Insurance Company, a Massachusetts

6    Corporation; Unum Group, a Delaware Corporation;

7    Austin Jerome Philbin, M.D., an individual; Suzanne

8    Benson, M.D., an individual, on December 7, 2018,

9    was stenographically recorded by me; that the

10   witness provided satisfactory evidence of

11   identification, as prescribed by Executive Order 455

12   (03-13), issued by the Governor of the Commonwealth

13   of Massachusetts, before being sworn by me, a Notary

14   Public in and for the Commonwealth of Massachusetts;

15   that the transcript produced by me is a true and

16   accurate record of the proceedings to the best of my

17   ability; that I am neither counsel for, related to,

18   nor employed by any of the parties to the above

19   action; and further that I am not a relative or

20   employee of any attorney or counsel employed by the

21   parties thereto, nor financially or otherwise

22   interested in the outcome of the action.

23   December 12, 2018        _____

24                            Julie Thomson Riley, RDR, CRR

1  WITNESS:   Paul Peter

2  DATE:      December 7, 2018

3  CASE:      Mark Biliack, M.D., an individual vs.

4             The Paul Revere Life Insurance Company, a

5             Massachusetts Corporation; Unum Group, a

6             Delaware Corporation; Austin Jerome Philbin,

7             M.D., an individual; Suzanne Benson, M.D.,

8             an individual

9

10 DISTRIBUTION TO COUNSEL  The original signature

11 page/errata sheet was sent to Theona Zhordania,

12 Esquire, to obtain signature from the deponent.

13 When signed, please send original to Steven Dawson,

14 Esquire.

15

16 WITNESS INSTRUCTIONS  After reading the transcript

17 of your deposition, please note any change or

18 correction and the reason for it on the errata

19 sheet.  DO NOT make any notations on the transcript

20 itself.  Use additional sheets if necessary.

21

22 SIGN AND DATE THE ERRATA SHEET before a notary

23 public and return it, along with the transcript, to

24 your counsel.

1  UNITED STATES DISTRICT COURT
2             DISTRICT OF ARIZONA

Mark Biliack, M.D., an individual,
3                              Plaintiff
v.
4
The Paul Revere Life Insurance Company, a
5  Massachusetts Corporation; Unum Group, a Delaware
   Corporation; Austin Jerome Philbin, M.D., an
6  individual; Suzanne Benson, M.D., an individual,
                              Defendants
7
      I, Paul Peter, do hereby certify, under the
8  pains and penalties of perjury, that the foregoing
   testimony is true and accurate, to the best of my
9  knowledge and belief, with the addition of the
   following changes/corrections:
10
   Page  Line    Change/Correction
11 _____|_____|_____
   _____|_____|_____
12 _____|_____|_____
   _____|_____|_____
13 _____|_____|_____
   _____|_____|_____
14 _____|_____|_____
   _____|_____|_____
15 _____|_____|_____
   _____|_____|_____
16 _____|_____|_____
   _____|_____|_____
17 _____|_____|_____
   _____|_____|_____
18 _____|_____|_____
   _____|_____|_____
19 _____|_____|_____
   _____|_____|_____
20 _____|_____|_____

21 WITNESS MY HAND, this    day of          , 2018.

22
                         _____
23                       Paul Peter

24
   cc:  Steven Dawson, Esquire

**$**

**$12** [1] - 58:24
**$8,900** [1] - 102:8

**'**

**'16** [1] - 20:7
**'80s** [2] - 24:16, 25:5
**'86** [1] - 10:9
**'90s** [2] - 24:16, 25:5
**'93** [1] - 124:22
**'exceptional** [1] - 229:22
**'paid** [1] - 229:23

**0**

**00049** [1] - 88:15
**001** [2] - 205:19, 205:20
**01605** [1] - 1:17
**03-13** [1] - 283:12
**04122** [1] - 3:16

**1**

**1** [13] - 1:1, 1:2, 4:15, 6:5, 50:19, 50:21, 52:14, 246:23, 247:21, 247:24, 248:21, 248:24, 249:5
**1,500** [2] - 14:7, 115:9
**1,800** [2] - 14:7, 115:9
**10** [13] - 38:12, 60:7, 60:13, 68:15, 128:15, 145:4, 145:8, 153:21, 159:19, 252:1, 265:3, 265:22, 278:17
**10-year** [7] - 218:19, 219:2, 251:1, 251:8, 251:11, 257:12, 278:12
**100** [3] - 155:18, 196:10, 212:21
**11021715** [1] - 250:12
**11:47** [2] - 1:16, 6:3
**11:48** [1] - 6:12
**12** [1] - 283:23
**13** [1] - 269:13
**135** [1] - 5:9
**15** [6] - 8:6, 60:22, 69:7, 119:15, 119:20, 192:6
**17** [2] - 268:10, 269:13
**18** [2] - 199:20,

200:14
**18-year-old** [3] - 200:10, 200:13, 207:23
**1980s** [3] - 24:10, 24:11, 31:23
**1986** [8] - 10:2, 10:20, 14:12, 23:14, 23:16, 24:15, 25:21, 75:19
**1990s** [5] - 11:5, 23:16, 31:24, 34:11, 36:1
**1992** [2] - 124:16, 124:22
**1993** [1] - 124:16
**1994** [1] - 11:3
**1995** [1] - 33:9
**1996** [2] - 14:10, 14:20
**1997** [1] - 15:5
**1998** [2] - 10:19, 11:18
**1999** [1] - 15:21
**1:25** [1] - 75:12
**1:37** [1] - 75:15

**2**

**2** [11] - 5:3, 58:19, 88:11, 88:13, 89:17, 151:16, 151:19, 157:4, 249:23, 250:6, 250:10
**2/4/98** [1] - 205:20
**20** [5] - 10:8, 116:20, 126:10, 198:9, 242:7
**20-year** [1] - 199:1
**2001** [4] - 268:7, 268:20, 268:23, 268:24
**2002** [1] - 268:3
**2004** [3] - 181:24, 268:21, 276:9
**2005** [11] - 4:16, 51:3, 51:7, 52:9, 52:22, 181:24, 183:12, 184:16, 186:23, 187:9, 276:9
**2006** [10] - 10:9, 11:6, 11:21, 11:22, 16:9, 21:19, 23:14, 167:9, 182:4, 187:17
**201** [1] - 2:18
**2015** [6] - 13:9, 20:7, 21:17, 186:24, 206:7, 269:14
**2016** [22] - 5:7, 11:23, 11:24, 13:9, 17:19, 18:21, 19:6,

19:12, 19:14, 19:15, 19:23, 21:17, 89:18, 142:19, 213:6, 213:10, 250:10, 265:13, 269:14, 279:17, 279:18
**2018** [6] - 1:15, 6:11, 283:8, 283:23, 284:2, 285:21
**206** [1] - 2:20
**207** [1] - 3:17
**208** [1] - 4:5
**213** [1] - 3:7
**22** [1] - 110:11
**2211** [1] - 3:15
**244-8858** [1] - 1:23
**248** [1] - 110:11
**25** [1] - 2:7
**250** [6] - 14:4, 111:3, 115:6, 119:1, 122:1, 235:15
**259** [1] - 4:6
**278** [1] - 4:7
**282-3111** [1] - 2:9
**285** [1] - 1:1
**28th** [2] - 157:19, 157:24
**2:16-cv-03631-DJH** [2] - 1:9, 6:10

**3**

**3** [7] - 1:2, 5:5, 135:16, 151:21, 172:24, 173:17, 227:17
**30** [6] - 9:24, 25:19, 126:13, 177:13, 208:10, 281:24
**30(b)(6** [1] - 37:2
**300** [5] - 14:4, 115:6, 119:1, 122:1, 235:15
**31** [1] - 5:7
**333** [1] - 3:5
**363** [2] - 1:17, 6:15
**3730** [2] - 4:19, 50:23
**3731** [1] - 51:14
**3765** [1] - 4:20
**3:19** [1] - 147:13
**3:29** [1] - 147:16

**4**

**4** [1] - 151:21
**40** [2] - 196:12, 212:22
**411** [1] - 4:20
**415** [3] - 205:4, 205:7, 205:11
**43rd** [1] - 3:5

**446** [1] - 4:21
**455** [1] - 283:11
**4:30** [1] - 192:11
**4:34** [1] - 192:9
**4:57** [1] - 208:14

**5**

**5/5/2000** [1] - 205:21
**50** [7] - 4:21, 60:7, 60:12, 60:13, 64:20, 68:15, 118:21
**501-4446** [1] - 2:20
**508** [1] - 1:23
**50s** [1] - 102:9
**51** [1] - 2:18
**575-3307** [1] - 3:17
**5:04** [1] - 208:17

**6**

**60** [4] - 155:13, 155:15, 196:11, 212:21
**617-5546** [1] - 3:7
**6:17** [1] - 258:21
**6:27** [1] - 258:24
**6:56** [2] - 282:3, 282:5

**7**

**7** [5] - 1:15, 4:4, 6:11, 283:8, 284:2
**755-1303** [1] - 1:23

**8**

**86336-4233** [1] - 2:8
**88** [1] - 5:4
**888** [1] - 1:23

**9**

**90** [1] - 155:18
**90-day** [1] - 205:21
**90071-1442** [1] - 3:6
**928** [1] - 2:9
**98101** [1] - 2:19

**A**

**a.m** [3] - 1:16, 6:3, 6:12
**aberration** [4] - 206:19, 225:8, 225:12, 252:15
**ability** [5] - 8:12, 113:5, 179:5, 283:17
**able** [5] - 61:24,

97:19, 98:24, 230:19, 274:8
**absence** [1] - 178:10
**absolutely** [2] - 122:16, 246:3
**absorb** [1] - 69:14
**accept** [1] - 262:10
**acceptable** [2] - 145:23, 171:19
**accepted** [7] - 35:11, 151:12, 160:2, 207:6, 251:6, 261:10, 261:24
**access** [12] - 56:18, 59:21, 81:19, 82:1, 97:3, 194:19, 218:2, 226:8, 274:11, 274:13, 274:17, 274:20
**accessible** [2] - 54:12, 207:14
**accident** [2] - 240:1, 242:19
**Accident** [1] - 241:12
**accidents** [1] - 243:20
**accomplish** [3] - 53:8, 144:9, 150:5
**accordance** [1] - 185:15
**according** [4] - 52:14, 66:13, 100:20, 269:11
**account** [2] - 184:6, 223:2
**accountabilities** [1] - 136:16
**accountable** [8] - 83:15, 83:20, 84:1, 84:2, 84:9, 85:20, 87:20, 191:6
**accounted** [1] - 159:6
**accounting** [2] - 149:12, 164:22
**accurate** [29] - 10:21, 17:19, 22:11, 22:20, 22:22, 23:12, 23:19, 24:16, 31:10, 35:1, 43:9, 45:7, 45:13, 45:17, 45:22, 46:2, 52:9, 54:5, 103:6, 114:10, 138:13, 153:9, 165:23, 166:10, 166:15, 237:19, 268:19, 283:16, 285:8
**accurately** [1] - 16:10
**achievable** [1] - 112:18

achieve [14] - 54:1, 79:11, 151:19, 151:20, 164:12, 164:16, 165:15, 228:16, 229:5, 229:9, 229:23, 231:23, 245:21, 263:4
achievement [2] - 139:20, 168:2
achieving [5] - 85:3, 145:19, 232:8, 234:11, 267:22
acquisition [1] - 75:21
acquisitions [1] - 16:9
acted [2] - 266:20, 266:21
action [3] - 180:23, 283:19, 283:22
active [6] - 12:17, 14:2, 14:7, 115:3, 115:10, 214:17
activities [1] - 193:13
activity [1] - 193:5
actual [26] - 43:20, 46:12, 49:2, 78:4, 78:23, 82:15, 83:21, 84:3, 95:22, 95:24, 99:18, 103:22, 117:12, 126:19, 127:4, 127:9, 127:20, 128:6, 139:11, 152:14, 157:12, 187:23, 188:3, 216:19, 227:1, 273:24
actuarial [12] - 42:11, 56:6, 103:11, 113:12, 115:16, 116:13, 119:22, 120:18, 121:3, 121:11, 121:19, 123:7
actuaries [2] - 126:3, 257:18
actuary [2] - 257:16, 257:23
ad [1] - 252:11
adamant [1] - 191:13
add [4] - 58:12, 61:9, 61:24, 63:4
added [2] - 34:1, 165:20
adding [1] - 34:9
addition [9] - 47:21, 53:21, 75:22, 76:9, 103:12, 175:11, 216:11, 241:3, 285:9
additional [10] - 46:22, 91:5, 141:12,

141:21, 151:2, 157:21, 231:8, 271:17, 271:20, 284:20
adequate [1] - 254:2
adjudicate [2] - 78:10, 159:3
adjusted [2] - 136:8, 215:21
adjusters [1] - 18:5
adjustments [1] - 113:18
administer [1] - 241:19
administration [2] - 29:5, 29:6
Administration [3] - 114:10, 114:19, 189:13
administrative [4] - 60:6, 61:22, 66:11, 132:13
admissible [1] - 36:23
admitted [1] - 188:15
admonishing [1] - 138:19
advance [1] - 244:16
advanced [5] - 243:3, 243:8, 244:6, 244:16, 245:22
adverse [7] - 144:15, 186:13, 191:1, 202:16, 273:24, 274:9, 277:11
adversely [1] - 262:22
advice [3] - 172:3, 177:17, 179:13
advised [1] - 206:1
advising [1] - 153:17
affect [4] - 232:1, 233:18, 239:20, 259:23
affected [5] - 140:14, 229:10, 232:1, 232:22, 233:12
affiliated [6] - 9:20, 179:6, 179:10, 180:5, 241:18, 241:21
affirmed [1] - 266:21
affirming [1] - 254:1
AFTERNOON [1] - 6:2
afterwards [2] - 177:12, 271:16
aggregate [13] - 58:3, 58:5, 58:8, 58:14, 58:22, 65:11, 96:16, 96:19, 96:21,

97:4, 97:17, 98:6, 220:1
aging [2] - 125:19, 126:4
ago [4] - 8:10, 25:19, 88:21, 199:20
agree [40] - 25:1, 25:13, 38:12, 38:23, 39:4, 39:23, 41:18, 81:7, 103:5, 103:21, 106:24, 117:1, 117:6, 117:23, 120:17, 120:21, 121:4, 121:12, 121:17, 141:16, 142:16, 145:9, 190:12, 193:11, 196:3, 200:16, 203:15, 203:20, 204:8, 209:4, 260:7, 260:19, 261:8, 262:14, 267:8, 270:5, 270:8, 270:13, 274:23, 277:10
agreed [4] - 9:1, 9:5, 244:10, 244:14
Agreement [4] - 181:20, 182:12, 183:4, 187:21
agreement [20] - 170:3, 170:6, 176:16, 176:22, 177:4, 177:7, 177:10, 177:23, 178:3, 178:6, 178:12, 178:16, 178:22, 182:14, 188:8, 188:9, 188:14, 209:3, 241:19, 259:18
Agreements [1] - 181:24
agreements [2] - 182:20, 182:24
ahead [32] - 23:3, 37:9, 40:19, 43:1, 44:4, 52:24, 64:1, 64:23, 79:2, 94:19, 101:9, 102:15, 104:3, 111:24, 120:3, 123:13, 125:8, 133:21, 148:12, 152:18, 164:10, 166:24, 168:24, 172:6, 187:4, 198:17, 200:2, 200:20, 202:12, 216:1, 255:4, 279:7
al [1] - 6:8
allegation [1] - 254:21
allegations [11] - 188:9, 188:13,

188:15, 188:24, 189:3, 189:5, 189:9, 189:14, 255:1, 275:2, 275:4
alleged [1] - 170:1
alleges [1] - 254:16
alleging [2] - 265:7, 278:14
allow [1] - 275:11
almost [3] - 225:24, 233:24, 237:6
altered [2] - 163:19, 164:1
altogether [1] - 20:1
amendment [8] - 183:13, 184:10, 184:16, 185:13, 185:24, 186:6, 186:24, 187:10
American [8] - 29:15, 29:18, 29:21, 30:2, 30:3, 30:4, 30:6, 242:7
amount [13] - 57:22, 58:3, 60:4, 103:13, 106:1, 106:10, 127:12, 156:13, 190:11, 226:13, 229:2, 246:10, 253:3
analysis [15] - 42:2, 42:8, 42:11, 113:20, 114:20, 115:16, 115:24, 117:9, 117:17, 119:22, 120:18, 121:19, 122:8, 123:7, 125:2
analyst [6] - 94:7, 94:21, 95:3, 95:15, 95:16, 97:7
analyzed [1] - 90:22
analyzing [1] - 122:14
AND [1] - 284:22
Angeles [1] - 3:6
Anita [2] - 2:5, 6:19
announced [2] - 14:21, 15:1
announcing [1] - 32:7
annual [3] - 49:22, 56:19, 146:6
answer [21] - 43:17, 77:10, 82:24, 97:24, 102:21, 107:11, 110:4, 110:9, 114:2, 114:23, 119:22, 146:13, 156:12, 171:11, 172:1, 172:4, 180:14, 195:18, 200:21, 201:2, 225:11

ANSWER [4] - 110:16, 110:20, 110:24, 111:7
answered [37] - 44:16, 46:6, 48:9, 57:7, 62:12, 64:23, 68:2, 73:13, 73:24, 75:3, 77:7, 77:9, 83:11, 83:23, 84:22, 85:7, 87:1, 98:19, 100:7, 100:10, 105:12, 107:14, 111:17, 121:14, 127:7, 127:16, 134:6, 138:7, 168:23, 180:12, 195:12, 196:6, 197:11, 201:18, 204:10, 281:9, 281:17
answering [1] - 146:15
answers [2] - 146:13, 223:5
Anthony [2] - 19:1, 176:10
anticipated [2] - 63:5, 63:11
anyway [3] - 76:22, 190:23, 268:22
AP [2] - 243:7, 245:21
apologize [1] - 278:5
apparent [1] - 210:17
appeal [22] - 90:17, 91:3, 91:5, 91:14, 91:21, 91:22, 92:2, 93:19, 101:13, 108:23, 217:8, 217:10, 217:13, 217:23, 217:24, 218:4, 223:16, 223:17, 237:9, 273:19, 273:21, 273:23
appealed [1] - 108:20
Appeals [3] - 217:3, 217:5, 266:21
appeals [23] - 89:4, 90:9, 90:10, 90:12, 90:14, 90:20, 92:3, 92:16, 93:11, 93:17, 94:10, 95:6, 97:15, 97:21, 99:6, 101:22, 217:17, 218:7, 218:10, 218:11, 250:14, 250:20, 273:20
appear [3] - 209:7, 209:12, 209:14

**APPEARANCES** [2] - 2:1, 3:1
**appeared** [5] - 69:16, 138:15, 154:13, 214:14, 230:7
**appearing** [1] - 138:14
**apples** [2] - 117:7
**apples-to-apples** [1] - 117:7
**applicable** [2] - 118:19, 185:18
**applicant** [1] - 239:13
**application** [1] - 239:6
**applied** [1] - 176:2
**apply** [2] - 186:18, 193:18
**applying** [5] - 32:12, 146:9, 184:10, 185:12, 239:17
**apprised** [10] - 86:5, 86:8, 86:11, 87:7, 87:13, 91:21, 96:9, 96:13, 97:2, 250:21
**approach** [2] - 32:8, 117:1
**appropriate** [19] - 121:6, 127:23, 127:24, 128:3, 128:11, 128:16, 130:23, 132:22, 143:10, 189:6, 203:6, 232:5, 232:9, 233:5, 233:10, 236:15, 255:11, 257:3, 257:7
**appropriately** [7] - 179:15, 183:11, 186:19, 218:17, 234:23, 255:8
**appropriateness** [1] - 87:18
**approval** [3] - 80:9, 236:5, 236:9
**approve** [1] - 109:9
**approved** [4] - 231:10, 231:11, 235:20, 262:9
**approving** [2] - 80:6, 220:20
**approximate** [4] - 60:3, 67:17, 68:6, 119:13
**approximation** [2] - 14:9, 62:14
**APV** [1] - 182:3
**area** [17] - 13:10, 38:14, 38:24, 39:19, 78:10, 90:11, 90:12,

90:13, 93:9, 115:6, 140:20, 192:4, 203:12, 216:16, 216:17, 237:4, 248:15
**areas** [12] - 53:23, 54:1, 123:16, 146:3, 165:5, 217:1, 224:12, 238:5, 238:6, 238:8, 238:10
**argue** [3] - 166:3, 232:14, 260:3
**arguing** [1] - 137:17
**argument** [1] - 151:14
**argumentative** [16] - 40:17, 42:24, 48:8, 52:19, 62:3, 100:6, 117:10, 118:1, 120:2, 121:13, 121:22, 128:20, 132:4, 137:15, 138:6, 187:3
**Arizona** [2] - 2:8, 6:9
**ARIZONA** [2] - 1:4, 285:1
**arrangement** [1] - 242:1
**arrangements** [1] - 29:3
**arrive** [1] - 105:3
**artfully** [1] - 28:23
**article** [2] - 33:7, 33:13
**articulated** [1] - 35:22
**ascertain** [1] - 90:23
**aside** [2] - 9:18, 27:20
**aspect** [4] - 78:21, 106:3, 106:6, 152:13
**aspects** [14] - 79:5, 112:19, 145:18, 152:4, 175:18, 175:19, 184:20, 185:17, 225:10, 225:15, 248:3, 248:5, 248:6, 278:22
**assess** [2] - 43:13, 49:5
**assessing** [1] - 48:15
**assigned** [4] - 12:19, 61:23, 250:11, 250:13
**assist** [1] - 144:23
**assistance** [2] - 219:14, 254:17
**assistant** [6] - 9:15, 60:6, 61:22, 66:12, 68:5, 132:13
**Assistant** [11] - 10:14, 10:17, 11:8,

11:9, 11:11, 11:18, 11:20, 18:14, 18:21, 75:22, 128:4
**associated** [11] - 58:6, 60:4, 62:19, 62:22, 67:24, 69:15, 72:16, 245:24, 246:6, 246:9, 253:1
**ASSOCIATES** [1] - 1:21
**Associates** [1] - 7:6
**Association** [1] - 33:9
**assume** [14] - 40:7, 48:6, 101:2, 102:7, 115:7, 116:12, 123:19, 124:10, 138:15, 145:15, 156:12, 159:21, 171:18, 215:7
**assumed** [2] - 16:22, 16:23
**assumes** [3] - 56:11, 202:11, 215:23
**assuming** [3] - 58:11, 92:12, 244:13
**assumption** [2] - 101:5, 155:2
**assumptions** [3] - 114:13, 277:15, 277:16
**assure** [1] - 216:6
**Attached** [1] - 89:7
**attend** [1] - 22:15
**attendance** [1] - 23:7
**attending** [6] - 184:1, 185:6, 185:20, 189:24, 244:10, 251:4
**attention** [2] - 104:13, 246:20
**Attorney** [1] - 5:24
**attorney** [7] - 172:18, 174:5, 174:15, 174:17, 174:20, 209:18, 283:20
**attorneys** [9] - 108:10, 172:2, 172:3, 172:4, 172:14, 172:21, 209:12, 210:6, 210:7
**attributed** [1] - 175:23
**audit** [5] - 170:14, 170:17, 171:5, 175:18, 176:4
**auditing** [1] - 171:5
**auditor** [1] - 275:11
**auditors** [1] - 276:21
**audits** [2] - 216:12, 270:17

**August** [4] - 4:19, 4:20, 50:23, 51:14
**Austin** [4] - 1:10, 283:7, 284:6, 285:5
**authority** [5] - 79:14, 80:9, 81:7, 122:3, 122:6
**authorized** [1] - 276:16
**authorizing** [1] - 185:9
**automatically** [1] - 98:23
**available** [9] - 26:1, 59:2, 98:22, 99:3, 136:22, 204:19, 204:20, 204:23, 204:24
**average** [9] - 22:14, 58:16, 58:23, 60:19, 63:20, 117:19, 119:3, 225:4, 256:13
**AVP** [53] - 3:13, 16:15, 16:23, 48:14, 51:8, 54:4, 72:4, 76:1, 76:5, 76:10, 76:15, 76:16, 83:8, 83:15, 86:15, 93:4, 119:12, 135:1, 145:4, 153:21, 154:2, 154:5, 154:9, 154:20, 155:1, 155:10, 156:23, 159:19, 159:24, 162:10, 190:4, 215:19, 217:19, 218:20, 219:3, 234:15, 247:23, 251:1, 251:8, 251:11, 257:13, 265:3, 265:11, 265:16, 265:17, 265:19, 272:8, 272:12, 273:2, 273:7, 275:6, 278:13
**AVPs** [11] - 19:8, 115:13, 115:15, 129:17, 135:7, 135:9, 162:6, 168:10, 176:9, 263:2, 273:10
**AVT** [1] - 190:4
**aware** [65] - 12:23, 17:2, 21:19, 29:16, 29:22, 30:1, 31:24, 32:11, 33:24, 34:8, 42:1, 49:16, 56:23, 86:17, 87:4, 106:15, 106:18, 107:3, 111:9, 113:15, 124:12, 139:10, 150:11, 150:15, 150:20, 159:22, 160:7,

161:10, 161:17, 167:24, 170:12, 170:15, 170:24, 171:2, 171:4, 184:2, 186:8, 186:10, 186:20, 187:7, 187:13, 187:15, 188:5, 188:18, 188:19, 191:20, 211:21, 214:20, 215:17, 219:1, 219:16, 222:16, 253:5, 269:16, 271:22, 271:24, 272:1, 272:3, 272:18, 272:20, 275:9, 275:17, 276:23, 277:2, 277:8
**awareness** [5] - 186:18, 188:12, 188:13, 273:15, 273:18

## B

**bachelor's** [1] - 9:12
**background** [3] - 9:9, 9:11, 103:1
**bad** [15] - 121:3, 121:11, 121:15, 252:23, 265:7, 266:19, 266:20, 266:21, 267:3, 275:2, 278:15, 278:23, 280:7, 280:18
**balance** [1] - 139:3
**barriers** [1] - 85:16
**base** [1] - 274:20
**based** [55] - 12:22, 39:23, 43:3, 44:20, 54:23, 104:22, 112:2, 112:8, 114:13, 114:16, 117:9, 118:15, 118:24, 124:19, 124:21, 124:22, 136:7, 194:21, 212:10, 215:11, 215:18, 218:1, 218:4, 223:11, 224:19, 226:14, 226:17, 227:6, 228:24, 229:8, 230:2, 231:10, 231:15, 231:20, 233:3, 233:16, 235:23, 236:16, 237:21, 239:4, 239:12, 240:2, 240:7, 241:5, 243:8, 246:16, 250:9, 254:22, 257:12, 261:23, 274:1,

274:21, 277:17, 279:1
**basic** [2] - 78:18,
108:9
**basis** [29] - 13:7,
42:12, 49:22, 60:1,
70:2, 77:14, 81:24,
94:22, 96:19, 96:21,
97:20, 100:1, 109:18,
109:19, 125:18,
144:19, 145:5,
166:17, 168:1,
173:12, 175:11,
178:1, 229:22,
231:18, 231:22,
239:9, 274:5, 275:12,
277:11
**Bates** [9] - 4:18, 5:3,
5:7, 50:22, 135:23,
135:24, 136:4, 205:4
**BBS** [2] - 4:17, 51:3
**bears** [1] - 173:2
**became** [12] - 15:9,
16:15, 23:17, 24:24,
27:16, 28:5, 39:13,
76:5, 76:9, 171:10,
210:16, 214:20
**become** [8] - 10:16,
16:17, 17:17, 24:11,
31:24, 43:11, 188:4,
199:3
**becoming** [2] - 51:8,
126:15
**Beechwood** [1] -
1:16
**began** [13] - 10:3,
10:20, 16:9, 16:11,
16:19, 26:2, 34:9,
42:14, 42:18, 42:20,
153:11, 210:5, 268:20
**begin** [3] - 10:1,
240:14, 244:21
**beginning** [9] -
19:13, 23:20, 24:10,
24:15, 53:5, 61:13,
75:19, 90:22, 122:21
**begins** [1] - 6:5
**behalf** [7] - 6:18,
6:24, 36:21, 172:3,
178:20, 221:17,
241:16
**behavior** [1] - 168:19
**behind** [5] - 117:17,
130:5, 130:23, 230:6,
256:10
**belief** [3] - 128:15,
145:6, 285:9
**believes** [1] - 200:14
**bell** [1] - 207:5
**below** [2] - 73:7,
109:6

**beneficial** [4] -
165:14, 165:17,
243:14, 244:2
**benefit** [15] - 25:11,
26:1, 26:11, 27:10,
31:8, 54:3, 90:11,
103:4, 103:13,
144:11, 156:16,
156:18, 157:5, 233:15
**benefits** [32] - 25:15,
25:18, 34:24, 35:15,
35:18, 37:15, 37:18,
37:22, 37:24, 38:5,
57:1, 57:11, 102:9,
124:18, 148:13,
185:10, 205:20,
229:21, 231:16,
231:21, 232:16,
232:21, 233:2, 233:5,
233:10, 239:15,
244:21, 248:15,
254:19, 261:13,
268:15, 278:15
**Benefits** [16] - 4:18,
11:15, 17:10, 17:13,
17:21, 18:1, 18:8,
32:24, 40:23, 51:4,
53:17, 56:19, 57:4,
136:18, 169:13, 235:3
**benefitted** [2] -
232:14, 260:4
**Benson** [4] - 1:11,
283:8, 284:7, 285:6
**best** [20] - 13:12,
20:11, 26:12, 27:24,
31:4, 37:13, 55:16,
56:5, 66:16, 68:4,
93:14, 94:24, 100:10,
129:9, 176:24, 237:4,
267:24, 278:16,
283:16, 285:8
**better** [4] - 33:21,
151:19, 164:6, 265:18
**between** [19] - 25:5,
28:8, 35:14, 35:21,
47:24, 48:10, 66:4,
79:8, 81:17, 85:4,
116:1, 116:8, 125:11,
125:16, 130:19,
143:14, 202:6, 253:6,
254:15
**beyond** [7] - 67:15,
82:23, 115:18, 155:4,
155:19, 157:24,
181:11
**bias** [1] - 163:23
**big** [3] - 68:10,
68:20, 248:20
**Biliack** [13] - 1:5, 6:7,
13:14, 92:12, 106:14,

108:13, 108:15,
108:19, 213:13,
254:16, 283:4, 284:3,
285:2
**BILIACK** [1] - 5:8
**Biliack's** [28] - 91:10,
100:19, 102:5,
102:23, 106:16,
106:19, 106:23,
107:5, 107:7, 107:16,
108:17, 124:11,
124:13, 199:18,
199:19, 206:7,
209:11, 209:18,
213:14, 213:17,
213:21, 215:4, 215:7,
215:9, 215:14,
250:18, 273:15,
273:18
**Biliack-PRL-MS-EA
-000049** [1] - 5:4
**bin** [1] - 132:23
**binding** [2] - 36:24,
198:16
**Birch** [1] - 12:13
**birch** [11] - 92:14,
253:15, 253:23,
254:1, 254:3, 254:18,
254:23, 255:7, 273:1,
273:7, 278:9
**birch's** [1] - 173:1
**birth** [1] - 132:18
**Bishop** [6] - 92:9,
220:24, 221:17,
250:9, 279:20, 280:8
**bishop** [6] - 254:17,
254:23, 255:6,
255:11, 279:23,
280:19
**bishop's** [1] - 93:20
**bit** [6] - 17:8, 18:18,
44:17, 45:12, 64:4,
238:23
**blank** [1] - 64:21
**bless** [1] - 6:22
**block** [80] - 21:21,
27:17, 27:21, 27:22,
28:5, 28:6, 28:8,
28:10, 28:16, 28:17,
29:22, 30:2, 30:19,
30:23, 31:5, 43:4,
43:14, 43:21, 44:7,
45:4, 46:16, 46:23,
47:5, 47:10, 47:19,
47:22, 48:1, 48:11,
48:12, 54:24, 55:2,
55:20, 66:20, 71:4,
72:1, 72:20, 73:16,
83:16, 89:3, 112:3,
113:1, 114:5, 116:4,

116:15, 119:4, 119:7,
120:10, 120:13,
123:9, 123:17,
123:18, 123:21,
123:24, 124:4, 124:7,
124:12, 124:14,
124:18, 124:24,
125:4, 125:11,
125:12, 125:14,
125:20, 125:23,
125:24, 126:5,
169:16, 226:18,
234:4, 235:12,
235:15, 240:23,
241:2, 241:4, 246:13,
246:18, 246:21
**Board** [2] - 52:16,
53:2
**board** [2] - 52:18,
53:6
**body** [1] - 89:6
**books** [1] - 146:8
**boss** [4] - 161:7,
161:8, 169:10, 169:11
**boss'** [2] - 169:10
**bottom** [5] - 50:24,
88:14, 88:24, 135:23,
205:9
**Boucher** [1] - 206:1
**break** [14] - 32:20,
75:7, 75:9, 75:13,
77:1, 125:11, 147:11,
147:14, 147:18,
208:6, 208:11,
208:15, 258:19,
258:22
**breaks** [1] - 117:1
**Brenda** [2] - 89:1,
250:10
**Brenda's** [1] - 92:18
**Britos** [2] - 3:13, 7:3
**BRITOS** [1] - 7:3
**broad** [3] - 27:8,
45:12, 136:9
**broader** [2] - 113:8,
134:18
**broke** [1] - 116:15
**broken** [2] - 116:1,
116:7
**Brokerage** [1] -
51:21
**brought** [2] - 175:22,
183:3
**bullet** [7] - 175:3,
228:12, 228:22,
229:20, 230:3,
232:15, 233:4
**bunch** [1] - 222:14
**burn** [1] - 281:12
**business** [40] - 26:2,

28:9, 29:2, 29:4,
29:22, 30:5, 30:7,
44:22, 44:24, 45:4,
49:21, 50:1, 53:12,
53:17, 56:10, 56:14,
56:19, 57:3, 57:10,
57:13, 94:7, 94:21,
95:3, 95:15, 124:9,
136:6, 136:8, 136:14,
140:21, 146:8,
165:10, 165:11,
168:7, 222:6, 233:24,
235:15, 237:6, 241:4,
247:18, 248:15
**Business** [2] - 4:16,
51:3
**businesses** [3] -
42:3, 44:20, 112:6
**buy** [3] - 260:7,
260:13, 260:15
**BY** [23] - 2:4, 2:5,
2:6, 2:17, 3:4, 3:13,
7:15, 75:16, 76:24,
123:4, 127:2, 134:3,
135:21, 147:17,
172:22, 192:13,
205:14, 208:19,
258:16, 259:2,
268:13, 278:3, 280:16

**C**

**C475** [1] - 3:15
**cabinet** [1] - 198:4
**calculate** [2] -
102:21, 257:19
**calculating** [1] -
102:17
**California** [1] - 3:6
**cancer** [1] - 203:13
**cannot** [1] - 177:21
**capacity** [2] - 107:18,
209:21
**CAPS** [1] - 149:24
**car** [1] - 239:23
**care** [2] - 27:20,
241:4
**Carlson** [2] - 92:16,
93:1
**Carlson's** [2] - 93:2,
93:3
**Carroll** [2] - 3:21,
6:13
**carry** [2] - 149:2,
165:16
**carrying** [3] - 156:18,
157:6, 157:7
**CASE** [1] - 284:3
**Case** [2] - 1:9, 6:9
**case** [70] - 13:2,

21:17, 25:15, 31:19,
37:6, 40:22, 42:3,
44:13, 44:19, 83:6,
85:8, 88:5, 90:20,
105:5, 109:18, 110:5,
110:8, 112:19,
116:11, 137:24,
140:6, 148:17,
156:11, 175:10,
179:6, 179:9, 180:5,
190:2, 191:4, 193:20,
195:1, 196:14,
197:12, 199:13,
206:15, 206:16,
206:17, 209:15,
209:17, 210:11,
210:12, 210:15,
210:18, 210:20,
210:24, 213:13,
215:3, 216:8, 218:15,
233:24, 239:10,
239:13, 242:19,
247:16, 248:15,
254:16, 269:12,
269:23, 270:1,
278:14, 278:23,
279:3, 279:11,
279:21, 279:23,
279:24, 280:19
**case-by-case** [1] -
109:18
**caseload** [1] -
235:16
**cases** [13] - 27:4,
27:7, 33:16, 40:5,
91:2, 99:1, 153:13,
153:14, 217:10,
229:4, 243:13,
246:20, 251:23
**categorized** [1] -
141:17
**category** [2] - 27:13,
242:21
**caused** [2] - 98:8,
219:10
**caution** [1] - 159:9
**cbritos@unum.**
**com** [1] - 3:18
**cc** [1] - 285:24
**CD** [2] - 211:17,
281:12
**Center** [4] - 4:18,
17:13, 18:1, 51:4
**CEO** [1] - 21:20
**certain** [20] - 9:9,
42:21, 44:11, 44:21,
52:10, 119:18,
134:20, 134:21,
156:8, 182:13,
192:16, 203:12,

214:3, 216:13, 219:5,
230:7, 234:1, 243:20,
248:10, 249:6
**certainly** [16] - 22:11,
50:1, 72:8, 74:16,
75:5, 108:23, 123:15,
129:14, 130:12,
138:22, 175:6, 197:5,
223:7, 249:10, 252:5,
261:7
**certainty** [1] - 262:7
**CERTIFICATE** [1] -
283:1
**certification** [1] -
243:18
**certify** [2] - 283:2,
285:7
**Cesar** [2] - 3:13, 7:3
**chance** [3] - 41:2,
41:14, 64:10
**chances** [1] - 126:14
**change** [45] - 11:6,
15:16, 29:7, 59:3,
59:13, 59:15, 59:17,
60:14, 61:20, 63:16,
64:4, 65:16, 66:3,
66:14, 66:17, 66:22,
67:5, 67:15, 79:6,
79:11, 91:6, 107:11,
119:15, 119:19,
132:11, 189:10,
189:16, 189:18,
192:20, 192:21,
214:15, 214:19,
215:1, 231:12,
237:17, 244:20,
267:10, 267:12,
273:1, 273:4, 273:6,
273:16, 284:17
**Change/Correction**
[1] - 285:10
**changed** [5] - 16:3,
19:6, 112:21, 183:7,
231:4
**changes** [6] - 25:8,
59:7, 60:17, 68:15,
183:3, 231:13
**changes/**
**corrections** [1] - 285:9
**changing** [1] - 25:19
**characteristics** [2] -
26:16, 30:21
**characterize** [2] -
165:8, 248:9
**charged** [2] - 186:5,
239:21
**Chattanooga** [1] -
19:3
**choose** [3] - 64:11,
134:4, 179:18

**chooses** [2] -
200:12, 261:19
**chose** [2] - 24:6,
134:20
**chosen** [1] - 180:4
**Chris** [1] - 39:9
**Cindy** [2] - 205:24,
206:1
**circled** [1] - 249:24
**circumstance** [2] -
131:3, 144:2
**circumstances** [11] -
38:18, 112:11,
112:21, 130:15,
130:24, 147:21,
172:17, 174:10,
178:13, 178:23, 210:1
**CIS** [12] - 132:11,
133:12, 133:15,
213:23, 214:3, 214:8,
215:5, 215:10,
215:15, 245:23,
246:6, 246:12
**Claim** [2] - 33:10,
205:15
**claim** [321] - 13:6,
28:22, 32:7, 32:8,
32:12, 33:14, 33:16,
34:21, 35:3, 35:10,
35:16, 37:14, 37:19,
37:22, 38:1, 38:5,
38:7, 39:22, 40:13,
40:22, 41:20, 42:2,
42:5, 42:22, 45:8,
45:11, 45:18, 45:23,
46:9, 57:24, 59:3,
60:19, 61:1, 61:3,
62:21, 62:24, 63:2,
64:8, 66:2, 74:10,
74:13, 74:16, 74:18,
74:22, 79:15, 79:17,
79:23, 80:8, 80:11,
80:12, 80:20, 81:3,
82:13, 82:17, 83:4,
85:17, 86:6, 86:11,
86:19, 87:18, 88:14,
89:21, 90:2, 90:18,
90:19, 90:21, 90:24,
91:8, 91:10, 91:11,
92:12, 96:6, 96:14,
96:18, 97:4, 97:9,
98:9, 98:16, 99:7,
99:13, 100:16,
100:19, 100:20,
101:1, 101:3, 101:4,
101:13, 101:15,
101:20, 101:23,
102:8, 102:10,
102:23, 103:17,
103:19, 103:20,

104:6, 104:10,
104:12, 104:20,
104:24, 105:1, 105:2,
105:9, 105:16, 106:5,
106:9, 106:14,
106:16, 106:20,
107:7, 108:20, 109:2,
109:6, 117:4, 117:8,
117:21, 118:8,
118:13, 118:15,
118:24, 119:9,
119:24, 120:19,
120:23, 121:17,
122:9, 122:15,
122:18, 122:20,
122:21, 123:21,
124:7, 124:13, 133:1,
133:3, 133:4, 136:12,
143:2, 143:8, 143:22,
144:12, 144:17,
149:18, 150:16,
158:21, 172:20,
179:14, 179:24,
180:1, 182:7, 182:9,
183:4, 183:6, 184:4,
184:6, 184:19,
185:15, 185:19,
186:13, 187:24,
188:22, 189:1,
190:10, 190:13,
190:17, 191:2, 193:4,
193:6, 193:13,
193:17, 193:19,
193:22, 194:11,
196:23, 196:24,
197:1, 197:3, 197:6,
197:24, 198:9,
198:11, 198:12,
198:19, 198:22,
198:24, 199:1, 199:3,
199:5, 199:7, 199:10,
199:12, 199:18,
199:19, 200:6,
200:10, 200:13,
201:1, 201:4, 201:15,
202:17, 203:4, 203:9,
205:2, 205:6, 205:19,
205:20, 206:2, 206:7,
207:12, 207:23,
211:15, 211:24,
212:1, 212:5, 212:13,
212:17, 213:14,
213:18, 213:20,
213:21, 214:13,
214:14, 214:17,
214:18, 215:4, 215:7,
215:9, 215:14,
215:15, 215:20,
216:3, 216:4, 216:9,
216:16, 217:9,
217:15, 217:21,

218:6, 220:4, 228:15,
229:3, 229:9, 230:13,
230:24, 231:10,
233:2, 235:10,
235:13, 235:17,
236:2, 236:8, 236:22,
240:18, 242:14,
242:16, 242:17,
243:9, 244:17,
244:21, 245:15,
245:24, 246:2, 246:5,
246:8, 246:9, 246:13,
250:18, 251:9,
251:14, 251:18,
252:4, 252:6, 252:22,
253:1, 253:3, 254:9,
254:12, 254:18,
255:10, 255:12,
257:14, 261:10,
261:24, 262:10,
262:12, 264:20,
265:1, 268:14,
268:17, 271:6, 272:5,
273:15, 273:18,
274:3, 274:12,
274:17, 274:18,
275:5, 275:9, 275:10,
275:12, 276:21,
277:3, 277:5, 277:17,
278:21, 279:4, 280:1,
281:6, 281:11, 281:15
**claim's** [1] - 122:4
**claimant** [33] - 35:14,
35:18, 37:17, 90:14,
90:17, 91:2, 91:4,
91:6, 144:16, 148:22,
149:11, 149:14,
157:8, 191:13, 217:7,
217:10, 217:12,
229:14, 229:19,
231:23, 232:10,
232:14, 233:14,
243:10, 243:14,
243:16, 244:4,
244:10, 244:18,
257:2, 261:17,
261:18, 262:22
**claimant'** [1] -
229:22
**claimant's** [3] -
132:17, 184:1, 214:23
**claiming** [2] - 40:14,
230:18
**Claims** [45] - 11:10,
11:12, 11:14, 11:18,
11:21, 16:15, 16:21,
16:24, 17:6, 17:9,
32:2, 32:24, 33:9,
33:21, 34:1, 34:2,
42:18, 42:20, 51:8,

54:4, 145:4, 153:21, 154:20, 159:19, 159:23, 159:24, 161:23, 162:7, 168:9, 168:10, 182:3, 215:19, 219:3, 247:23, 251:2, 251:9, 251:12, 257:13, 265:17, 272:8, 272:11, 272:12, 272:13, 278:13
**claims** [288] - 12:16, 12:20, 12:22, 13:3, 13:5, 14:3, 14:8, 16:8, 16:11, 17:20, 17:24, 18:5, 18:22, 20:3, 21:5, 21:12, 21:19, 22:1, 22:13, 23:6, 26:24, 27:4, 27:7, 27:23, 28:2, 28:5, 28:11, 29:6, 29:15, 29:20, 30:2, 30:8, 30:13, 30:19, 32:13, 33:5, 33:22, 34:9, 34:15, 36:5, 36:11, 36:12, 38:12, 38:13, 38:18, 38:21, 38:23, 39:19, 39:22, 40:5, 40:6, 41:1, 41:5, 41:8, 41:9, 41:11, 41:13, 41:24, 43:5, 43:6, 43:10, 43:14, 43:21, 44:1, 44:7, 47:16, 47:19, 47:21, 47:22, 47:24, 48:10, 48:16, 53:24, 54:3, 54:24, 55:2, 55:21, 57:19, 58:3, 58:4, 58:6, 59:8, 59:11, 60:2, 60:4, 60:8, 60:20, 61:23, 62:18, 63:16, 63:18, 63:21, 64:9, 64:11, 66:12, 66:20, 66:22, 66:23, 67:3, 68:6, 69:5, 71:4, 72:1, 72:17, 72:20, 73:16, 73:18, 77:19, 78:2, 78:10, 78:14, 78:15, 78:16, 78:17, 79:4, 79:10, 83:16, 86:3, 86:16, 87:2, 87:8, 87:13, 87:21, 88:5, 88:17, 90:11, 90:13, 96:23, 97:13, 97:16, 100:2, 100:4, 100:5, 101:12, 103:10, 104:7, 104:8, 104:14, 105:20, 105:22, 111:6, 111:12, 112:3, 112:4, 112:12, 112:20, 113:2, 113:4,

114:6, 114:18, 114:21, 115:3, 115:6, 115:9, 115:10, 115:19, 116:1, 116:2, 116:16, 116:19, 117:3, 117:4, 117:18, 118:18, 118:19, 118:21, 119:2, 119:4, 119:11, 119:15, 119:18, 119:20, 120:6, 120:7, 120:10, 120:11, 120:12, 120:15, 122:1, 123:9, 123:17, 124:11, 128:8, 133:24, 145:8, 146:9, 153:16, 155:4, 155:13, 155:16, 155:19, 156:9, 159:3, 167:8, 167:19, 170:13, 171:5, 175:14, 175:21, 176:9, 181:18, 182:6, 182:21, 183:1, 183:20, 184:3, 184:9, 184:23, 185:10, 186:16, 187:6, 187:10, 187:17, 187:20, 188:7, 188:10, 191:20, 192:16, 192:19, 193:1, 199:9, 215:15, 216:12, 216:13, 216:19, 217:6, 218:19, 218:22, 219:4, 220:21, 221:16, 222:13, 226:12, 226:18, 230:4, 230:7, 230:8, 234:4, 234:22, 235:12, 235:15, 235:20, 235:24, 239:2, 241:16, 241:20, 241:24, 246:17, 246:18, 247:7, 247:8, 248:15, 249:17, 252:10, 252:12, 255:8, 257:12, 261:22, 264:2, 264:20, 265:5, 265:23, 266:1, 266:5, 266:14, 266:16, 266:22, 268:3, 269:2, 269:3, 269:8, 270:4, 270:13, 270:16, 271:10, 272:18, 272:24, 274:14, 275:4, 275:22, 276:22, 277:11, 278:18, 279:11
**clarification** [1] - 27:15

**clarified** [1] - 147:5
**clarify** [14] - 41:6, 58:2, 61:18, 68:11, 69:13, 120:4, 128:22, 157:17, 165:2, 170:21, 172:13, 181:9, 190:16, 207:2
**classified** [1] - 16:10
**clean** [2] - 33:17, 76:8
**clear** [10] - 38:19, 40:15, 67:6, 83:7, 83:8, 84:8, 84:13, 144:13, 179:7, 281:19
**clearly** [1] - 84:17
**close** [19] - 60:12, 74:11, 79:14, 80:7, 80:11, 81:3, 85:18, 88:6, 103:17, 119:16, 119:18, 179:19, 179:21, 226:12, 243:3, 243:8, 244:17, 245:22, 249:16
**closed** [66] - 21:20, 27:17, 27:21, 28:6, 28:7, 28:8, 28:10, 30:19, 30:23, 31:4, 37:19, 38:1, 38:5, 43:10, 46:16, 46:23, 47:5, 47:10, 47:19, 47:22, 48:1, 48:11, 74:13, 79:24, 80:21, 86:11, 86:19, 87:8, 87:14, 87:23, 96:6, 96:14, 96:23, 101:24, 106:16, 109:11, 123:8, 123:18, 123:24, 124:4, 124:7, 124:8, 124:12, 124:14, 124:18, 124:24, 125:4, 125:11, 125:14, 125:20, 125:23, 130:5, 130:11, 130:12, 130:23, 131:4, 169:16, 199:6, 240:22, 241:1, 246:13, 246:18, 246:21, 256:11
**closely** [1] - 71:15
**closes** [1] - 99:7
**closing** [3] - 85:18, 219:4, 220:4
**closure** [3] - 79:17, 136:11, 229:3
**closures** [4] - 42:22, 227:2, 228:16, 229:9
**coach** [2] - 216:24, 223:20
**Coast** [1] - 13:13

**coding** [3] - 228:15, 229:3, 229:9
**coin** [1] - 152:21
**coinciding** [1] - 68:8
**collectively** [1] - 223:15
**column** [1] - 51:18
**combined** [1] - 116:4
**coming** [11] - 53:8, 54:1, 55:1, 55:4, 55:8, 113:20, 114:2, 119:17, 123:24, 162:14, 230:22
**comment** [2] - 122:24, 197:7
**common** [7] - 30:21, 92:3, 112:7, 154:14, 195:6, 237:3, 260:12
**commonly** [1] - 226:22
**Commonwealth** [1] - 283:12, 283:14
**communicate** [10] - 55:6, 55:17, 95:2, 130:14, 148:12, 148:14, 159:4, 235:2, 236:12, 236:15
**communicated** [9] - 52:13, 54:4, 56:24, 84:17, 128:24, 129:24, 130:15, 168:17, 226:21
**communicating** [4] - 55:19, 78:20, 130:24, 131:6
**communication** [6] - 51:15, 52:3, 79:8, 91:16, 129:1, 166:8
**Communication** [2] - 51:19, 51:20
**Communications** [2] - 4:17, 51:4
**communications** [2] - 52:17, 128:18
**community** [1] - 140:24
**Companies** [1] - 15:17
**companies** [26] - 9:21, 14:14, 15:3, 15:8, 15:12, 24:18, 26:12, 26:14, 28:12, 28:13, 28:14, 28:20, 28:24, 29:4, 29:14, 30:15, 30:17, 30:22, 180:6, 241:17, 241:18, 241:21, 241:22, 242:1, 242:3, 242:7
**Company** [8] - 1:9,

6:8, 9:17, 15:18, 29:16, 283:5, 284:4, 285:4
**company** [77] - 9:20, 9:23, 20:1, 20:3, 20:24, 24:6, 27:24, 28:3, 28:4, 33:5, 34:22, 39:12, 39:15, 40:2, 41:20, 42:14, 42:21, 43:20, 52:10, 52:11, 53:2, 53:7, 53:11, 53:23, 56:10, 56:14, 75:23, 91:7, 92:2, 117:20, 121:20, 122:18, 123:17, 126:14, 128:9, 128:14, 143:5, 143:19, 152:1, 165:6, 177:5, 179:6, 179:10, 181:18, 183:14, 187:6, 187:8, 188:14, 188:15, 188:17, 207:3, 222:11, 224:11, 227:10, 227:23, 236:23, 237:5, 238:7, 239:11, 241:9, 241:10, 241:23, 248:10, 248:20, 253:6, 254:20, 263:19, 263:20, 263:21, 264:12, 264:14, 264:19, 265:11, 276:16, 276:20, 277:4, 280:14
**company's** [9] - 132:21, 136:7, 140:14, 140:15, 140:21, 185:2, 274:5, 274:9, 277:10
**company-wide** [1] - 56:10
**comparable** [2] - 206:10, 247:6
**compare** [2] - 25:22, 271:16
**compared** [10] - 35:15, 46:11, 99:18, 126:19, 127:4, 127:20, 139:21, 143:16, 165:9, 267:19
**compares** [1] - 44:24
**comparison** [2] - 43:14, 117:7, 218:6
**compel** [1] - 178:1
**compelled** [1] - 178:11
**compensation** [6] - 15:12, 126:21, 127:6, 127:13, 264:6, 264:11

competition [1] - 24:23
competitive [3] - 24:12, 24:17, 29:9
competitors [1] - 14:17
compile [7] - 95:4, 96:20, 97:12, 97:17, 98:2, 98:24, 99:16
compiled [2] - 81:23, 95:21
compiling [7] - 94:8, 94:12, 94:21, 95:4, 95:10, 95:24, 96:19
complain [1] - 236:14
complaint [1] - 255:1
complaints [2] - 40:9, 93:8
complete [1] - 219:18
completed [2] - 35:17, 91:23
completely [2] - 8:13, 8:17
complexity [1] - 38:17
compliance [4] - 79:22, 93:8, 128:11, 187:9
compliant [1] - 185:4
compliment [1] - 216:23
comply [1] - 273:11
complying [1] - 184:15
component [2] - 66:18, 276:7
comport [1] - 182:1
composition [1] - 136:9
compound [7] - 29:12, 45:16, 120:2, 132:5, 133:19, 161:15, 202:11
comprised [8] - 27:20, 28:11, 46:16, 123:18, 124:7, 124:13, 125:14, 213:4
comprising [3] - 30:23, 46:23, 47:4
concept [1] - 141:4
concern [14] - 82:12, 83:3, 110:14, 111:10, 111:20, 113:9, 113:10, 171:6, 187:8, 187:13, 187:15, 187:16, 219:11, 252:23
concerned [3] -

competition [1] -

171:10, 171:15, 220:19
concerning [2] - 41:21, 267:17
concerns [6] - 110:16, 111:16, 116:24, 253:2, 253:22, 253:24
conclude [2] - 70:22, 102:10
concluded [1] - 282:5
concludes [1] - 202:14
conclusion [2] - 275:15, 277:1
conclusions [1] - 196:4
condition [2] - 239:22, 244:19
Conduct [16] - 188:20, 189:22, 268:18, 269:4, 269:9, 271:13, 271:15, 271:18, 275:19, 275:20, 275:21, 276:9, 276:15, 276:20, 277:2, 277:18
conduct [5] - 204:17, 219:8, 265:7, 276:16, 276:19
conducted [1] - 217:13
conducting [1] - 254:1
conference [1] - 169:22
confidential [5] - 50:8, 50:9, 50:16, 177:1, 257:1
Confidential [1] - 1:14
confidentiality [1] - 176:23
confirmation [2] - 233:6, 233:11
confirming [2] - 233:6, 233:11
conflicts [1] - 9:2
Congress [1] - 3:15
conjunction [5] - 88:20, 90:18, 130:17, 235:18, 273:19
connected [1] - 63:5
connection [5] - 7:1, 9:20, 210:19, 212:12, 265:20
consideration [2] - 87:9, 123:8
considerations [1] -

111:20
considered [16] - 12:16, 26:17, 35:10, 39:22, 40:5, 46:19, 47:5, 86:20, 87:14, 91:14, 128:15, 143:10, 143:19, 179:3, 204:5, 211:1
considering [1] - 179:8
consistency [12] - 139:13, 139:15, 141:4, 141:8, 152:10, 153:8, 156:15, 156:24, 161:11, 162:20, 238:5, 238:9
consistent [40] - 14:20, 90:24, 107:21, 139:23, 140:1, 140:7, 142:3, 143:22, 144:7, 145:19, 151:7, 151:11, 151:18, 151:23, 152:7, 153:2, 153:4, 160:4, 160:22, 161:19, 162:9, 162:12, 163:11, 164:4, 164:7, 164:17, 165:15, 166:3, 166:9, 167:13, 168:3, 199:21, 229:6, 234:7, 234:12, 238:2, 238:3, 238:4, 267:22
consistently [3] - 166:14, 166:16, 168:11
constitute [1] - 136:10
consult [5] - 7:22, 8:1, 178:17, 179:5, 179:9
consultant [4] - 7:21, 79:22, 209:21, 210:21
consultation [1] - 179:12
consulted [1] - 110:1
consulting [3] - 9:18, 178:16, 210:6
consuming [1] - 212:23
contact [5] - 191:15, 210:3, 210:4, 254:13, 254:14
contacted [4] - 210:6, 210:10, 210:19, 210:23
contain [3] - 175:3, 176:22, 196:23
contained [10] - 31:7, 31:11, 67:17, 68:6, 136:6, 196:11,

198:5, 204:1, 235:6, 281:15
contestable [1] - 278:21
context [3] - 69:9, 247:12, 247:16
continually [1] - 120:11
continue [1] - 112:15
continued [5] - 2:24, 3:1, 4:24, 5:1, 113:9
contract [1] - 239:9
contracts [1] - 239:11
contradicted [1] - 231:7
contrary [2] - 95:17, 160:19
convenient [2] - 147:6, 147:8
conversation [2] - 71:19, 256:9
conversational [1] - 180:20
conversations [3] - 213:16, 250:2, 257:3
conversely [3] - 120:12, 233:14, 254:3
convey [4] - 129:11, 134:4, 198:6, 255:19
conveyed [1] - 151:17
cooperating [1] - 178:7
copied [10] - 91:17, 91:20, 93:10, 93:21, 94:2, 97:8, 249:20, 250:3, 250:5, 250:10
copies [2] - 205:3, 281:1
copy [11] - 72:15, 106:17, 106:23, 135:22, 138:13, 200:5, 207:12, 274:11, 274:18, 281:6, 281:10
corner [2] - 50:24, 88:14
corporate [7] - 30:4, 49:21, 50:1, 52:4, 53:21, 248:14, 248:18
Corporate [2] - 51:19, 51:21
Corporation [8] - 1:9, 1:10, 283:6, 284:5, 284:6, 285:5, 285:5
correct [222] - 8:3, 8:4, 8:21, 10:11, 12:5, 13:24, 14:15, 14:16,

15:5, 15:8, 15:13, 15:18, 15:24, 16:1, 16:4, 16:12, 17:11, 18:6, 18:15, 19:9, 19:17, 21:6, 22:3, 25:6, 25:9, 25:12, 26:18, 27:17, 28:12, 28:18, 28:22, 30:8, 30:10, 31:21, 31:22, 34:6, 35:20, 36:13, 36:16, 38:8, 38:10, 40:11, 40:12, 41:2, 42:18, 42:23, 43:22, 45:5, 46:5, 46:13, 46:20, 48:17, 48:19, 49:3, 49:9, 49:22, 51:5, 53:13, 53:19, 54:4, 54:9, 54:16, 54:20, 55:4, 55:9, 56:1, 56:20, 57:6, 57:17, 57:24, 59:4, 59:8, 59:11, 59:19, 59:23, 60:10, 61:2, 61:11, 61:23, 62:20, 63:2, 63:12, 69:3, 70:15, 70:18, 72:7, 72:11, 73:8, 73:12, 74:5, 74:13, 75:24, 77:20, 79:15, 79:16, 80:2, 80:13, 81:9, 81:15, 81:21, 83:10, 83:22, 84:5, 85:24, 87:4, 88:23, 89:13, 92:7, 92:10, 93:21, 93:24, 96:1, 96:7, 96:10, 96:23, 99:9, 99:14, 99:19, 105:22, 106:7, 108:6, 109:8, 114:3, 114:22, 115:12, 116:21, 116:22, 120:24, 121:20, 122:4, 124:1, 124:18, 125:5, 126:21, 129:1, 129:3, 130:1, 131:10, 131:13, 131:16, 131:22, 131:23, 132:1, 132:14, 134:15, 135:8, 136:22, 137:14, 139:1, 139:2, 139:11, 140:16, 142:4, 142:9, 142:22, 144:4, 145:1, 145:5, 147:24, 148:6, 148:8, 150:7, 152:7, 152:11, 152:15, 153:5, 154:20, 155:1, 161:14, 161:23, 162:13, 162:22, 163:8, 164:7, 166:1, 172:15, 175:16,

176:20, 181:20, 182:7, 182:14, 186:14, 187:14, 192:17, 193:4, 193:23, 194:22, 195:10, 196:20, 197:9, 197:17, 197:20, 198:6, 201:5, 201:12, 202:9, 202:19, 206:22, 209:16, 209:18, 258:1, 259:12, 259:20, 260:1, 260:16, 263:12, 263:17, 264:2, 264:6, 264:21, 265:1, 268:15, 270:18, 270:22, 273:3, 273:8, 273:12, 273:18, 274:21, 275:6, 275:16, 281:3
**correction** [1] - 284:18
**correctly** [19] - 23:23, 51:9, 136:19, 143:4, 160:18, 173:1, 179:11, 207:19, 212:13, 226:15, 229:24, 232:18, 233:7, 239:2, 260:5, 262:2, 264:10, 278:12, 279:1
**corroborate** [1] - 252:8
**Counsel** [1] - 3:13
**counsel** [13] - 6:16, 8:23, 37:3, 106:17, 106:24, 107:5, 107:16, 177:17, 209:8, 259:8, 283:17, 283:20, 284:24
**COUNSEL** [1] - 284:10
**count** [15] - 57:19, 58:4, 58:6, 106:2, 106:3, 106:5, 106:6, 106:9, 118:22, 142:12, 156:19, 158:16, 253:10, 253:13
**country** [1] - 13:10
**couple** [9] - 16:2, 156:18, 177:15, 181:17, 220:1, 222:3, 228:7, 236:20, 253:21
**course** [10] - 19:15, 44:23, 49:15, 82:20, 107:24, 206:13, 209:2, 214:12, 216:14, 224:23

**COURT** [4] - 1:3, 135:19, 231:19, 285:1
**court** [7] - 7:5, 7:7, 178:1, 178:5, 267:11, 267:13, 280:18
**Court** [4] - 1:19, 1:22, 6:9, 266:21
**Courts** [1] - 266:16
**coverage** [1] - 239:22
**covering** [2] - 137:5, 138:5
**Crawford** [2] - 19:1, 176:10
**create** [2] - 181:2, 261:7
**criteria** [5] - 223:1, 223:5, 224:4, 224:5, 235:22
**critical** [2] - 189:22, 220:14
**criticized** [1] - 160:11
**critiqued** [1] - 160:13
**CROSS** [1] - 208:18
**cross** [1] - 229:4
**CROSS-EXAMINATION** [1] - 208:18
**CRR** [3] - 1:19, 283:2, 283:24
**cubicle** [1] - 255:23
**cumbersome** [1] - 212:23
**curious** [1] - 101:17
**current** [21] - 66:24, 67:15, 68:7, 136:8, 141:11, 141:20, 199:3, 199:5, 199:7, 199:10, 200:6, 201:1, 201:4, 201:15, 202:17, 206:21, 207:11, 207:16, 207:17, 208:1, 226:18
**customer** [9] - 72:23, 224:8, 224:14, 225:6, 225:10, 230:17, 238:10, 248:11, 249:9
**customers** [2] - 224:10, 230:18
**cut** [2] - 28:1, 38:19
**cut-off** [1] - 28:1

**D**

**dandr@dawsonandrosenthal .com** [1] - 2:11
**darryn** [1] - 3:21
**Darryn** [1] - 6:13

**data** [15] - 62:10, 94:13, 113:16, 114:8, 114:12, 117:2, 117:17, 125:3, 137:2, 138:24, 170:13, 215:12, 269:12, 277:17, 277:22
**database** [1] - 214:12
**DATE** [2] - 284:2, 284:22
**date** [10] - 6:11, 89:8, 89:17, 131:21, 132:18, 173:22, 174:1, 214:24, 244:8, 244:12
**Davis** [1] - 19:2
**Dawson** [18] - 2:3, 2:4, 2:6, 4:4, 4:6, 5:24, 6:19, 6:20, 209:23, 210:3, 210:7, 210:19, 210:23, 235:7, 235:10, 240:16, 284:13, 285:24
**DAWSON** [66] - 6:18, 6:22, 7:15, 50:5, 50:11, 50:13, 75:16, 76:24, 88:9, 98:13, 98:16, 123:2, 123:4, 126:23, 127:1, 127:2, 133:10, 133:14, 134:3, 135:15, 135:20, 135:21, 147:4, 147:8, 147:10, 147:17, 155:23, 172:7, 172:12, 172:22, 192:3, 192:6, 192:8, 192:12, 192:13, 205:14, 208:5, 210:22, 215:23, 227:12, 228:1, 245:7, 245:11, 247:10, 254:24, 257:20, 258:16, 258:19, 259:2, 268:4, 268:6, 268:8, 268:10, 268:13, 268:23, 276:1, 276:4, 277:24, 279:5, 279:13, 280:3, 280:9, 280:13, 281:8, 281:17, 282:1
**day-to-day** [3] - 80:12, 80:15, 222:21
**days** [3] - 156:19, 177:13, 281:24
**DBS** [39] - 80:8, 80:11, 80:18, 81:2, 81:5, 92:9, 92:11, 92:12, 102:2, 118:20,

130:21, 194:5, 214:14, 216:13, 217:14, 217:20, 217:21, 218:1, 218:3, 218:14, 218:21, 220:23, 221:12, 221:15, 222:10, 223:13, 230:12, 235:9, 236:1, 236:6, 250:11, 250:13, 251:13, 252:3, 252:6, 254:15, 256:24, 257:7
**DBS's** [4] - 159:2, 235:16, 235:17, 256:20
**DBSs** [29] - 11:15, 18:5, 18:11, 45:14, 45:24, 77:16, 77:19, 78:2, 78:9, 78:13, 78:22, 79:3, 79:9, 79:14, 118:17, 118:22, 158:19, 159:7, 216:8, 216:23, 220:12, 221:8, 232:20, 233:9, 236:3, 249:1, 251:3, 271:7, 279:12
**dealing** [3] - 114:21, 117:3, 123:8
**dealings** [1] - 254:10
**deceive** [2] - 163:24, 164:3
**deceiving** [1] - 164:20
**December** [6] - 1:15, 5:7, 6:11, 283:8, 283:23, 284:2
**decide** [4] - 162:18, 170:5, 176:18, 202:5
**decided** [6] - 29:1, 63:1, 93:19, 148:4, 266:13, 266:16
**decides** [1] - 34:23
**deciding** [2] - 98:9, 120:19
**decision** [63] - 30:4, 80:1, 80:4, 80:7, 80:10, 89:14, 89:16, 90:14, 90:15, 90:23, 91:7, 91:15, 92:4, 101:12, 101:19, 102:2, 105:3, 105:4, 108:20, 109:3, 109:16, 110:2, 111:12, 118:8, 119:9, 122:9, 185:1, 185:3, 185:6, 186:13, 190:7, 191:2, 191:14, 191:18, 194:8, 201:23, 202:3,

202:17, 203:1, 203:5, 217:8, 217:22, 217:24, 218:12, 224:13, 229:16, 230:8, 234:23, 245:16, 250:14, 255:14, 261:18, 267:6, 267:13, 274:1, 274:3, 274:6, 274:9, 274:20, 275:12, 277:12
**decisions** [22] - 82:17, 83:4, 84:16, 87:19, 87:24, 90:12, 111:6, 111:21, 117:4, 119:24, 149:8, 184:9, 187:11, 223:12, 224:9, 235:24, 236:3, 240:10, 240:13, 250:24, 261:13, 261:20
**dedicated** [2] - 186:4, 220:10
**defend** [1] - 180:23
**Defendants** [2] - 1:12, 285:6
**defendants** [3] - 6:24, 36:21, 198:16
**DEFENDANTS** [1] - 3:2
**define** [1] - 27:19
**defined** [2] - 46:18, 79:20
**definitely** [4] - 55:18, 67:14, 249:18, 262:6
**definition** [8] - 31:12, 34:24, 38:4, 40:4, 46:20, 47:9, 76:17, 82:8
**definitions** [1] - 47:6
**definitive** [2] - 40:15, 40:20
**degree** [4] - 9:12, 141:1, 253:8, 269:20
**Delaware** [4] - 1:10, 283:6, 284:6, 285:5
**delay** [20] - 144:14, 144:15, 144:19, 144:23, 145:23, 146:7, 148:18, 148:21, 149:14, 149:15, 150:12, 151:1, 155:5, 155:20, 157:21, 163:11, 229:12, 229:13, 229:17, 230:10
**delayed** [4] - 141:14, 141:23, 142:11, 157:14
**delaying** [15] - 143:1,

143:7, 144:2, 144:11,
150:4, 154:11, 157:6,
158:11, 160:9, 163:1,
167:17, 169:3,
175:12, 229:3, 238:20
**delineated** [1] -
176:2
**delivering** [1] - 238:1
**delved** [1] - 113:1
**demographics** [2] -
119:4, 126:1
**demonstrable** [1] -
40:10
**denial** [10] - 35:12,
35:21, 90:18, 136:11,
184:24, 185:10,
216:9, 217:6, 246:2,
278:15
**denials** [2] - 220:20,
254:1
**denied** [17] - 35:10,
61:1, 61:3, 117:22,
122:4, 122:15,
190:17, 190:18,
217:22, 235:20,
236:8, 242:14,
254:18, 264:24,
265:5, 266:5, 270:4
**denotes** [1] - 54:19
**deny** [9] - 90:24,
91:7, 101:13, 122:19,
217:8, 235:24,
249:17, 255:10, 274:3
**denying** [3] - 218:21,
219:4, 220:4
**Department** [16] -
3:14, 17:7, 17:9, 32:2,
33:10, 33:21, 34:1,
34:2, 42:18, 42:21,
217:3, 217:6, 219:15,
252:11, 272:11,
272:14
**department** [12] -
10:3, 10:7, 33:14,
33:17, 82:13, 110:1,
170:14, 170:18,
171:5, 226:10, 254:9,
272:5
**departments** [1] -
207:8
**Departments** [5] -
188:6, 193:9, 270:21,
276:18, 276:22
**deponent** [1] -
284:12
**Depos** [2] - 3:22,
6:13
**deposed** [10] - 8:3,
8:8, 110:7, 265:15,
265:20, 265:22,

278:14, 278:18,
279:2, 279:10
**deposing** [1] -
209:19
**DEPOSITION** [1] -
1:15
**Deposition** [2] - 4:2,
282:5
**deposition** [16] - 6:6,
6:14, 7:2, 50:7, 50:16,
88:18, 88:19, 146:18,
173:1, 177:22,
178:12, 181:6, 209:7,
278:19, 283:3, 284:17
**depositions** [1] -
266:12
**depression** [2] -
40:14, 40:22
**derivative** [2] -
56:10, 56:13
**describe** [6] - 43:2,
169:19, 220:9,
220:10, 222:19,
237:19
**described** [5] -
95:15, 124:21, 128:2,
232:3, 232:5
**describes** [1] - 241:1
**describing** [2] -
52:17, 71:5
**description** [1] -
51:20
**designate** [3] -
50:12, 50:15, 230:15
**Designated** [1] -
211:7
**designated** [1] - 50:7
**designation** [1] -
76:15
**designations** [1] -
50:17
**desire** [1] - 141:8
**destroyed** [1] - 206:2
**detail** [3] - 100:12,
149:6, 257:22
**detailed** [1] - 275:10
**details** [7] - 129:21,
140:18, 148:11,
148:15, 149:1, 149:2,
210:18
**determination** [2] -
233:6, 233:11
**determine** [8] - 64:7,
113:2, 113:17,
127:12, 128:10,
136:12, 177:14, 207:4
**determined** [11] -
24:5, 26:6, 26:13,
35:17, 37:17, 37:23,
126:21, 127:6,

210:13, 218:15, 244:2
**detriment** [4] -
157:8, 232:13,
232:24, 233:14
**detrimental** [1] -
260:1
**develop** [1] - 223:20
**development** [1] -
249:8
**devise** [1] - 95:1
**dictates** [1] - 182:14
**dictionary** [1] - 40:3
**different** [30] - 20:20,
20:23, 28:3, 30:22,
34:18, 34:19, 55:21,
64:3, 64:5, 71:7, 72:2,
73:19, 73:20, 86:8,
94:8, 135:3, 138:23,
149:23, 166:12,
182:16, 220:1,
236:23, 237:1,
237:13, 246:8, 248:2,
251:17, 253:6,
263:22, 280:2
**differently** [5] - 64:4,
113:17, 152:22,
204:18, 246:18
**difficult** [1] - 104:9
**DIRECT** [1] - 7:14
**direct** [2] - 221:10,
272:2
**directly** [6] - 158:19,
211:5, 221:3, 221:12,
224:10, 240:20
**Director** [104] -
13:20, 14:3, 49:8,
49:12, 58:9, 58:18,
60:8, 60:20, 64:14,
66:2, 66:13, 68:13,
68:17, 68:24, 71:6,
73:6, 73:11, 73:15,
74:3, 74:11, 74:24,
77:5, 79:18, 80:1,
80:5, 80:19, 81:1,
81:5, 81:6, 84:8,
84:14, 85:16, 86:4,
87:19, 88:2, 88:3,
92:19, 93:20, 101:21,
102:3, 109:1, 109:22,
115:5, 117:21, 119:1,
119:12, 121:24,
122:1, 122:3, 127:19,
128:5, 130:19,
130:20, 150:8,
184:23, 185:8,
185:17, 185:22,
186:10, 214:8,
214:13, 214:20,
216:6, 216:10,
216:12, 217:14,

217:19, 218:14,
218:21, 219:4, 219:7,
219:17, 220:11,
220:15, 221:4,
223:11, 223:14,
223:17, 224:21,
225:1, 225:12,
225:19, 226:10,
230:12, 235:18,
236:5, 236:7, 244:24,
245:10, 245:13,
250:23, 251:13,
252:3, 252:7, 254:15,
256:14, 257:8,
264:24, 267:18,
270:17
**director's** [5] - 78:8,
85:23, 127:3, 127:5,
127:8
**Director's** [3] -
152:6, 156:23,
219:12, 235:14, 236:9
**Directors** [108] -
11:14, 11:24, 12:3,
12:15, 12:19, 14:2,
18:11, 18:13, 45:15,
45:21, 46:4, 46:9,
47:18, 49:6, 53:2,
55:7, 55:15, 55:18,
58:23, 59:6, 59:13,
59:22, 63:6, 63:10,
64:3, 66:18, 66:19,
68:9, 69:23, 70:1,
70:7, 70:15, 70:17,
70:24, 71:2, 71:9,
72:10, 74:6, 77:2,
77:15, 77:21, 77:22,
77:24, 78:12, 78:22,
79:7, 79:8, 81:12,
84:3, 84:19, 85:5,
85:11, 85:20, 115:8,
115:11, 115:14,
130:1, 130:16,
131:24, 132:6, 134:5,
142:8, 150:11,
150:18, 150:23,
153:12, 153:14,
153:21, 154:3, 154:4,
154:8, 154:17,
154:18, 154:24,
158:9, 161:13,
161:20, 162:20,
168:10, 184:14,
185:9, 185:11, 214:2,
215:12, 216:21,
216:22, 221:23,
224:2, 226:6, 231:16,
231:21, 232:20,
233:9, 234:17,
236:12, 236:17,

246:1, 246:7, 246:17,
248:22, 249:4,
249:16, 251:2, 263:3,
263:9, 270:20, 271:3,
279:12
**Directors'** [4] -
48:15, 58:13, 124:7,
141:5
**Disability** [8] - 11:15,
16:20, 18:8, 19:9,
19:12, 136:18,
161:23, 235:3
**disability** [36] - 7:24,
10:22, 13:17, 24:10,
24:19, 24:24, 29:2,
29:8, 30:24, 31:12,
35:1, 39:23, 46:18,
46:22, 114:7, 116:1,
116:2, 189:7, 213:17,
213:21, 230:18,
232:16, 232:21,
233:6, 233:11,
239:14, 241:7,
241:16, 242:17,
242:22, 243:17,
251:14, 254:18,
260:8, 260:24, 279:4
**disabled** [6] - 118:9,
126:15, 239:16,
243:16, 243:19,
260:21
**disabling** [1] - 40:14
**disadvantaged** [1] -
232:10
**disagree** [2] -
143:11, 180:22
**disagreed** [1] -
189:24
**disagreeing** [1] -
61:17
**disappointed** [1] -
258:8
**discipline** [1] -
203:13
**disclose** [4] - 158:5,
158:6, 172:10, 174:8
**disclosed** [2] -
158:12, 158:14
**disclosing** [3] -
158:9, 172:5, 178:24
**discuss** [11] - 63:10,
74:1, 74:17, 75:6,
177:3, 210:10,
216:22, 218:14,
221:23, 238:13,
238:19
**discussed** [8] -
106:8, 144:3, 148:8,
158:18, 161:13,
238:15, 263:10,

273:10
  **discussing** [1] -
66:17
  **discussion** [9] -
55:12, 74:24, 160:3,
163:3, 249:19, 250:4,
251:22, 256:23, 257:7
  **discussions** [5] -
85:4, 85:10, 85:15,
86:4, 182:19
  **dishonest** [1] - 165:9
  **Disk** [1] - 6:5
  **disk** [2] - 197:22,
211:17
  **dispose** [1] - 132:22
  **disregarding** [1] -
262:13
  **disruptions** [1] -
261:8
  **distinction** [7] - 27:9,
28:7, 35:14, 35:21,
76:16, 116:8, 143:14
  **distinguished** [1] -
35:9
  **distinguishing** [1] -
131:2
  **distracted** [1] - 240:5
  **DISTRIBUTION** [1] -
284:10
  **DISTRICT** [4] - 1:3,
1:4, 285:1, 285:1
  **District** [2] - 6:9
  **divided** [2] - 12:22,
13:6
  **division** [2] - 12:21,
169:16
  **DMO** [16] - 186:1,
186:11, 202:4,
202:19, 202:20,
202:24, 203:6, 203:7,
203:11, 203:14,
203:17, 203:23,
204:2, 204:7, 204:19,
204:23
  **DMO's** [2] - 203:2,
204:16
  **DMOs** [3] - 193:16,
211:8, 252:20
  **DMS** [2] - 13:15,
13:23
  **DO** [1] - 284:19
  **doctor** [3] - 189:24,
195:3, 202:7
  **doctors** [1] - 183:15
  **document** [32] -
50:9, 52:7, 52:22,
132:17, 138:10,
138:14, 138:19,
138:20, 161:6,
169:24, 173:18,

174:5, 175:22,
175:24, 176:22,
188:3, 193:13,
195:21, 206:18,
211:19, 247:5, 247:9,
247:14, 247:20,
247:24, 248:3, 248:4,
248:9, 249:4, 249:13
  **Document** [6] - 4:15,
5:5, 50:19, 88:11,
135:16, 205:16
  **documentation** [1] -
275:9
  **documented** [3] -
193:22, 195:9, 195:14
  **documents** [17] -
9:6, 52:8, 132:15,
135:12, 187:21,
187:22, 187:24,
198:20, 217:16,
248:2, 248:6, 248:7,
274:8, 274:11,
274:14, 274:17,
274:20
  **dollar** [6] - 57:22,
58:2, 104:12, 106:1,
156:13, 158:16
  **dollars** [4] - 58:17,
103:19, 106:11,
132:12
  **done** [48] - 42:2,
42:8, 42:10, 42:11,
43:5, 43:8, 44:23,
52:15, 76:20, 79:7,
103:9, 129:1, 129:3,
134:13, 148:5, 158:4,
163:14, 164:2, 164:3,
164:4, 164:5, 164:11,
164:24, 165:10,
165:11, 166:14,
166:17, 166:22,
167:4, 193:5, 194:22,
194:12, 202:5,
216:15, 216:20,
216:24, 217:20,
219:8, 219:20,
223:14, 225:22,
229:16, 229:17,
252:2, 259:7, 262:16,
262:18, 262:21
  **door** [9] - 130:7,
130:11, 131:4, 131:5,
256:1, 256:3, 256:6,
256:7, 257:4
  **doors** [6] - 130:5,
130:10, 130:13,
130:23, 256:11
  **down** [12] - 73:5,
116:15, 117:1,
121:19, 121:24,

125:11, 128:1,
131:10, 132:1, 192:4,
235:15, 262:12
  **dozen** [4] - 117:3,
118:19, 118:21, 119:2
  **dozens** [1] - 104:7
  **Dr** [35] - 100:19,
102:5, 102:23,
106:14, 106:16,
106:19, 106:23,
107:5, 107:7, 107:16,
108:17, 108:19,
124:11, 124:13,
186:22, 187:3, 187:5,
199:18, 199:19,
199:24, 206:7,
209:11, 209:18,
213:14, 213:17,
213:21, 215:4, 215:7,
215:9, 215:14,
250:18, 254:7,
254:16, 273:15,
273:18
  **drafting** [1] - 183:9
  **dramatically** [1] -
234:19
  **driven** [2] - 121:19,
121:24
  **driving** [1] - 168:13
  **dual** [1] - 122:6
  **due** [5] - 30:3, 113:4,
168:3, 261:4
  **duly** [1] - 7:11
  **duration** [1] - 103:4
  **during** [31] - 13:5,
19:6, 19:14, 19:23,
22:12, 23:15, 24:16,
25:18, 32:15, 53:8,
82:12, 143:17, 145:3,
165:7, 167:8, 211:4,
218:19, 219:2, 220:3,
221:23, 247:8,
247:22, 251:1, 251:8,
251:11, 265:3,
265:19, 269:20,
278:12, 278:17
  **duties** [4] - 11:12,
78:1, 170:22, 214:12

---

### E

  **E-mail** [1] - 5:3
  **e-mail** [15] - 88:24,
89:4, 89:6, 89:23,
90:3, 90:8, 92:6, 97:8,
98:8, 98:14, 100:13,
217:17, 250:6,
250:10, 273:17
  **e-mailed** [1] - 210:8
  **e-mails** [3] - 93:10,

106:14, 249:20
  **earning** [1] - 260:21
  **easier** [1] - 105:21
  **economics** [1] - 9:12
  **educational** [1] -
9:11
  **effect** [6] - 9:7,
52:22, 167:14,
167:16, 187:1, 211:11
  **effectiveness** [2] -
234:11, 234:17
  **efficiency** [2] -
129:20, 244:15
  **effort** [1] - 165:12
  **eight** [5] - 60:22,
69:4, 69:7, 119:15,
119:20
  **either** [21] - 18:23,
19:4, 22:16, 23:7,
43:2, 53:4, 153:24,
159:18, 173:24,
177:24, 198:10,
200:24, 207:12,
207:17, 207:23,
218:21, 224:10,
232:10, 249:14,
252:8, 279:20
  **EKG** [1] - 196:13
  **elected** [1] - 30:7
  **electronic** [9] -
133:3, 133:6, 133:8,
161:6, 198:23, 199:2,
207:12, 211:19,
281:11
  **electronically** [1] -
136:22
  **eligibility** [2] -
232:16, 232:21
  **elimination** [1] -
205:21
  **Elysabeth** [4] - 12:4,
93:21, 110:7, 219:21
  **emotional** [1] -
262:13
  **emphasis** [2] -
156:15, 224:3
  **employed** [5] - 7:21,
244:13, 279:19,
283:18, 283:20
  **employee** [3] -
36:23, 198:15, 283:20
  **employees** [7] -
15:9, 52:13, 248:17,
264:2, 264:3, 264:4
  **employer** [1] -
244:14
  **employment** [14] -
7:20, 9:19, 88:21,
143:17, 170:1, 211:4,
215:18, 233:18,

247:23, 258:6,
258:11, 265:13,
278:12, 279:16
  **enable** [1] - 88:1
  **enabled** [1] - 61:8
  **enabling** [1] - 104:20
  **encompassed** [1] -
31:5
  **encounter** [2] -
209:17, 209:19
  **encourage** [1] -
263:11
  **encouraged** [2] -
140:6, 144:6
  **encroaching** [2] -
137:8, 137:12
  **end** [11] - 53:4, 62:7,
62:15, 96:15, 98:7,
122:21, 146:17,
156:6, 165:22,
180:21, 226:14
  **ended** [2] - 10:13,
279:17
  **ending** [1] - 148:13
  **engaged** [2] - 143:1,
219:8
  **engaging** [1] - 179:8
  **ensure** [3] - 184:15,
185:14, 215:20
  **ensuring** [2] -
185:18, 241:11
  **enter** [4] - 64:9,
64:11, 66:15, 214:21
  **entered** [3] - 181:19,
181:24, 188:14
  **entering** [1] - 66:21
  **entire** [5] - 90:19,
135:5, 196:16, 247:8,
247:22
  **entities** [2] - 241:11,
264:15
  **entitled** [7] - 4:15,
5:5, 53:9, 34:23,
232:12, 233:3, 254:19
  **entity** [3] - 15:24,
241:9, 263:19
  **EP** [1] - 205:21
  **equal** [4] - 112:10,
234:4, 234:6, 237:23
  **equally** [2] - 193:18,
224:15
  **Equitable** [2] - 30:10,
242:6
  **errata** [1] - 284:18
  **ERRATA** [1] - 284:22
  **especially** [4] -
86:19, 87:13, 191:13,
202:1
  **Esquire** [8] - 2:4, 2:5,
2:6, 2:17, 3:4, 284:12,

RUDOLF ABRAMOWSKI 1/31/19 TERRY v. UCOR

284:14, 285:24
**essence** [1] - 142:14
**essentially** [3] -
52:3, 173:11, 188:5
**established** [5] -
52:10, 68:14, 99:14,
109:8, 194:18
**establishing** [1] -
103:8
**estimate** [5] - 22:14,
58:20, 68:15, 69:8,
119:6
**estimated** [5] - 66:1,
69:5, 69:7, 115:12,
115:13
**estimating** [1] -
102:17
**et** [1] - 6:8
**ethically** [1] - 255:9
**evaluate** [17] - 44:7,
45:21, 45:23, 46:9,
72:19, 72:22, 73:2,
94:9, 100:1, 112:7,
112:8, 113:16,
118:15, 185:1, 234:2,
234:16, 250:23
**evaluated** [16] - 63:1,
72:9, 72:10, 136:13,
141:6, 156:23,
158:22, 162:9,
222:22, 223:14,
224:2, 232:17,
232:22, 235:22,
237:2, 237:7
**evaluating** [2] -
160:17, 223:2
**evaluation** [9] -
44:23, 46:4, 127:11,
162:19, 219:17,
224:1, 225:22, 267:17
**evaluations** [5] -
85:23, 152:10,
156:24, 161:4, 162:11
**event** [4] - 30:6,
207:9, 217:13, 239:15
**events** [2] - 206:13,
222:21
**evidence** [7] - 56:12,
188:21, 202:11,
215:24, 251:13,
273:24, 283:10
**exact** [7] - 28:1, 45:3,
94:6, 95:18, 169:9,
169:14, 224:18
**exactly** [5] - 19:2,
56:4, 76:7, 171:7,
194:5
**Exam** [1] - 271:19
**EXAMINATION** [5] -
7:14, 208:18, 258:15,

259:1, 278:2
**Examination** [10] -
188:20, 189:22,
268:18, 269:4, 269:9,
271:13, 271:15,
275:21, 275:22,
277:19
**Examinations** [4] -
275:20, 276:9,
276:20, 277:3
**examinations** [1] -
189:23
**examined** [1] - 7:12
**examiner** [1] -
202:21
**examiners** [1] -
277:5
**example** [42] - 24:20,
25:8, 28:15, 29:14,
34:5, 38:22, 40:9,
40:10, 50:4, 61:4,
88:3, 94:9, 98:7,
120:4, 145:21, 146:4,
151:13, 151:19,
156:10, 157:3,
159:11, 165:5,
183:12, 188:4,
188:21, 195:2,
196:10, 197:13,
197:16, 199:1,
212:20, 226:2, 232:3,
239:19, 245:20,
249:7, 252:13, 257:9,
270:17, 273:2, 273:6
**examples** [7] - 41:8,
53:12, 61:6, 156:4,
242:5, 242:9, 243:1
**Exams** [1] - 276:15
**exceed** [3] - 156:8,
157:1, 269:17
**exceeded** [2] -
225:4, 225:14
**exceeding** [2] -
156:17, 157:7
**except** [1] - 141:16
**exceptional** [2] -
231:17, 231:22
**exceptions** [1] -
199:15
**exclude** [1] - 37:3
**excluded** [1] -
239:22
**excuse** [4] - 123:15,
185:6, 216:12, 227:7
**execute** [1] - 149:2
**Executive** [1] -
283:11
**executive** [1] - 169:7
**exempt** [1] - 178:2
**exercise** [1] - 276:19

**exhibit** [4] - 135:18,
228:11, 228:12,
249:22
**Exhibit** [21] - 4:15,
5:3, 5:5, 50:19, 50:21,
52:14, 88:11, 88:13,
135:16, 172:24,
173:17, 227:17,
228:10, 246:23,
247:21, 247:24,
248:21, 248:24,
249:5, 249:23, 250:6
**Exhibits** [1] - 1:2
**exhibits** [1] - 5:23
**exist** [4] - 85:16,
88:2, 112:11, 277:8
**existed** [4] - 116:17,
126:1, 167:5, 211:18
**existence** [1] - 198:1
**existing** [4] - 165:22,
183:7, 212:1, 261:23
**exists** [2] - 207:9,
207:13
**exit** [1] - 30:7
**expect** [28] - 41:22,
64:15, 78:22, 112:14,
119:11, 126:4,
193:15, 194:9, 196:8,
196:13, 196:15,
198:21, 200:3, 200:5,
200:22, 200:24,
201:3, 201:9, 201:15,
206:9, 206:12,
206:20, 207:8,
207:16, 215:9, 234:6,
261:12, 263:4
**expectation** [41] -
43:11, 44:5, 46:2,
58:17, 83:10, 94:23,
112:22, 133:18,
139:20, 142:15,
143:22, 145:22,
149:7, 151:6, 151:15,
151:18, 157:1,
158:12, 158:18,
164:16, 168:6, 168:8,
168:12, 186:21,
195:23, 200:7,
215:22, 216:3,
225:17, 225:20,
226:23, 227:7,
237:14, 237:16,
245:1, 245:3, 245:21,
252:16, 255:20, 278:8
**expectations** [55] -
27:11, 45:1, 49:9,
49:13, 54:10, 54:14,
55:1, 55:7, 57:12,
57:15, 83:14, 83:18,
84:14, 84:15, 95:1,

104:23, 110:15,
111:11, 112:2,
112:17, 113:3,
119:13, 121:3,
128:23, 129:12,
130:1, 131:1, 131:7,
131:9, 133:15,
139:18, 139:22,
142:7, 144:24,
145:17, 146:7, 153:8,
156:17, 158:16,
159:5, 160:4, 165:12,
167:18, 175:15,
223:8, 225:2, 227:8,
235:3, 236:16,
238:14, 252:19,
257:13, 267:21, 278:6
**expected** [54] -
42:15, 43:22, 44:1,
44:15, 44:18, 57:20,
59:7, 59:10, 59:12,
59:15, 59:16, 60:2,
60:9, 60:11, 60:14,
62:6, 63:7, 63:22,
66:12, 66:19, 66:23,
66:24, 69:4, 70:11,
71:3, 74:11, 78:1,
80:18, 85:18, 85:21,
86:6, 86:9, 119:16,
127:9, 131:24, 132:7,
139:10, 186:17,
192:21, 194:7,
203:14, 214:21,
215:1, 216:22,
226:12, 226:13,
234:24, 235:9, 238:5,
238:9, 244:7, 269:13,
273:11, 276:21
**expecting** [1] -
171:12
**expedite** [1] - 245:16
**expenses** [1] -
230:21
**experience** [21] -
23:13, 26:24, 27:4,
38:11, 63:20, 64:19,
115:24, 126:13,
136:8, 218:19,
224:19, 235:23,
239:4, 241:5, 251:1,
251:8, 251:11,
254:22, 255:9,
257:12, 260:23
**experienced** [1] -
218:9
**expert** [7] - 7:23,
40:18, 125:7, 126:8,
207:2, 275:15, 277:1
**expertise** [5] - 203:8,
203:15, 210:15,

211:1, 254:5
**expires** [1] - 146:17
**explain** [7] - 27:7,
37:11, 73:11, 73:18,
183:22, 243:6, 277:11
**explained** [7] -
115:17, 148:15,
148:23, 148:24,
250:8, 261:21, 274:3
**explanation** [7] -
38:4, 73:22, 74:12,
75:1, 116:23, 155:21,
261:16
**exposure** [1] - 135:5
**express** [5] - 83:3,
110:13, 111:4, 113:9,
180:15
**expressed** [1] -
187:16
**expressing** [1] -
111:10
**expressly** [2] - 9:1,
9:4
**extend** [2] - 183:14,
257:2
**extended** [1] -
234:19
**extending** [1] -
248:13
**extension** [2] -
101:24, 200:9
**extent** [19] - 9:9,
17:14, 17:23, 20:9,
23:1, 26:14, 80:15,
93:12, 102:13,
108:14, 111:22,
123:11, 125:6,
141:17, 153:13,
172:18, 261:3,
275:14, 276:24
**extreme** [1] - 156:3
**eyeball** [1] - 64:17
**eyes** [1] - 127:22

## F

**fact** [34] - 14:17,
19:7, 79:13, 87:10,
107:7, 118:16,
125:13, 150:18,
155:15, 160:21,
163:16, 164:3,
164:21, 165:1, 168:4,
185:20, 186:8, 193:8,
196:16, 198:10,
200:17, 205:6,
231:21, 232:20,
233:9, 243:19,
244:11, 246:19,
253:9, 255:11, 259:5,

260:3, 271:11, 275:3
**factor** [9] - 85:2,
126:20, 127:5,
127:14, 184:4,
223:16, 223:18,
224:4, 224:5
**factored** [1] - 123:20
**factoring** [1] -
125:19
**factors** [11] - 72:8,
83:24, 84:6, 84:24,
103:8, 103:12,
103:14, 127:10,
223:24, 224:6, 224:15
**facts** [3] - 56:11,
202:11, 215:23
**fail** [1] - 186:12
**fair** [25] - 13:21,
20:18, 27:3, 31:7,
32:17, 49:17, 75:1,
79:13, 82:6, 82:17,
83:4, 84:9, 84:23,
114:19, 126:16,
139:14, 145:2, 164:2,
167:1, 192:3, 229:2,
237:21, 273:21,
274:7, 274:23
**fairly** [12] - 27:8,
117:22, 121:7,
122:15, 145:5,
154:14, 195:6,
215:21, 216:4,
267:22, 270:16
**fairness** [1] - 111:12
**faith** [11] - 265:7,
266:19, 266:20,
266:22, 267:3, 275:3,
278:15, 278:23,
280:7, 280:18
**fall** [4] - 27:13,
242:21, 256:22,
264:12
**fallen** [1] - 17:16
**falling** [1] - 153:5
**familiar** [14] - 12:23,
27:16, 32:21, 33:7,
35:6, 35:24, 36:5,
52:1, 89:20, 90:1,
100:11, 186:5,
247:11, 247:19
**familiarity** [6] -
39:17, 51:11, 51:13,
90:7, 165:7, 277:6
**family** [1] - 181:10
**far** [17] - 21:10, 22:2,
51:18, 108:10,
114:15, 116:3,
123:21, 145:16,
156:16, 174:12,
174:19, 176:8,

194:14, 204:11,
241:24, 277:22,
278:23
**fashion** [1] - 160:14
**fast** [1] - 147:1
**fault** [1] - 218:2
**favorable** [2] -
160:20, 234:24
**feedback** [3] -
160:21, 160:24, 224:9
**fell** [1] - 225:1
**felt** [5] - 91:6,
112:17, 230:12,
251:10, 252:2
**Ferranti** [3] - 92:20,
92:21, 93:2
**few** [12] - 15:17,
17:5, 117:3, 118:18,
118:21, 119:2, 171:8,
174:2, 210:9, 218:24,
251:17, 278:1
**field** [4] - 9:14,
59:17, 119:16, 273:16
**fields** [2] - 59:4, 67:5
**File** [1] - 205:18
**file** [94] - 13:14,
32:20, 80:12, 88:14,
88:17, 88:20, 90:19,
91:11, 100:20, 101:3,
106:14, 106:17,
106:22, 106:23,
108:3, 108:17,
109:10, 109:11,
122:21, 193:4,
193:17, 194:11,
194:15, 194:17,
195:10, 196:16,
196:19, 196:23,
197:2, 197:4, 197:6,
197:8, 197:15,
197:20, 198:1, 198:4,
198:5, 198:12,
198:19, 198:24,
199:1, 199:3, 199:5,
199:12, 199:22,
200:5, 200:6, 200:7,
200:10, 200:13,
201:1, 201:4, 203:24,
204:14, 204:19,
204:20, 205:2, 205:3,
205:6, 206:2, 206:7,
206:13, 206:20,
206:21, 207:1, 207:9,
207:11, 207:12,
207:13, 207:15,
207:16, 207:17,
207:18, 207:19,
211:15, 211:16,
212:1, 213:20,
214:13, 214:14,

218:6, 219:10,
250:11, 274:12,
274:14, 274:18,
275:9, 281:6, 281:11,
281:12, 281:15
**filed** [3] - 264:15,
265:4, 266:4
**files** [15] - 133:1,
133:3, 133:5, 133:6,
198:22, 199:9,
207:10, 212:6,
212:17, 254:2,
254:12, 275:10,
276:21, 277:3, 277:5
**fill** [2] - 64:21, 214:8
**filling** [1] - 59:23
**filtering** [1] - 128:1
**final** [2] - 51:21,
186:12
**finance** [5] - 42:11,
56:1, 56:6, 103:10,
113:12
**financial** [17] - 29:9,
29:21, 30:3, 32:3,
95:16, 97:7, 110:14,
111:5, 111:20,
118:23, 119:23,
136:5, 140:15,
140:23, 253:5,
253:11, 253:12
**financially** [3] - 24:3,
24:8, 283:21
**findings** [14] - 176:1,
176:4, 182:20,
182:24, 183:24,
188:20, 189:7,
189:13, 194:24,
216:21, 216:23,
269:3, 280:7, 280:18
**fine** [4] - 50:11,
180:2, 188:18, 235:7
**fined** [2] - 188:17,
270:21
**finish** [1] - 62:15
**fired** [1] - 168:21
**firms** [1] - 210:8
**first** [23] - 9:13, 9:15,
30:23, 38:3, 39:8,
50:21, 50:23, 63:13,
76:11, 89:1, 107:2,
155:24, 164:23,
184:18, 185:12,
202:19, 209:17,
209:19, 228:15,
228:22, 236:20,
265:1, 276:10
**fit** [2] - 235:18,
248:19
**fits** [1] - 109:19
**five** [3] - 77:16,

259:15, 268:21
**flip** [1] - 247:21
**Floor** [1] - 3:5
**Flynn** [1] - 7:6
**FLYNN** [1] - 1:21
**focus** [2] - 79:8,
146:14
**focused** [1] - 79:3
**folder** [1] - 32:18
**folks** [2] - 103:11,
113:12
**follow** [11] - 74:3,
77:5, 81:12, 81:14,
105:23, 132:7,
258:17, 263:11,
263:13, 263:15, 269:5
**follow-up** [7] - 74:3,
81:12, 81:14, 258:17,
263:11, 263:13,
263:15
**follow-ups** [1] - 77:5
**followed** [2] -
134:21, 218:16
**following** [16] -
127:19, 134:7,
134:12, 134:13,
141:15, 141:23,
142:11, 142:13,
146:1, 150:6, 156:19,
165:17, 165:21,
215:16, 273:15, 285:9
**follows** [1] - 7:13
**font** [1] - 68:21
**footage** [3] - 107:1,
197:17, 197:19
**FOR** [2] - 2:2, 3:2
**forecast** [24] - 24:8,
26:14, 27:5, 27:12,
29:11, 42:4, 61:13,
70:11, 71:1, 71:8,
71:16, 71:19, 72:2,
72:21, 104:21, 120:6,
120:8, 120:11,
123:21, 126:20,
127:5, 237:20,
237:22, 257:19
**forecasted** [7] - 27:1,
43:10, 44:1, 62:6,
70:3, 105:18, 120:13
**forecasting** [3] -
43:5, 43:8, 44:14
**forecasts** [3] -
113:13, 228:17,
229:10
**foregoing** [1] - 285:8
**forever** [2] - 231:9,
243:22
**forewarning** [1] -
170:10
**forget** [10] - 45:3,

53:12, 66:4, 93:7,
94:6, 115:2, 169:14,
175:10, 187:18, 266:3
**form** [3] - 57:16,
136:10, 257:20
**former** [2] - 36:23,
198:15
**forms** [1] - 239:9
**forth** [6] - 53:24,
54:15, 72:23, 78:17,
97:23, 113:6
**forward** [2] - 68:1,
165:16, 281:21
**foundation** [97] -
20:19, 24:4, 24:13,
26:3, 26:9, 29:23,
31:13, 32:4, 32:10,
32:14, 33:23, 38:9,
39:3, 41:17, 42:24,
48:3, 49:23, 52:6,
52:20, 53:18, 56:3,
56:12, 62:4, 63:14,
64:22, 65:23, 69:21,
71:12, 71:17, 78:7,
79:2, 80:3, 80:23,
84:11, 91:19, 94:17,
96:3, 96:12, 97:1,
98:20, 99:21, 100:22,
101:7, 107:22, 108:5,
113:23, 115:21,
117:11, 117:24,
123:12, 124:20,
125:7, 126:8, 126:12,
128:20, 132:5,
134:17, 137:7,
137:16, 140:17,
141:2, 144:5, 152:16,
157:16, 162:4,
162:16, 164:8, 175:5,
178:9, 188:23,
189:19, 191:23,
194:1, 194:13, 195:5,
195:11, 196:7,
196:21, 197:11,
198:13, 200:1,
201:18, 201:19,
202:10, 203:21,
228:1, 255:1, 260:11,
261:14, 269:19,
269:22, 270:7,
270:24, 272:19,
277:20, 280:4, 280:10
**four** [8] - 18:23, 19:4,
115:11, 115:12,
115:13, 175:3, 220:2,
228:12
**frame** [13] - 13:9,
14:23, 20:7, 23:16,
24:14, 25:21, 32:16,
67:3, 74:21, 74:23,

124:22, 171:1, 207:5
**Frame** [1] - 52:15
**framed** [1] - 267:13
**frequently** [1] -
23:10
**Friedman** [1] - 2:16
**front** [3] - 51:16,
100:23, 117:21
**full** [1] - 7:18
**Fuller** [1] - 258:2
**fully** [2] - 232:17,
232:22
**function** [3] - 55:21,
222:9, 236:23
**functional** [3] -
53:23, 123:16, 237:4
**functions** [3] -
184:21, 186:16,
236:24
**future** [16] - 41:21,
42:5, 42:15, 43:16,
44:22, 59:11, 59:18,
66:3, 66:5, 66:15,
66:21, 67:1, 67:19,
68:8, 69:6, 237:23

## G

**gain** [4] - 71:24,
73:15, 107:18, 113:7
**gauge** [1] - 45:4
**gears** [1] - 193:3
**general** [18] - 37:4,
48:6, 90:2, 90:3, 90:6,
102:4, 103:7, 110:5,
126:16, 130:22,
136:6, 136:14, 190:4,
210:18, 212:3, 212:4,
213:9, 248:9
**General** [8] - 29:15,
29:18, 29:21, 30:2,
30:3, 30:4, 30:6,
242:6
**generalist** [1] -
203:10
**generally** [20] - 45:5,
77:17, 109:21, 111:7,
130:4, 131:18, 133:4,
151:4, 160:20, 164:4,
191:4, 195:20, 196:9,
199:16, 200:6, 207:6,
208:4, 218:2, 218:8,
269:16
**generate** [1] - 118:10
**generated** [2] -
214:4, 214:9
**generic** [1] - 40:3
**geographically** [2] -
13:8, 13:10
**Gillaspie** [14] - 94:2,

94:11, 94:15, 95:15,
95:23, 96:9, 96:21,
97:7, 98:5, 98:22,
99:16, 99:22, 249:20,
250:5
**given** [66] - 43:14,
49:8, 49:12, 53:5,
56:15, 57:2, 57:14,
57:16, 57:23, 62:10,
64:16, 67:7, 68:13,
69:8, 69:16, 74:18,
86:5, 87:19, 88:2,
94:23, 96:15, 96:18,
104:6, 104:10, 115:5,
115:7, 118:20, 119:1,
120:19, 121:17,
124:6, 130:19,
139:21, 139:24,
144:4, 149:5, 155:11,
155:12, 155:15,
156:17, 169:1, 170:4,
171:15, 171:22,
175:13, 175:17,
176:15, 177:13,
185:19, 185:20,
189:12, 193:21,
194:3, 222:3, 222:10,
223:14, 223:16,
224:24, 226:1,
226:17, 240:11,
242:4, 244:23,
255:20, 263:8
**glad** [2] - 146:23,
147:4
**goal** [14] - 54:8, 74:5,
77:6, 81:15, 161:11,
161:12, 161:18,
161:19, 162:1,
162:1, 162:6, 168:8,
168:12, 248:18
**goals** [16] - 42:22,
43:3, 51:21, 52:4,
52:10, 53:7, 53:21,
53:22, 54:2, 54:14,
57:1, 111:11, 128:19,
142:7, 167:18, 168:17
**Governor** [1] -
283:12
**granular** [1] - 121:20
**gray** [4] - 38:14,
38:20, 38:24, 39:19
**greater** [6] - 27:1,
41:1, 41:14, 67:3,
156:18, 157:5
**Griffin** [4] - 16:16,
16:17, 54:7, 176:11
**griffin** [41] - 19:16,
20:8, 20:22, 21:8,
54:11, 54:13, 54:22,
55:22, 56:9, 57:15,

58:7, 60:5, 61:21,
65:16, 66:11, 67:8,
68:5, 69:1, 72:16,
81:13, 81:19, 82:1,
82:4, 93:24, 127:18,
128:24, 129:11,
131:8, 132:13, 135:4,
135:8, 135:9, 148:8,
159:9, 159:21, 160:5,
161:2, 226:20, 227:1,
263:8
**griffin's** [2] - 20:17,
161:6
**groomed** [1] - 13:20
**Group** [33] - 1:10,
3:12, 16:3, 16:11,
17:9, 37:1, 211:4,
213:6, 219:3, 236:10,
240:8, 241:6, 241:8,
241:14, 241:15,
251:9, 251:12,
257:24, 258:5,
258:10, 263:16,
263:19, 264:1, 264:5,
264:8, 264:12,
264:13, 264:14,
264:21, 278:13,
283:6, 284:5, 285:5
**group** [10] - 27:22,
28:2, 28:5, 66:20,
103:23, 116:2, 124:1,
125:19, 153:22
**growth** [1] - 52:11
**guaranteed** [3] -
26:18, 31:17, 124:17
**guess** [46] - 27:9,
33:12, 52:2, 64:16,
71:22, 75:20, 80:22,
82:8, 87:15, 89:15,
94:20, 99:10, 122:23,
128:21, 129:9, 131:2,
143:14, 152:19,
155:24, 156:14,
160:2, 163:22, 165:4,
166:23, 171:11,
179:21, 190:16,
192:6, 195:7, 197:12,
225:11, 232:2,
236:20, 237:15,
243:15, 244:15,
245:12, 245:20,
248:8, 248:19,
251:21, 255:5,
259:17, 261:20,
272:10
**guidance** [5] -
158:23, 204:4, 227:5,
237:18, 247:15
**guideline** [2] - 112:5,
243:12

**guidelines** [8] -
184:6, 185:2, 185:16,
186:18, 188:1,
240:18, 264:21, 277:7
**guideposts** [1] -
136:10

## H

**Hackett** [1] - 93:6
**half** [3] - 103:19,
129:18, 210:12
**halfway** [3] - 155:16,
156:1, 177:15
**hallway** [1] - 221:6
**Hampton** [1] - 3:3
**Hancock** [1] - 242:6
**HAND** [1] - 285:21
**handle** [8] - 12:16,
78:9, 216:19, 235:9,
235:17, 242:2, 246:7,
246:17
**handled** [18] -
120:23, 121:7,
179:14, 179:24,
183:1, 185:15,
215:21, 216:3, 216:4,
258:11, 264:20,
266:14, 266:17,
270:16, 271:11,
275:5, 276:23, 280:19
**handlers** [1] - 271:6
**handles** [2] - 241:15,
241:24
**handling** [19] -
28:22, 30:8, 30:12,
79:4, 180:1, 186:16,
187:20, 189:1, 206:6,
221:17, 234:22,
236:2, 243:9, 252:3,
255:8, 279:3, 279:11,
280:1
**hard** [6] - 10:18,
25:20, 205:3, 219:18,
220:11, 253:20
**hard-working** [1] -
220:11
**head** [2] - 21:12,
142:14
**headed** [2] - 220:13,
230:7
**heads** [1] - 219:1
**hear** [5] - 33:18,
135:2, 257:5, 257:6,
257:7
**heard** [2] - 21:11,
33:13
**hearing** [1] - 18:18
**held** [6] - 38:6,
83:15, 83:20, 84:1,

87:20, 172:16
**help** [33] - 32:2, 42:4,
72:17, 73:18, 78:17,
91:6, 98:2, 104:21,
112:18, 118:4, 118:5,
118:7, 118:13,
119:23, 142:2, 142:6,
144:3, 144:9, 144:12,
150:5, 150:7, 164:12,
165:15, 216:6,
216:24, 229:5,
234:14, 245:15,
245:16, 245:19,
245:20, 250:23,
252:10
**helped** [2] - 127:12,
240:9
**helpful** [5] - 119:3,
119:6, 204:3, 223:23,
247:13
**helps** [2] - 72:18,
72:19
**hereby** [1] - 285:7
**hiding** [1] - 137:13
**hierarchy** [2] - 17:6,
18:4
**high** [3] - 88:7,
222:8, 240:12
**higher** [13] - 20:16,
65:7, 65:10, 65:11,
88:3, 102:23, 103:4,
159:21, 160:6,
162:14, 162:23,
203:8, 269:13
**highest** [1] - 10:12
**highly** [1] - 218:9
**Hill** [1] - 2:7
**himself** [1] - 95:16
**hiring** [2] - 34:13,
211:2
**historical** [39] - 42:2,
43:4, 43:15, 44:7,
44:20, 45:1, 54:23,
71:8, 72:2, 83:18,
104:23, 112:2,
112:22, 113:3,
113:16, 113:19,
114:1, 114:20,
115:24, 117:8,
117:17, 119:13,
120:18, 121:18,
123:6, 125:2, 125:17,
136:7, 139:17,
158:23, 226:15,
226:17, 227:6, 227:7,
234:8, 235:11,
236:16, 277:15,
277:16
**historically** [4] -
116:19, 118:11,

234:3, 234:5
**history** [4] - 112:3, 215:18, 239:19, 278:13
**hit** [3] - 65:9, 65:21, 155:15
**hmm** [1] - 205:12
**hoc** [1] - 252:11
**hold** [1] - 84:2
**holding** [4] - 84:9, 85:20, 241:10, 263:19
**Holly** [2] - 19:1, 176:10
**honest** [3] - 164:22, 165:3, 165:8
**honestly** [2] - 149:21, 150:1
**Hope** [1] - 3:5
**hope** [3] - 83:9, 172:10, 260:15
**hopefully** [1] - 53:8
**Hotel** [1] - 1:16
**hour** [1] - 210:12
**housed** [1] - 211:20
**huge** [1] - 118:12
**human** [5] - 169:7, 169:23, 176:17, 177:6, 247:14
**hung** [1] - 44:17
**hurt** [2] - 164:24, 165:1
**hurting** [1] - 164:21
**hypothetical** [16] - 39:2, 101:8, 103:18, 104:1, 116:23, 151:16, 193:24, 195:12, 196:7, 196:22, 197:11, 198:14, 200:18, 201:18, 203:22, 206:23
**hypothetically** [2] - 104:9, 155:8

**I**

**idea** [6] - 8:5, 47:8, 48:6, 102:6, 180:17, 230:6
**ideally** [1] - 153:7
**identical** [1] - 175:8
**identification** [4] - 50:20, 88:12, 135:17, 283:11
**identified** [5] - 7:11, 63:17, 66:2, 132:19, 247:18
**identify** [4] - 6:16, 54:23, 228:7, 252:14
**identifying** [1] -

132:16
**IDI** [10] - 10:21, 21:4, 23:17, 29:15, 29:20, 30:8, 33:22, 115:18, 240:24, 241:3
**ignoring** [3] - 188:21, 251:13, 251:19
**illness** [3] - 242:19, 243:20, 261:4
**imagine** [1] - 109:23
**imaging** [2] - 40:10, 40:21
**IMEs** [1] - 190:5
**immediate** [1] - 67:24
**impact** [22] - 103:22, 104:5, 104:9, 104:10, 105:9, 111:11, 119:8, 144:15, 149:10, 149:11, 152:15, 179:5, 187:9, 229:18, 248:18, 253:5, 253:7, 253:11, 253:12, 260:1, 262:14, 262:22
**impacted** [2] - 140:20, 152:6
**impairment** [1] - 12:23
**impetus** [3] - 80:7, 80:10, 81:4
**implemented** [3] - 189:10, 189:17, 189:18
**implementing** [2] - 183:10, 187:19
**implications** [1] - 168:6
**implicit** [1] - 114:23
**implies** [2] - 163:23, 244:16
**importance** [2] - 84:19, 85:3
**important** [7] - 85:1, 184:24, 202:1, 208:24, 239:5, 239:17, 275:12
**impossible** [1] - 69:18
**impress** [2] - 84:18, 85:1
**improper** [5] - 220:5, 221:16, 236:11, 269:3, 275:4
**Improperly** [1] - 228:15
**improperly** [6] - 175:14, 218:21, 219:4, 229:9, 264:24, 270:4

**improvement** [1] - 217:1
**inability** [1] - 113:2
**inactive** [1] - 214:17
**inappropriate** [6] - 36:22, 143:15, 143:17, 236:19, 237:12, 262:19
**incentive** [5] - 126:21, 127:6, 127:12, 264:5, 264:9
**include** [16] - 49:2, 57:4, 59:10, 60:3, 60:15, 66:1, 67:8, 115:18, 157:10, 185:4, 207:17, 207:22, 223:7, 227:20, 248:3, 248:8
**included** [16] - 34:5, 67:18, 85:23, 86:2, 95:23, 106:9, 107:9, 188:20, 199:2, 200:6, 200:10, 201:1, 206:14, 206:21, 214:23, 248:5
**includes** [2] - 140:11, 241:3
**including** [8] - 55:3, 69:5, 86:9, 95:8, 95:12, 186:16, 224:3, 225:3
**inclusive** [1] - 61:5, 196:16, 204:5
**income** [6] - 7:24, 25:9, 29:8, 118:10, 230:22, 260:21
**incomplete** [13] - 39:2, 101:8, 103:24, 193:24, 195:12, 196:7, 196:22, 197:11, 198:13, 200:18, 201:18, 203:21, 206:23
**incorporate** [3] - 182:13, 207:22, 211:24
**incorporated** [4] - 185:16, 199:10, 207:11, 207:16
**incorporating** [1] - 182:24
**incorporation** [1] - 182:20
**incorrect** [1] - 31:3
**incorrectly** [1] - 160:18
**increase** [2] - 71:15, 71:20
**increased** [7] - 25:9, 25:12, 26:21, 34:4,

34:5, 34:8, 126:5
**increasing** [1] - 71:11
**independent** [6] - 92:1, 189:23, 202:21, 218:5, 272:4, 272:11
**independently** [3] - 122:20, 148:2, 217:13
**indicate** [4] - 150:19, 196:15, 203:15, 261:17
**indicated** [5] - 73:5, 89:3, 170:7, 218:8, 218:11
**indicates** [4] - 51:2, 51:20, 52:16, 136:5
**indicating** [1] - 100:15
**indirectly** [1] - 267:10
**Individual** [5] - 16:20, 19:9, 19:12, 161:23, 168:9
**individual** [24] - 1:6, 1:11, 1:12, 24:24, 29:2, 63:10, 70:24, 73:6, 97:8, 97:9, 106:5, 116:1, 240:11, 242:16, 280:11, 283:4, 283:7, 283:8, 284:3, 284:7, 284:8, 285:2, 285:6
**individually** [4] - 96:14, 97:5, 196:13, 238:18
**individuals** [5] - 45:8, 45:11, 93:18, 216:18, 255:6
**industry** [5] - 9:10, 9:19, 24:17, 207:7, 260:24
**influence** [6] - 82:17, 83:4, 104:24, 191:8, 191:10, 191:17
**influenced** [2] - 201:14, 255:13
**inform** [1] - 117:20
**information** [108] - 54:22, 55:17, 55:23, 59:22, 61:8, 61:12, 62:13, 65:3, 66:1, 67:2, 67:14, 67:15, 67:18, 67:19, 68:6, 68:7, 81:22, 81:24, 82:2, 91:3, 91:6, 95:5, 95:10, 96:22, 97:3, 97:16, 97:18, 98:1, 98:6, 98:22, 99:3, 99:24, 101:18, 101:20, 102:17,

102:18, 102:19, 110:3, 114:1, 116:15, 118:3, 118:23, 123:14, 125:10, 125:13, 125:18, 125:22, 128:2, 128:14, 130:14, 130:16, 130:22, 131:19, 131:20, 132:8, 132:9, 132:16, 132:22, 133:16, 134:2, 134:5, 134:21, 137:13, 137:20, 158:17, 166:14, 172:5, 172:10, 174:13, 179:1, 180:21, 198:11, 199:7, 200:8, 200:9, 200:24, 203:4, 204:1, 204:4, 204:14, 214:3, 214:21, 215:12, 217:11, 217:12, 218:1, 218:3, 218:5, 218:13, 220:7, 225:22, 226:9, 230:9, 230:11, 230:13, 231:1, 231:5, 231:13, 250:20, 252:8, 257:1, 257:2, 257:6, 261:24, 262:8, 263:7, 267:2, 268:19
**informative** [1] - 65:4
**informed** [2] - 116:4, 158:3
**infrequent** [1] - 221:5
**initial** [1] - 276:8
**injury** [1] - 261:5
**input** [6] - 190:3, 192:15, 214:2, 215:4, 215:8, 215:13
**inquire** [1] - 85:16
**instance** [2] - 185:12, 265:21
**instances** [2] - 91:4, 154:18
**instead** [1] - 221:9
**institute** [1] - 271:22
**instituted** [1] - 272:3
**instruct** [5] - 81:2, 154:10, 154:17, 172:1, 174:8
**instructed** [6] - 134:9, 149:13, 154:15, 156:8, 176:17, 267:9
**instructing** [4] - 153:17, 154:13, 172:8, 172:9

instructional [1] - 267:7
instructions [2] - 149:6, 172:14
INSTRUCTIONS [1] - 284:16
insurance [22] - 7:24, 9:10, 9:14, 9:19, 24:11, 29:8, 207:8, 239:6, 239:11, 239:18, 241:9, 260:8, 260:17, 260:24, 263:17, 263:20, 263:21, 266:19, 276:16, 276:20, 277:10
Insurance [13] - 1:9, 6:8, 9:16, 15:18, 29:16, 188:6, 193:9, 270:21, 276:19, 276:22, 283:5, 284:4, 285:4
insurance-related [1] - 9:14
insured [25] - 34:23, 37:23, 109:17, 148:13, 164:21, 164:24, 165:1, 166:8, 178:20, 233:1, 239:5, 239:23, 244:1, 260:1, 260:4, 261:12, 262:14, 273:22, 274:4, 274:8, 274:10, 274:16, 281:5, 281:10, 281:13
insured's [6] - 82:18, 83:5, 198:9, 202:15, 206:2, 251:14
insureds [9] - 125:20, 229:11, 232:1, 232:23, 233:12, 233:18, 265:4, 266:4, 281:2
insuring [1] - 264:15
intended [4] - 112:5, 136:15, 136:17, 158:24
intent [7] - 163:24, 164:5, 164:11, 164:14, 164:20, 164:24, 262:11
intention [1] - 211:2
intentionally [1] - 254:18
interact [1] - 221:2
interchangeably [1] - 95:20
interest [8] - 9:2, 83:5, 86:19, 105:8, 105:13, 105:15,

156:22
interested [2] - 29:19, 283:22
interests [1] - 82:18
interim [1] - 261:18
internal [22] - 141:13, 141:22, 142:11, 143:3, 143:8, 144:12, 144:14, 144:20, 148:19, 149:12, 149:16, 149:18, 150:13, 163:12, 165:16, 170:14, 170:17, 171:4, 175:18, 229:4, 229:13, 229:17
International [1] - 33:8
interpretation [1] - 270:22
interpreted [1] - 81:1
interrupt [2] - 66:6, 170:16
interrupting [1] - 122:2
interviewed [2] - 174:5, 174:14
inventory [11] - 14:3, 48:7, 48:15, 48:16, 59:3, 71:3, 72:17, 77:19, 78:14, 84:4, 104:17
investigation [1] - 172:19
investment [1] - 140:24
involved [22] - 22:12, 59:6, 103:14, 109:21, 110:4, 120:14, 134:19, 163:7, 171:2, 179:22, 180:5, 182:19, 183:9, 187:6, 193:19, 217:14, 277:3, 278:23, 278:24, 279:12, 279:21, 279:24
involvement [8] - 108:17, 179:12, 182:9, 183:8, 184:13, 191:5, 265:24, 278:19
involves [2] - 108:9, 275:5
involving [3] - 40:5, 179:6, 179:9
issue [12] - 70:8, 78:23, 107:19, 108:1, 108:11, 109:13, 123:1, 123:5, 263:16, 276:16, 279:4, 280:1
issued [13] - 28:9,

28:12, 30:18, 31:6, 48:11, 108:8, 124:9, 124:16, 125:12, 125:15, 125:23, 241:11, 283:12
issues [6] - 37:6, 130:21, 222:4, 222:16, 224:9, 241:6
issuing [1] - 108:11, 239:12
itemized [1] - 200:4
items [1] - 222:20
itself [3] - 193:22, 206:19, 284:20

**J**

Jack [3] - 21:15, 238:14, 238:19
James [1] - 12:13
Jeff [1] - 6:19
Jeffrey [1] - 2:17
Jerome [4] - 1:10, 283:7, 284:6, 285:5
job [14] - 9:13, 9:15, 11:7, 11:12, 20:24, 84:8, 100:3, 125:22, 159:2, 235:5, 235:6, 235:17, 242:24, 254:6
Jodi [6] - 92:9, 220:24, 221:13, 221:17, 250:9, 279:20
John [1] - 242:6
joined [4] - 41:24, 236:21, 239:2, 271:2
joining [9] - 15:2, 15:4, 15:7, 15:11, 51:8, 153:16, 167:6, 167:9, 188:10
Jones [2] - 117:5, 119:9
Joseph [1] - 12:7
jrubin@
friedmanrubin.com
[1] - 2:21
judged [1] - 72:5
Julie [4] - 1:19, 7:5, 283:2, 283:24
jump [5] - 46:15, 150:5, 150:8, 238:23, 259:3
June [1] - 186:24
juries [1] - 266:13
jury [6] - 123:3, 266:20, 267:4, 280:7, 280:18
justified [2] - 127:23, 127:24

**K**

Keep [1] - 273:17
keep [14] - 43:20, 99:5, 100:15, 109:11, 131:12, 131:14, 131:22, 132:2, 132:9, 132:10, 133:1, 217:19, 227:23, 250:17
kept [10] - 86:5, 86:11, 100:21, 101:6, 197:23, 198:5, 207:5, 211:11, 250:15, 250:21
Kim [1] - 19:2
Kinback [3] - 39:5, 39:9, 39:18
kinbacks [1] - 39:6
kind [28] - 18:13, 64:17, 69:14, 75:17, 78:17, 90:22, 93:16, 95:3, 98:23, 99:5, 123:23, 159:5, 170:7, 210:17, 217:19, 219:19, 222:19, 224:8, 226:3, 235:8, 239:23, 240:9, 243:13, 243:20, 248:13, 248:18, 252:11, 256:18
kinds [1] - 149:1
knowing [2] - 78:3, 254:19
knowledge [37] - 19:24, 20:13, 21:7, 21:15, 25:16, 26:12, 57:9, 66:20, 71:3, 82:14, 82:20, 82:24, 83:2, 94:24, 106:21, 108:13, 113:1, 113:5, 120:10, 123:19, 125:13, 125:15, 167:22, 173:14, 180:1, 180:7, 183:6, 190:1, 228:3, 236:24, 237:4, 266:22, 267:24, 275:23, 279:21, 280:5, 285:9
knowledgeable [2] - 120:15, 223:22
known [11] - 13:15, 16:6, 17:24, 27:16, 28:6, 37:19, 151:12, 166:21, 174:22, 230:5, 254:4
knows [3] - 126:18, 197:8, 198:4

**L**

label [1] - 135:23, 136:5, 263:22
lack [6] - 128:17, 128:22, 129:20, 272:22, 280:3, 280:9
lacks [11] - 91:18, 96:12, 98:20, 99:21, 101:7, 117:11, 200:1, 201:19, 202:10, 255:1, 269:22, 270:7, 270:23
language [12] - 136:4, 137:1, 138:4, 138:10, 138:14, 138:20, 139:7, 184:10, 185:23, 186:24, 187:7, 272:15
large [21] - 43:4, 104:12, 105:6, 105:22, 114:7, 114:21, 119:21, 123:6, 128:9, 212:18, 235:11, 235:14, 245:24, 246:6, 252:23, 253:7, 253:14, 269:20, 270:3, 271:12
larger [8] - 65:18, 65:20, 103:3, 105:20, 114:12, 226:1, 248:18, 253:1
last [11] - 8:7, 109:13, 109:15, 116:20, 137:13, 145:22, 145:24, 202:18, 233:4, 259:15
Laughter [2] - 76:21, 117:15
Law [1] - 3:14
law [3] - 114:21, 119:21, 123:6
lawsuit [2] - 108:3, 275:5
lawsuits [4] - 265:4, 265:7, 265:10, 266:4
lawyer [2] - 259:8, 259:11
layperson [1] - 61:1
lead [1] - 89:4
leader [1] - 114:7
leading [3] - 210:22, 247:10, 279:6
learn [1] - 23:14, 25:23, 33:20, 41:20, 49:20, 71:6, 73:6, 73:17, 98:4, 135:2, 145:12, 148:10, 153:12

**learned** [4] - 147:19, 147:23, 153:11, 180:17
**learning** [1] - 218:18
**least** [11] - 30:14, 33:3, 43:24, 122:17, 196:8, 198:6, 202:18, 204:8, 231:16, 241:2, 273:16
**leave** [4] - 20:1, 127:23, 174:10, 194:22
**leaving** [1] - 222:11
**led** [1] - 220:17
**left** [8] - 19:21, 19:22, 39:15, 51:18, 122:17, 146:12, 173:16, 241:2
**legal** [3] - 110:1, 275:15, 277:1
**legally** [1] - 178:11
**leisure** [1] - 176:18
**less** [9] - 17:4, 17:17, 23:10, 24:7, 102:23, 104:13, 193:15, 205:21, 252:23
**lessen** [1] - 32:2
**letter** [2] - 107:8, 229:15
**level** [13] - 10:12, 121:20, 122:1, 149:6, 162:10, 164:7, 167:3, 167:7, 171:10, 203:8, 220:13, 221:9, 221:11
**level-headed** [1] - 220:13
**levels** [3] - 20:20, 20:24, 38:17
**liberal** [2] - 25:1, 25:7
**licensed** [1] - 241:8
**Life** [13] - 1:8, 6:7, 9:16, 14:13, 14:14, 15:18, 29:16, 30:13, 241:12, 242:5, 283:5, 284:4, 285:4
**life** [3] - 26:21, 261:8, 261:12
**lifetime** [5] - 25:15, 25:18, 25:24, 102:9, 124:18
**likelihood** [5] - 42:5, 64:8, 65:4, 69:17, 70:3
**likely** [22] - 31:18, 40:16, 43:6, 55:1, 61:10, 61:14, 62:10, 62:15, 64:12, 65:9, 65:21, 70:24, 71:5, 112:1, 114:13,

219:20, 230:12, 230:23, 233:15, 251:24, 262:4, 266:6
**limit** [2] - 8:12, 8:16
**limitations** [1] - 202:15
**limited** [4] - 179:12, 204:2, 230:20, 243:21
**Line** [1] - 285:10
**line** [7] - 36:22, 37:5, 52:23, 110:11, 137:13, 140:21, 180:2
**lines** [4] - 56:7, 110:19, 113:13, 177:2
**link** [1] - 198:2
**list** [20] - 61:21, 63:22, 64:6, 64:21, 65:3, 65:12, 65:15, 65:24, 66:10, 93:15, 103:15, 192:20, 196:1, 196:13, 200:22, 212:12, 212:24, 222:18, 224:7, 242:4
**listed** [6] - 74:10, 118:2, 195:22, 196:5, 198:19, 200:4
**Listen** [1] - 33:10
**listing** [1] - 213:3
**lists** [1] - 204:2
**litany** [1] - 223:24
**literal** [1] - 187:9
**literally** [3] - 161:5, 161:8, 212:24
**litigated** [1] - 8:1
**lives** [2] - 123:24, 260:22
**Liz** [2] - 213:17, 220:9
**LLP** [1] - 3:3
**locked** [1] - 132:23
**Loftus** [5] - 12:9, 173:3, 173:5, 173:9, 175:4
**logic** [1] - 146:9
**logical** [3] - 155:2, 189:9, 220:14
**long-standing** [1] - 236:21
**long-tenured** [1] - 218:9
**long-term** [6] - 21:5, 27:20, 116:2, 241:4, 261:19, 264:8
**look** [19] - 67:5, 73:21, 89:20, 97:19, 136:24, 138:3, 164:6, 184:21, 196:2, 196:3, 225:21, 225:23, 226:1, 226:2, 228:10,

234:2, 240:13, 250:24, 270:12
**looked** [13] - 88:7, 104:24, 138:16, 139:7, 163:14, 195:17, 196:9, 196:10, 227:15, 234:1, 247:17, 252:8, 252:9
**looking** [19] - 32:1, 46:10, 48:5, 50:8, 60:18, 103:20, 104:16, 116:19, 117:2, 118:2, 122:8, 163:18, 163:19, 165:23, 166:4, 173:17, 203:19, 205:8, 210:16
**looks** [6] - 50:8, 155:17, 195:8, 195:22, 247:20, 249:23
**loop** [1] - 250:15
**loosely** [1] - 167:20
**Los** [1] - 3:6
**loss** [1] - 260:20
**losses** [1] - 32:3
**lost** [1] - 205:3
**low** [2] - 65:22, 73:12
**lower** [1] - 73:23
**LTC** [2] - 21:4, 21:9
**LTD** [1] - 116:2

## M

**M.D** [13] - 1:5, 1:11, 1:11, 6:7, 283:4, 283:7, 283:8, 284:3, 284:7, 285:2, 285:5, 285:6
**mail** [16] - 5:3, 88:24, 89:4, 89:6, 89:23, 90:3, 90:8, 92:6, 97:8, 98:8, 98:14, 100:13, 217:17, 250:6, 250:10, 273:17
**mailed** [1] - 210:8
**mails** [3] - 93:10, 106:14, 249:20
**main** [3] - 56:24, 118:17, 122:17
**Maine** [1] - 3:16
**maintain** [1] - 276:21
**major** [2] - 53:23, 224:6
**majority** [9] - 31:11, 31:16, 75:5, 153:14, 224:22, 225:4, 225:14, 230:19, 242:20

**makeup** [2] - 119:4, 226:18
**manage** [4] - 33:22, 72:17, 72:19, 113:6
**managed** [1] - 271:7
**management** [28] - 12:17, 13:17, 22:4, 23:6, 32:8, 32:12, 48:15, 48:16, 54:24, 73:17, 78:18, 83:16, 112:4, 112:20, 119:5, 119:12, 159:10, 159:21, 166:21, 166:24, 167:2, 167:7, 167:8, 168:16, 191:20, 214:17, 222:20, 247:4
**Management** [1] - 247:9
**Manager** [6] - 4:16, 51:3, 51:12, 246:23, 247:1, 247:11
**manager** [25] - 54:7, 84:13, 84:17, 93:1, 93:2, 93:3, 102:18, 113:10, 134:8, 134:13, 134:20, 145:16, 147:23, 148:7, 152:3, 153:11, 161:2, 176:11, 219:16, 236:5, 245:18, 247:13, 247:15, 256:22
**managerial** [4] - 78:1, 136:16, 221:19, 221:24
**managing** [8] - 11:13, 47:19, 47:21, 55:20, 59:2, 77:19, 222:21, 234:15
**manipulated** [4] - 163:10, 163:19, 163:22, 163:23
**manipulating** [2] - 163:7, 163:13
**manner** [3] - 160:8, 220:20, 235:1
**manually** [1] - 99:5
**March** [2] - 89:17, 250:10
**mark** [4] - 50:5, 88:9, 135:15, 172:23
**Mark** [4] - 1:5, 283:4, 284:3, 285:2
**marked** [3] - 50:19, 88:11, 135:16
**market** [5] - 24:11, 24:20, 29:8, 114:7, 276:2
**Market** [15] - 188:20,

268:18, 269:4, 269:9, 271:12, 271:15, 271:18, 275:19, 275:20, 275:21, 276:9, 276:15, 276:19, 277:2, 277:18
**Mary** [1] - 258:2
**Massachusetts** [8] - 1:9, 1:17, 6:15, 283:5, 283:13, 283:14, 284:5, 285:5
**match** [1] - 71:15
**matches** [1] - 43:18
**material** [5] - 175:17, 196:4, 196:9, 200:15, 248:8
**math** [1] - 115:8
**matter** [13] - 6:7, 7:23, 19:7, 121:16, 178:18, 179:13, 198:16, 213:2, 242:23, 244:15, 250:19, 256:19, 283:3
**matters** [1] - 8:1
**Maureen** [2] - 16:16, 176:11
**McGarry** [9] - 21:15, 21:20, 21:22, 21:24, 23:7, 159:11, 167:3, 238:14, 238:19
**McGee** [12] - 20:12, 20:23, 21:2, 21:12, 21:14, 22:5, 22:12, 22:16, 23:11, 159:16, 176:12, 240:20
**McGee's** [2] - 20:13, 169:10
**mean** [46] - 14:5, 27:6, 35:2, 40:13, 50:1, 68:11, 69:10, 72:14, 76:4, 80:15, 82:7, 83:7, 84:7, 89:22, 105:19, 105:23, 110:20, 111:7, 115:1, 121:16, 128:22, 137:12, 144:1, 148:1, 148:11, 148:15, 160:16, 165:14, 188:4, 194:4, 198:2, 204:6, 212:18, 215:22, 221:3, 238:16, 241:18, 241:21, 242:14, 244:3, 251:15, 254:8, 260:14, 271:1, 274:2, 276:2
**meaning** [5] - 31:20, 34:19, 106:5, 149:10, 161:5
**means** [6] - 58:21,

82:24, 89:13, 155:16, 249:24, 261:17

**meant** [6] - 26:20, 35:7, 36:6, 115:15, 168:7, 181:12

**measure** [10] - 45:4, 45:8, 45:14, 46:3, 49:2, 49:17, 126:19, 127:3, 225:9, 234:10

**measured** [5] - 84:4, 95:24, 237:11, 253:9, 253:11

**measurement** [3] - 152:5, 153:2, 162:14

**measurements** [2] - 152:23, 237:1

**measures** [2] - 51:22, 52:4

**measuring** [2] - 83:21, 267:19

**mechanics** [1] - 108:10

**mechanism** [1] - 90:17

**medical** [17] - 34:5, 186:4, 189:23, 194:7, 195:24, 196:11, 200:8, 200:9, 202:21, 203:8, 203:13, 204:15, 212:21, 233:5, 233:10, 239:19, 239:21

**Medical** [1] - 211:7

**medically** [1] - 191:3

**medium** [1] - 105:6

**meet** [29] - 34:24, 53:2, 53:3, 63:9, 70:23, 121:2, 121:10, 144:3, 150:5, 153:7, 156:24, 165:12, 167:18, 168:11, 175:15, 219:5, 220:5, 221:8, 221:11, 224:20, 225:16, 226:5, 245:2, 254:20, 255:16, 256:5, 256:13, 262:12

**Meeting** [1] - 52:16

**meeting** [30] - 22:8, 22:15, 53:6, 55:11, 65:5, 69:17, 72:7, 74:12, 84:19, 85:12, 85:21, 130:12, 141:8, 142:15, 144:24, 150:6, 150:8, 152:14, 152:23, 152:24, 153:1, 169:6, 170:4, 176:16, 180:19, 191:7, 221:10, 222:2, 238:17, 263:11

**meetings** [16] - 22:5, 22:11, 23:10, 81:17, 81:18, 82:3, 129:3, 130:18, 131:2, 163:3, 221:19, 221:24, 255:17, 256:15, 256:18

**member** [1] - 181:11

**Memo** [1] - 89:7

**memo** [2] - 39:18, 89:9

**memory** [5] - 14:20, 14:23, 67:22, 109:15, 182:1

**mental** [1] - 38:23

**mention** [4] - 13:14, 33:14, 54:7, 162:12

**mentioned** [14] - 53:9, 103:12, 154:16, 176:10, 186:17, 192:14, 198:22, 211:10, 213:5, 217:2, 224:16, 238:8, 255:6, 270:17

**mentor** [2] - 216:24, 223:20

**merely** [1] - 83:9

**merged** [2] - 15:18, 15:23

**merger** [7] - 15:1, 75:19, 75:21, 76:4, 76:6, 76:10, 76:12

**mergers** [1] - 16:9

**merit** [1] - 104:13

**merits** [11] - 105:3, 105:4, 118:16, 118:24, 120:24, 121:8, 121:11, 136:13, 158:22, 216:4, 235:10

**mess** [1] - 33:17

**messaging** [1] - 167:13

**met** [11] - 52:18, 74:6, 145:23, 150:24, 157:20, 224:21, 225:4, 225:14, 225:19, 256:10, 267:20

**methods** [1] - 159:5

**metric** [20] - 42:4, 43:12, 44:6, 44:9, 45:3, 45:7, 45:13, 45:17, 45:19, 46:3, 46:7, 46:10, 49:7, 49:11, 72:24, 74:8, 99:24, 225:17, 234:14, 240:9

**metrics** [48] - 44:10, 44:21, 45:19, 45:20,

45:23, 46:8, 48:19, 48:20, 49:1, 49:4, 72:24, 73:1, 74:9, 83:14, 85:9, 85:14, 85:22, 94:8, 95:4, 97:12, 99:24, 105:10, 112:6, 136:5, 136:15, 142:3, 158:22, 161:19, 162:21, 179:2, 219:5, 220:5, 220:7, 225:9, 228:16, 229:10, 229:23, 231:24, 232:9, 234:1, 237:1, 237:7, 237:9, 254:20, 259:24, 262:13, 267:19, 273:11

**mid** [4] - 24:10, 25:5, 34:11

**might** [43] - 17:24, 22:15, 30:17, 32:19, 39:21, 41:22, 56:15, 59:17, 60:13, 61:1, 71:10, 73:5, 85:16, 86:4, 86:11, 88:1, 88:4, 89:11, 91:17, 109:24, 111:11, 115:6, 170:11, 179:18, 181:22, 191:10, 191:11, 191:15, 194:5, 197:3, 199:6, 199:15, 201:9, 203:10, 206:15, 213:2, 222:3, 225:1, 232:12, 249:6, 251:16, 251:19

**migrated** [1] - 154:9

**million** [9] - 58:19, 58:24, 103:19, 151:16, 151:19, 151:20, 151:21, 157:4

**mind** [4] - 185:24, 219:19, 260:8, 261:3

**minority** [1] - 47:13

**minutes** [6] - 146:12, 146:16, 146:17, 146:22, 192:6, 208:10

**miscellaneous** [1] - 181:17

**mischaracterizes** [3] - 120:1, 123:11, 199:23

**misconduct** [6] - 142:22, 142:24, 143:20, 169:2, 170:1, 233:17

**missing** [1] - 32:18

**misstates** [16] - 44:3, 54:21, 56:21, 69:24, 73:14, 78:6, 79:1,

83:12, 86:22, 105:12, 121:23, 152:17, 163:9, 187:2, 254:24, 279:5

**misunderstood** [1] - 279:14

**mix** [2] - 47:24, 48:10

**model** [2] - 43:5, 277:7

**modified** [3] - 46:20, 46:24, 116:9

**Moffat** [1] - 4:21

**Moffatt** [1] - 4:20

**moment** [2] - 171:6, 193:3

**money** [1] - 232:11

**monitor** [2] - 6:12, 87:23

**monitoring** [1] - 82:15

**month** [153] - 22:10, 54:6, 54:20, 55:2, 55:4, 55:8, 55:13, 55:24, 57:15, 57:20, 59:18, 60:8, 60:9, 60:20, 61:13, 61:14, 62:2, 62:7, 62:16, 63:6, 63:9, 63:19, 65:5, 65:17, 66:3, 66:4, 66:11, 66:14, 66:24, 67:3, 67:16, 67:19, 67:24, 68:7, 69:8, 70:18, 70:23, 71:15, 73:7, 74:2, 94:22, 95:22, 96:15, 98:7, 102:8, 104:6, 104:11, 106:9, 117:5, 117:20, 118:12, 119:16, 131:15, 131:16, 131:17, 131:19, 131:23, 132:3, 132:14, 139:11, 139:19, 139:21, 139:22, 139:23, 139:24, 140:1, 140:2, 140:3, 140:4, 140:8, 141:11, 141:12, 141:15, 141:20, 141:21, 141:23, 142:3, 142:4, 142:8, 142:12, 142:13, 142:16, 143:24, 144:10, 145:22, 146:1, 147:21, 148:14, 150:7, 150:9, 151:1, 151:2, 151:3, 151:15, 151:20, 151:21, 151:22, 155:11, 155:12, 155:15,

155:17, 156:2, 156:6, 156:20, 157:1, 157:2, 157:5, 157:19, 157:22, 157:24, 160:22, 163:2, 163:14, 163:16, 164:13, 165:17, 165:21, 165:22, 166:9, 166:12, 166:13, 175:13, 215:1, 222:3, 224:24, 225:24, 226:1, 226:14, 227:9, 229:4, 243:16, 244:6, 244:23, 255:20

**month's** [5] - 54:8, 74:4, 77:6, 81:15, 156:17

**month-to-month** [1] - 94:22

**monthly** [18] - 56:8, 58:21, 60:1, 69:14, 70:4, 85:12, 95:6, 97:19, 103:3, 105:17, 125:10, 140:15, 141:9, 146:6, 225:17, 225:22, 226:23, 263:3

**months** [18] - 17:5, 66:5, 66:15, 67:1, 67:6, 67:9, 68:1, 68:8, 69:6, 69:12, 157:13, 210:9, 226:4, 243:12, 243:24, 244:7, 259:15

**morbidity** [1] - 126:6

**morning** [2] - 7:16, 7:17

**mortality** [1] - 126:5

**most** [8] - 16:10, 40:16, 118:19, 129:5, 133:4, 193:9, 226:22, 260:7

**motion** [1] - 75:18

**move** [4] - 81:8, 122:24, 143:13, 222:8

**moved** [3] - 11:8, 33:4, 181:18

**moving** [4] - 32:7, 37:3, 214:17, 214:18

**MR** [67] - 6:18, 6:22, 7:3, 7:15, 50:5, 50:11, 50:13, 75:16, 76:24, 88:9, 98:13, 98:16, 123:2, 123:4, 126:23, 127:1, 127:2, 133:10, 133:14, 134:3, 135:15, 135:20, 135:21, 147:4, 147:8, 147:10, 147:17, 155:23, 172:7, 172:12, 172:22,

192:3, 192:6, 192:8, 192:12, 192:13, 205:14, 208:5, 210:22, 215:23, 227:12, 228:1, 245:7, 245:11, 247:10, 254:24, 257:20, 258:16, 258:19, 259:2, 268:4, 268:6, 268:8, 268:10, 268:13, 268:23, 276:1, 276:4, 277:24, 279:5, 279:13, 280:3, 280:9, 280:13, 281:8, 281:17, 282:1

**MRI** [1] - 196:14
**MS** [225] - 5:8, 6:21, 6:23, 17:1, 20:9, 20:19, 22:19, 23:1, 24:4, 24:13, 25:3, 26:3, 26:9, 27:2, 29:12, 29:23, 31:13, 32:4, 32:10, 32:14, 33:23, 35:4, 36:3, 36:20, 38:9, 38:15, 39:2, 40:17, 41:3, 41:16, 41:23, 42:24, 44:3, 44:16, 45:10, 45:16, 46:6, 47:3, 47:11, 48:2, 48:8, 48:22, 49:23, 50:6, 50:12, 50:15, 52:5, 52:19, 53:14, 53:18, 54:21, 56:2, 56:11, 56:21, 57:7, 62:3, 62:12, 63:14, 63:23, 64:22, 65:23, 68:2, 69:21, 69:24, 71:12, 71:17, 73:13, 73:24, 75:3, 76:20, 76:23, 77:7, 78:6, 79:1, 80:3, 80:23, 83:11, 83:23, 84:11, 84:21, 85:6, 86:13, 86:22, 91:18, 93:12, 94:17, 96:2, 96:11, 96:24, 97:10, 98:11, 98:15, 98:19, 99:20, 100:6, 100:9, 100:22, 101:7, 102:12, 103:24, 105:11, 105:24, 107:14, 107:22, 108:4, 111:17, 111:22, 113:21, 113:23, 115:20, 117:10, 117:24, 120:1, 121:13, 121:22, 122:24, 123:10, 124:2, 124:20, 125:6, 126:7, 126:12, 126:22,

126:24, 127:7, 127:16, 128:20, 132:4, 133:9, 133:12, 133:19, 134:6, 134:17, 135:18, 137:7, 137:15, 138:6, 140:17, 141:2, 144:5, 146:21, 147:6, 147:9, 149:4, 152:16, 155:22, 157:16, 159:23, 162:3, 162:16, 163:9, 164:8, 166:23, 168:23, 171:24, 172:9, 172:15, 173:13, 174:7, 175:5, 178:9, 180:12, 187:2, 188:23, 189:19, 190:14, 191:23, 192:5, 192:7, 192:9, 192:11, 193:24, 194:13, 195:5, 195:11, 196:6, 196:21, 197:10, 198:13, 199:23, 200:18, 201:6, 201:8, 201:17, 202:8, 202:10, 203:21, 204:10, 205:5, 205:10, 205:12, 206:11, 206:23, 208:3, 208:6, 208:9, 208:12, 208:19, 258:18, 259:13, 260:10, 261:14, 265:16, 266:24, 268:5, 268:9, 268:12, 269:19, 269:22, 270:7, 270:23, 272:6, 272:19, 275:14, 275:24, 276:2, 276:6, 276:24, 277:20, 278:1, 278:3, 279:15, 280:15, 280:16, 281:20

**mudslide** [1] - 33:15
**Mullin** [1] - 3:3
**multiple** [7] - 22:24, 67:6, 67:8, 68:1, 69:12, 104:11, 174:17
**multiplier** [1] - 14:6
**multiply** [1] - 68:17
**Multistate** [5] - 188:19, 189:21, 269:4, 275:20, 277:18
**Music** [1] - 240:4
**must** [1] - 136:13
**mutually** [2] - 243:13, 244:2
**MY** [1] - 285:21

## N

**NAIC** [1] - 277:6
**naive** [3] - 167:11, 168:5, 168:16
**name** [15] - 7:18, 8:20, 16:3, 39:8, 54:19, 132:17, 149:22, 154:1, 169:7, 174:24, 175:10, 214:24, 220:24, 237:13, 244:16
**names** [1] - 265:9
**Nancy** [5] - 20:12, 21:2, 159:16, 176:11, 240:20
**narrative** [2] - 196:12, 212:22
**narrow** [1] - 83:19
**nature** [13] - 29:9, 38:13, 38:22, 53:13, 90:1, 90:6, 113:4, 180:19, 242:16, 242:17, 243:21, 256:8, 265:24
**natured** [1] - 41:8
**necessarily** [14] - 97:4, 119:8, 152:24, 163:7, 165:19, 180:3, 200:3, 200:22, 203:18, 214:11, 242:13, 267:12, 270:6, 272:1
**necessary** [3] - 123:7, 211:1, 284:20
**need** [17] - 27:14, 70:14, 97:16, 99:19, 108:21, 129:21, 129:22, 132:9, 146:13, 154:17, 159:3, 172:23, 182:16, 203:18, 208:6, 222:8, 245:16
**needed** [15] - 49:16, 78:16, 79:17, 80:9, 86:16, 87:3, 88:6, 100:3, 113:18, 154:15, 230:10, 231:1, 236:8, 249:16
**needs** [1] - 108:7
**negatively** [1] - 233:19
**nervous** [1] - 38:23
**never** [8] - 116:14, 135:5, 248:23, 257:23, 264:23, 278:13, 279:2, 279:24
**New** [2] - 30:13, 242:5
**new** [15] - 20:2, 28:7,

90:3, 91:3, 101:18, 101:20, 123:24, 131:18, 145:16, 217:11, 217:12, 217:15, 218:1, 218:4, 218:12
**next** [20] - 51:14, 54:8, 59:18, 87:11, 131:16, 142:8, 142:16, 145:22, 147:21, 148:14, 150:9, 151:3, 151:21, 151:22, 157:22, 163:2, 166:13, 175:13, 202:4
**nine** [4] - 146:12, 146:16, 146:17, 146:21
**nonaffiliated** [2] - 241:16, 241:23
**noncancellable** [4] - 10:22, 26:17, 31:17, 124:17
**nondisclosure** [3] - 170:7, 177:2, 178:3
**none** [5] - 151:22, 158:18, 186:7, 187:16, 237:11
**normal** [2] - 170:22, 206:13
**normally** [1] - 206:16
**Northeast** [1] - 13:13
**Nos** [1] - 4:19
**NOT** [1] - 284:19
**Notary** [2] - 7:12, 283:13
**notary** [1] - 284:22
**notation** [2] - 206:14, 206:16
**notations** [1] - 284:19
**note** [6] - 157:23, 201:10, 201:16, 205:18, 206:10, 284:17
**Note** [1] - 205:18
**noted** [2] - 59:16, 202:4
**notes** [2] - 212:22, 238:24
**nothing** [2] - 117:20, 258:14
**notice** [3] - 37:3, 88:1, 222:11
**noticeable** [3] - 103:22, 104:2, 104:10
**notification** [2] - 144:17, 229:15
**notified** [1] - 93:19
**notify** [1] - 92:4

**November** [3] - 163:15, 265:13, 279:18
**now's** [1] - 147:8
**number** [72] - 41:21, 43:9, 43:24, 44:2, 44:14, 58:4, 58:8, 58:14, 58:16, 60:9, 60:11, 60:13, 65:5, 65:8, 65:9, 65:10, 65:11, 65:18, 65:19, 65:20, 65:22, 68:12, 73:11, 73:22, 88:3, 88:15, 91:11, 97:20, 104:8, 105:20, 105:22, 112:12, 114:15, 114:18, 114:20, 115:2, 115:3, 118:11, 118:19, 119:21, 132:18, 135:23, 135:24, 141:19, 155:4, 155:9, 155:15, 155:19, 156:9, 157:20, 157:23, 163:15, 163:17, 163:18, 172:24, 214:24, 216:13, 226:11, 226:12, 234:5, 235:16, 235:20, 249:24, 250:12, 252:17, 253:10, 253:12, 263:3, 269:18, 270:3
**numbers** [39] - 50:22, 57:16, 58:9, 58:12, 61:22, 69:16, 82:16, 83:9, 84:20, 95:10, 105:20, 114:21, 115:16, 119:14, 123:6, 131:10, 131:17, 132:1, 140:3, 144:4, 150:24, 152:14, 157:1, 163:8, 164:6, 164:12, 164:15, 164:22, 165:13, 165:20, 165:21, 165:24, 179:2, 226:20, 226:24, 234:18, 235:14, 263:12
**numerous** [2] - 83:13, 84:13

## O

**oath** [1] - 208:22
**object** [14] - 45:10, 52:23, 93:13, 101:7, 102:12, 102:13,

121:22, 123:10,
125:6, 133:19, 174:7,
257:20, 275:14,
276:24
  **objecting** [1] - 164:1
  **objection** [50] -
36:21, 40:17, 41:16,
52:5, 52:19, 56:21,
62:3, 78:6, 79:1,
84:11, 84:21, 85:6,
91:18, 99:20, 103:24,
105:11, 111:22,
117:10, 117:24,
120:1, 126:7, 132:4,
137:15, 138:6, 144:5,
152:16, 164:9, 187:2,
196:21, 197:10,
198:14, 199:23,
201:6, 201:8, 201:17,
202:8, 210:22,
215:23, 227:12,
228:1, 247:10,
254:24, 270:23,
276:5, 276:6, 279:5,
279:13, 280:3, 280:9,
281:8
  **objective** [5] - 71:24,
105:2, 118:15,
151:23, 168:4
  **objectives** [10] -
52:10, 53:7, 53:21,
53:22, 54:2, 54:10,
56:24, 168:18,
248:10, 248:14
  **obligated** [1] -
277:11
  **obligations** [1] -
177:21
  **obscuring** [4] -
137:2, 137:4, 137:5,
137:20
  **observed** [2] -
107:10, 134:19
  **obtain** [2] - 231:6,
284:12
  **obtained** [1] - 231:5
  **obtaining** [2] - 233:5,
233:10
  **obviously** [1] - 54:3
  **occ** [5] - 116:9,
116:16, 116:17
  **occasion** [4] - 86:7,
184:18, 191:12,
218:14
  **occasional** [2] -
225:12, 276:14
  **occasionally** [3] -
23:9, 225:7, 252:1
  **occupation** [16] -
10:22, 23:17, 24:19,

24:24, 26:10, 30:24,
31:8, 31:11, 46:18,
46:20, 46:24, 47:1,
47:5, 47:9, 116:8,
124:17
  **occupy** [2] - 38:13,
38:24
  **occupying** [2] -
20:16, 39:19
  **occur** [2] - 108:7,
143:24
  **occurred** [5] - 145:4,
166:7, 188:10,
198:21, 233:1
  **occurrence** [1] -
237:3
  **occurring** [2] -
167:12, 167:24
  **October** [4] - 142:19,
213:8, 213:10, 279:17
  **odd** [1] - 260:14
  **OF** [4] - 1:4, 1:15,
283:1, 285:1
  **offer** [2] - 24:6, 177:8
  **offered** [5] - 25:11,
27:23, 41:1, 41:13,
180:22
  **offering** [5] - 10:21,
11:1, 24:2, 24:19,
25:17
  **offerings** [2] - 25:1,
25:14
  **office** [6] - 130:6,
255:23, 255:24,
256:3, 256:5, 256:6
  **officer** [7] - 75:23,
76:2, 76:9, 76:14,
76:17, 76:18, 186:4
  **Officers** [1] - 211:8
  **officially** [1] - 263:20
  **often** [8] - 38:24,
74:24, 197:17, 199:8,
203:7, 221:2, 260:22
  **old** [2] - 199:1, 206:3
  **older** [6] - 126:14,
199:5, 206:20,
206:21, 207:1, 207:10
  **OMAR** [2] - 149:20,
149:21
  **on-site** [10] - 186:3,
186:22, 189:23,
190:9, 190:11,
193:16, 193:21,
211:5, 211:22, 212:11
  **once** [7] - 8:9, 16:15,
36:11, 209:20,
219:17, 230:24,
279:16
  **one** [162] - 12:3,
12:21, 19:15, 19:16,

21:1, 21:16, 21:23,
22:23, 26:16, 35:2,
35:24, 38:3, 39:7,
39:13, 43:12, 44:6,
44:9, 45:2, 45:19,
46:3, 46:7, 49:4, 50:5,
50:23, 53:6, 57:19,
58:12, 58:19, 59:12,
61:3, 64:14, 67:3,
69:22, 70:6, 70:9,
70:10, 71:21, 72:8,
72:14, 72:24, 73:1,
74:10, 76:12, 77:12,
78:12, 78:20, 80:12,
80:19, 81:16, 82:5,
83:15, 83:24, 84:6,
84:24, 88:3, 91:22,
95:23, 96:4, 99:6,
99:24, 104:5, 104:10,
108:11, 109:13,
109:15, 109:19,
114:8, 116:4, 122:3,
125:3, 127:9, 127:15,
129:3, 130:3, 130:17,
132:2, 138:21,
140:20, 144:9,
144:11, 145:18,
149:10, 150:3,
151:20, 152:6,
152:23, 152:24,
157:2, 159:13,
162:11, 162:18,
166:12, 171:14,
172:2, 174:17,
174:19, 175:4,
175:19, 176:2, 176:3,
181:17, 184:20,
184:21, 184:24,
186:22, 189:3, 189:5,
189:8, 189:14, 192:4,
194:11, 199:11,
202:22, 205:8, 210:7,
215:15, 216:6,
217:16, 217:17,
217:18, 221:9, 224:4,
228:9, 228:15,
229:18, 234:2,
234:10, 234:16,
235:13, 237:9,
238:16, 243:11,
243:23, 245:20,
247:5, 248:4, 249:21,
252:12, 252:13,
253:13, 255:16,
256:15, 257:8,
265:21, 268:22,
269:23, 272:20,
273:17, 276:3,
278:18, 279:17, 280:5
  **one's** [2] - 163:18,
165:23

**one-on-one** [7] -
129:3, 130:3, 130:17,
132:2, 238:16,
255:16, 256:15
  **one-on-ones** [1] -
221:9
  **one-policy-fits-all**
[1] - 109:19
  **ones** [8] - 86:9,
147:2, 150:14,
150:18, 157:21,
221:9, 271:14, 276:10
  **ongoing** [9] - 42:11,
42:12, 70:2, 77:13,
85:4, 85:10, 100:1,
216:11, 263:11
  **online** [12] - 59:7,
59:14, 59:21, 66:16,
67:4, 67:12, 67:14,
68:9, 137:24, 138:10,
214:11, 214:21
  **open** [3] - 62:21,
63:2, 115:10
  **opened** [1] - 98:17
  **Operation** [8] -
17:10, 17:21, 33:1,
40:24, 53:17, 56:19,
57:4, 169:13
  **operation** [21] -
12:22, 13:3, 13:6,
17:20, 17:24, 34:9,
41:13, 41:20, 45:9,
54:3, 54:9, 82:13,
140:10, 167:19,
182:21, 222:6,
266:23, 268:3,
268:14, 268:17, 269:2
  **operational** [13] -
48:20, 49:1, 49:4,
49:7, 49:11, 85:21,
85:22, 97:13, 105:10,
140:7, 162:20,
267:19, 273:11
  **Operations** [1] -
206:1
  **operations** [3] -
90:11, 90:13, 216:16
  **opinion** [16] - 40:18,
128:12, 128:13,
168:15, 179:23,
185:6, 185:21, 195:1,
195:19, 201:14,
203:19, 251:17,
254:5, 255:2, 275:15,
277:1
  **opinions** [4] -
183:15, 196:4,
200:15, 251:4
  **opportunity** [7] -
41:14, 180:22, 181:2,

217:8, 256:15, 273:22
  **opposed** [10] -
65:19, 65:21, 109:18,
131:4, 139:24,
187:24, 198:23,
211:19, 213:3, 272:21
  **opposite** [1] - 204:7
  **option** [2] - 26:1,
192:24
  **orally** [3] - 129:1,
130:1, 131:9
  **order** [20] - 49:15,
49:16, 96:20, 97:14,
97:16, 98:2, 99:16,
100:2, 107:24,
164:16, 175:15,
178:1, 178:5, 179:23,
214:3, 214:8, 219:5,
229:5, 230:16, 254:19
  **Order** [1] - 283:11
  **organization** [43] -
34:13, 34:16, 36:9,
36:10, 36:11, 42:1,
56:1, 57:1, 57:11,
58:8, 58:22, 72:6,
81:20, 82:6, 90:9,
90:10, 90:20, 92:3,
97:13, 101:22,
103:10, 115:3,
115:10, 118:12,
128:8, 133:5, 145:8,
146:3, 146:5, 153:16,
153:23, 165:6, 167:6,
167:9, 236:22, 237:2,
240:23, 248:17,
250:15, 250:21,
254:13, 271:2, 272:24
  **organization's** [1] -
72:6
  **original** [4] - 5:23,
281:21, 284:10,
284:13
  **originally** [5] - 24:8,
27:1, 30:18, 145:12,
272:9
  **originate** [1] - 171:17
  **orthopedic** [1] -
203:12
  **OSP** [40] - 186:1,
186:11, 190:8, 191:4,
191:15, 192:15,
192:24, 194:6,
194:10, 194:15,
194:16, 194:19,
194:20, 195:8,
195:22, 197:16,
198:8, 198:11,
198:18, 199:18,
200:3, 200:8, 200:12,
200:22, 201:9,

201:13, 201:15, 201:21, 202:2, 202:5, 202:14, 203:10, 203:16, 203:18, 204:2, 204:8, 204:13, 204:18, 204:22
**OSP's** [4] - 200:15, 202:6, 202:24, 203:5
**OSPs** [5] - 191:8, 191:19, 197:16, 252:17, 254:14
**OSPs'** [2] - 212:3, 212:4
**otherwise** [3] - 232:12, 242:2, 283:21
**outcome** [10] - 29:9, 91:22, 94:10, 96:18, 97:15, 99:6, 105:8, 136:12, 171:13, 283:22
**outcomes** [3] - 53:6, 111:5, 119:23
**outdated** [1] - 132:9
**outlined** [3] - 169:24, 175:18, 275:18
**outlook** [1] - 136:9
**outside** [7] - 103:10, 170:4, 216:15, 216:16, 222:9, 257:4
**overall** [5] - 14:6, 49:21, 120:9, 127:10, 224:14
**overbroad** [2] - 45:11, 63:23
**overlapping** [1] - 138:24
**oversaw** [1] - 47:16
**overseeing** [2] - 13:11, 271:10
**overturn** [1] - 217:24
**overturned** [4] - 97:23, 217:22, 218:4, 218:12
**overturns** [1] - 223:17
**own** [39] - 10:22, 23:17, 24:19, 24:24, 26:10, 30:24, 31:8, 31:11, 46:18, 46:20, 46:24, 105:3, 116:8, 116:9, 116:16, 116:17, 118:16, 120:24, 121:7, 122:23, 124:17, 136:13, 148:5, 148:19, 149:3, 158:22, 159:3, 163:23, 172:2, 172:21, 177:17, 190:20, 204:17,

216:4, 235:10, 236:4, 272:16

**P**

**P.C** [1] - 2:3
**p.m** [10] - 75:12, 75:15, 147:13, 147:16, 208:14, 208:17, 258:21, 258:24, 282:3, 282:5
**PACE** [1] - 149:24
**page** [8] - 51:15, 88:13, 88:14, 110:11, 111:3, 135:23, 212:24, 247:17
**Page** [4] - 4:2, 4:14, 5:2, 285:10
**page/errata** [1] - 284:11
**Pages** [1] - 1:1
**pages** [7] - 68:12, 68:20, 196:10, 196:11, 196:12, 212:19, 212:21
**paid** [63] - 36:16, 36:18, 37:12, 37:14, 37:15, 37:19, 37:22, 38:3, 38:6, 59:10, 59:12, 60:23, 117:22, 142:2, 157:12, 205:19, 224:4, 224:7, 225:16, 227:10, 227:14, 227:20, 227:24, 228:5, 230:5, 231:16, 231:21, 231:23, 232:8, 232:21, 233:10, 233:22, 234:14, 235:2, 236:11, 236:16, 237:8, 237:13, 238:13, 238:20, 242:9, 242:11, 242:13, 242:21, 243:1, 245:1, 252:16, 252:19, 255:19, 256:23, 257:13, 257:19, 259:23, 261:22, 262:12, 262:23, 263:2, 263:3, 263:12, 267:23, 278:5, 278:8
**pain** [4] - 39:23, 40:5, 40:9, 41:8
**pains** [1] - 285:8
**paper** [7] - 30:18, 72:15, 133:5, 195:21, 198:23, 207:10, 207:13
**paperwork** [4] -

214:7, 214:11, 243:15, 244:4
**paraphrasing** [2] - 53:10, 110:8
**pardon** [1] - 75:8
**parent** [4] - 241:9, 263:20, 264:12, 264:19
**part** [67] - 24:16, 30:18, 33:3, 34:2, 36:8, 36:10, 36:11, 47:20, 56:16, 57:12, 60:15, 74:1, 78:1, 84:7, 86:14, 87:21, 90:10, 91:23, 91:24, 92:1, 101:10, 111:6, 119:24, 120:19, 122:5, 124:12, 124:24, 126:1, 126:2, 131:1, 137:20, 140:10, 141:5, 151:10, 153:18, 168:3, 170:22, 172:13, 172:19, 178:3, 178:22, 183:20, 184:19, 197:19, 198:12, 199:3, 201:4, 201:16, 201:22, 202:3, 211:15, 224:11, 224:17, 238:17, 246:21, 247:6, 247:19, 253:18, 254:9, 268:2, 268:14, 268:17, 269:2, 272:13, 272:24, 277:17
**partially** [1] - 123:18
**particular** [38] - 36:6, 37:7, 38:17, 49:11, 64:24, 71:1, 79:10, 85:2, 85:17, 89:22, 97:4, 114:15, 132:20, 136:12, 150:8, 155:17, 162:13, 169:15, 191:13, 194:16, 203:8, 210:15, 215:20, 235:12, 239:21, 244:24, 245:24, 246:5, 246:8, 247:5, 248:14, 251:13, 251:23, 252:3, 252:6, 254:10, 256:17, 257:14
**particularly** [2] - 35:6, 118:14
**parties** [2] - 283:18, 283:21
**partly** [1] - 180:3

**partner** [1] - 191:19
**parts** [4] - 13:12, 13:13, 194:16, 249:6
**party** [1] - 177:6
**passed** [2] - 131:15, 132:3
**past** [5] - 17:23, 25:15, 112:9, 112:13, 237:22
**path** [1] - 122:7
**Paul** [37] - 1:8, 4:3, 6:6, 6:7, 7:19, 9:16, 10:21, 11:1, 14:12, 14:13, 14:22, 15:8, 23:20, 26:11, 28:16, 29:14, 29:20, 30:1, 30:7, 31:24, 32:11, 32:22, 39:11, 39:12, 39:14, 75:18, 75:24, 76:6, 76:12, 124:16, 283:3, 283:4, 284:1, 284:4, 285:4, 285:7, 285:23
**PAUL** [2] - 1:15, 7:10
**Pause** [1] - 248:1
**pay** [6] - 230:14, 243:3, 243:8, 244:15, 245:22, 246:20
**payable** [3] - 230:8, 230:14, 230:24
**paycheck** [1] - 15:14
**Paying** [3] - 229:20, 232:15, 233:4
**paying** [4] - 8:23, 175:14, 244:21, 259:22
**payment** [19] - 32:7, 34:22, 144:16, 144:21, 149:19, 149:23, 149:24, 150:16, 169:3, 177:8, 188:22, 230:16, 231:8, 231:12, 232:4, 232:6, 232:7, 244:6, 244:17
**payments** [2] - 175:20, 231:1
**pays** [1] - 264:1
**peace** [1] - 260:8
**peer** [1] - 88:4
**peers** [5] - 110:2, 129:17, 129:22, 145:10, 223:21
**peers'** [1] - 257:9
**pejorative** [1] - 163:20
**penalties** [1] - 285:8
**people** [28] - 93:15, 113:15, 123:16, 125:12, 125:21,

128:9, 129:13, 160:5, 166:11, 173:8, 174:18, 180:9, 190:20, 207:3, 218:9, 222:16, 230:19, 230:20, 242:22, 248:19, 249:8, 251:6, 257:4, 260:7, 260:12, 260:20, 266:10, 271:7
**per** [6] - 60:8, 60:19, 60:20, 81:24
**percent** [1] - 64:20
**percentage** [14] - 43:6, 47:8, 48:12, 63:21, 64:2, 64:13, 65:1, 88:8, 97:22, 97:23, 100:2, 125:16, 139:23, 237:10
**percentages** [2] - 42:3, 65:1
**perfectly** [2] - 128:16, 232:5
**perform** [3] - 27:11, 44:22, 119:7
**performance** [71] - 43:4, 43:14, 43:15, 43:21, 43:22, 44:8, 44:20, 45:14, 45:21, 45:24, 46:4, 46:9, 49:5, 54:24, 61:10, 61:14, 62:1, 62:5, 72:20, 73:2, 74:7, 85:21, 85:23, 94:22, 95:6, 97:13, 105:18, 112:7, 112:8, 119:11, 127:8, 127:10, 127:11, 140:19, 141:5, 152:5, 152:6, 152:10, 156:23, 160:17, 160:20, 161:4, 162:11, 162:19, 220:5, 222:22, 223:2, 223:6, 226:15, 226:17, 227:7, 228:16, 229:10, 229:23, 231:24, 232:8, 234:2, 234:7, 234:8, 234:9, 235:11, 235:21, 236:17, 237:7, 255:8, 256:20, 256:24, 257:8, 259:23, 262:12
**performances** [1] - 257:9
**performed** [2] - 83:17, 118:23
**performing** [5] - 26:13, 44:24, 45:5, 45:9, 82:2
**perhaps** [8] - 60:6,

88:5, 110:1, 113:11,
113:16, 238:18,
239:20, 267:9
**period** [25] - 25:4,
29:1, 31:6, 35:15,
37:15, 83:17, 94:9,
96:15, 103:13,
117:19, 131:14,
154:22, 154:23,
155:1, 205:20,
205:21, 224:24,
225:23, 230:20,
234:19, 242:18,
242:23, 243:11,
243:23, 269:21
**periodic** [7] - 22:7,
74:3, 77:5, 81:12,
81:14, 82:3, 85:15
**periodically** [4] -
22:12, 74:6, 221:8,
256:12
**periods** [1] - 25:11
**perjury** [1] - 285:8
**person** [10] - 22:16,
23:8, 118:9, 132:20,
176:17, 179:8, 218:5,
239:13, 239:17,
272:23
**person's** [4] - 35:2,
118:8, 261:8, 261:10
**personal** [5] -
123:19, 132:16,
138:1, 167:22, 257:1
**personally** [6] -
86:17, 87:4, 150:15,
175:24, 226:19,
246:17
**personnel** [3] -
130:21, 186:15,
256:19
**perspective** [6] -
72:1, 73:16, 104:15,
106:22, 116:13,
248:19
**pertaining** [1] -
213:21
**pertinent** [13] -
193:5, 193:13, 194:7,
194:18, 195:24,
196:24, 197:7, 200:8,
200:9, 200:15, 203:4,
204:14, 222:16
**PETER** [2] - 1:15,
7:10
**Peter** [20] - 4:3, 6:6,
7:19, 7:20, 70:13,
75:17, 88:13, 110:14,
110:23, 111:5,
113:24, 120:17,
147:18, 172:21,

208:20, 259:3, 283:3,
284:1, 285:7, 285:23
**Philbin** [7] - 1:11,
186:22, 187:5, 254:7,
283:7, 284:6, 285:5
**Philbin's** [2] - 187:3,
199:24
**phone** [3] - 209:20,
229:15, 274:4
**photocopy** [1] -
199:2
**phrase** [1] - 35:5
**phrased** [2] - 143:12,
227:4
**physical** [3] -
197:22, 211:18
**physically** [1] - 161:8
**physician** [12] -
184:1, 186:4, 187:6,
189:24, 190:9,
190:11, 193:21,
211:23, 230:11,
243:18, 244:4, 244:10
**physician's** [3] -
185:6, 185:20, 251:4
**physicians** [4] -
186:22, 193:16,
211:5, 212:11
**pick** [1] - 194:11
**picked** [1] - 132:23
**picking** [1] - 197:8
**picks** [1] - 199:11
**picture** [2] - 40:15,
248:20
**piece** [1] - 195:21
**place** [17] - 6:14,
66:8, 90:16, 138:23,
170:15, 215:20,
216:5, 218:24,
270:15, 270:20,
271:12, 271:14,
271:18, 271:21,
271:24, 273:21,
275:22
**placed** [1] - 168:9
**Plaintiff** [2] - 1:6,
285:3
**PLAINTIFF** [1] - 2:2
**plaintiff** [2] - 6:18,
259:6
**plaintiff's** [1] - 209:8
**plan** [97] - 49:3,
49:16, 49:21, 53:17,
54:16, 54:18, 54:19,
55:13, 55:23, 56:9,
56:10, 56:14, 56:19,
57:3, 57:5, 57:10,
57:13, 57:14, 57:16,
61:11, 62:2, 63:8,
65:8, 65:9, 65:18,

65:21, 69:17, 70:23,
72:7, 73:7, 73:12,
73:20, 73:23, 78:5,
81:20, 82:2, 82:15,
83:8, 83:21, 84:5,
85:3, 94:16, 94:23,
95:1, 95:6, 95:22,
96:1, 99:18, 103:22,
104:22, 105:17,
105:18, 105:21,
106:2, 106:8, 112:17,
113:3, 123:14,
125:10, 125:19,
128:23, 129:12,
131:9, 133:14,
133:17, 136:14,
140:3, 141:19,
142:13, 142:15,
150:6, 150:9, 150:24,
152:14, 153:5, 153:8,
155:9, 155:14,
156:24, 157:20,
165:13, 168:11,
175:15, 191:7, 223:8,
226:23, 227:8,
228:16, 229:10,
245:21, 247:18,
264:6, 264:9, 267:19,
269:17
**Plan** [2] - 4:17, 51:3
**Planet** [2] - 3:22,
6:13
**planned** [6] - 46:12,
65:5, 71:16, 78:23,
126:20, 127:5
**planning** [2] -
182:19, 244:11
**plans** [4] - 50:1,
53:12, 106:4, 127:17
**Plantation** [2] - 1:17,
6:15
**play** [7] - 94:15,
111:5, 119:24,
120:18, 123:5,
224:17, 257:14
**players** [1] - 223:23
**playing** [2] - 111:20,
240:4
**PLLP** [1] - 2:16
**pods** [3] - 130:8,
130:10
**point** [27] - 12:21,
15:23, 16:11, 19:22,
21:16, 21:23, 23:15,
35:24, 37:17, 42:13,
53:4, 91:13, 109:5,
110:21, 114:8, 151:1,
155:16, 171:9, 228:6,
228:22, 229:20,
230:3, 232:15, 233:4,

240:9, 260:22, 271:9
**pointed** [1] - 235:10
**points** [4] - 170:8,
175:3, 228:12, 269:14
**policies** [44] - 23:17,
26:7, 26:17, 26:19,
26:24, 27:10, 27:12,
27:23, 28:2, 28:4,
28:10, 28:11, 28:16,
28:17, 28:20, 29:6,
30:21, 31:1, 31:5,
31:7, 31:16, 31:21,
46:17, 46:19, 46:23,
47:4, 47:9, 47:14,
116:8, 124:16, 179:2,
180:1, 240:23, 241:3,
241:6, 241:7, 241:10,
241:13, 263:17,
263:21, 264:15,
276:17, 280:22
**policies)** [1] - 205:19
**policy** [25] - 26:21,
29:5, 35:19, 37:16,
37:24, 106:22, 107:2,
107:12, 107:21,
109:19, 110:6, 125:5,
125:24, 132:17,
134:14, 190:4,
211:21, 211:22,
214:24, 218:16,
233:3, 239:12,
239:14, 239:20,
267:10
**policyholder** [2] -
108:1, 239:16
**populate** [2] - 59:6,
59:14
**populated** [2] -
66:18, 68:9
**populating** [2] -
66:13, 79:5
**portion** [2] - 97:21,
97:22
**portions** [1] - 88:18
**Portland** [1] - 3:16
**position** [18] - 11:7,
13:15, 16:18, 18:14,
20:3, 20:14, 20:17,
80:20, 81:7, 92:23,
93:6, 94:5, 162:1,
162:15, 231:14,
270:11, 271:22, 272:4
**positions** [3] - 34:14,
93:16, 93:18
**possibility** [1] -
103:20
**possible** [5] - 86:21,
116:10, 116:12,
191:14, 193:2
**possibly** [2] - 19:2,

181:5
**Post** [1] - 52:16
**Post-Board** [1] -
52:16
**posted** [5] - 100:15,
100:21, 101:6,
250:18, 273:17
**potential** [4] - 9:2,
63:17, 66:2, 66:22
**potentially** [2] -
174:9, 210:20
**practical** [1] - 220:13
**practice** [74] - 79:16,
82:14, 83:3, 92:3,
107:3, 107:12,
107:21, 127:21,
128:1, 128:7, 131:18,
132:7, 132:15,
132:20, 132:21,
133:23, 134:7,
134:12, 134:14,
142:2, 143:1, 143:7,
145:7, 145:13,
147:20, 151:5,
153:19, 154:10,
154:14, 154:18,
155:24, 157:9,
157:10, 157:22,
158:4, 158:10,
159:17, 159:20,
159:22, 160:3,
160:13, 163:1, 163:6,
163:16, 166:3, 166:9,
167:5, 168:14,
171:16, 171:18,
171:19, 178:17,
180:9, 181:4, 184:2,
189:10, 189:16,
189:18, 193:21,
202:18, 204:21,
206:19, 207:7, 212:4,
213:2, 218:16,
236:21, 238:20,
251:6, 260:4, 267:11,
281:14
**practices** [23] - 37:4,
90:16, 91:1, 158:17,
170:23, 179:2, 180:2,
183:5, 183:6, 185:16,
186:18, 188:1, 188:7,
188:10, 189:1, 213:9,
218:7, 240:18, 269:3,
269:8, 271:17, 275:3,
275:4
**preceded** [1] - 167:9
**precise** [2] - 48:5,
272:22
**predated** [2] - 34:15,
51:7
**predecessor** [4] -

9:21, 9:23, 28:14, 29:4
**predict** [3] - 43:6, 43:15, 44:21
**predictability** [2] - 141:1, 156:16
**predictable** [15] - 140:7, 144:7, 145:20, 151:7, 151:18, 151:23, 160:4, 160:22, 164:17, 165:15, 167:13, 168:3, 229:6, 238:3, 238:4
**predicted** [1] - 79:12
**preface** [1] - 123:10
**preferred** [1] - 139:14
**prefers** [1] - 141:1
**premise** [1] - 158:19
**premium** [1] - 52:12
**premiums** [2] - 26:20, 31:20
**preparation** [1] - 88:19
**prescribed** [1] - 283:11
**presence** [1] - 129:13
**Present** [1] - 3:20
**present** [6] - 22:5, 22:17, 23:6, 129:17, 213:11, 238:17
**presented** [1] - 267:12
**Presidency** [1] - 20:17
**President** [21] - 10:14, 10:17, 11:9, 11:10, 11:11, 11:18, 11:21, 16:20, 18:15, 19:9, 20:15, 20:16, 20:21, 21:3, 21:4, 75:23, 128:4, 128:5, 161:22, 168:9, 169:15
**President's** [1] - 135:6
**Presidents** [5] - 18:22, 19:11, 20:22, 93:23, 134:22
**press** [1] - 14:21
**presumably** [2] - 125:15, 204:13
**presume** [5] - 125:12, 137:23, 138:12, 138:14, 162:5
**presuming** [2] - 125:17, 125:21
**pretty** [4] - 121:20, 237:3, 251:6, 259:4

**prevalent** [1] - 17:17
**prevent** [4] - 85:17, 178:6, 178:16, 209:4
**prevented** [1] - 33:16
**previous** [1] - 212:5
**previously** [11] - 87:24, 124:6, 124:23, 131:20, 165:5, 174:23, 176:9, 200:21, 229:5, 232:3, 277:21
**primarily** [4] - 7:23, 79:7, 184:17, 254:14
**primary** [1] - 184:21
**print** [2] - 138:16, 235:7
**printed** [2] - 60:2, 212:19
**printouts** [1] - 132:11
**prioritize** [3] - 191:11, 191:16, 192:24
**prioritizing** [1] - 192:16
**privilege** [2] - 172:16, 172:20
**privileged** [3] - 172:5, 172:10, 174:9
**PRL** [1] - 5:8
**PRL-MS-BILIACK-WKLY** [1] - 5:8
**probable** [1] - 262:8
**problem** [1] - 244:20
**problems** [2] - 29:21, 30:3
**procedures** [4] - 179:3, 213:10, 215:19, 218:7
**proceedings** [1] - 283:16
**process** [5] - 105:1, 171:10, 182:7, 182:10, 204:11
**produced** [2] - 269:12, 283:15
**product** [7] - 10:22, 11:1, 23:21, 24:2, 24:6, 24:7, 260:14
**products** [3] - 24:19, 24:24, 30:18
**Professional** [1] - 1:22
**prohibit** [1] - 178:12
**prohibited** [1] - 179:4
**projected** [9] - 68:15, 71:7, 71:10, 71:14, 72:15, 73:7, 73:11, 74:18, 74:22

**projecting** [1] - 42:14
**projection** [3] - 72:3, 73:18, 73:19
**projections** [3] - 41:21, 136:7, 136:15
**prompt** [1] - 191:15
**promulgated** [1] - 264:21
**proper** [2] - 202:10, 270:23
**properly** [1] - 179:24
**proprietary** [2] - 179:1, 179:4
**prospective** [1] - 179:8
**proven** [1] - 24:7
**provide** [13] - 54:13, 54:15, 54:23, 58:7, 109:16, 118:3, 134:20, 194:23, 230:17, 243:17, 244:4, 247:14, 277:5
**provided** [40] - 54:11, 56:18, 57:8, 57:10, 58:4, 61:13, 61:21, 62:14, 65:24, 67:2, 90:17, 91:4, 96:22, 98:1, 102:19, 106:8, 116:14, 118:22, 123:14, 123:15, 123:16, 125:10, 125:21, 127:18, 131:21, 134:23, 149:7, 158:23, 169:24, 175:4, 180:21, 194:10, 194:14, 194:16, 217:17, 227:1, 231:7, 239:10, 263:2, 283:10
**Provident** [11] - 14:13, 14:21, 15:9, 15:13, 15:17, 28:16, 32:1, 32:6, 39:12, 75:22, 241:12
**provides** [2] - 204:4, 239:15
**providing** [8] - 67:23, 99:23, 107:13, 109:14, 123:20, 125:13, 280:23, 281:1
**provision** [1] - 176:23
**provisions** [5] - 26:13, 27:10, 27:13, 125:24, 182:13
**psychiatric** [4] - 38:22, 39:18, 40:13, 41:8

**Public** [2] - 7:12, 283:14
**public** [1] - 284:23
**purchase** [1] - 15:1
**purchasing** [1] - 14:22
**pure** [1] - 139:24
**purpose** [6] - 46:21, 90:8, 130:18, 131:6, 232:8, 261:15
**purposely** [1] - 156:3
**purposes** [2] - 101:2, 214:9
**pursuing** [1] - 210:5
**pushback** [1] - 110:22
**pushing** [1] - 111:1
**put** [17] - 33:21, 36:20, 37:2, 52:2, 64:6, 71:21, 110:15, 132:23, 162:19, 162:22, 163:20, 184:2, 194:5, 224:3, 271:18, 271:21, 271:24
**putting** [3] - 9:18, 27:20, 248:19

## Q

**QCC** [21] - 12:11, 55:12, 55:19, 79:18, 79:20, 80:2, 80:6, 81:9, 92:14, 102:3, 122:5, 184:22, 184:24, 185:11, 186:12, 216:10, 217:14, 254:4, 256:14, 271:22, 272:4
**QCC's** [1] - 122:22
**QCCs** [6] - 122:8, 272:8, 272:16, 272:17, 272:23, 278:6
**Qtr** [1] - 5:6
**qualified** [1] - 37:18
**qualify** [2] - 35:18, 37:24
**quality** [30] - 45:20, 46:8, 72:22, 79:21, 84:15, 87:18, 87:23, 102:2, 111:12, 216:11, 216:17, 216:19, 217:20, 222:14, 223:11, 223:13, 224:5, 224:8, 224:13, 224:20, 225:2, 225:5, 237:10, 238:8, 238:10, 240:10, 240:13, 248:12, 249:9, 250:24

**Quality** [2] - 219:14, 252:10
**quantify** [1] - 102:24
**quarter** [4] - 22:10, 160:23, 224:24
**Quarterly** [2] - 227:16, 227:19
**quarterly** [4] - 97:20, 140:15, 146:6, 226:2
**QUESTION** [4] - 110:13, 110:17, 110:22, 111:4
**questioning** [3] - 36:22, 37:5, 52:23
**questions** [5] - 41:11, 195:18, 234:20, 246:22, 262:23
**quick** [2] - 258:17, 258:19
**quickly** [1] - 259:4
**quite** [2] - 218:24, 230:9
**quoting** [1] - 53:11

## R

**raised** [3] - 31:21, 113:10, 234:20
**raises** [1] - 133:7
**raising** [2] - 111:15, 116:24
**range** [4] - 48:13, 60:14, 60:21, 65:1
**rate** [2] - 43:6, 239:20
**rates** [10] - 42:2, 223:16, 237:10, 238:9, 238:11, 240:3, 240:8, 240:12, 269:17
**rather** [2] - 58:18, 110:8
**ratio** [1] - 139:22
**rationale** [6] - 63:10, 107:8, 115:16, 201:22, 202:3, 202:6
**ratios** [1] - 25:9
**ray** [2] - 40:21, 196:14
**RDR** [3] - 1:19, 283:2, 283:24
**reach** [1] - 113:3
**reached** [1] - 92:5
**reaction** [4] - 254:21, 255:3, 255:5, 275:2
**read** [18] - 110:9, 123:2, 136:19, 137:2, 137:20, 138:3, 138:4, 138:10, 138:20, 158:20, 228:22,

229:24, 232:18, 233:7, 235:8, 240:15, 240:17, 240:18
**readily** [2] - 26:1, 40:9
**reading** [4] - 172:24, 174:4, 181:23, 284:16
**real** [1] - 81:23
**real-time** [1] - 81:23
**really** [33] - 36:5, 44:10, 44:11, 48:12, 55:19, 64:7, 64:13, 78:11, 79:3, 79:6, 79:10, 81:4, 82:10, 103:2, 104:24, 108:7, 117:1, 120:18, 125:9, 129:14, 133:22, 135:5, 147:1, 158:15, 159:2, 191:10, 223:24, 231:2, 235:4, 237:18, 249:13, 256:24, 260:15
**Really** [1] - 33:9
**realtime** [2] - 143:23, 144:19
**reason** [28] - 37:18, 70:14, 86:20, 87:17, 87:21, 118:17, 120:8, 121:5, 148:21, 149:14, 151:8, 151:10, 159:4, 159:6, 159:20, 166:20, 167:2, 169:1, 171:6, 171:14, 175:13, 180:8, 191:3, 220:5, 221:14, 255:10, 260:12, 284:18
**reasonable** [10] - 23:4, 58:20, 112:14, 119:10, 201:20, 228:8, 234:6, 243:23, 243:24, 261:12
**reasons** [5] - 34:3, 71:6, 72:14, 236:20, 245:14
**reassessment** [2] - 182:7, 182:10
**reassign** [1] - 222:12
**recalled** [1] - 39:8
**receive** [6] - 50:17, 60:2, 60:5, 132:8, 160:20, 226:20
**received** [20] - 35:15, 55:22, 67:17, 68:5, 116:15, 144:16, 144:17, 144:18, 172:4, 172:21, 215:10, 220:6, 230:13, 232:11, 232:12, 233:2, 245:1,

245:23, 247:4, 250:20
**receiving** [4] - 34:22, 180:21, 230:11, 261:13
**recent** [1] - 222:14
**recently** [6] - 28:8, 48:11, 124:8, 125:11, 125:15, 125:23
**recipient** [3] - 92:7, 102:18, 128:13
**recognize** [2] - 35:20, 41:14
**recognized** [2] - 40:23, 41:12
**recollection** [44] - 13:12, 19:13, 20:2, 20:11, 20:21, 22:21, 24:5, 27:24, 31:4, 34:12, 37:13, 53:1, 53:20, 55:17, 56:5, 66:16, 68:4, 76:5, 76:11, 81:22, 86:14, 93:15, 96:4, 98:21, 102:4, 106:19, 107:20, 108:16, 138:1, 138:17, 148:1, 158:2, 176:24, 202:20, 214:10, 219:24, 267:1, 267:20, 268:1, 274:2, 274:10, 274:16, 278:17, 279:2
**recommend** [1] - 101:23
**recommendation** [9] - 81:4, 81:8, 100:24, 109:1, 109:10, 122:19, 203:16, 236:7
**recommendations** [1] - 236:2
**recommended** [6] - 87:22, 100:20, 101:4, 122:15, 185:1, 216:9
**recommending** [2] - 109:6, 184:23
**reconciled** [1] - 62:8
**record** [18] - 36:21, 37:8, 75:11, 75:14, 131:12, 131:22, 147:12, 147:15, 147:20, 157:21, 208:13, 208:16, 255:7, 258:20, 258:23, 273:23, 282:2, 283:16
**recorded** [7] - 143:2, 143:23, 144:20, 146:8, 157:14, 166:5, 283:9
**recording** [21] -

141:13, 141:22, 142:10, 143:7, 144:2, 144:11, 144:23, 145:24, 149:16, 150:4, 150:12, 151:1, 154:11, 155:5, 155:20, 158:11, 160:9, 163:2, 163:12, 167:17, 238:20
**Records** [1] - 206:1
**records** [7] - 14:19, 194:2, 195:3, 195:4, 207:2, 207:4, 212:21
**recover** [18] - 43:7, 57:20, 60:3, 63:22, 64:12, 66:12, 66:23, 67:1, 74:18, 74:23, 86:6, 86:9, 104:7, 120:6, 120:11, 190:10, 190:20
**recovered** [13] - 38:7, 43:10, 62:18, 62:20, 64:20, 96:1, 96:7, 96:23, 99:8, 120:8, 120:13, 242:18
**recoveries** [91] - 36:12, 36:16, 36:18, 37:12, 41:22, 42:5, 42:14, 42:22, 44:15, 49:2, 54:20, 55:4, 55:8, 57:6, 59:10, 59:12, 60:9, 60:12, 60:15, 60:18, 60:23, 63:5, 63:7, 63:9, 63:11, 65:16, 69:4, 71:1, 71:14, 72:6, 72:15, 73:7, 78:4, 78:23, 78:24, 82:15, 83:21, 84:3, 99:18, 103:22, 104:18, 112:13, 117:19, 118:11, 123:22, 125:2, 127:9, 140:13, 141:12, 141:13, 141:21, 143:2, 143:23, 151:2, 157:13, 157:20, 157:24, 160:9, 163:2, 163:15, 163:17, 165:24, 169:3, 175:12, 190:20, 224:4, 224:7, 224:13, 226:13, 227:10, 227:14, 227:20, 227:24, 228:5, 233:22, 234:5, 236:12, 237:8, 238:21, 242:10, 242:21, 243:1, 253:10, 256:23,

257:19, 262:24, 263:2, 263:4, 267:23
**recovering** [2] - 64:8, 64:10
**recovers** [1] - 190:13
**recovery** [119] - 37:14, 37:20, 37:21, 38:2, 38:4, 42:2, 44:1, 45:18, 45:19, 45:23, 46:2, 46:12, 46:13, 49:9, 49:13, 54:16, 54:18, 55:13, 55:23, 56:8, 57:12, 57:14, 58:17, 59:16, 60:24, 61:4, 62:17, 63:17, 65:5, 69:17, 70:23, 72:24, 74:5, 74:8, 77:6, 78:4, 79:24, 81:15, 81:20, 82:15, 83:8, 84:15, 84:20, 85:3, 85:12, 94:16, 95:8, 95:12, 95:24, 105:21, 106:2, 106:3, 106:8, 111:11, 125:18, 126:19, 127:4, 127:17, 128:19, 128:23, 129:12, 129:24, 131:1, 131:6, 131:9, 133:15, 133:17, 139:11, 139:16, 140:11, 141:9, 141:10, 141:19, 142:3, 142:7, 142:10, 142:12, 143:8, 144:12, 147:20, 150:6, 150:9, 150:13, 150:24, 151:15, 154:11, 155:9, 158:15, 159:5, 160:21, 161:19, 165:16, 165:20, 165:21, 191:7, 192:21, 214:16, 225:17, 231:24, 232:8, 234:14, 235:2, 236:16, 237:14, 238:13, 242:11, 242:13, 245:1, 252:16, 252:19, 255:19, 257:13, 259:23, 262:12, 262:13, 263:12, 278:5, 278:8
**recovery'** [1] - 229:23
**recreate** [1] - 275:11
**RECROSS** [1] - 278:2
**RECROSS-**

**EXAMINATION** [1] - 278:2
**REDIRECT** [2] - 258:15, 259:1
**refer** [5] - 18:4, 226:19, 227:10, 228:4, 230:3
**reference** [18] - 24:14, 25:21, 33:18, 34:10, 36:15, 89:13, 197:24, 198:3, 198:10, 199:22, 200:16, 201:23, 207:13, 207:18, 207:24, 211:16, 213:2, 249:8
**referenced** [6] - 91:11, 118:18, 201:1, 223:4, 227:14, 233:17
**references** [1] - 178:22
**referencing** [3] - 34:19, 89:16, 205:22
**referral** [1] - 194:5
**referred** [8] - 17:10, 17:20, 18:5, 21:12, 38:2, 54:15, 95:14, 211:8
**referring** [8] - 40:8, 133:12, 133:14, 183:16, 209:22, 228:24, 229:1, 276:3
**refers** [1] - 37:12
**reflect** [5] - 68:17, 101:3, 136:6, 193:4, 207:17
**reflected** [2] - 105:4, 129:20
**reflecting** [1] - 206:10
**regard** [11] - 43:24, 59:23, 82:4, 82:18, 83:5, 107:3, 128:18, 134:15, 136:14, 191:17, 192:19
**regarding** [5] - 57:5, 108:15, 198:15, 210:4, 213:17
**regardless** [4] - 44:9, 70:3, 70:10, 272:11
**regular** [3] - 22:7, 145:5, 221:5
**regularity** [1] - 22:9
**regulator** [1] - 275:11
**regulatory** [1] - 188:8
**Regulatory** [5] - 181:19, 181:23, 182:12, 183:4, 187:21

**relate** [1] - 84:15
**related** [18] - 9:14, 49:7, 49:12, 105:17, 139:17, 152:19, 178:18, 179:13, 189:1, 191:3, 222:6, 248:11, 256:20, 266:1, 278:19, 278:21, 283:17
**relates** [2] - 50:2, 248:16
**relating** [2] - 93:11, 169:2
**relation** [16] - 49:8, 49:13, 69:8, 74:4, 74:7, 77:6, 81:14, 82:2, 83:18, 85:12, 94:23, 104:22, 105:16, 105:18, 127:8, 223:8
**relationship** [2] - 28:13, 29:8
**relative** [18] - 43:21, 52:11, 55:3, 55:12, 61:10, 62:1, 65:8, 65:18, 73:12, 78:3, 78:5, 81:20, 94:15, 99:17, 125:4, 130:20, 145:19, 283:19
**relatively** [4] - 64:10, 102:11, 235:16, 243:10
**release** [6] - 14:21, 57:23, 58:5, 106:10, 110:3, 151:16
**released** [4] - 38:7, 99:11, 99:12, 226:14
**relevance** [1] - 207:8
**relevant** [18] - 37:6, 104:20, 114:14, 150:2, 184:4, 193:5, 194:19, 196:24, 199:7, 201:7, 217:21, 224:15, 235:5, 235:12, 235:14, 235:21
**reliance** [1] - 261:13
**relied** [2] - 65:2, 203:19
**relocated** [1] - 19:3
**rely** [1] - 179:24
**relying** [3] - 201:21, 202:2, 274:9
**remember** [20] - 10:18, 67:10, 68:20, 107:4, 107:13, 115:4, 135:12, 135:13, 139:5, 149:22, 150:1, 169:9, 174:21, 176:8, 177:1, 210:13,

214:22, 242:8, 251:23, 253:20
**remembering** [3] - 23:23, 129:8, 264:9
**Renaissance** [1] - 1:16
**render** [1] - 179:23
**rendered** [1] - 250:14
**renew** [1] - 198:14
**renewable** [3] - 26:18, 31:17, 124:17
**reopen** [21] - 86:12, 86:21, 87:22, 100:5, 101:1, 101:16, 101:19, 103:20, 104:8, 104:15, 109:2, 109:10, 237:10, 238:9, 238:10, 240:3, 240:8, 240:12, 244:20, 253:13, 269:17
**reopened** [18] - 86:16, 87:3, 87:10, 87:14, 98:10, 99:13, 100:2, 100:4, 101:4, 101:16, 101:17, 101:23, 108:20, 109:7, 252:22, 253:2, 253:4, 270:13
**reopening** [2] - 88:8, 100:19
**reopens** [5] - 88:4, 99:19, 253:12, 269:13, 270:3
**repeat** [8] - 29:13, 37:10, 41:10, 49:10, 86:24, 182:15, 202:13, 240:6
**rephrase** [1] - 280:15
**replaced** [1] - 20:5
**replacement** [1] - 25:9
**reply** [1] - 100:13
**report** [64] - 12:11, 16:14, 18:11, 18:14, 19:8, 20:8, 21:15, 60:2, 62:11, 63:17, 67:2, 67:7, 67:13, 67:16, 67:23, 68:5, 68:10, 68:16, 68:19, 68:21, 68:23, 69:13, 69:15, 69:16, 70:21, 94:13, 95:10, 97:17, 135:9, 136:6, 137:1, 137:3, 137:9, 137:13, 137:21, 138:3, 138:11, 138:13, 138:16, 138:24, 140:14, 158:21,

184:12, 194:21, 195:17, 195:23, 196:5, 196:11, 212:24, 214:3, 214:7, 214:8, 215:5, 215:10, 215:11, 215:15, 221:3, 221:10, 240:20, 245:23, 246:6, 246:12, 272:8
**reported** [21] - 12:3, 12:15, 13:24, 20:23, 21:1, 54:7, 55:12, 135:4, 135:7, 153:15, 184:11, 184:14, 186:7, 219:24, 221:4, 225:3, 226:7, 256:14, 272:12, 272:21
**REPORTER** [3] - 135:19, 231:19, 283:1
**Reporter** [1] - 1:19
**reporter** [2] - 7:5, 7:7
**Reporters** [1] - 1:22
**reporting** [16] - 11:16, 12:1, 16:19, 98:2, 99:2, 99:23, 115:8, 140:22, 140:23, 168:13, 175:12, 224:24, 269:14, 272:17, 273:2, 273:7
**Reporting** [1] - 7:6
**REPORTING** [1] - 1:21
**reports** [13] - 99:1, 99:17, 133:13, 133:15, 133:18, 136:22, 185:24, 211:10, 213:23, 227:11, 227:13, 228:4, 281:16
**represent** [4] - 6:17, 60:16, 91:10, 136:9
**representation** [1] - 166:10
**representations** [1] - 239:12
**representative** [2] - 169:6, 169:23
**represented** [3] - 37:14, 172:2, 277:22
**representing** [4] - 6:13, 7:6, 8:21, 57:23
**request** [1] - 274:18
**requested** [4] - 106:17, 205:19, 281:5, 281:10
**require** [1] - 273:21
**required** [16] - 87:16, 87:17, 108:11, 108:24, 109:3,

109:12, 182:13, 183:13, 184:7, 193:9, 201:24, 211:22, 236:4, 243:17, 271:21, 277:4
**requirement** [1] - 183:23
**requirements** [1] - 185:2
**reservation** [17] - 175:14, 175:21, 229:21, 230:5, 230:15, 231:2, 231:9, 231:17, 231:22, 232:4, 232:6, 259:22, 261:11, 261:16, 261:22, 262:1, 262:10
**reserve** [42] - 38:6, 57:23, 58:5, 60:3, 61:22, 62:21, 66:1, 67:17, 68:7, 99:8, 99:11, 99:12, 99:14, 102:5, 102:10, 102:17, 102:22, 103:5, 103:8, 103:18, 104:13, 104:19, 104:23, 105:5, 105:6, 105:7, 106:10, 109:7, 118:23, 132:12, 133:16, 151:15, 158:16, 231:12, 245:24, 246:6, 246:9, 253:2, 253:6, 253:7, 253:14, 255:13
**reserves** [14] - 58:17, 62:18, 63:5, 65:12, 65:18, 67:24, 69:15, 72:16, 96:23, 97:3, 105:20, 105:22, 156:13, 253:3
**reserving** [1] - 231:3
**residual** [1] - 214:18
**resolution** [2] - 41:2, 41:15
**resolutions** [2] - 36:1, 190:23
**resolve** [1] - 63:19
**resource** [2] - 169:23, 247:14
**resources** [9] - 33:20, 33:24, 34:4, 34:6, 34:9, 169:7, 176:17, 177:6, 235:19
**respect** [14] - 37:7, 78:14, 95:5, 95:6, 95:8, 144:20, 146:6, 212:4, 217:6, 220:11, 220:12, 239:18, 280:22, 281:15
**respected** [1] - 254:5

**respective** [2] - 53:24, 241:11
**respond** [1] - 90:3
**responding** [1] - 111:1
**response** [4] - 44:12, 87:6, 188:2, 194:23
**responsibilities** [2] - 96:5, 184:19
**responsibility** [21] - 14:6, 21:8, 28:21, 77:16, 77:18, 78:8, 78:10, 86:15, 97:11, 100:11, 101:11, 109:9, 122:16, 122:17, 128:10, 182:23, 183:2, 185:14, 187:18, 191:7, 204:16
**responsible** [29] - 11:13, 29:5, 48:14, 66:21, 79:4, 80:6, 90:12, 94:8, 94:12, 95:4, 95:9, 96:18, 98:3, 99:1, 99:17, 99:22, 109:22, 118:17, 122:20, 183:5, 183:10, 185:18, 185:22, 203:24, 216:7, 236:1, 243:14, 264:5, 264:8
**rest** [1] - 225:13
**restate** [2] - 45:12, 61:19
**restrictions** [1] - 202:15
**result** [12] - 71:10, 71:11, 71:14, 71:18, 168:18, 183:3, 183:8, 196:1, 267:11, 267:13, 271:18, 272:2
**resulted** [3] - 131:3, 234:5, 240:19
**results** [55] - 46:12, 46:13, 54:9, 70:4, 70:11, 71:7, 95:22, 95:24, 96:1, 96:16, 96:17, 96:19, 96:21, 126:19, 127:4, 128:6, 139:11, 139:13, 139:16, 139:21, 139:24, 140:8, 140:11, 140:15, 140:22, 140:24, 144:7, 144:10, 145:20, 145:24, 151:7, 152:7, 152:10, 153:4, 160:4, 160:21, 162:13, 164:15, 165:15, 167:14,

167:17, 168:3,
168:11, 196:12,
196:17, 212:23,
213:3, 213:4, 229:7,
234:12, 238:2, 238:3,
238:4, 238:6
  **retain** [1] - 131:19
  **retaining** [1] - 210:20
  **retention** [1] - 207:2
  **retrieved** [1] - 199:6
  **retrograde** [1] -
75:17
  **return** [7] - 89:11,
242:23, 244:1, 244:7,
244:12, 244:19,
284:23
  **returned** [2] - 5:23,
242:20
  **returning** [1] -
243:10
  **reveal** [1] - 172:13
  **revenue** [1] - 248:11
  **Revere** [28] - 1:8,
6:7, 9:16, 10:21, 11:1,
14:13, 14:22, 15:8,
23:21, 26:11, 28:16,
29:15, 29:20, 30:1,
30:7, 32:1, 32:11,
32:22, 39:11, 39:12,
39:14, 75:18, 75:24,
124:16, 283:5, 284:4,
285:4
  **Revere/Provident** [2]
- 76:6, 76:12
  **reversed** [1] - 253:4
  **Review** [3] - 219:15,
227:19, 252:10
  **review** [57] - 35:16,
86:15, 87:2, 87:12,
87:16, 87:17, 90:23,
91:23, 91:24, 92:1,
101:22, 105:2,
122:18, 138:18,
170:3, 170:5, 170:13,
170:18, 175:19,
176:18, 177:13,
183:20, 183:21,
184:2, 184:18,
184:23, 190:8,
193:22, 194:3, 194:7,
194:10, 194:24,
195:9, 195:13,
195:24, 197:17,
198:8, 200:8, 200:12,
201:16, 202:5,
202:19, 202:24,
203:3, 204:17,
217:16, 218:8, 223:6,
236:4, 236:9, 244:5,
252:11, 254:2, 277:3,

281:23, 281:24
  **reviewed** [26] -
88:17, 88:20, 90:19,
90:21, 161:7, 161:9,
170:23, 195:2,
196:16, 196:19,
198:20, 199:10,
199:19, 200:4,
200:23, 201:10,
201:11, 201:13,
204:3, 211:23,
212:12, 216:14,
219:10, 219:12,
223:11, 254:12
  **reviewing** [19] -
87:21, 90:12, 105:1,
122:20, 184:4, 184:5,
197:1, 197:3, 197:6,
197:14, 198:18,
203:24, 204:13,
212:5, 212:7, 213:20,
214:13, 216:7, 218:6
  **reviews** [9] - 92:2,
216:15, 216:17,
216:20, 218:10,
222:14, 223:13,
223:16
  **revisions** [1] - 188:1
  **reword** [2] - 126:23,
127:1
  **Richter** [1] - 3:3
  **rights** [18] - 175:14,
175:21, 229:21,
230:6, 230:15, 231:2,
231:3, 231:9, 231:17,
231:22, 232:4, 232:6,
259:23, 261:11,
261:16, 261:22,
262:1, 262:11
  **Riley** [4] - 1:19, 7:5,
283:2, 283:24
  **rings** [1] - 207:5
  **rising** [1] - 10:13
  **risk** [1] - 122:2
  **Road** [1] - 2:7
  **role** [19] - 16:22,
16:23, 21:20, 94:15,
94:20, 95:2, 95:17,
99:23, 111:20, 120:4,
126:2, 145:16,
145:17, 146:9,
153:15, 184:22,
217:5, 257:14, 269:7
  **roles** [3] - 153:19,
154:19, 184:24
  **Room** [1] - 1:16
  **room** [5] - 131:4,
131:5, 169:22, 257:3,
257:5
  **rooms** [2] - 130:12,

130:13
  **ROR** [1] - 230:6
  **ROSENTHAL** [4] -
192:11, 205:5,
258:18, 268:5
  **Rosenthal** [3] - 2:3,
2:5, 6:19
  **rough** [1] - 68:15
  **roughly** [4] - 38:11,
58:13, 119:12, 177:15
  **routine** [3] - 222:20,
250:20, 276:14
  **routinely** [1] - 170:22
  **RSA** [21] - 182:20,
182:24, 183:8,
183:13, 184:6, 185:2,
185:17, 186:23,
187:7, 187:19,
187:23, 188:2, 188:3,
189:11, 189:17,
189:18, 240:15,
240:17, 240:19,
268:20, 272:2
  **RT** [2] - 89:7, 89:9
  **Rubin** [3] - 2:16,
2:17, 6:20
  **Rule** [1] - 37:2
  **run** [3] - 32:19,
115:4, 168:7
  **Rutledge** [4] - 32:21,
33:5, 33:8, 33:12

**S**

  **safe** [1] - 186:12
  **safeguard** [1] -
271:20
  **safeguards** [3] -
216:5, 218:24, 271:17
  **sake** [1] - 151:14
  **salaries** [1] - 264:1
  **sales** [7] - 28:7,
52:11, 53:13, 53:24,
146:5, 146:7, 165:6
  **sample** [3] - 226:1,
252:9, 252:12
  **sampling** [1] -
219:12
  **Sander** [2] - 2:6, 6:20
  **SANDER** [3] - 268:4,
268:6, 268:23
  **sanderdawson@**
**dawsonandrosenthal**
**.com** [1] - 2:12
  **satisfactorily** [1] -
7:11
  **satisfactory** [1] -
283:10
  **saw** [11] - 89:12,
161:5, 163:15,

187:23, 188:2,
215:11, 235:18,
244:23, 245:23,
246:5, 248:23
  **scenario** [1] - 71:5
  **scheduled** [1] - 22:8
  **Schnebly** [1] - 2:7
  **Scorecard** [1] -
51:21
  **scorecard** [1] - 52:4
  **scorecards** [3] -
139:3, 139:4, 139:7
  **Scott** [4] - 19:19,
94:2, 249:19, 250:5
  **screen** [7] - 119:19,
137:1, 138:15,
138:16, 138:19,
138:20, 139:8
  **Scuderi** [2] - 19:1,
176:10
  **sdawson@**
**dawsonandrosenthal**
**.com** [1] - 2:10
  **se** [1] - 81:24
  **searched** [1] - 206:8
  **Seattle** [1] - 2:19
  **second** [7] - 57:22,
66:6, 114:9, 114:18,
170:17, 229:20,
236:22
  **secondly** [1] -
184:21
  **secret** [1] - 227:23
  **secretary** [1] - 192:2
  **section** [2] - 33:1,
54:9
  **security** [1] - 260:9
  **Security** [5] - 114:9,
114:18, 132:18,
189:7, 189:12
  **Sedona** [1] - 2:8
  **see** [52] - 13:14,
27:14, 34:18, 50:23,
51:15, 51:23, 61:9,
61:24, 62:5, 62:7,
63:6, 74:4, 76:19,
77:5, 88:15, 89:18,
90:3, 91:11, 92:6,
94:3, 96:15, 96:16,
97:20, 100:17,
100:23, 107:17,
108:2, 136:1, 136:3,
137:6, 162:12, 173:3,
183:18, 184:9,
187:20, 194:11,
197:2, 199:12,
199:21, 205:15,
205:22, 206:4,
206:14, 206:16,
215:9, 221:6, 228:13,

228:18, 251:9,
262:21, 273:22,
276:22
  **seeing** [8] - 52:7,
70:21, 113:14,
181:22, 187:24,
248:4, 248:6, 248:7
  **seek** [3] - 74:12,
130:13, 177:17
  **seeking** [1] - 131:5
  **seem** [3] - 110:17,
154:14, 167:11
  **self** [4] - 7:21, 198:5,
243:21, 244:13
  **self-contained** [1] -
198:5
  **self-employed** [2] -
7:21, 244:13
  **self-limited** [1] -
243:21
  **selling** [2] - 23:21,
28:5
  **send** [3] - 106:24,
281:13, 284:13
  **senior** [1] - 168:16
  **sense** [20] - 28:6,
40:21, 64:18, 124:23,
138:8, 146:1, 146:10,
150:21, 151:11,
160:6, 163:13,
163:18, 189:13,
193:10, 208:4, 213:1,
244:6, 254:8, 267:13,
277:4
  **sent** [4] - 106:23,
122:18, 185:11,
284:11
  **sentence** [1] - 33:12
  **separate** [11] - 14:14,
55:11, 55:14, 55:15,
76:16, 90:10, 116:3,
149:9, 152:20,
211:16, 217:15
  **separately** [4] -
157:12, 197:24,
211:11, 211:20
  **separation** [7] -
170:3, 176:15,
176:21, 177:10,
178:6, 209:3, 259:18
  **sequence** [1] - 89:1
  **service** [17] - 45:20,
46:8, 72:23, 79:5,
149:8, 224:8, 224:14,
225:6, 225:10,
225:14, 229:22,
230:17, 231:23,
238:10, 248:12, 249:9
  **services** [2] - 179:8,
210:4

serving [1] - 55:21
SESSION [1] - 6:2
set [3] - 44:14, 54:15, 93:16
setting [5] - 169:18, 170:8, 177:22, 177:24, 238:16
Settlement [5] - 181:19, 181:23, 182:12, 183:4, 187:21
settlement [2] - 188:8, 188:9
seven [2] - 206:3, 207:5
seven-year [1] - 207:5
seventeen [1] - 268:6
several [9] - 11:14, 28:12, 28:13, 45:19, 53:3, 74:8, 173:8, 176:6, 216:5
severance [1] - 177:8
shadow [1] - 191:19
share [4] - 252:16, 252:19, 278:5, 278:8
shared [6] - 136:17, 161:12, 161:16, 161:17, 216:21, 266:22
sheet [2] - 284:11, 284:19
SHEET [1] - 284:22
sheets [1] - 284:20
Shepard [3] - 89:1, 89:2, 90:21
Shepard's [5] - 90:8, 92:19, 93:1, 100:14, 250:10
Sheppard [1] - 3:3
Short [4] - 75:13, 147:14, 208:15, 258:22
short [5] - 63:8, 153:5, 225:1, 243:11, 244:24
shortly [1] - 265:22
show [1] - 14:19
showed [1] - 97:17
shows [1] - 51:19
shred [3] - 132:14, 132:15, 133:2
shredding [2] - 132:24, 133:17
shut [1] - 262:11
sick [1] - 126:15
side [2] - 122:7, 268:15
sides [1] - 152:20

sign [20] - 86:15, 87:2, 87:12, 105:4, 108:14, 108:22, 108:24, 109:3, 109:5, 109:12, 122:4, 161:3, 161:5, 161:8, 170:5, 173:18, 176:19, 177:10, 177:14, 216:10
SIGN [1] - 284:22
signature [8] - 89:3, 161:7, 161:9, 173:3, 281:23, 284:10, 284:12
signed [5] - 9:6, 79:17, 80:2, 175:3, 284:13
significance [1] - 253:8
significant [21] - 102:11, 102:12, 114:14, 181:10, 183:14, 183:24, 184:10, 184:16, 185:5, 185:13, 185:19, 185:23, 186:5, 187:10, 189:11, 190:11, 191:5, 201:22, 251:3, 253:13, 261:7
signing [4] - 80:6, 88:6, 175:6, 186:13
signs [1] - 122:5
similar [9] - 26:10, 52:8, 53:16, 158:20, 225:11, 234:8, 247:24, 249:4, 256:18
similarly [1] - 77:24
simplify [1] - 46:1
simply [6] - 30:4, 94:21, 174:14, 175:24, 229:13, 240:18
single [3] - 195:21, 212:24, 213:4
sister [1] - 241:22
sit [1] - 73:5
site [10] - 186:3, 186:22, 189:23, 190:9, 190:11, 193:16, 193:21, 211:5, 211:22, 212:11
sited [1] - 250:12
sitting [2] - 138:17, 164:19
situation [21] - 26:11, 35:14, 35:16, 37:14, 37:21, 91:20, 145:20, 166:11, 170:7, 195:24,

218:10, 219:13, 222:7, 222:10, 230:16, 232:2, 232:5, 242:15, 243:8, 244:9, 245:17
situations [8] - 74:17, 75:6, 109:24, 112:11, 225:14, 230:4, 230:23, 251:16
six [8] - 12:2, 14:7, 58:23, 66:5, 68:18, 77:16, 115:8
size [12] - 68:16, 68:18, 102:5, 104:19, 104:23, 105:7, 105:16, 114:6, 114:9, 114:17, 226:1, 255:12
skills [1] - 220:14
skip [2] - 221:9, 221:11
sloppy [1] - 272:15
small [8] - 64:10, 69:18, 105:5, 105:22, 235:16, 252:22, 253:6, 253:14
smaller [4] - 65:19, 105:19, 246:9, 253:3
smallest [1] - 104:14
Smith [1] - 117:5
Smith's [1] - 117:8
smooth [3] - 144:10, 164:12, 164:14
so's [1] - 195:3
so-called [2] - 213:23, 230:14
Social [5] - 114:9, 114:18, 132:18, 189:6, 189:12
sold [1] - 28:3
sole [1] - 262:11
someone [13] - 29:19, 40:14, 94:7, 95:3, 160:16, 174:24, 175:1, 177:6, 191:20, 213:2, 244:13, 261:4, 270:11
someplace [1] - 157:23
sometime [3] - 19:14, 25:4, 213:6
sometimes [27] - 17:13, 36:15, 75:4, 129:4, 129:6, 138:23, 141:14, 141:23, 146:5, 150:12, 165:16, 191:19, 197:22, 197:23, 199:4, 202:20, 202:21, 211:13, 211:14, 211:15,

217:11, 230:10, 231:1, 255:15, 256:5, 256:8, 274:4
somewhat [5] - 23:10, 23:18, 83:19, 95:19, 258:7
somewhere [7] - 11:4, 14:7, 58:23, 66:4, 157:23, 197:8, 202:4
soon [2] - 181:18, 191:14
sooner [2] - 106:2, 192:17
sorry [19] - 11:22, 41:10, 71:13, 76:10, 86:23, 98:11, 115:15, 126:6, 154:4, 160:1, 187:18, 189:15, 202:13, 231:19, 240:5, 245:7, 250:8, 258:19, 275:8
sort [7] - 13:19, 36:1, 50:13, 109:18, 186:11, 190:3, 206:9
sound [5] - 11:3, 15:5, 15:20, 221:20, 237:16
sounds [8] - 15:22, 21:6, 22:2, 35:13, 98:5, 156:7, 182:2, 208:11
source [1] - 161:1
South [1] - 3:5
span [3] - 23:15, 113:19, 113:24
speaking [13] - 40:3, 71:9, 71:24, 73:1, 77:2, 102:11, 111:7, 120:5, 144:13, 167:7, 178:23, 196:18, 273:20
speaks [2] - 178:24, 235:8
Specialist [1] - 18:9
specialist [7] - 13:18, 89:4, 93:17, 195:3, 203:11, 218:7, 218:11
specialists [1] - 217:18
Specialists [3] - 11:15, 136:18, 235:3
specialized [1] - 210:14
specialty [1] - 203:9
specific [16] - 11:5, 17:7, 34:14, 48:13, 49:24, 50:17, 64:13, 78:21, 90:2, 136:14,

167:1, 173:14, 174:3, 216:17, 251:15, 265:9
specifically [18] - 55:3, 111:1, 124:3, 131:5, 145:14, 149:16, 154:12, 163:5, 169:2, 170:24, 189:2, 198:19, 212:8, 241:14, 269:16, 275:17, 278:21
specifics [2] - 190:2, 210:13
specify [3] - 39:7, 175:22, 275:24
speculate [1] - 118:5
speculating [1] - 267:14
speculation [41] - 17:1, 20:10, 23:2, 26:4, 29:24, 31:14, 36:3, 39:3, 47:3, 47:11, 48:2, 56:2, 63:24, 64:23, 93:13, 94:18, 96:2, 96:11, 96:24, 97:10, 98:20, 99:21, 100:9, 102:14, 104:1, 108:4, 111:23, 113:21, 115:20, 126:22, 162:3, 162:17, 173:13, 199:24, 200:19, 206:11, 206:24, 208:3, 260:10, 266:24, 270:24
speed [1] - 149:10
spend [1] - 10:6
spent [1] - 229:1
split [1] - 125:16
spoken [2] - 209:20, 219:16
spread [1] - 272:21
square [1] - 14:22
Sr [1] - 3:13
staff [2] - 222:1, 256:18
staffing [1] - 222:7
Stamp [3] - 4:19, 5:3, 5:8
stand [2] - 64:17, 122:22
standard [3] - 93:16, 185:13, 186:6
standards [6] - 83:14, 162:8, 187:19, 224:20, 225:5, 225:6
standing [2] - 222:1, 236:21
standpoint [3] - 166:15, 183:10, 247:15

**stands** [3] - 13:17, 18:8, 79:21
**start** [5] - 142:15, 150:6, 150:8, 204:7, 219:9
**started** [3] - 131:19, 158:8, 204:12
**starting** [2] - 21:19, 145:16
**state** [7] - 6:17, 7:18, 80:20, 104:9, 105:15, 261:2, 276:17
**State** [1] - 276:18
**statement** [6] - 103:7, 126:16, 130:22, 137:19, 145:2, 243:17
**STATES** [2] - 1:3, 285:1
**States** [1] - 6:8
**states** [2] - 264:16, 276:15
**stating** [1] - 61:16
**statistically** [1] - 114:14
**status** [39] - 59:4, 59:7, 59:13, 59:17, 60:14, 60:17, 61:20, 63:17, 64:4, 65:16, 66:3, 66:14, 66:17, 66:22, 67:5, 67:15, 68:16, 79:6, 79:11, 86:5, 86:8, 87:8, 91:9, 91:13, 100:15, 100:21, 101:6, 119:15, 119:19, 132:11, 144:17, 192:20, 192:21, 214:15, 214:16, 214:19, 215:1, 250:18, 273:16
**stenographically** [1] - 283:9
**step** [2] - 202:4, 243:15
**steps** [12] - 69:19, 69:22, 70:6, 70:9, 70:10, 183:18, 184:8, 245:2, 245:4, 245:9, 245:12, 252:14
**Steve** [6] - 6:19, 32:21, 32:23, 169:8, 191:24, 209:23
**Steven** [5] - 2:4, 7:19, 92:16, 284:13, 285:24
**stick** [1] - 129:6
**still** [8] - 10:24, 33:5, 63:8, 76:4, 107:15, 155:23, 272:13,

272:23
**stipulate** [1] - 207:4
**stipulated** [1] - 189:11
**stop** [1] - 11:1
**stopped** [1] - 24:2
**stopping** [1] - 23:21
**Street** [6] - 1:17, 2:18, 3:5, 3:15, 6:15, 141:1
**Street-C475** [1] - 3:15
**strike** [24] - 21:3, 122:24, 141:9, 157:11, 164:18, 209:24, 210:1, 212:9, 220:17, 227:22, 228:21, 237:24, 244:22, 246:4, 246:15, 250:16, 251:10, 252:24, 253:23, 257:10, 257:11, 258:4, 258:13
**string** [1] - 5:3
**stringent** [1] - 23:18
**strive** [1] - 54:1
**stronger** [1] - 32:12
**studies** [2] - 40:10, 40:21
**subdivision** [1] - 116:17
**subject** [6] - 7:23, 32:19, 85:4, 163:3, 178:5, 198:16
**subjective** [6] - 38:22, 39:22, 40:1, 40:4, 40:6, 41:7
**submit** [4] - 62:24, 91:2, 91:5, 217:12
**submitted** [6] - 35:16, 37:22, 91:14, 97:15, 97:21, 101:14
**submitting** [2] - 35:9, 217:11
**subpoena** [6] - 107:19, 108:1, 108:8, 108:11, 178:1, 178:5
**subpoenaed** [2] - 209:7, 259:6
**subpoenaing** [1] - 259:19
**subsequent** [4] - 15:11, 53:5, 210:9, 276:14
**subsequently** [5] - 88:8, 90:14, 101:16, 231:13, 244:18
**subsidiaries** [1] - 241:22
**substance** [2] -

137:2, 278:18
**substantively** [2] - 122:8, 122:14
**successful** [2] - 24:3, 24:8
**sued** [1] - 266:19
**suffer** [1] - 260:20
**sufficiently** [1] - 275:10
**suggest** [10] - 65:20, 71:8, 72:3, 112:20, 158:4, 204:6, 243:21, 249:15, 270:3, 270:8
**suggested** [3] - 115:17, 159:16, 260:23
**suggesting** [1] - 113:14
**suing** [1] - 178:8
**suit** [1] - 134:21
**Suite** [1] - 2:18
**Sullivan** [1] - 12:7
**summarize** [1] - 196:9
**summarizing** [1] - 194:24
**summary** [1] - 176:3
**superiors** [1] - 144:24
**supervise** [2] - 211:5, 211:7
**supervised** [3] - 218:20, 219:21, 246:17
**supervising** [1] - 47:18
**supervision** [5] - 68:24, 77:2, 150:23, 253:17, 267:17
**supervisor** [5] - 81:13, 92:17, 272:17, 272:18, 272:22
**supervisors** [1] - 271:4
**supervisory** [2] - 21:8, 270:11
**support** [1] - 251:14
**supported** [2] - 188:22, 202:16
**supposed** [1] - 234:21
**surface** [1] - 112:14
**surprise** [4] - 172:11, 187:1, 187:5, 255:5
**surprised** [2] - 206:14, 206:15
**surrounding** [2] - 158:17, 178:14
**surveillance** [35] - 107:1, 107:9, 107:10,

107:13, 107:17, 109:14, 109:17, 110:3, 197:17, 197:19, 198:3, 200:13, 200:14, 201:4, 201:10, 201:11, 201:13, 201:21, 202:2, 204:15, 204:22, 204:24, 207:22, 207:23, 208:1, 208:2, 211:10, 211:17, 211:23, 212:5, 212:6, 270:22, 280:23, 281:1, 281:16
**surveilled** [1] - 108:2
**survey** [1] - 224:11
**suspect** [11] - 9:5, 112:16, 170:21, 207:7, 218:20, 219:3, 220:4, 220:6, 220:17, 221:16, 251:16
**suspected** [2] - 219:7, 264:24
**suspicious** [1] - 220:19
**sustain** [1] - 230:21
**Suzanne** [4] - 1:11, 283:7, 284:7, 285:6
**swear** [1] - 7:7
**switch** [1] - 193:3
**switched** [1] - 41:19
**sworn** [2] - 7:11, 283:13
**synonymous** [1] - 36:2
**system** [34] - 62:20, 98:23, 99:2, 141:14, 141:22, 142:11, 143:3, 143:8, 144:12, 144:14, 144:21, 144:23, 147:21, 148:19, 149:16, 149:17, 149:19, 149:21, 149:22, 150:1, 150:4, 150:13, 151:3, 157:15, 163:12, 165:17, 169:3, 175:12, 214:11, 214:22, 215:8, 229:4, 229:13, 229:18
**systematically** [1] - 252:4
**systems** [6] - 149:23, 149:24, 150:16, 270:15, 271:9, 271:11

# T

**tape** [3] - 109:14, 146:16, 146:19
**target** [4] - 85:13, 141:10, 227:3, 246:1
**targets** [7] - 42:21, 43:3, 136:11, 141:9, 141:17, 158:24, 227:2
**task** [1] - 118:24
**teach** [1] - 63:21
**teaches** [1] - 64:19
**team** [52] - 11:13, 58:13, 58:18, 61:14, 62:15, 77:13, 78:9, 78:18, 82:1, 87:19, 88:3, 91:24, 95:11, 104:21, 113:6, 115:6, 120:16, 130:21, 153:23, 154:2, 154:5, 155:10, 161:16, 190:4, 218:18, 222:2, 222:9, 222:21, 223:12, 223:15, 223:19, 223:20, 223:21, 223:23, 225:13, 234:11, 234:15, 234:20, 240:12, 244:24, 249:16, 250:24, 256:17, 256:22, 265:5, 266:5, 266:11, 266:17, 267:6, 275:6
**team's** [4] - 61:9, 62:1, 74:7, 279:3
**teams** [11] - 42:12, 55:8, 58:9, 73:3, 83:17, 88:2, 88:4, 94:23, 154:6, 154:9, 234:18
**techniques** [1] - 32:12
**temporary** [1] - 242:22
**ten** [7] - 69:4, 116:20, 135:1, 135:23, 215:18, 247:22, 258:18
**ten-year** [2] - 215:18, 247:22
**tend** [4] - 38:24, 60:8, 60:19, 82:4
**tended** [1] - 115:3
**tends** [1] - 64:19
**tens** [2] - 117:2, 117:18
**tenure** [12] - 16:8, 22:1, 22:13, 24:15, 25:18, 34:15, 36:4, 75:18, 128:8, 133:24,

135:5, 265:19
**tenured** [1] - 218:9
**term** [23] - 21:5,
27:20, 35:5, 36:12,
40:1, 44:5, 44:6,
44:18, 51:13, 99:10,
116:2, 135:13, 139:5,
163:20, 164:1, 164:2,
241:4, 247:3, 247:11,
261:19, 264:8,
272:22, 281:12
**termed** [1] - 177:1
**terminated** [25] -
35:3, 35:8, 142:18,
142:22, 160:10,
169:5, 170:2, 172:18,
173:5, 173:6, 173:7,
173:8, 173:9, 173:11,
173:15, 176:6, 176:9,
176:12, 180:9,
190:18, 213:5, 213:7,
258:5, 265:14
**terminating** [1] -
233:17
**termination** [17] -
35:12, 35:21, 107:7,
107:8, 143:6, 143:9,
143:16, 143:19,
169:20, 171:12,
171:21, 173:22,
175:17, 177:3,
178:13, 178:24,
185:10
**terminations** [2] -
36:2, 176:7
**terminology** [2] -
17:8, 17:14
**terms** [52] - 22:10,
27:19, 34:4, 34:10,
34:17, 35:19, 36:6,
37:16, 37:24, 46:17,
55:22, 58:16, 59:15,
62:24, 63:21, 95:19,
96:22, 102:16,
102:20, 104:17,
104:20, 105:8,
107:12, 114:17,
119:14, 123:22,
148:10, 148:15,
149:1, 156:13, 164:6,
165:24, 177:3, 177:4,
177:21, 183:4,
186:12, 190:5, 191:6,
210:18, 223:10,
223:22, 223:23,
233:3, 238:10,
240:23, 254:5,
258:17, 263:7,
267:18, 273:14, 275:1
**test** [7] - 40:21,

196:1, 196:12,
196:17, 212:22,
213:3, 213:4
**testified** [18] - 7:12,
142:21, 175:10,
186:23, 186:24,
212:10, 213:23,
215:3, 226:11,
255:15, 259:24,
264:23, 265:12,
270:15, 279:3,
279:23, 279:24,
280:21
**testify** [8] - 8:12,
8:16, 178:11, 209:12,
209:14, 259:7,
265:10, 278:14
**testifying** [7] - 37:1,
208:22, 238:24,
266:11, 266:12,
271:10, 277:16
**testimony** [40] -
36:23, 36:24, 44:3,
54:21, 56:22, 69:24,
73:14, 78:7, 79:2,
83:12, 86:22, 98:5,
105:12, 120:2,
121:23, 122:22,
123:11, 125:7, 126:8,
127:21, 129:10,
152:17, 163:9, 178:2,
181:23, 187:3,
198:15, 199:17,
199:21, 199:24,
212:13, 212:14,
242:12, 255:21,
265:24, 270:2,
278:11, 279:6,
280:24, 285:8
**testing** [1] - 109:14
**text** [1] - 192:1
**THE** [24] - 2:2, 3:2,
6:5, 7:4, 75:11, 75:14,
76:22, 133:22,
135:19, 147:12,
147:15, 192:10,
205:8, 205:11,
205:13, 208:7,
208:11, 208:13,
208:16, 231:19,
258:20, 258:23,
282:2, 284:22
**themes** [1] - 222:15
**themselves** [3] -
6:17, 216:7, 230:21
**Theona** [4] - 3:4,
6:21, 6:24, 284:11
**thereby** [5] - 79:24,
99:7, 99:8, 109:7,
274:19

**therefore** [5] - 38:19,
101:24, 200:7,
265:24, 269:1
**thereto** [1] - 283:21
**they've** [1] - 194:21
**thinking** [2] - 78:16,
220:14
**third** [2] - 166:13,
232:15
**Thomson** [3] - 1:19,
283:2, 283:24
**thorough** [1] - 254:4
**thoroughly** [1] -
113:17
**thousand** [1] - 268:4
**thousands** [3] -
117:2, 117:18, 212:19
**three** [14] - 18:23,
19:4, 66:5, 82:9,
135:19, 135:20,
177:16, 220:2, 222:3,
224:6, 224:12,
243:11, 243:24, 244:7
**thresholds** [1] - 64:5
**throughout** [4] -
70:17, 128:8, 133:24,
145:8
**til** [1] - 10:9
**time-consuming** [1]
- 212:23
**timeline** [2] - 51:9,
51:15
**timeliness** [4] -
84:16, 224:9, 224:14,
225:10
**timely** [4] - 144:19,
149:8, 234:22, 235:1
**timing** [2] - 143:2,
175:20
**Timothy** [2] - 12:9,
173:3
**title** [11] - 20:14,
21:22, 22:1, 76:1,
76:15, 93:7, 94:6,
95:19, 169:9, 169:14,
264:9
**titled** [1] - 247:9
**titles** [1] - 271:1
**TO** [1] - 284:10
**today** [25] - 6:13, 7:5,
8:13, 8:17, 8:21, 16:6,
24:20, 138:18,
164:19, 180:16,
181:5, 208:22, 209:5,
209:8, 209:12,
213:24, 217:2,
227:15, 238:1,
242:13, 247:2,
248:23, 249:21,
255:15, 280:21

**today's** [2] - 6:11,
89:7
**together** [2] -
129:16, 254:8
**took** [9] - 20:2,
21:20, 29:15, 30:1,
30:7, 134:8, 147:18,
223:1, 238:24
**tool** [8] - 59:2, 59:14,
64:4, 66:17, 68:9,
72:21, 79:6, 218:18
**toolkit** [1] - 247:4
**Toolkit** [7] - 4:16,
51:3, 51:12, 246:23,
247:1, 247:9, 247:12
**tools** [1] - 72:22
**top** [2] - 51:19,
205:15
**topic** [2] - 78:24,
238:18
**topics** [2] - 130:20,
249:10
**total** [4] - 57:19,
60:14, 65:17, 214:19
**totaled** [1] - 239:24
**totally** [2] - 116:3,
217:15
**touched** [2] - 18:14,
270:2
**toward** [3] - 142:12,
156:19, 230:8
**track** [13] - 43:20,
70:4, 99:5, 155:18,
157:12, 217:20,
236:11, 240:3, 240:8,
244:1, 244:11, 255:7,
263:2
**tracking** [11] -
135:12, 136:22,
137:1, 138:9, 138:18,
227:24, 228:5,
234:14, 235:7,
262:23, 269:12
**Tracking** [3] - 5:6,
227:16, 227:19
**TRACKING-
CONFIDENTIAL-
000010** [1] - 5:9
**tracks** [1] - 233:22
**traditional** [1] -
222:9
**traditionally** [3] -
93:10, 175:1, 234:13
**train** [2] - 248:21,
248:24
**training** [4] - 102:16,
102:20, 103:2, 264:13
**transcript** [6] -
50:18, 110:12,
283:15, 284:16,

284:19, 284:23
**transcripts** [1] -
281:22
**transferred** [1] - 33:4
**transitioned** [1] -
265:23
**transparency** [3] -
128:17, 128:22,
129:20
**treating** [2] - 183:15,
202:6
**trend** [1] - 252:15
**trends** [2] - 88:1,
222:15
**trial** [2] - 266:9,
266:12
**tried** [6] - 105:15,
112:24, 113:2, 113:7,
225:21, 225:23
**trigger** [2] - 67:22,
108:21
**trouble** [2] - 18:18,
188:6
**true** [36] - 24:21,
30:10, 30:24, 31:2,
43:11, 60:4, 65:8,
72:4, 76:3, 83:20,
85:5, 85:13, 86:6,
105:19, 122:9,
122:11, 122:13,
124:4, 125:20, 127:3,
127:14, 137:18,
140:9, 141:15,
141:24, 145:7, 154:7,
193:16, 197:13,
199:20, 226:6, 226:9,
263:1, 271:13,
283:15, 285:8
**truth** [2] - 209:1,
209:5
**truthful** [2] - 239:5,
239:18
**truthfully** [2] - 8:13,
8:17
**try** [7] - 43:18, 61:18,
146:14, 184:8,
184:15, 252:14, 259:3
**trying** [6] - 27:9,
80:24, 98:4, 104:16,
157:3, 172:12
**turn** [11] - 11:14,
55:6, 84:2, 127:11,
140:21, 167:14,
208:5, 223:14,
234:17, 244:5, 263:8
**turned** [3] - 24:2,
29:19, 231:4
**two** [26] - 8:7, 8:9,
15:2, 15:8, 19:11,
19:14, 19:16, 39:6,

PLO v. ABRAMOWSKI ADV. PETER BRODART, CSR

50:22, 57:16, 81:17,
82:9, 88:9, 88:21,
93:23, 116:20,
125:16, 149:9, 152:4,
152:20, 156:5, 157:6,
184:17, 244:7, 268:22
  **Two** [1] - 268:4
  **type** [17] - 15:2,
39:21, 41:2, 89:15,
90:3, 90:23, 91:16,
94:13, 112:3, 137:8,
163:24, 214:19,
229:14, 239:20,
240:23, 243:4, 264:11
  **types** [12] - 28:4,
34:14, 41:1, 41:5,
41:13, 46:17, 59:13,
60:17, 86:8, 112:11,
190:19, 221:22
  **typical** [1] - 155:9
  **typically** [22] - 18:4,
40:2, 55:16, 57:11,
80:8, 91:17, 91:20,
109:2, 110:4, 130:5,
171:2, 190:7, 193:8,
198:21, 198:23,
203:6, 203:7, 215:17,
236:6, 260:16,
267:20, 281:5
  **tzhordania@**
**sheppardmullin.com**
[1] - 3:8

### U

  **ultimately** [6] -
74:19, 107:5, 107:16,
109:1, 242:23, 248:17
  **unable** [4] - 179:9,
239:16, 244:18, 261:4
  **unaware** [1] - 186:23
  **uncovered** [1] -
175:19
  **under** [46] - 34:13,
35:18, 37:16, 37:24,
38:4, 51:4, 51:19,
52:15, 54:24, 64:5,
71:4, 73:16, 83:16,
112:4, 112:20, 119:5,
119:11, 130:15,
144:2, 147:21,
150:23, 172:17,
175:14, 177:20,
182:7, 202:17,
208:22, 210:1,
229:21, 230:5,
230:14, 231:2, 231:9,
231:17, 231:22,
241:11, 253:17,
259:18, 259:22,

261:11, 261:16,
261:22, 262:10,
264:12, 264:20, 285:7
  **underneath** [10] -
68:24, 77:2, 77:16,
77:20, 84:3, 142:8,
150:11, 153:12,
161:13, 185:9
  **underpriced** [1] -
26:8
  **understood** [7] -
53:11, 69:9, 134:14,
151:4, 151:17,
242:12, 263:23
  **underwriter** [1] -
9:16
  **underwriting** [18] -
10:3, 10:7, 10:13,
10:24, 23:14, 23:17,
25:24, 33:2, 53:23,
126:9, 146:4, 165:7,
239:1, 239:4, 241:5,
265:23, 266:1, 278:20
  **Underwriting** [2] -
10:15, 11:9
  **unfair** [4] - 188:7,
188:9, 269:8, 270:22
  **unfairly** [1] - 252:3
  **unfavorable** [1] -
234:24
  **unhappy** [1] - 258:10
  **unit** [3] - 110:15,
272:16, 272:20
  **United** [1] - 6:8
  **UNITED** [2] - 1:3,
285:1
  **units** [2] - 12:22,
13:6
  **University** [1] - 2:18
  **unless** [1] - 109:5
  **unlike** [1] - 146:2
  **unlikely** [7] - 63:16,
63:18, 70:22, 167:11,
167:21, 167:23, 168:1
  **unpack** [1] - 123:23
  **unpaid** [10] - 36:15,
36:18, 37:11, 37:21,
38:2, 60:23, 60:24,
61:4, 62:17, 62:18
  **unrelated** [1] - 14:14
  **Unum** [107] - 1:10,
3:12, 7:3, 8:23, 9:20,
9:21, 9:23, 11:15,
14:14, 15:18, 16:3,
16:11, 17:9, 17:20,
18:5, 28:14, 28:17,
28:21, 29:3, 30:12,
37:1, 44:13, 75:20,
89:5, 106:24, 108:1,
114:6, 114:17,

118:12, 124:8,
127:22, 142:18,
172:3, 172:16,
172:19, 174:6,
174:15, 178:8,
178:18, 179:1, 179:4,
179:6, 179:10,
179:13, 180:1, 180:5,
181:12, 182:13,
183:23, 188:5,
188:21, 189:6,
189:22, 202:18,
207:6, 209:4, 209:14,
211:4, 211:21, 213:6,
216:15, 219:3,
231:16, 231:21,
233:17, 233:21,
236:10, 240:2, 240:8,
241:1, 241:6, 241:8,
241:14, 241:15,
241:19, 241:24,
247:23, 251:9,
251:12, 257:24,
258:5, 258:10, 259:7,
259:11, 262:23,
263:1, 263:2, 263:16,
263:19, 264:1, 264:5,
264:8, 264:12,
264:13, 264:14,
264:21, 266:19,
270:21, 271:21,
272:3, 275:22,
278:13, 281:7,
281:11, 283:6, 284:5,
285:5
  **Unum's** [12] - 37:4,
90:24, 134:14,
141:13, 141:22,
185:16, 213:9,
238:20, 259:8,
259:11, 280:22,
281:14
  **Unum-affiliated** [1] -
9:20
  **Unum-related** [2] -
178:18, 179:13
  **UnumProvident** [4] -
4:15, 15:24, 16:3,
51:2
  **unusual** [3] - 170:17,
170:19, 170:23
  **unusually** [1] - 88:7
  **up** [46] - 10:13,
12:20, 13:6, 14:10,
18:17, 23:16, 27:11,
32:19, 33:17, 43:18,
44:18, 47:9, 47:17,
58:12, 61:9, 61:24,
62:14, 63:4, 64:7,
74:3, 76:8, 81:12,

81:14, 107:6, 126:15,
127:19, 128:5,
132:24, 148:3, 149:3,
165:23, 174:10,
175:22, 181:6,
194:11, 197:8,
199:11, 215:16,
219:1, 222:21,
258:17, 261:20,
263:11, 263:13,
263:15, 273:15
  **upcoming** [4] -
54:20, 65:17, 71:15,
214:15
  **updated** [2] - 131:17,
132:8
  **updates** [1] - 82:5
  **upheld** [1] - 97:22
  **Upjohn** [6] - 171:22,
173:2, 173:18, 175:2,
175:7, 228:10
  **upper** [5] - 159:10,
166:21, 166:24,
167:7, 167:8
  **ups** [1] - 77:5
  **upset** [1] - 258:5
  **US** [1] - 51:21
  **utilize** [2] - 65:2,
94:13
  **utilized** [2] - 64:3,
218:17

### V

  **vacuum** [2] - 104:6,
118:2
  **vague** [37] - 22:19,
25:3, 27:2, 29:12,
32:4, 33:23, 34:12,
35:4, 38:15, 41:3,
41:16, 41:23, 45:11,
48:22, 52:5, 53:14,
86:13, 102:13, 104:1,
105:24, 124:2,
133:20, 149:4,
155:22, 157:16,
166:23, 178:9, 190:1,
190:14, 191:23,
227:12, 228:2,
259:13, 272:6, 276:6
  **valid** [1] - 112:22
  **valued** [1] - 151:24
  **variables** [1] -
104:11
  **variation** [3] - 64:14,
64:16, 64:17
  **varied** [2] - 140:2,
140:3
  **variety** [10] - 31:17,
38:17, 95:5, 97:12,

99:23, 130:20,
130:21, 223:5, 225:9,
256:21
  **various** [12] - 45:20,
125:24, 145:17,
188:6, 188:24,
196:17, 210:6,
212:22, 223:13,
225:10, 248:6, 270:21
  **vast** [3] - 224:22,
225:4, 225:13
  **verbal** [3] - 133:8,
133:18, 134:2
  **verbally** [1] - 134:5
  **versa** [2] - 81:5,
214:19
  **versus** [8] - 1:7, 6:7,
46:12, 48:1, 116:9,
129:20, 224:5
  **vice** [2] - 81:5,
214:19
  **Vice** [27] - 10:14,
10:17, 11:8, 11:9,
11:11, 11:18, 11:20,
16:20, 18:14, 18:21,
19:8, 19:11, 20:15,
20:16, 20:17, 20:21,
20:22, 21:3, 21:4,
75:22, 93:23, 128:4,
128:5, 134:22, 135:6,
161:22, 168:9
  **video** [5] - 6:12,
6:14, 109:17, 197:17,
198:4
  **Videographer** [1] -
3:21
  **VIDEOGRAPHER**
[12] - 6:5, 7:4, 75:11,
75:14, 147:12,
147:15, 192:10,
208:13, 208:16,
258:20, 258:23, 282:2
  **videographer** [1] -
6:12
  **videos** [1] - 281:16
  **videotape** [1] - 108:2
  **videotaped** [1] - 6:6
  **VIDEOTAPED** [1] -
1:15
  **view** [5] - 98:24,
137:24, 138:9,
152:19, 235:7
  **View** [2] - 5:6, 227:16
  **violate** [2] - 179:16,
179:20
  **virtually** [2] - 22:16,
23:8
  **virtue** [7] - 76:1,
108:19, 114:6,
114:20, 207:12,

207:13, 207:18
**voice** [2] - 6:16, 181:2
**voiced** [1] - 181:10
**volume** [1] - 1:1
**voluntarily** [2] - 178:7
**vote** [2] - 146:24, 147:2
**VP** [2] - 159:23, 159:24
**vs** [2] - 283:4, 284:3
**vulnerable** [2] - 260:23, 261:5

### W

**wait** [1] - 148:13
**waiting** [2] - 147:20, 231:6
**waivers** [1] - 9:2
**walk** [1] - 180:3
**Wall** [1] - 141:1
**wants** [1] - 258:18
**warning** [6] - 171:22, 173:2, 173:18, 175:2, 175:7, 228:11
**Washington** [1] - 2:19
**ways** [1] - 54:12
**week** [5] - 81:24, 82:9, 256:13
**week-to-week** [1] - 81:24
**Weekly** [3] - 5:5, 227:15, 227:19
**weekly** [11] - 81:23, 82:5, 135:11, 136:21, 136:24, 138:9, 138:18, 222:1, 228:5, 235:7, 269:11
**weeks** [3] - 171:9, 174:2, 177:16
**weigh** [2] - 183:21, 194:8
**weight** [16] - 183:14, 183:24, 184:10, 184:16, 185:5, 185:13, 185:19, 185:23, 186:6, 187:10, 189:6, 189:12, 224:18, 226:17, 251:3, 251:21
**West** [1] - 13:13
**Wetton** [46] - 12:4, 93:21, 110:7, 111:15, 112:16, 113:24, 115:17, 116:24, 119:17, 120:5, 126:18, 130:10,

213:17, 215:3, 215:16, 219:21, 220:4, 220:9, 220:16, 220:18, 222:23, 223:3, 224:3, 224:20, 225:3, 225:13, 225:16, 226:4, 226:21, 250:17, 254:17, 254:22, 255:7, 255:16, 256:2, 256:10, 267:18, 268:2, 268:14, 269:1, 269:7, 269:11, 270:11, 279:20, 280:7, 280:19
**Wetton's** [4] - 110:11, 113:5, 120:2, 256:6
**whereas** [1] - 203:10
**whichever** [1] - 143:24
**whoa** [1] - 280:9
**whole** [6] - 58:8, 119:7, 204:19, 204:20, 223:24, 273:22
**wide** [2] - 56:10, 95:4
**widely** [2] - 251:6, 254:5
**wider** [2] - 219:12, 252:12
**widespread** [3] - 166:16, 180:10, 181:4
**Williams** [3] - 19:19, 19:22, 93:24
**willingness** [1] - 8:16
**withdraw** [2] - 164:9, 279:13
**WITNESS** [10] - 76:22, 133:22, 205:8, 205:11, 205:13, 208:7, 208:11, 284:1, 284:16, 285:21
**witness** [9] - 7:1, 7:8, 37:2, 37:7, 52:21, 174:8, 255:2, 281:22, 283:10
**witness'** [1] - 123:11
**WKLY** [1] - 5:8
**wonder** [1] - 88:4
**wondering** [2] - 33:13, 179:19
**Worcester** [3] - 1:17, 6:15, 19:3
**word** [4] - 45:10, 227:3, 227:5, 266:3
**worded** [2] - 28:23, 187:19
**wording** [2] - 158:20,

159:1
**words** [7] - 34:18, 45:3, 191:12, 195:16, 206:18, 209:11, 241:22
**workload** [1] - 222:7
**worsens** [1] - 244:19
**worth** [1] - 79:21
**worthy** [1] - 251:22
**write** [2] - 131:9, 132:1
**writing** [2] - 134:24, 274:5
**written** [13] - 33:8, 39:18, 67:7, 67:13, 67:16, 67:23, 68:4, 131:12, 133:15, 133:17, 194:23, 211:22, 240:19
**www.
flynnreporting.com** [1] - 1:23

### X

**X-ray** [2] - 40:21, 196:14

### Y

**year** [22] - 10:1, 10:16, 11:19, 17:5, 22:15, 22:23, 51:9, 52:3, 53:4, 53:5, 53:8, 54:1, 57:2, 57:4, 57:11, 207:5, 215:18, 216:14, 247:6, 247:22, 268:11
**years** [43] - 8:7, 8:9, 9:22, 10:6, 15:17, 16:2, 25:19, 26:2, 38:12, 82:12, 88:21, 114:15, 116:20, 126:10, 126:13, 128:15, 135:1, 145:4, 145:8, 153:21, 154:19, 154:21, 159:19, 181:3, 198:9, 199:6, 199:20, 200:14, 206:3, 220:2, 228:7, 252:1, 253:21, 265:3, 265:22, 268:6, 268:10, 276:14, 277:22, 278:17
**yesterday** [1] - 199:17
**yield** [1] - 123:22
**yielded** [1] - 112:12
**York** [2] - 30:13, 242:5

**yourself** [3] - 261:21, 273:2, 273:8

### Z

**Zabel** [5] - 169:8, 169:12, 169:23, 176:16, 180:15
**ZABEL** [1] - 169:8
**ZHORDANIA** [220] - 6:21, 6:23, 17:1, 20:9, 20:19, 22:19, 23:1, 24:4, 24:13, 25:3, 26:3, 26:9, 27:2, 29:12, 29:23, 31:13, 32:4, 32:10, 32:14, 33:23, 35:4, 36:3, 36:20, 38:9, 38:15, 39:2, 40:17, 41:3, 41:16, 41:23, 42:24, 44:3, 44:16, 45:10, 45:16, 46:6, 47:3, 47:11, 48:2, 48:8, 48:22, 49:23, 50:6, 50:12, 50:15, 52:5, 52:19, 53:14, 53:18, 54:21, 56:2, 56:11, 56:21, 57:7, 62:3, 62:12, 63:14, 63:23, 64:22, 65:23, 68:2, 69:21, 69:24, 71:12, 71:17, 73:13, 73:24, 75:3, 76:20, 76:23, 77:7, 78:6, 79:1, 80:3, 80:23, 83:11, 83:23, 84:11, 84:21, 85:6, 86:13, 86:22, 91:18, 93:12, 94:17, 96:2, 96:11, 96:24, 97:10, 98:11, 98:15, 98:19, 99:20, 100:6, 100:9, 100:22, 101:7, 102:12, 103:24, 105:11, 105:24, 107:14, 107:22, 108:4, 111:17, 111:22, 113:21, 113:23, 115:20, 117:10, 117:24, 120:1, 121:13, 121:22, 122:24, 123:10, 124:2, 124:20, 125:6, 126:7, 126:12, 126:22, 126:24, 127:7, 127:16, 128:20, 132:4, 133:9, 133:12, 133:19, 134:6, 134:17, 135:18, 137:7, 137:15, 138:6, 140:17, 141:2, 144:5,

146:21, 147:6, 147:9, 149:4, 152:16, 155:22, 157:16, 159:23, 162:3, 162:16, 163:9, 164:8, 166:23, 168:23, 171:24, 172:9, 172:15, 173:13, 174:7, 175:5, 178:9, 180:12, 187:2, 188:23, 189:19, 190:14, 191:23, 192:5, 192:7, 192:9, 193:24, 194:13, 195:5, 195:11, 196:6, 196:21, 197:10, 198:13, 199:23, 200:18, 201:6, 201:8, 201:17, 202:8, 202:10, 203:21, 204:10, 205:10, 205:12, 206:11, 206:23, 208:3, 208:6, 208:9, 208:12, 208:19, 259:13, 260:10, 261:14, 265:16, 266:24, 268:9, 268:12, 269:19, 269:22, 270:7, 270:23, 272:6, 272:19, 275:14, 275:24, 276:2, 276:6, 276:24, 277:20, 278:1, 278:3, 279:15, 280:15, 280:16, 281:20
**Zhordania** [6] - 3:4, 4:5, 4:7, 6:24, 8:20, 284:11